**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | | |
|---|---|---|
| BUCKS COUNTY EMPLOYEES RETIREMENT SYSTEM, Individually and on Behalf of All Others Similarly Situated, | ) | Civil Action No. 1:23-cv-04175-SDG |
| Plaintiff, | ) | CLASS ACTION |
| vs. | ) | |
| NORFOLK SOUTHERN CORPORATION, JAMES A. SQUIRES, ALAN H. SHAW, and CYNTHIA M. SANBORN, | ) | |
| Defendants. | ) | DEMAND FOR JURY TRIAL |

CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION AND SUMMARY OF THE FRAUD.........................2

II. JURISDICTION AND VENUE.........................................................14

III. THE PARTIES ....................................................................................15

IV. RELEVANT NON-PARTIES.................................................................18

A. Non-Party Executives.....................................................................18

B. Former Employees ..........................................................................19

C. Witnesses Interviewed by the NTSB ..................................................23

V. BACKGROUND.......................................................................................26

A. The Advent and Adoption of PSR by Major Freight Railroads..........26

B. After Rejecting PSR as Elevating Cost-Cutting Above Customer Service, Norfolk Southern Reverses Course and Says It Will Implement PSR "Safely" .........................................................29

VI. DEFENDANTS REASSURED INVESTORS THAT NORFOLK SOUTHERN'S VERSION OF PSR PRIORITIZED BOTH EFFICIENCY AND SAFETY ..................................................................32

A. Norfolk Southern Claims Safety Is a "Core Value" ...........................32

B. Defendants Affirm Safety Is a "Business Imperative" Despite Questions Raised About PSR at the June 14, 2022 U.S. House of Representatives Hearing on Rail Safety .......................................33

1. Congress Expressed Concern that PSR Negatively Impacts Safety.....................................................................34

2. Workers Union Representatives Express Concerns Under Oath that PSR Negatively Impacts Safety ...............................36



4879-1894-0589.v6

**Page**


3. Norfolk Southern Assures Congress that It Implemented PSR Without Sacrificing Safety.............................................37

4. Norfolk Southern Reassures Congress that Implementing PSR Safely Is "Imperative," While Claiming that It Follows Safe Operating Practices .............................................38

VII. IN TRUTH, DEFENDANTS' IMPLEMENTATION OF PSR SIDELINED SAFETY .....................................................................40

A. Norfolk Southern's Execution of PSR Elevated Efficiency over Safety.....................................................................................41

B. Under PSR, Norfolk Southern Knowingly Operated with an Exhausted and Overextended Workforce, Which Heightened Risks ........................................................................................44

C. Norfolk Southern Began Operating Trains of "Astronomical Lengths" in Its Implementation of PSR .............................................50

D. Norfolk Southern's PSR Cost Cuts Caused a "Dangerous" Lack of Training and Promoted Unqualified Trainees to Active Service .....................................................................................57

E. Norfolk Southern Implemented a Dangerously Superficial 30-Second "Inspection" of 90 Safety Points for Each Train Car's Side ........................................................................................67

F. Norfolk Southern Exploited Regulatory Loopholes to Conduct Fewer Inspections of Freight Cars .....................................................73

G. Norfolk Southern Took Other Shortcuts on Train Inspections and Maintenance...................................................................................79

H. Norfolk Southern Enacted Strategies to Avoid Addressing Train Defects in Order to Keep Its Trains Moving.......................................84

**Page**


I. Norfolk Southern's Wayside Desk – Covering Its Entire Rail System – Was Staffed with a Lone Individual Working a 12-Hour Shift ....95

J. Norfolk Southern Disciplined and Retaliated Against Employees Who Voiced Safety Concerns ....98

K. Norfolk Southern Flouted FRA Regulations by Implementing a Purely Symbolic Risk Reduction Plan ....109

VIII. DEFENDANTS CONTINUED TO PLACE EFFICIENCY OVER SAFETY FOLLOWING THE EAST PALESTINE DERAILMENT AND ENGAGED IN FURTHER DECEPTION THAT RESULTED IN THE UNNECESSARY EXPLOSION OF TOXIC CHEMICALS ....113

A. As Fires Erupted, Norfolk Southern Destroyed Evidence, and Instructed Local First Responders to Leave the Scene ....114

B. Norfolk Southern Tried to Quickly "Restore [T]rain [O]perations" While Experts at Oxy Vinyls – the Producers of the Vinyl Chloride – Swung into Action....117

C. By Saturday, Fires "[R]educed in [I]ntensity" and the Vinyl Chloride Cars Began Cooling ....119

D. Vinyl Chloride Producer Oxy Vinyls Told Norfolk Southern that the Cars Carrying the Vinyl Chloride Faced "Extremely Low" Probability of Polymerization and Provided Norfolk Southern with a Way to Know "Exactly" What Was True....121

E. The Oxy Vinyls Experts Told Norfolk Southern (Again) that the Vinyl Chloride Cars Were Not Undergoing a Runaway Chemical Reaction and Informed Norfolk Southern (Again) Exactly How to Know for Sure ....123

**Page**

F. Norfolk Southern Knew that the Five Vinyl Chloride Cars Would Not "Burst" Until They Reached over 300° Fahrenheit .......125

G. In the Presence of the NTSB, Norfolk Southern Assured Oxy Vinyls that Norfolk Southern Would Convey Oxy Vinyls' Input to the NTSB .......131

H. The Norfolk Southern Team Got "[G]ood [T]emperature [R]eading[s]" on All Five Vinyl Chloride Cars' "[I]nternal [T]ank[s]" Starting at 4:00 P.M. on Sunday, February 5, 2023 .......132

I. Norfolk Southern Learned from Oxy Vinyls that the Car Temperatures Showed No Runaway Chemical Reaction Because "the [S]cience [I]s that [C]lear" .......133

J. Because the Science Proved "No" Runaway Chemical Reaction, Norfolk Southern Started Lying to Public Officials to Persuade Them It Was Occurring .......138

1. Norfolk Southern Lies to the Local Fire Chief .......138

2. Norfolk Southern Lies to the NTSB .......139

3. Norfolk Southern Lies to Governor DeWine .......140

K. By Monday Morning, Norfolk Southern Had "[C]onclusive" Scientific Verification that No Runaway Chemical Reaction Was Occurring .......143

1. Norfolk Southern Again Lies to the NTSB .......145

2. Norfolk Southern Again Lies to Governor DeWine and the Local Fire Chief .......146

3. Norfolk Southern Lies to the Public .......151

**Page**

L. Norfolk Southern Intentionally Detonated Five Vinyl Chloride Tank Cars, Purposefully Creating a Deadly Chemical Mushroom Cloud that Spread for Miles....155

M. Norfolk Southern Declared the Explosion a Success....159

N. One Day After Turning Five Vinyl Chloride Tank Cars into a Deadly Chemical Explosion, Norfolk Southern Restored Train Service....160

O. More Scientific Evidence Proved that Norfolk Southern's "Polymerization" Story Was False....160

P. Norfolk Southern Continued Lying, Telling Senator Cruz that It Gave Authorities "the Best Information that We Had"....161

Q. NTSB Chairperson Homendy Concluded Norfolk Southern Had Facts Contradicting Its Private and Public Statements that the Five Vinyl Chloride Cars Were Undergoing a Runaway Chemical Reaction – and that the Cars' Intentional Detonation Was Unnecessary....162

R. Governor DeWine Confirmed that Norfolk Southern Lied About the Need for the Vent and Burn....167

IX. NORFOLK SOUTHERN FACED WIDESPREAD PUBLIC SCRUTINY AND INVESTIGATIONS AS A RESULT OF THE EAST PALESTINE DERAILMENT....168

A. The NTSB Initiated an Investigation of the East Palestine Derailment....169

B. The Federal Railroad Association Conducted a Detailed Assessment of the Safety Culture at Norfolk Southern....171

**Page**

C. Following the East Palestine Derailment, the Environmental Protection Agency Has Closely Monitored the Cleanup of Toxic Chemicals Released During the Derailment and Subsequent Vent and Burn ....174

D. The State Legislatures of Ohio and Pennsylvania Took Action Following the East Palestine Derailment ....175

E. Private Citizens of East Palestine and the Surrounding Area Impacted by the Derailment Brought Suit Against Norfolk Southern....176

F. The United States Senate Commerce, Science, and Transportation Committee Held a Hearing on Improving Rail Safety in Response to the East Palestine Derailment....177

X. DEFENDANTS MADE MATERIALLY FALSE OR MISLEADING STATEMENTS AND OMISSIONS OF MATERIAL FACT ....183

A. False or Misleading Statements Regarding Norfolk Southern's Safe Implementation of PSR Principles....183

B. False or Misleading Statements Regarding Employee Safety and Reportable Accidents....201

C. False or Misleading Statements Regarding Norfolk Southern's Handling of Hazardous Materials ....206

D. False or Misleading Statements Regarding the Expansion of the Length of Norfolk Southern Trains....207

E. False or Misleading Statements Regarding Norfolk Southern's Capital Expenditures Related to Safety....211

**Page**


F. False or Misleading Statements Regarding the Quality of Norfolk Southern's Training Program ....217

G. False or Misleading Statements Regarding the February 6, 2023 "Vent and Burn" ....224

XI. ADDITIONAL INDICIA OF SCIENTER ....232

A. The Individual Defendants Closely Monitored PSR's Impact at Norfolk Southern's Railyards....233

B. Norfolk Southern Monitored Train Length and Train Speed as Key Risk Indicators ....235

C. Defendants Shaw and Sanborn Received Regular Updates Regarding Operations and Safety Issues....237

D. Defendants Were Contacted by the FRA Numerous Times During the Class Period Regarding the FRA's Concerns with Respect to Norfolk Southern and the Class I Railroads as a Whole ....239

1. FRA Administrator Bose Sent a Series of Letters Relaying Safety Concerns to Defendants Norfolk Southern, Squires, and Shaw During the Class Period....239

2. The FRA Conducted a System-Wide Special Audit of Norfolk Southern's Compliance with FRA Regulations During the Class Period ....245

E. Norfolk Southern Tied Executive Compensation to Achieving the Company's PSR Goals ....246

F. High-Level Departures During the Class Period Support an Inference of Scienter ....250




4879-1894-0589.v6

**Page**


G. Norfolk Southern Holds Its Executives Accountable for the Impaired Safety Measures that Led to the East Palestine Derailment ....................252

I. The Norfolk Southern Team, Which Included Defendant Shaw, that Responded to the East Palestine Derailment Knew that the Cars Carrying Vinyl Chloride Posed No Danger of Polymerization....................253

XII. LOSS CAUSATION ....................255

XIII. THE FRAUD ON THE MARKET PRESUMPTION APPLIES ..........278

XIV. CLASS ACTION ALLEGATIONS....................280

XV. THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE ARE INAPPLICABLE ....................283

XVI. CLAIMS FOR RELIEF....................284

COUNT I ....................284

For Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Against All Defendants....................284

COUNT II ....................287

For Violation of Section 20(a) of the Exchange Act Against the Individual Defendants ....................287

PRAYER FOR RELIEF ....................289

DEMAND FOR JURY TRIAL ....................289

Court-appointed Lead Plaintiffs Ironworkers Locals 40, 361 & 417 Union Annuity, Pension and Topping Out Funds and Akademikernes Pensionskasse (together, "Plaintiffs"), by their undersigned attorneys, bring this action individually and on behalf of all other persons and entities who purchased or otherwise acquired Norfolk Southern Corporation ("Norfolk Southern," "NS" or the "Company") common stock between October 28, 2020 and March 3, 2023, inclusive (the "Class Period"), and were damaged thereby (the "Class").

Plaintiffs assert claims pursuant to §§10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and SEC Rule 10b-5 promulgated thereunder, against Norfolk Southern and certain of its former and current executives: James A. Squires, Alan H. Shaw, and Cynthia M. Sanborn (together with Norfolk Southern, "Defendants"). As alleged in this Consolidated Complaint for Violations of the Federal Securities Laws (the "Complaint"), Defendants made a series of statements that they knew or recklessly disregarded were materially false or misleading at the time the statements were made, and omitted material information necessary to make the statements, in light of those material omissions, not materially false or misleading.

Except as to the allegations specifically pertaining to Plaintiffs, all allegations in this Complaint are based on the ongoing investigation conducted by and through

Plaintiffs' attorneys, which includes, among other things, a review and analysis of: (i) public filings made by Norfolk Southern with the U.S. Securities and Exchange Commission ("SEC"); (ii) research reports issued by securities and financial analysts; (iii) media and news reports about the Company and the facts alleged herein; (iv) transcripts of Norfolk Southern's earnings and other investor conference calls; (v) publicly available presentations, press releases, and interviews by Norfolk Southern and its employees; (vi) statements by percipient witnesses to the alleged fraud; (vii) annual reports made to the Surface Transportation Board ("STB"); (viii) Congressional hearings and government reports regarding the rail industry and Norfolk Southern; and (ix) the public docket and hearing by the National Transportation Safety Board ("NTSB") regarding the derailment of a Norfolk Southern freight train in East Palestine, Ohio on February 3, 2023. Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I. INTRODUCTION AND SUMMARY OF THE FRAUD

1. This securities fraud action arises from Defendants' repeated declarations that Norfolk Southern operated its railroad safely. While pursuing an operating strategy known as Precision Schedule Railroading, or "PSR," which emphasized cutting costs and accelerating timetables, Defendants' "safety"

assurances became mere lip service. In truth, Norfolk Southern's PSR strategy systematically ignored safety because, as defendant Shaw put it, Norfolk Southern was focused "solely on profits." The results were catastrophic: an excessively long and heavy train derailed in a fiery crash that led to a mushroom cloud of toxic chemicals over a small town in Ohio. As the market came to learn that Norfolk Southern had, at every turn, prioritized expediency and profits over the safety, health, and environmental well-being of its workers and the communities in which it operated, the price of Norfolk Southern's common stock plummeted, causing damages to Plaintiffs and other Norfolk Southern investors.

2. On the evening of February 3, 2023, Train 32N operated by Norfolk Southern derailed near East Palestine, Ohio (the "East Palestine Derailment"). The train was long. At almost 9,309 feet long – nearly two miles – it comprised 149 railcars with two locomotives at the front and one locomotive in the middle providing distributed power. It carried 17,977 tons, with twenty of its cars containing hazardous materials, including vinyl chloride, a hazardous and flammable chemical known to cause cancer.

3. Before its departure, the train had undergone an abbreviated inspection. As it made its way eastbound from Madison, Illinois toward its destination in Conway, Pennsylvania, a journal bearing on one of the cars began to heat up. A

journal bearing is a mechanism forming part of a train wheel's axle and its temperature is monitored by hot box detectors (also known as hot bearing detectors) ("HBD") placed periodically along the train tracks. As Train 32N neared East Palestine, it passed an HBD registering a journal bearing on the 23rd car that was running 38°F above ambient temperature. Just ten miles later, the next HBD indicated that same bearing was running 65ºF hotter at 103°F above ambient temperature – an increase of nearly 200%.

4. The train's crew was unaware of the 65°F temperature increase and was not told to stop. In fact, the single Norfolk Southern employee operating Norfolk Southern's Wayside Detector Help Desk, which monitors HBD alerts for the Company's entire rail system from a desk in Atlanta, was attending to three other alerts at the time and missed the alert on Train 32N. Twenty miles later, the train passed a third and final HBD, which recorded that the same journal bearing had reached a temperature of 253°F above ambient. Only at this point did the train crew receive an alarm to slow the train to inspect the hot axle, but seconds later, the automatic emergency brake initiated. When the train stopped, 38 cars had derailed, and the train, including cars containing vinyl chloride, was on fire.

5. The five cars containing the vinyl chloride were specifically designed to vent their contents, if their temperature rose, to relieve pressure in the car and

prevent an explosion. However, when Norfolk Southern officials descended on East Palestine in response to the derailment, they once again elevated profits over safety in deciding that waiting for the vinyl chloride cars to cool and to arrange safe transport of their contents would cause too much delay in resuming train traffic. Though experts were on hand telling Norfolk Southern that there was nearly no chance that the vinyl chloride cars would self-combust in a process called polymerization, Norfolk Southern excluded them from the emergency responders' decision-making. Instead, Norfolk Southern stoked fears of runaway polymerization and convinced the Ohio governor that military-grade charges should be detonated for a "controlled release" of the five vinyl chloride cars. The resulting explosion formed a toxic cloud of chemical gas towering over East Palestine and caused an environmental and medical calamity that is still being felt throughout the community.

6. All of this was avoidable. Both the derailment and the ensuing catastrophe – caused when Company officials detonated the derailed cars carrying toxic substances – were the result of Norfolk Southern's systematic campaign to boost profits and efficiency by reducing the Company's operating ratio ("OR"), an indicator of how efficiently a railroad generates revenues, while marginalizing what it viewed as unnecessarily costly and time-consuming safety measures. However,

unbeknownst to investors, these efforts came at the expense of operating safely and keeping safe the communities in which Norfolk Southern operated.

7. As Defendants pursued an optimized OR by implementing PSR, Defendants consistently represented that they would maintain safety as the Company's "core value." While PSR, as already implemented by Norfolk Southern's major competitors, focused on efficiency and streamlining operations to achieve greater profits, Defendants maintained that they would operate "efficiently ***and*** safely." Thus, Defendants emphasized the Company's "commitment to safety" and claimed that "[s]afety is part of who we are," from "top down [to] bottom up."

8. On June 14, 2022, Congress held a hearing where rail workers, union officials, and company leaders spoke about PSR and its effects on safety. At this hearing, defendant Sanborn, representing Norfolk Southern, was unequivocal in her stance that under Norfolk Southern's implementation of PSR, safety was of "paramount" importance. Under oath, she asserted that for Norfolk Southern, "***pursuing safe operations is not optional, it's an imperative***."

9. In reality, Norfolk Southern had accelerated a "cut-to-the-bone strategy" that defendant Squires had once eschewed. Now, eyeing short-term profits, Defendants pressed the tenets of PSR to a point where the Company's operations were ***not*** safe, despite Defendants' public statements to the contrary.

Indeed, according to an assessment of safety at Norfolk Southern released during the summer of 2023, accidents per million train-miles from 2018-2022 grew faster at Norfolk Southern than at any other of its competitors.

10. The hallmark of PSR is running fewer but longer and heavier trains, reflecting the notion that it is more efficient to move the same amount of cargo in less time and with less equipment and personnel. At Norfolk Southern, however, trains were "astronomical" – so long that the engineer in the front-end locomotive could lose radio communication if the conductor was at the back of the train, thwarting the train crew's ability to address safety issues that may come up while the train was moving. Longer trains were also heavier, making them significantly more difficult to manage and run safely.

11. Reducing the amount of time that trains are stopped at terminals, known as "dwell time," is another PSR mandate for achieving greater efficiency and increased profits. But at Norfolk Southern, reducing dwell time led to dangerous reductions in inspection times. As witnesses told NTSB investigators, under Norfolk Southern's implementation of PSR, car inspectors were expected to examine "***at least 90 points of inspection per side of a car***" in ***thirty seconds*** per car side. As that was "not at all really feasible," inspectors who did not meet the time requirements set by Norfolk Southern management simply let the train go without

adequate inspection. Other inspectors reported Norfolk Southern "***threatening discipline if they don't get their inspection times down***."

12. Attempts to reduce dwell times also resulted in Norfolk Southern skipping inspections entirely and thus "wildly blowing" their internal requirements that train cars undergo a mechanical inspection every 3,500 miles. Records shown to the NTSB in the investigation following the East Palestine Derailment indicated that Norfolk Southern train cars had gone anywhere from 19,000 miles to as much as 90,000 miles since their last mechanical inspection.

13. PSR also calls for a leaner workforce, but Norfolk Southern eliminated nearly 40% of its employees, with cuts particularly affecting inspection and maintenance crews. Because there were fewer people to handle inspections and maintenance, Norfolk Southern instituted forced overtime shifts. Carmen complained about being so tired that they could not "see straight, let alone look at a car."

14. Moreover, fewer inspectors not only allowed Norfolk Southern to decrease its compensation and benefits expenses, but also to exploit a "massive loophole" in federal regulations to run abbreviated inspections. While the regulations require a train to undergo a full inspection by a carman if it comes into a terminal where one is available, if there are no carmen, then the regulation permitted

conductors – who were neither trained nor had the equipment for inspections – to do abbreviated inspections. Having decimated the ranks of its carmen, Norfolk Southern could thus further reduce dwell time by relying on unqualified conductors to inspect its trains.

15. Under the guise of instituting efficiencies under PSR, Norfolk Southern also eliminated its safety committees, which were "looked upon as a waste of resources." As witnesses told NTSB investigators, "[n]othing was fixed unless it actually got to the point that it broke," which was "***utterly insane***" given the "dangerous environment" in which railroad employees work and the "unstoppable/immovable forces" involved.

16. Norfolk Southern also attempted to increase efficiency by dramatically shortening the training time for its employees – to the point where employees felt wholly unprepared to carry out their duties. For example, while Norfolk Southern had once required at least six months of training to become a conductor, under Norfolk Southern's new policies, conductors would be rushed through in 10 weeks. Meanwhile, witnesses noted that the training quality was deficient since it was "the blind leading the blind." As one witness told NTSB investigators, even Norfolk Southern's "records will show you that you have new people training new people, that's against their own policy." Consistent with Norfolk Southern's unparalleled

reduction in training, the conductor that drove Train 32N through East Palestine expressed to his supervisors before departing on the day of the crash that he felt uncomfortable driving the train since it was the largest and heaviest train he had ever run.

17. Other measures Norfolk Southern undertook to increase efficiency at the expense of safety involved its wayside detection system, which included the HBDs involved in the East Palestine Derailment. To avoid the resulting delay when a train has to undergo maintenance, dispatchers told train crews simply to "bypass wayside detectors." Another measure taken by Norfolk Southern to minimize stoppage time was to "silence[]" the wayside detector alerts on the train's radio unless there was an "alarm," meaning an emergency. Instead, alerts from the wayside detectors were sent to the Wayside Detector Help Desk at Norfolk Southern's headquarters in Atlanta, Georgia which monitors alerts from the wayside detectors, including the HBD alerts for Norfolk Southern's entire rail system (the "Wayside Desk"). But only one person manned the Wayside Desk, which covered Norfolk Southern's entire system. That person worked a 12-hour shift – without breaks – during which time it was typical to receive over 300 alerts.

18. In sum, Norfolk Southern put in place a series of policies that would inevitably cause an increase in safety issues, and then did everything in its power to ensure that those safety issues would go unaddressed – all in the name of efficiency.

19. Yet this reality was at odds with Defendants' public statements, as Defendants knew or recklessly disregarded. In fact, defendants Squires and Shaw had received correspondence from the Federal Railroad Administration ("FRA") in which safety concerns, including tactics to minimize or avoid train inspections, were raised. Moreover, both defendants Shaw and Sanborn claimed to have visited crews in crew rooms and at railyards where they heard the concerns of employees. They also attended daily meetings addressing safety issues. Nevertheless, in an effort to increase short-term profits, Defendants systematically impaired safety for the sake of efficiency in Norfolk Southern's operations. Defendants were rewarded for their focus on the Company's efficiency over safety, as the performance-based cash incentives paid to executives based the pay-out amounts on metrics reporting OR and operating income. Only after the East Palestine Derailment did the Company set safety as a basis for executive incentive awards.

20. Having deceived investors that it was operating "efficiently ***and*** safely," the truth – that Norfolk Southern's operations had compromised safety at every turn – began to be revealed with the East Palestine Derailment. But the

derailment posed a new problem for the Company – derailed train cars, some of which were carrying toxic vinyl chloride, were blocking the tracks and impeding any further train operations. To get its trains moving again as soon as possible, Norfolk Southern once again placed profits over safety.

21. Since the trucks and other equipment needed to move the derailed train off of the tracks would "not [be] available anytime soon," Norfolk Southern and defendant Shaw devised a plan to clear the tracks by detonating the vinyl chloride cars, and manufactured a cover story to justify their plan. Norfolk Southern executives, including defendant Shaw, who had rushed to the site of the derailment, told local and federal officials, as well as the public, that detonating the cars – referred to as "venting and burning" – was necessary because the vinyl chloride was in the midst of polymerization that, if left unchecked, would result in a spontaneous combustion. According to Norfolk Southern, the strategy to "vent and burn" the cars would allow them to control the time and manner in which the cars released toxins into the environment.

22. In truth, as Norfolk Southern and defendant Shaw knew, the vinyl chloride was not undergoing polymerization. Experts from the company that produced the vinyl chloride, and who had years of experience in handling it, told Norfolk Southern that because the temperatures on the vinyl chloride cars were

decreasing or stabilizing, polymerization could not occur. Furthermore, the vinyl chloride cars' temperatures, which indicated whether pressure was building within the cars, were well below the maximum that the cars were designed to handle. Under these circumstances, as the experts told Norfolk Southern, there was no reason to vent and burn "***because polymerization is not occurring***." Thus, as NTSB Chairperson Jennifer Homendy later confirmed when testifying at a hearing before the U.S. Senate, Norfolk Southern lacked scientific basis to conclude that polymerization was taking place.

23. Yet, having convinced public officials that "venting and burning" was the course that should be taken to avoid a "high probability" of a "catastrophic" explosion ensuing from polymerization, Norfolk Southern detonated the derailed cars on the evening of February 6, 2023, releasing a huge plume of toxic smoke into the environment and poisoning the air and water. The very next day, February 7, 2023, rail service through East Palestine was restored.

24. As the true nature of Norfolk Southern's disregard for safety began to materialize and be revealed by the East Palestine Derailment and subsequent explosion of toxic chemicals, Norfolk Southern's stock price began a sharp decline and investors were harmed. In the weeks that followed, investigations were initiated and reports were released relating to the derailment, Norfolk Southern's deficient

safety measures, the costs of clean-up, and the legal repercussions, causing Norfolk Southern's stock price to continue declining. The Company's stock price was further depressed by news of two additional Norfolk Southern derailments. As a result of Norfolk Southern's precipitous decline in its stock price following the East Palestine Derailment, Plaintiffs and the other Class members suffered significant damages.

## II. JURISDICTION AND VENUE

25. The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5.

26. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §27 of the Exchange Act, 15 U.S.C. §78aa.

27. Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b). Norfolk Southern is headquartered in this District and many of the acts charged herein, including the preparation and dissemination of materially false or misleading information, occurred in substantial part in this District.

28. In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce,

including, but not limited to, the mails, interstate telephone communications, and the facilities of the New York Stock Exchange ("NYSE").

## III. THE PARTIES

29. Lead Plaintiff Ironworkers Locals 40, 361 & 417 Union Annuity, Pension and Topping Out Funds ("Ironworkers") provides disability, death, unemployment benefits, and unreimbursed medical expense payments to its members. Its members are ironworkers who perform all phases of ironworking – structural, rebar, ornamental, and reinforcing – and whose typical projects include assembling the iron skeletons that provide the foundations for large buildings in New York City, as well as ironwork on two to five story buildings, road and bridge work, fence, security, and rigging. The Ironworkers purchased Norfolk Southern common stock at artificially inflated prices during the Class Period as set forth in the Certification previously filed (ECF 25-4) and incorporated herein, and was damaged thereby.

30. Lead Plaintiff Akademikernes Pensionskasse ("AkademikerPension") purchased Norfolk Southern common stock at artificially inflated prices during the Class Period as set forth in the Certification previously filed (ECF 24-3) and incorporated herein, and was damaged thereby. Ironworkers and AkademikerPension are collectively referred to as "Plaintiffs."

31. Defendant Norfolk Southern is a rail transportation company, incorporated in Virginia and headquartered at 650 W. Peachtree St. NW, Atlanta, Georgia 30308. It owns a major freight railroad, the Norfolk Southern Railway Company, and is engaged in the rail transportation of raw materials, intermediate products, and finished goods, primarily in the Southeast, East, and Midwest. As of December 31, 2022, Norfolk Southern operated approximately 19,100 route miles in 22 states and the District of Columbia. Norfolk Southern's common stock is traded under the ticker "NSC" on the NYSE, an efficient market.

32. Defendant Alan H. Shaw has been Chief Executive Officer ("CEO") of Norfolk Southern since May 1, 2022 and President since December 1, 2021. Shaw has been a Director of Norfolk Southern since 2022. Shaw previously served as Norfolk Southern's Executive Vice President ("VP") and Chief Marketing Officer ("CMO"), VP Intermodal Operations, and in various other positions since joining the Company in 1994. Shaw took home $18.475 million in compensation during the 2020-2022 period as he implemented PSR.

33. Defendant James A. Squires served as Chairman of the Board of Directors (the "Board") and CEO of Norfolk Southern from 2015 to May 2022. Squires served as the Company's President from June 2013 until December 2021.

He has been a Director of the Company since 2014. Squires took home $37.75 million in compensation during the 2020-2022 period as he implemented PSR.

34. Defendant Cynthia ("Cindy") M. Sanborn served as Executive VP and Chief Operations Officer ("COO") from September 1, 2020 until January 1, 2023. Sanborn took home $11.67 million in compensation during the 2020-2022 period as she implemented PSR.

35. Defendants Squires, Shaw, and Sanborn are collectively referred to herein as the "Individual Defendants." The Individual Defendants made, or caused to be made, false or misleading statements that caused the price of Norfolk Southern common stock to be artificially inflated or maintained artificial inflation in Norfolk Southern's common stock during the Class Period. Each of the Individual Defendants was directly involved in the management and day-to-day operations of the Company at the highest levels and was privy to confidential proprietary information concerning the Company and its business, operations, services, competition, and present and future business prospects. In addition, the Individual Defendants were involved in drafting, producing, reviewing, and disseminating the false or misleading statements and information alleged herein, were aware of, or recklessly disregarded, the false or misleading statements being issued regarding the

Company, and approved or ratified these statements, in violation of the federal securities laws.

36. As officers and controlling persons of a publicly held company whose securities are registered with the SEC pursuant to the Exchange Act and traded on the NYSE, which is governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to promptly disseminate accurate, truthful, and complete information with respect to the Company's operations, business, services, markets, competition, and present and future business prospects. In addition, the Individual Defendants each had a duty to correct any previously issued statements that were materially misleading or untrue, so that the market price of the Company's publicly traded shares would be based upon truthful, accurate, and complete information. Defendants' false or misleading misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

## IV. RELEVANT NON-PARTIES

### A. Non-Party Executives

37. Mark R. George is the current Chief Financial Officer ("CFO") of Norfolk Southern, a position he was appointed to in November of 2019.

38. Paul Duncan succeeded defendant Sanborn as Norfolk Southern's COO in January of 2023, a position he held for the remainder of the Class Period.

39. Floyd Hudson was appointed Norfolk Southern's VP of Transportation in April of 2022, a position he held for the remainder of the Class Period. Hudson is currently the VP of Field Engagement at Norfolk Southern.

## B. Former Employees[1]

40. FE-1 was a railroad engineer based out of Ohio for over 20 years and operated the locomotives until departing from Norfolk Southern in 2023.

41. FE-2 was a sheet metal worker and diesel mechanic in Virginia for about eight years before leaving Norfolk Southern in 2019.

42. FE-3 held various roles throughout his two-decade tenure with Norfolk Southern, but held the title engineer upon leaving the Company in 2022. FE-3 worked during the implementation of PSR and, as part of a "fill in" crew, was exposed to numerous railyards in Norfolk Southern's system.

[1] Regardless of the former Norfolk Southern employee's gender, the pronoun "he" and the possessive "his" are uniformly used in connection with the former employees ("FE") alleged in the Complaint to facilitate references to what they witnessed without disclosing their identities.

43. FE-4 was a locomotive engineer for more than a decade prior to the beginning of the Class Period, and during the Class Period until late 2022. Most recently, FE-4 operated trains primarily from a terminal in Ohio.

44. FE-5 worked as a conductor out of a Norfolk Southern railyard in Ohio between 2015 and 2021.

45. FE-6 worked as a conductor at Norfolk Southern for more than a decade before the Class Period and up until early 2022. FE-6's route was on a line which cut through parts of Ohio.

46. FE-7 was a general foreman in Ohio from April 2021 to May 2022 and was a mechanical supervisor at various Norfolk Southern railyards for 11 years prior to that. FE-7 witnessed operational changes resulting from PSR, starting from his role as mechanical supervisor in Pennsylvania. His role involved overseeing train inspections and mechanical repairs.

47. FE-8 was employed by Norfolk Southern for about 10 years. Before leaving in early 2022, FE-8 worked at the Norfolk Southern headquarters in Atlanta, Georgia as a system support engineer who worked with the Signal Help Desk, monitoring and troubleshooting issues with communications equipment and dispatching crews to make repairs when needed to communications and signal equipment.

48. FE-9 joined Norfolk Southern as an operations supervisor trainee in 2020 and left as an operations supervisor in 2021. FE-9 supervised the schedules of the trains passing through or stopping in his terminal in Ohio and managed the schedules of their crews.

49. FE-10 worked at Norfolk Southern between 2020 and 2022 as a terminal manager in the territory adjacent to East Palestine, Ohio. FE-10 was responsible for configuring and moving trains through his territory and had approximately 120 direct reports, which included conductors and engineers.

50. FE-11 worked as a locomotive engineer for approximately 12 years until 2022, primarily operating trains out of an Indiana railyard.

51. FE-12 was a senior terminal trainmaster from early 2021 to late 2022 in Pennsylvania. In this role, FE-12 managed transportation crews totaling approximately 320 employees, kept operations on plan, managed safety requirements, and ensured trains had sufficient power.

52. FE-13 was employed at Norfolk Southern as a conductor from 2018 until 2022. FE-13's home terminal was in Georgia, but he had experience at approximately five terminals in Norfolk Southern's network.

53. FE-14 was with Norfolk Southern for over twelve years, leaving in 2020 as a road manager. FE-14 supervised day-to-day operations of his territory,

which ran from Ohio across Pennsylvania and down to Virginia, including ensuring trains and yards ran on schedule and managing customers. FE-14's supervisors directly reported to, and had frequent interactions with, Senior VP of Operations and Mechanical, Michael Farrell, who implemented PSR at Norfolk Southern.

54. FE-15, a signal maintainer (an employee who installs, repairs, and maintains the various railroad signals that are fixed along the railway), worked at several different Norfolk Southern locations between 2017 and 2023, including in Pennsylvania, Ohio, New York, Illinois, Indiana, and Maryland. FE-15's direct responsibilities involved maintaining HBDs.

55. FE-16 worked primarily as a maintenance of way and structures training specialist at Norfolk Southern's Training Facility in McDonough, Georgia where he trained about 1,000 workers from approximately 2015 to 2020.

56. FE-17 worked at Norfolk Southern as a mechanical supervisor during the Class Period. FE-17 primarily worked in a railyard in Georgia.

57. FE-18 was a senior director of commercial planning for one year during the Class Period. FE-18's role involved working with Norfolk Southern's marketing and sales departments, and the Company's industry customers to help grow the business while implementing PSR. FE-18 frequently worked with defendant Sanborn in this role.

58. FE-19 started at Norfolk Southern in 2006 and left in 2022 as a track inspections supervisor out of a North Carolina railyard. FE-19's duties as a track inspections supervisor included inspecting tracks, both in the yard and along the main rail, and track maintenance, which included repairing non-functioning tracks.

59. FE-20 was an analyst in the Accounting Department for four months during the Class Period and tracked the impact that longer and heavier trains from PSR had on the useful life of the Company's equipment.

60. FE-21 was a manager in the Enterprise Risk Management ("ERM") Department for two years during the Class Period. FE-21 had direct access to the Company's internal risk evaluations.

61. FE-22 held various positions while employed at Norfolk Southern for over 20 years, until 2022. During the Class Period, FE-22 was a Director of Service and Business Processes.

**C. Witnesses Interviewed by the NTSB**

62. As part of a sweeping investigation following the East Palestine Derailment in Ohio, the NTSB conducted interviews with Norfolk Southern employees, including defendant Shaw, and union representatives. The focus of the NTSB's inquiries was on the circumstances leading up to the East Palestine Derailment in particular and on Norfolk Southern's safety culture in general.

Several of those whom the NTSB interviewed provided information that is relevant here. Those individuals are identified below in ¶¶63-70.

63. David Arouca is the National Legislative Director for the Transportation Communications Union ("TCU"), which includes a division for the Brotherhood of Railway Carmen and represents 35,000 employees in the U.S. railroad industry. Prior to joining the TCU in 2015, Arouca worked in legislative roles both on and off Capitol Hill.

64. Jared Cassity was elected in 2019 as the Alternate National Legislative Director for the Sheet Metal Air Rail Transportation Union's ("SMART") Transportation Division. Cassity is also SMART's Chief of Safety. Prior to joining SMART, Cassity worked with CSX Transportation ("CSX"), another major railroad company operating in the U.S. and Canada, as a conductor and locomotive engineer.

65. Jason Cox is a national representative for the Brotherhood of Railway Carmen/TCU, a position he has held since 2011. From 2001 to 2011 Cox worked as a carman for CSX, and from 1998 to 2001 worked as a carman for Norfolk Southern.

66. Randy Fannon is the VP of the Brotherhood of Locomotive Engineers and Trainmen ("BLET") and the National Coordinator for the BLET Safety Taskforce. He also worked for Norfolk Southern from 1988 through the end of 2022,

holding several positions including locomotive engineer, trainmaster, and terminal superintendent.

67. Nick Greficz is SMART's Associate General Chairman. Greficz was hired by Norfolk Southern in 2005 as a conductor.

68. Rusty Pitts is a local chairman of SMART Local 48, which covers Birmingham, Alabama. Pitts worked for Norfolk Southern for approximately 15 years, four of them as an engineer.

69. Gary Rambo was on duty at the Norfolk Southern Wayside Desk as an analyst for Automatic Train Control ("ATC") operations at the time Train 32N derailed in East Palestine on February 3, 2023. Rambo had been an ATC Analyst with Norfolk Southern for six or seven years prior to the derailment. Before working the Wayside Desk, Rambo was a general foreman at Norfolk Southern's Inman Yard in Atlanta for approximately nine years.

70. Tim Sloper is a Legislative Representative with SMART Local 768 in Decatur, Illinois, a position he has held since January 2020. Sloper joined Norfolk Southern in 1999 and during his 24 years with the Company worked both as an engineer and a conductor.

## V. BACKGROUND

71. Defendant Norfolk Southern, an Atlanta, Georgia-based company, owns Norfolk Southern Railway Company, a major freight railroad operating in the eastern half of the United States. Norfolk Southern and its subsidiaries are primarily engaged in the rail transportation of raw materials, intermediate products, and finished goods in the Southeast, East, and Midwest and, via interchange with rail carriers, to and from the rest of the United States. As of December 31, 2022, the Company operated approximately 19,100 route miles in 22 states and the District of Columbia. Norfolk Southern's railway network crisscrosses hundreds of cities and towns up and down the East Coast and into the Midwest. Norfolk Southern's footprint reaches numerous manufacturing plants, electric generating facilities, mines, distribution centers, transload facilities, and other businesses located in the Company's service area.

### A. The Advent and Adoption of PSR by Major Freight Railroads

72. PSR, according to the U.S. Government Accountability Office ("GAO"), is generally understood to be an overarching strategy to increase a railroad's efficiency by: (1) reducing staff; (2) operating longer trains; and (3) reducing assets like locomotives. E. Hunter Harrison developed PSR in the 1990s

when he introduced the strategy to the Canadian National Railway Company and later implemented it at CSX after becoming CSX's CEO.

73. At its core, PSR dictates that railroads operate long trains that transport larger and heavier loads with fewer workers in less time. Since its inception and implementation in 1998, PSR has become all but ubiquitous among major freight railroads. According to a study performed by the GAO, as of December 2022, six of the seven largest U.S. freight railroads – the so called "Class I" railroads – have reported implementing their own version of PSR, including Norfolk Southern.[2]

74. PSR's impact on the structure and operation of Class I railroads has been considerable. From 2011 through 2021, the overall number of staff employed across all Class I railroads decreased by roughly 28%, while conversely all Class I railroads reported increased train length in the years prior to the East Palestine Derailment. One Class I railroad reported to the GAO that its average train length increased from 5,250 feet in 2011 to about 7,000 feet in 2021. Another Class I

[2] There are currently only six Class I railroads: BNSF Railway Co. ("BNSF"), Canadian National Railway (Grand Trunk Corporation), CSX Transportation, Canadian Pacific Kansas City Limited ("CPKC"), Norfolk Southern Combined Railroad Subsidiaries, and Union Pacific Railroad Co. Following the GAO's study, CPKC was formed by a merger of two formerly separate Class I railroads: Canadian Pacific Railway and Kansas City Southern Railway Co.

railroad reported that the percentage of trains over 10,000 feet has increased from less than 3% in 2017 to more than 25% in 2021. At the same time, Class I railroads cut expenditures on railyards and facilities by 27%, collectively, between 2011 and 2021.

75. To measure the success of implementing PSR, railroads focus on OR as a key measure of efficiency and profitability in the rail industry. It is calculated by dividing operating expenses by operating revenues. Thus, a decrease in OR is desirable because it means a company generates more income from revenue after removing operating expenses. By this measure, PSR seems to have borne fruit. Across Class I railroads, OR fell by over 10% from 2011 through 2021. Remarking on the impact of low OR targets, a November 2023 Senate Report found that railroads were decreasing OR even as their volumes of shipments diminished:

> While much of the rest of the American economy has been struggling to recover from a deep recession, the freight railroads have been achieving new financial performance milestones. ***These financial results are especially remarkable as they were accomplished even while overall rail volumes were still below prerecession levels***, and while the two dominant railroads operating east of the Mississippi River, CSX ***and Norfolk Southern, experienced significant drops in the volume of their coal shipments***.

### B. After Rejecting PSR as Elevating Cost-Cutting Above Customer Service, Norfolk Southern Reverses Course and Says It Will Implement PSR "Safely"

76. Norfolk Southern and defendant Squires first rejected PSR but later embraced it, telling investors that the Company would prioritize safety when implementing it.

77. Before 2019, Squires criticized PSR, calling it a "short-term, cut-to-the-bone strategy that could cause Norfolk Southern to lose substantial revenues" due to poor customer service.

78. The same message was repeated to employees of the Company. FE-1, a railroad engineer, recalled that Norfolk Southern leadership told employees that they would not adopt PSR. FE-2, a sheet metal worker and diesel mechanic, agreed that Norfolk Southern leadership told employees that they would never use PSR.

79. In February 2019, however, Squires changed his mind. At the time, he said that "[w]e decided to adopt precision scheduled railroading because it works." He stated that the Company had "hired people in key positions who have worked under PSR and told them to lead us from the front." In connection with Norfolk Southern's implementation of PSR, the Company instituted its "latest operating plan, TOP21, which is built on a new, simpler PSR foundation." According to Squires, "[t]he goal [was] to make the entire network more efficient." To that end, Norfolk

Southern installed Michael Farrell – a direct disciple of E. Hunter Harrison while at Canadian National, as Senior VP of Transportation.

80. Norfolk Southern immediately assured investors that its PSR implementation would ***not*** come at the expense of safety, but rather would make safety a top priority. The Company explained that PSR (or the "TOP21" plan) had "5 core principles: Serve our customers, manage assets, control costs, ***work safely*** and develop people." Through TOP21, Squires said that "we will operate fewer heavier trains," and "drive down costs." Norfolk Southern expected by 2021 to cut 3,000 employees from its workforce of about 26,000 and to jettison 500 locomotives from its fleet of about 4,100. With TOP21 in place, Norfolk Southern's "new objective" was to reach an OR of 60% by 2021, and to do so, it established a "4-key discipline" that required "[w]e run trains on time, switch in 6 hours, put the right car in the right train, right block, ***and we do it all safely***."

81. Throughout 2019, Norfolk Southern executed its new PSR strategy while reassuring investors that "[w]e are all working hard to operate ***as safely and efficiently as possible*** and deliver what we promise to our customers and shareholders," as Squires stated during an earnings call on October 23, 2019. When announcing the 2019 year-end results on January 29, 2020, Norfolk Southern's management crowed over the "tremendous strides" made in launching TOP21.

Squires praised "this organization's strong momentum in streamlining our operations," and reported the full year's "record operating ratio of 64.7%, a 70 basis point improvement over 2018," which he noted was "particularly impressive against the backdrop of contracting volumes." During the same call, Mark George, who was participating for the first time as Norfolk Southern's CFO, noted his intention of "[d]rilling into" Norfolk Southern's capital expenditures, the funds spent by a company to acquire or upgrade physical assets such as property or equipment. George emphasized that "certainly, half of that is related to maintaining this big infrastructure to serve your customers and ***to do it safely***."

82. When the COVID-19 pandemic hit and the railroad adjusted to suddenly carrying far fewer goods, Norfolk Southern began "pressing the TOP21 accelerator." On April 29, 2020, Norfolk Southern hosted an earnings call with investors to discuss its 1Q 2020 financial results.[3] On that call, defendant Squires explained that "pressing the TOP21 accelerator" meant "crew start reductions going forward, a hard look at our yard and facilities network, blending more trains, the kind of step[s] straight out of the PSR playbook to continue to drive down costs."

[3] As used herein, the letter "Q" refers to the Company's fiscal quarter (*e.g.*, 1Q 2020 means the first fiscal quarter of the Company's fiscal year ("FY") 2020).

George likewise touted that "the underlying change to our cost structure continued to shine through in the first quarter as we reduce and realign resources around our new operating model." But even with these changes, George promised that Norfolk Southern would be "focused on what we can control, service and costs," while noting that "[w]e never want to cut in a way where we can't handle volume when a recovery occurs, which would then adversely impact customer service. ***And we absolutely won't compromise on network safety***."

## VI. DEFENDANTS REASSURED INVESTORS THAT NORFOLK SOUTHERN'S VERSION OF PSR PRIORITIZED BOTH EFFICIENCY AND SAFETY

83. As the Class Period commenced on October 28, 2020, Defendants highlighted their ability to "continue rolling out PSR" while representing that the Company remained focused on safety. Through the Company's operating plans designed to implement PSR, which Norfolk Southern referred to as TOP21, and later as TOP|SPG, Defendants represented to investors and the public that while striving to run more efficiently, Norfolk Southern still prioritized safety.

### A. Norfolk Southern Claims Safety Is a "Core Value"

84. While implementing PSR, Norfolk Southern continued to emphasize the Company's commitment to safety. Repeatedly, Defendants and other Norfolk Southern executives publicly stated that Norfolk Southern's railroad operated

"efficiently and ***safely***" and had achieved "record productivity levels while providing ***safe*** and reliable freight solutions for our customers." For example, while noting the "push for efficiency" to attain record productivity levels, Sanborn underscored that "***most importantly, we did so safely***."

85. Likewise, in Norfolk Southern's SEC filings, Defendants called out "***safety as a core value of Norfolk Southern***," and further claimed that "***[s]afety is a way of life at Norfolk Southern***." Emphasizing its safety culture, Norfolk Southern reported that in 2020, its Board had established a "Safety Committee." Thus, Norfolk Southern committed that "***safety is top down-bottom up***." As Floyd Hudson, Norfolk Southern's then-VP of Transportation, stated: "***Safety is part of who we are***," and thus, "***[w]e're as disciplined about safety as we are about executing the plan***."

**B. Defendants Affirm Safety Is a "Business Imperative" Despite Questions Raised About PSR at the June 14, 2022 U.S. House of Representatives Hearing on Rail Safety**

86. Norfolk Southern maintained its public assurances that safety remained its core value even as Congress made inquiries into the impact of PSR on the rail industry. On June 14, 2022, the U.S. House of Representatives held a public hearing titled: "Examining Freight Rail Safety" before the Subcommittee on Railroads,

Pipelines, and Hazardous Materials of the Committee on Transportation and Infrastructure of the House of Representatives (the "Rail Safety Hearing").

### 1. Congress Expressed Concern that PSR Negatively Impacts Safety

87. U.S. Representative Donald M. Payne, Jr. (D-NJ) commenced the hearing and stated its purpose. He said that there had been "a plateauing of safety improvements in recent years" in the rail industry. He also noted that large railroads' "adoption of PSR has added new complications." Representative Payne said: "This is why this committee is concerned: We are concerned that the recent attempts to reduce short-term costs have had a negative impact on safety practices and the historically proud railroad safety culture. And today's hearing is intended to consider some of these current issues."

88. U.S. Representative Seth Moulton (D-MA) echoed safety concerns. He said that "a big topic of conversation these days in the freight rail world is Precision Scheduled Railroading." Representative Moulton further stated: "It affects railroad employees and most specifically their safety."

89. Witnesses from federal rail regulatory agencies – the NTSB (Thomas Chapman) and the FRA (Administrator Amit Bose) – also expressed concerns about PSR and safety at the hearing. Chapman said that "from a safety standpoint, we are

certainly aware of the concerns, the PSR concerns." Bose similarly noted in response to a representative's question:

> Congressman, as you know, safety is FRA's priority, and PSR is a term that encompasses many different aspects of safety and operations. I can assure you that FRA is looking at the operational and process changes that seem to have resulted from the railroad's implementation of what is called PSR.

90. Representative Garcia also expressed concern that railroads were implementing PSR at the expense of safety. He raised his concerns with the FRA administrator, stating:

> In your testimony, you note some of the recent actions that the FRA has taken to address fatigue among railroad employees and advance traincrew staffing safety requirements. I applaud these actions and your leadership, but more action, of course, is needed to address the harm to workers from Precision Scheduled Railroading, including the increased safety risk workers are facing as a result of PSR.

91. Representative Johnson questioned Bose, asking: "Mr. Bose, does the FRA have concerns about the quality of certification trainings, given that the reduced certification period risks worker safety?" Bose responded:

> Congressman, that is something that FRA looks at every day, and we know the concerns that have been expressed. And we have actually caught some situations where the training and certification process needs to be improved, and we have shared that with the railroads directly so that the system can be safe.

92. Representative Carter also had questions regarding rail safety. Bose responded, noting:

> Every day there are reports I get about injuries and the quality of the workplace. We want to make sure that there is a safe environment for workers. So, after that, I sent a letter. I contacted the railroads directly, making sure that training and awareness of the workers is paramount in their minds.

### 2. Workers Union Representatives Express Concerns Under Oath that PSR Negatively Impacts Safety

93. Railroad industry witnesses also gave testimony, including rail worker union representative Dan Grissom. Grissom testified that:

> Since each car has up to 90 inspection points per car per side, or 180 in total, carmen were allowed around 3 minutes per car on inspection. That is until the PSR era. Today, in most locations, on all the Class I's, carmen [are] only allowed 1 minute for inspection, and I provided evidence in my written statement. ***As a result, cars often go uninspected***.

The evidence that Grissom referenced included a Norfolk Southern document titled: "Field Scorecard." The document indicated that Norfolk Southern conducted just 1.1 minutes of inspections for trains entering its yards and 1.7 minutes of inspections for cars exiting its yards.

94. Representative Payne had questions about the information Grissom provided. He asked: "Mr. Grissom, what are the effects of allowing carmen only one-third of the usual time to inspect railcars?" Grissom responded:

> Employees are pressured to rush the inspection, and they are not doing a proper inspection on the cars or repairs. When you inspect it, you might have to change a brake shoe or go underneath, check the side bearing clearance or clearance on the center plate, and this isn't being

> allowed because with the pressure from management to get the cars out, to get the train out to keep everything on schedule, there is not enough time or employees allowed to properly inspect the freight trains.

### 3. Norfolk Southern Assures Congress that It Implemented PSR Without Sacrificing Safety

95. In her capacity as Norfolk Southern's COO, Sanborn testified at the Rail Safety Hearing, assuring Congress that safety was of utmost importance to Norfolk Southern. Sanborn told Congress that "Norfolk Southern and the approximately 630 other freight railroads operating in the United States form an integrated system that provides the ***world's safest***, most productive, and lowest cost freight rail service." She said that the "men and women of Norfolk Southern put their boots on every day and work hard to ***safely and efficiently*** serve our customers." "In railroading, the relentless ***pursuit of safe operations is not optional; it is a business imperative***." "But the most important factor in achieving continuous safety improvement," Sanborn explained, "is the creation of a company culture that promotes safety through behavioral changes."

96. Responding to comments from Representative Grace Napolitano (D-CA) regarding rail employees coming to her on safety issues, Sanborn responded:

> To your point, I would agree [with] that and involve myself in listening to employees. In fact, in the last 30 days, I have been in Roanoke, Virginia; Cincinnati, Ohio; Pittsburgh, Pennsylvania; and I will be in the yard in Atlanta here on Thursday and listening to our employees and what they have to say around safety and concerns that they have.

Sanborn further stated that Norfolk Southern rail employees "feel better when the railroad operates better. And we absolutely want to do that, both from a safety perspective and serving our customers as well."

97. Sanborn's written testimony reiterated several points she made in her live testimony. "For Norfolk Southern – and I'm sure I can speak for all railroads here too – ***pursuing safe operations is not optional; it's a business imperative*****e. *We have an obligation to operate safely*** for the benefit of our employees, our customers, and the communities where we operate." Again, Sanborn said that "the most important factor in achieving continuous safety improvement is the creation of a company culture that promotes safety through continuous education and reinforcement of safe behaviors."

### 4. Norfolk Southern Reassures Congress that Implementing PSR Safely Is "Imperative," While Claiming that It Follows Safe Operating Practices

98. After the hearing, Representative Moulton issued written questions to Norfolk Southern. His written questions reviewed statistics noting the "rate of train derailments increased at exactly the same moment [large railroad's] began cutting their workforce." He asked, "What effect has precision scheduled railroading (PSR) had on the number of workers employed by the [large] railroads?"

99. On behalf of Norfolk Southern, Sanborn provided written responses to Representative Moulton's questions for the record. Sanborn responded:

> At a fundamental level, precision scheduled railroading is about using assets in the most efficient manner possible ***without sacrificing safety***. The benefits associated with PSR – including reduced circuity and improved velocity – will directly benefit our customers through faster, more predictable transit times that require fewer assets to move their shipments.

100. Representative Moulton also wrote that "PSR is based on the preeminence of lowering operating ratios." He then asked, "How are today's [large railroad's] balancing safety, customer service, and stock performance?" Sanborn responded:

> ***None of the three elements listed – safety, customer service, or returning value to shareholders – has to come at the expense of the others***.
>
> ***Safety is paramount***. As I noted in my testimony, ***for Norfolk Southern, pursuing safe operations is not optional, it's an imperative***. ***We know we have an obligation to operate safely*** for the benefit of our employees, our customers, and the communities where we operate. ***That means that if an operating practice is unsafe, we will change it. If an employee acts in an unsafe manner, that will be addressed. If we are bringing on new employees, we will not rush the process such that they are not properly trained to be able to safely do the work we need them to do. We work very hard to instill in our employees a high level of safety awareness in everything they do***. We also spend enormous amounts of capital to expand and enhance the capacity and capability of our network; virtually all of those investments directly or indirectly improve safety in some way.

> Moreover, an unsafe railroad cannot possibly provide optimal customer service. Today, we know our customer service is not what our customers want or deserve. Restoring service to where it should be is crucial. ***That entails having the right number of employees, at the right location, at the right time to meet demand safely and efficiently***.

101. Representative Moulton further wrote: "PSR includes the operation of longer and heavier trains, so even holding steady on derailments per million train-miles could result in more disruptive and devastating derailments." He then asked what Norfolk Southern was "doing to mitigate derailments and the effects of those derailments on the surrounding communities?" Sanborn responded:

> Railroads are ***committed to the safe operation of all their trains, no matter the length***. Railroads have also adopted a variety of new technologies to make their operations safer and more secure. Railroads work hard to instill in their employees a high level of safety awareness in everything they do, and they work diligently to identify new operational enhancements, training, and other ways to further improve safety.

## VII. IN TRUTH, DEFENDANTS' IMPLEMENTATION OF PSR SIDELINED SAFETY

102. To realize PSR's effects on OR, as implemented through Norfolk Southern's TOP21, and later its TOP|SPG, strategy, Defendants engaged in a top-to-bottom dismantling of Norfolk Southern's safety infrastructure, which upended safe operations in favor of speed and the economic bottom line, altered internal safety protocols to allow greater risk with fewer safety requirements, and engaged in a concerted effort to subvert federal regulations in order to legitimize their new,

unsafe practices. Meanwhile, employees who raised issues relating to safety faced intimidation or reprimand. In this way, Defendants gutted the Company's safety practices and protocols while representing to the investing public that it was doing the opposite – namely, continuing to prioritize both efficiency and safety.

### A. Norfolk Southern's Execution of PSR Elevated Efficiency over Safety

103. Although Defendants claimed that their PSR initiatives would be implemented while continuing to operate safely, the reality was that safety, as a priority in Norfolk Southern's operations, was supplanted by a focus on efficiency and a reduction in the OR. As defendant Shaw admitted in his March 8, 2023 testimony before the U.S. Senate Committee on Environment and Public Works, Norfolk Southern's "***near-term focus***" leading up to the East Palestine Derailment had been "***solely on profits***." This was apparent to union officials and former Norfolk Southern employees who spoke about Norfolk Southern's policies during an investigation undertaken by the NTSB into the cause of the East Palestine Derailment. According to Cox, a former Norfolk Southern employee and national representative for the Brotherhood of Railway Carmen – the union that represents employees who are responsible for the inspection and repair of railroad cars – safety

was "not the priority" under the PSR model, and the Company's focus was on getting cargo to the destination "***fast***" and "***by any way possible***."

104. Others agreed that the Company prioritized efficiency over safety. Fannon, a Norfolk Southern engineer and supervisor, as well as the General Chairman of BLET, provided insights on this point. Specifically, Fannon responded to the following question posed by an NTSB investigator looking into the East Palestine Derailment and overall Norfolk Southern safety operations:

> Q. Thank you. I don't want to put words in your mouth, but it sounds like what you're describing is saying that productivity and safety are perceived as in conflict with one another.
>
> A. That's the message that [Norfolk Southern senior vice president] put [out], ***that they would lower safety*** . . . .

105. Greficz, Associate General Chairman at SMART and conductor for Norfolk Southern since 2005, similarly noted the disconnect between Norfolk Southern's safety messaging and its drive for efficiencies under PSR. He explained, "you go out there and you talk about the safety culture, [but] right from the rip (ph.), as soon as you show up to work, you're pushed out the door, not a lot of talk about what needs to be done, you're pushed out the door." He said that before PSR, as a conductor, he would show up for work, "pull my paperwork, have a job briefing, figure out what's going on," including "where's the hazardous loads at."

106. Under PSR at Norfolk Southern, though, the policy became that conductors had to "be out on your engine within 15 minutes of on-duty time." Greficz said it was "absurd to think that you can come into work," perform the tasks required on a doubled-up train, obtain the appropriate paperwork and notices for setting out, including "air slips" for the brakes and "safety briefings," and have "all this stuff you have to communicate and be out on your engine within 15 minutes. It's all a result of the PSR." According to Greficz, the result is that employees who want to follow the policies and not "be targeted for discipline" show up for work at their on-duty time, and one minute later, they have "already got [their] bags and [they're] already walking out to the engine." Thus, said Greficz:

> We don't even have a job briefing, we don't even talk[,] because it's the expectation that you need to go get on your locomotive now and you need to be moving the engine, you need to be doing something. It creates a real safety concern because if I have any questions, if I'm a newer guy like we have in the field, or if he needs to know something, you don't have time for positive interaction about what we're actually doing.

107. Defendant Shaw, who also participated in the NTSB investigation of the East Palestine Derailment, was asked about Norfolk Southern's safety culture. He was shown a document, with which he said he was familiar, that he described Norfolk Southern's principles under PSR: "[S]erve your customers, manage your assets, control costs, focus on safety, and develop your people. And then these are

the disciplines of PSR[:] run trains on time, switch cars in less than 6 hours, right car, right train, right block, safety." Shaw said that "[t]hese should not have been in this order" and "it sends a really bad message to people and that was one of the things I also heard, right, it's like out in the crew rooms, it's like they were really, really frustrated that ***safety was fourth on this list***." Indeed, a number of former employees, including FE-3, FE-4, FE-5, and FE-6, criticized Norfolk Southern's downgrading of safety from the first point to the fourth point in Company materials, while recognizing that it was consistent with how the railroad began to operate after PSR.

108. When interviewed by the NTSB following the East Palestine Derailment, Shaw later admitted that this document "created a problem because our culture, our safety culture, has been really strong," "[b]ut candidly, when we put out that thing, it sent a wrong message to our team." Shaw explained that it was "our operations team at the time," who put out Norfolk Southern's messaging, and "the folks that did that are no longer here."

### B. Under PSR, Norfolk Southern Knowingly Operated with an Exhausted and Overextended Workforce, Which Heightened Risks

109. Norfolk Southern's shifting of priorities away from safety manifested in significant cuts to personnel responsible for the safety of Norfolk Southern's

operations, including engineers, conductors, and personnel responsible for maintaining the Company's locomotives, train cars, and train tracks. In implementing PSR, the Company cut personnel by nearly 40% with large cuts occurring in key safety positions tasked with ensuring that the trains were thoroughly inspected, had undergone the maintenance they required, and operated safely. Accounts from numerous former Norfolk Southern employees and union officials confirm the impacts of Norfolk Southern's efficiency measures on its workforce.

110. Cox, a national representative for the Brotherhood of Railway Carmen representing carmen at Norfolk Southern and other railroads, told NTSB investigators how complaints of fatigue increased as carmen were cut from the workforce:

> Because if I can lay off a third employee and get the other two employees to pick up overtime to cover him, I don't have to pay his retirement or pay his other benefits and I can work the dog out of these two . . . to make up that difference. And I have ***numerous, numerous, numerous complaints about forced overtime, 16 hours a day, 5 days a week, put to paper where our guys are saying, I'm so freaking tired I can't see straight, let alone look at a car***.

111. Greficz called Norfolk Southern's PSR policy of cutting its workforce a "self-imposed manpower shortage." He explained the resulting fatigue to workers:

> The expectation is you're on call 24/7, it's not a joke, you can't even make people understand the lifestyle. It's so hard to articulate and

> explain, you just can't, and you have no sleep rhythm, you have no sleep cycle, you just go through life tired, absolutely tired.
>
> And when you combine that with the lack of training, the lack of communication, ***safety, it goes out the window, it doesn't matter what you say. You know, their policy can say it's an apple all day long, but when you eat it, it's a lemon, that the policy***.

112. Sloper, another SMART union official with 24 years of service as an engineer and conductor for Norfolk Southern, showed NTSB investigators an example of the paperwork that overworked engineers and conductors were expected to wade through upon arrival for their shifts. Sloper explained that to find the speed limit for a trip, the conductor and engineer "had to go through 44 pages of text and you hope that he sees this one line that says 40 [mph]."

113. Former employees also recalled how Norfolk Southern's lay-offs undermined safety. FE-1 recalled that his train yard in Ohio used to have 50 car maintainers, who completed repairs and maintenance of the train cars; but, after PSR, the number was reduced by almost 90% to five or six. FE-7 likewise noted that the downsizing of maintenance employees at his train yard meant employees were regularly required to work overtime, working as much as 16 hours a day for four or five days a week. FE-7 explained that this led to fatigue and errors during train inspections because the carmen were exhausted, and overall, there were "not enough people or time or anything" to run trains safely.

114. FE-2 recalled that Norfolk Southern originally told employees there would be no layoffs with PSR. But within weeks of implementing PSR, Norfolk Southern began laying off employees, which FE-2 felt compromised safety. FE-2 stated that layoffs at his train yard were across the board – pipefitters, electricians, mechanics and laborers. FE-2 estimated that Norfolk Southern reduced the number of pipefitters (who are responsible for installing, maintaining, and repairing the pipes carrying fuel, water, steam, and air to various parts of the train car) at his train yard, for example, from between 10 to 15 pipefitters to one or two. FE-2 further explained that it was common to have two employees working together, for safety purposes, but the pipefitters did not have enough people on their team to pair up, so most jobs were completed by only one person.

115. FE-8 was charged with monitoring railroad communications and signals, and dispatching crews to inspect equipment, stated that the workforce reduction that accompanied Norfolk Southern's PSR implementation particularly impacted employees on the ground, including maintainers and mechanical crews. As a result of PSR, Norfolk Southern decreased Track Department crews, who were responsible for building trains and preventing potential safety issues, from ten to two employees. Norfolk Southern also reduced the trainmen staff that built the trains by half, which FE-8 felt directly led to an increase in sticking hand brakes, which occurs

when a hand brake is not fully released when the train car begins moving. FE-8 noted that under PSR, the remaining Norfolk Southern employees worked more hours and went from covering 50 miles to covering 100 miles.

116. FE-9, an operations supervisor responsible for managing crew schedules, reported that his experience with PSR at Norfolk Southern involved running trains as much as possible with "skeleton" crews. FE-9's supervisors pushed him to schedule crews for the maximum time permitted while providing the minimum allowable time off.

117. As a terminal manager, FE-10 recalled that 100-hour weeks and working 12-16 straight days without a break were not uncommon occurrences. With 120 direct reports, FE-10 described daily meetings in which management would often question why he needed extra workers. Norfolk Southern's policy was "do more with less."

118. FE-11 stated that as manpower was reduced, people refused to return to Norfolk Southern following the Company's relentless furloughs. He further reported that management expected current employees to pick up the slack, resulting in longer work hours and much more stress. FE-11 stated that as a result of the working conditions, the 60-80 hour work weeks, and the feeling that they were being treated unfairly by management, there was a large exodus of employees, which

further exacerbated the problems with increased workload for the remaining employees.

119. FE-11 also described that the FRA requires that employees receive 48 hours off after working six straight days. However, according to FE-11, Norfolk Southern would work employees for five days straight, keep them idle in a hotel for 24 hours, and then start the clock again. The employee might be expected to work another six days straight before they were entitled to 48 hours off.

120. FE-5 experienced the same treatment in Ohio. FE-5 said that managers frequently manipulated the schedules to deny employees their days off. As a result of this and other lapses in safety, FE-5 said that he and his co-workers knew that something like the East Palestine Derailment would happen.

121. When speaking with NTSB investigators, one of the SMART union officials, Greficz, concluded that the East Palestine Derailment was "inevitable," because "the lack of infrastructure on the railroad in general is not made to run these trains and it's not made to run with this amount of manpower." Greficz continued: "They cannot move the car counts they're moving, it's not sustainable, it's just not."

### C. Norfolk Southern Began Operating Trains of "Astronomical Lengths" in Its Implementation of PSR

122. Despite Norfolk Southern's public claims that its implementation of PSR maintained its previously held core value of safety, it began operating extremely long trains that posed new safety problems. Numerous union officials and former employees described Norfolk Southern's strategy of setting out ever-longer trains and the consequences that strategy had on safety.

123. Cassity, one of the SMART union officials who participated in the NTSB's investigation of the East Palestine Derailment, explained that "since the implementation of PSR," Norfolk Southern and other railroads "are intending on growing the length of trains to ***astronomical lengths***," with trains sometimes as long as 5 miles and "daily routine trains being operated in excess of 3 miles." Cassity noted that "[t]he notion of long trains is not new," "but it was extremely rare" before PSR. Long trains were rare, according to Cassity, because they "are complicated to operate, especially in undulating territory where you have hills going up and down, and curvature. Ideally, you like your train to be in one consistent state."

124. Cassity also noted that the way in which Norfolk Southern was building its trains was irresponsible, telling the NTSB that "railroads and Norfolk Southern,

in particular," built trains "in a way that doesn't prioritize the placement of tonnage."

According to Cassity:

> [W]hen you're building these long trains and you're doing it so nonchalantly that you're not paying attention to where the tonnage actually sits, it's extremely likely that you're going to have a lot of tonnage behind a lot of empties. . . .
>
> Simple physics is the rule at play here. You know, if you take a Slinky and tie a 10-pound weight to the rear end of it and you start to stretch the Slinky out, when you finally get to the weight at the end, you're going to feel that Slinky have that force and that stretch . . . . That's true on a train. ***The equipment, I would argue, is not built for those kind of excessive forces*** . . . .

125. Cassity further explained that when the heavier cars are disproportionately placed at the rear of the train, there is an increased likelihood that those cars will come crashing forward when the brakes are applied:

> But when you take that Slinky and you get it moving and all of a sudden you stop quickly, that rear-end weight does not stop as fast as the Slinky, it keeps moving and pushing forward and that's what's happening with very long trains. ***When you put the brakes on, that weight comes crashing in, what we refer to as a run-in, and the harder the run-in, the more likelihood that the weight on the rear end is going to push the empties, it's going to make them want to lift vertically in the air***.

126. Cassity further explained that "when you look at East Palestine, because of the weight on the rear[,] it also presents a likelihood, a greater likelihood of more damage being done in the derailment, which also can lead to breaches of cars and the release of commodities, some of which are hazardous materials." As Cassity

described it, with "weight on the rear," it increases the likelihood of "an accordion-style accident."

127. Norfolk Southern also broke rules that prohibited placing hazardous materials too close to the engine. FE-6 described an incident in which management ordered a train to make its scheduled trip despite warnings that hazmat cars were only four positions from the engine – a violation of rules that ban hazmat within six cars of the engine. Orders like this were so commonplace that FE-6 began logging all the times that he received an order that made him uncomfortable as a way to protect himself when something inevitably went awry.

128. FE-5 also recalled that Norfolk Southern trains arriving in his train yard in Ohio sometimes did not conform to rules regarding hazmat car placement. FE-9, who supervised the trains coming in and out of the terminal, recalled a specific incident in the fall of 2020 where a hazmat car was improperly placed on a train in transit to Chattanooga. The yardmaster had to stop the train to reconfigure the misplaced hazmat car.

129. Cassity also stated that, with increased train length, there are increased issues in communication, particularly for trains that use distributed power. A train with distributed power has one or two additional locomotives inserted in the middle and/or the end of the train to provide additional power to move a longer and heavier

train. Train 32N, for instance, had one distributed power locomotive located between railcars 109 and 110. Cassity noted that there were "a lot of instances where you don't know what's going on with the distributed power back there, they're constantly on fire, you'll see a big fireball going down the road and someone else has to tell you hey, I think you've lost your mid or rear unit." Cassity also said that because train technology is often dated, "you can almost guarantee you're going to lose communication" with the rear of the train. According to Cassity, "that has an impact on your ability to know the integrity of your train and how the brake system and air system is functioning," as well as causing breakdowns in communications between the engineer and the conductor, who may be trying to communicate from the rear of the train the movements needed to proceed safely, but the engineer cannot hear him or her. And notably, even for very long trains, the crew size was still generally only two people.

130. FE-12 likewise stated that it was common for trains to be about two miles long. FE-12 recalled that employees were required to assemble trains to the max tonnage for which an engine was rated. FE-12 added that because the hand-held radios used by the crews to communicate only reached a distance of up to 1.5 miles and because the crews had only two people, the engineer could lose communication with the conductor. This presented a safety risk as the engineer

driving the train relies on the conductor to direct movements within areas of the train that the engineer cannot see.

131. FE-13 explained that PSR necessarily meant longer trains because Norfolk Southern cut the number of trains it operated and shrank crews. FE-13, a conductor, also recalled "frustrati[on]" losing radio communication with his crew. On one occasion, by the time FE-13 spotted the problem on his train after walking over a mile and a half to find it, his radio failed to connect with his crew's radio because of the distance between the two devices. FE-14 estimated that teams lost signals with each other while walking the length of oversized trains two or three times per week.

132. Fannon also told NTSB investigators that Norfolk Southern had "started making these trains longer and longer and heavier and heavier." Because of the extraordinary train lengths, trains blocked roads along their routes for several hours. Fannon related an incident, stating:

> [O]ne of my engineers was actually arrested for following instructions of Norfolk Southern and blocking a road crossing for hours at a time. The sheriff's department showed up at his house and put him in handcuffs. . . .
>
> . . . And then N[orfolk] S[outhern] had the audacity to charge him for a disciplinary hearing for failure to follow the state police direction, but yet he was following the direction to do exactly as he was told by Norfolk Southern.

133. FE-8 explained that railroads place detectors at regular intervals along all train tracks which alert train operators if, among other things, a train wheel or a bearing is excessively hot. A hot wheel or bearing can indicate that there is an issue with the brakes or another piece of equipment on the train car. FE-8 stated that trains were so long after the implementation of PSR that if a heat detector alerted, a hot wheel or hot bearings would cool off by the time the conductor walked to the car to perform an inspection. The conductor would report this as a false hit; however, the issue would still be present and "would create more problems" when the faulty wheel or bearing would heat up again.

134. Greficz relayed a similar account to NTSB investigators, describing a situation where a crew was alerted by a wayside detector that there was a hot box at the train's 186th car when it was 30°F outside. As Greficz stated, the conductor had to walk "the two and a half miles" to the particular car with his temperature stick, which is a tool that uses wax to test if the train wheel is overheated. "[I]f it doesn't melt the temp[.] stick, you report it [']nothing found[']," said Greficz. But, as Greficz noted, by the time the conductor walked 186 cars back, the hot box had cooled given the outside air temperature.

135. According to FE-2, Norfolk Southern ran longer trains and refused to spend money on replacement parts – forcing employees to take parts from other

active locomotives. As FE-7 also recalled, trains used to be around 90 to 110 cars, but with PSR's implementation, the trains were closer to 210 or 220 cars. FE-7 even recalled one "insanely long" train that had 256 cars, which was almost two miles. FE-7 explained that the length of the trains was a common topic of discussion between the trainmaster and the yardmaster – the employees responsible for overseeing terminal operations – but when engineers, conductors, and craft people brought their concerns to management, they were generally told to "shut up" and "just do their jobs." FE-7 reported that at certain points, oversized trains in his train yard in Ohio were rushed through their brake inspections because once a long train was formed it blocked the rest of the yard.

136. Other former Norfolk Southern employees related their perceptions of Norfolk Southern's expanding train length. For example, FE-15 did not think trains could even be built as long as Norfolk Southern was making them. New trains were the equivalent of two old trains linked together, with the crew size remaining the same.

137. FE-11 also said that train lengths doubled in size in the last few years of his employment at Norfolk Southern. FE-11 stated that it was not uncommon for trains to contain 250 cars. In fact, FE-11 recalled the longest train that he was required to move, which consisted of 238 cars and weighed over 20,000 tons.

138. FE-10 believed some trains weighed over the permissible limit and recalled long trains that were unable to fit in the train yards.

139. FE-1 explained that prior to PSR, employees would have considered a huge train length to have been 10,000 feet. After PSR, a 16,000-to-18,000-foot mixed-car train, weighing 21,000 tons was not uncommon.

140. Union officials attributed the severity of the East Palestine Derailment to the length of the train. Sloper recalled to the NTSB that he had spoken with the crew that ran the first leg of the train's journey between Decatur, Illinois to Peru, Indiana. He stated that when the crew "got their paperwork and they saw immediately how long and heavy the train was and how many dangerous cars there were and that they were concerned with the weight and the length, as the engineer had never run a train that was that long or heavy before." When the crew questioned the yardmaster about "running this train this long and heavy," they were told, "this is how we run trains now."

### D. Norfolk Southern's PSR Cost Cuts Caused a "Dangerous" Lack of Training and Promoted Unqualified Trainees to Active Service

141. As numerous witnesses recalled during the NTSB investigation, Norfolk Southern's significant personnel cuts ultimately resulted in a shortage of employees which, in turn, led Norfolk Southern to reduce training time for engineers

and conductors, who consequently found themselves operating trains they were not qualified to operate. In the words of Sloper:

> [A]ll N[orfolk] S[outhern] cares about with their conductor trainees right now is just get your starts in as fast as you can so that we can get you promoted so that we can get you out there working on these trains and they don't care what you know or what you don't know, they just want you to be able to pass the paper test and demonstrate that you can repeat the rules back but to actually be proficient at the craft, it takes years to learn how to do what we do and do it well . . . .
>
> ***Once [trainees are] promoted, they're just kind of learning on their own and it's dangerous and we're seeing the fruits of that right now***.

Pitts agreed, and described to NTSB investigators the ways in which Norfolk Southern attempted to compensate for its young and inexperienced workforce by hastily promoting trainees prematurely:

> [T]he company policy is if you have a trainee, you have to have more than a year's experience. ***And then we get a verbal instruction from management that says we've got way too many C[onductor] T[rainees] and our conductor pools is so young, it's impossible, we can't get our [trainees] through to do their training. So as long as you're comfortable, break the rule and do it, just do it.*** We're not going to – I know it's one of our rules, but if you're comfortable and the [trainee is] comfortable, go ahead and do it.

142. Pitts further explained that there was a "disconnect" with management wanting to get the trains moving to make their numbers but not having enough people to operate them, so trainees were "marked up," or promoted, before they were fully trained:

> I've sat in meetings with terminal superintendents or division superintendents while they were on conference calls and it's all about why do we have this number, why do we have that number, I don't care, mark these people up . . . ***I don't care if they haven't worked or they haven't trained on this job, mark them the freak up*** . . . but have a general manager specifically tell a division superintendent "***I don't care whether they're trained fully or not, mark them up, we've got to get these trains across the road," and that's what's happening at the management levels with Norfolk Southern***.

143. The SMART union officials also recounted to NTSB investigators the lack of proper conductor training as a result of Norfolk Southern's focus on improving efficiency and operating at minimal cost. Sloper related the following to this effect:

> [A]ll [Norfolk Southern] cares about with their conductor trainees right now is ***just get your starts in as fast as you can so that we can get you promoted so that we can get you out there working on these trains*** and they don't care what you know or what you don't know, they just want you to be able to pass the paper test and demonstrate that you can repeat the rules back but to actually be proficient at the craft, ***it takes years to learn how to do what we do and . . . they're just expecting people to do it.***
>
> ***Once they're promoted, they're just kind of learning on their own and it's dangerous and we're seeing the results of that right now***.

144. Pitts also discussed lack of proper training under PSR:

> I believe the crux of the issue is PSR. I think that was the beginning of the end for Class I railroads, that's just an opinion, but it has created a culture because training comes within that and ***when everything's run by the number and people are forced through the training process in McDonough, they're rushed through real fast*** . . . .

* * *

> I know that all my other brothers here will say the same thing, when [the new conductors] come out, you have zero confidence in them being able to perform the job, to be honest with you . . . . [T]hey're not being trained properly, they're not getting what they need to be able to do the job safely. I don't believe they have a third of what we were taught.

145. Greficz also spoke about the lack of proper training even according to Norfolk Southern's internal policies, stating: "***[T]heir records will show you that you have new people training new people, that's against their own policy***."

146. FE-5 said that when he started as a conductor around 2015 his on-the-job training lasted six months during which the Company had him shadow a conductor with at least one year of experience. Toward the end of 2019, Norfolk Southern cut training time in half and began pairing trainees with conductors with far less than a year experience, sometimes only a few weeks. FE-5 described these situations as "***the blind leading the blind***."

147. FE-1 attended six months of conductor training in McDonough, Georgia when he began working for Norfolk Southern over 20 years ago. But, FE-1 noticed that about three years ago the length of the training was shortened to two or three months.

148. Another conductor, FE-13, recounted that after Norfolk Southern adopted PSR, new conductors received only six to eight weeks of training – down

from several months. These shorter training times, according to FE-13, meant that newer employees were a "bit more clueless" about their jobs than those who had longer training periods.

149. Fannon, a union representative for engineers and trainmen, also told the NTSB during its investigation following the East Palestine Derailment about the significant decrease in the time Norfolk Southern took to train new conductors, to no more than 60 days. He detailed that once a person was "marked up," or promoted, to being a conductor, they would partner them on a train with an engineer who "usually is a seasoned veteran" meant "to look out for that conductor." Fannon questioned how helpful this was considering the lengths of Norfolk Southern trains and the fact that a train was only staffed with two crew members, stating that "if something were to happen a hundred cars deep in the train, that engineer can't see what that conductor's doing."

150. FE-4, a locomotive engineer, stated that, before PSR, locomotive engineers and trainmen used to have 180 days of training, with a training program held in Atlanta, Georgia. FE-4 added that a trainee would then be assigned to a team consisting of an engineer, a conductor and a brakeman for further on-site training. However, after PSR, Norfolk Southern eliminated the training program in Atlanta and training instead happened on-the-job for 90 days with only a conductor and

engineer. FE-4 indicated that because the crew operating the train had the same workload and fewer team members, "the training takes a back seat."

151. FE-11's initial training as an engineer at Norfolk Southern occurred in the yard operations area for his first four weeks with the Company and involved getting familiar with the train yard and learning how to pull and move trains. For the next six months, FE-11 was assigned to drive trains in one direction, west to Chicago, while working with an experienced engineer. FE-11 stated when PSR started, training was "drastically cut" and got "progressively worse." FE-11 said new trainees under PSR got much less training than previous ones: 90 days to learn to drive in both east and west directions – as opposed to learning one direction at a time as he did. FE-11 explained that it was "a lot to comprehend" in such a short amount of time. FE-11 believes management took the position that the trainees were always going to be with someone else and would have maps, so they could "figure it out."

152. Norfolk Southern cut back on training widely across numerous trades. FE-16, a training specialist at Norfolk Southern's training facility in Georgia, stated that new hire training for maintenance of way workers who maintain the tracks "drastically" dropped off with PSR's implementation. FE-16 explained that Norfolk

Southern employees then were required to do more work with less training and while working short-staffed.

153. During his interview with NTSB investigators, Fannon stated that the focus on productivity manifested in decreasing frequency of safety training, to the overall detriment in safety:

> Due to the cost measures in 2019, ***they went from an annual rules class to every 3 years, so now you do not bring your [trains and engineers] people in except once every 3 years and that way they did not lose 1 or 2 or 3 days of productivity every year, now you only had to do it every 3 years***. And bringing people together to bring up issues and ideas . . . is tantamount to having it out in an open discussion. [Norfolk Southern], in their efforts to raise the value of their stock, made that one of their cuts and not bringing people in, not telling them how important they are and their safety has led ***to everybody's perception that safety is not important at [Norfolk Southern]***.

154. The safety concerns caused by Norfolk Southern's inadequate training of new conductors and engineers were exacerbated by the increasingly long and heavy trains operated by the Company after implementing PSR. Cassity informed the NTSB inspectors that, in violation of FRA regulations, engineers were asked to operate trains far heavier and longer than ones they had ever encountered in training. Cassity explained:

> [W]hen you look at the regulations, specifically for engineers, they're supposed to be qualified on the train they're called to operate[. I]t could be possible that an engineer has never operated a train more than 8,000 feet and 15,000 tons, we'll say, and all of a sudden they get a 20,000



4879-1894-0589.v6

> foot train with 60,000 tons[. T]he railroad's approach to that is that a train is a train no matter what and that's not true.
>
> Every train is different, ***it's a lot harder to operate a train that is bigger than any you've ever operated before***, but ***there is no concern or care whatsoever into your inexperience in operating a train that big***.

155. Similarly, FE-13 learned that Norfolk Southern engineers also felt that they received inadequate training, specifically on operating distributed power trains containing additional locomotives in the middle and/or the end of the train, which were becoming more common as Norfolk Southern increasingly used lengthier trains. FE-13 recalled engineers complaining that they were required to run more complicated trains but were not provided with adequate preparation.

156. Cassity likewise stated that "if you're already a marked-up engineer," the training Norfolk Southern provided for a train with distributed power was "***nothing more than a pamphlet***."

157. According to Cassity, this lack of training was made apparent by the numerous, repeat errors made by new conductors whom Norfolk Southern simply disciplined and terminated. Cassity stated that management at Norfolk Southern was unmoved by the escalation in discipline and firings, and he testified to the NTSB that it was "***almost impossible to convince management***" that more training or qualification was needed.

158. In addition to neglecting the initial training of its new employees, as Norfolk Southern implemented PSR, the Company slowly eliminated all continuing safety training for its existing workforce. According to FE-7, quarterly safety meetings became semi-annual, and then annual meetings. FE-7 stated that eventually Norfolk Southern eliminated the safety meetings and employees were required to take time out of their workday to watch safety-training videos. FE-7 expressed some skepticism as to whether all employees actually watched the videos, or whether they simply logged in and fast-forwarded through them so they could return to their duties.

159. FE-1, who worked at Norfolk Southern for approximately twenty years, said there was an annual Book of Rules training that had previously involved two eight-hour days of training and a test. At one point, the class time was shortened to one eight-hour day and, later, class time was eliminated and replaced with a test every three years. FE-1 indicated that most trainings had been reduced to emails or videos that employees were instructed to watch. FE-1 added that Norfolk Southern would administer tests "just to appease the FRA." For example, the same 12-question test on hazardous materials was administered each cycle. FE-1 noted that the hazardous material training used to be provided every year, but Norfolk Southern

now only provided the training every three years. FE-1 had not taken the training or test for three years prior to leaving Norfolk Southern in 2023.

160. This lack of training came to a disastrous, yet predictable, conclusion on the day of the East Palestine Derailment. Sloper, in his NTSB interview, tied the lack of proper training directly to the crew that took Train 32N from Decatur, Illinois to Toledo, Ohio prior to the derailment[4]:

> If you want to bring us back to the East Palestine [Derailment], . . . ***I represent the engineer that took that train from Decatur***, so that train's consist that eventually derailed in East Palestine came from Decatur, Illinois. . . . [W]hen [that engineer] came to work [the day of the accident], ***that was the largest and heaviest train that he had ever run and he didn't feel comfortable running it***. They called the yardmaster and said why are we running this train so big . . . .
>
> * * *
>
> ***[H]e's a very . . . young engineer, he was concerned about the build of his train, the weight of his train, and they said, just like everything, oh, in the last few years it was just take it and, you know, hope for the best***.[5]

---

[4] At Toledo, Ohio, a new crew boarded the train. That new crew was operating the train at the time of the East Palestine Derailment.

[5] Railroads are required to keep a "consist" that records details about each rail car, listing of the makeup (number and identity) of a train (*i.e.*, freight, car types, etc.). This is one of the key records that first responders wanted in the East Palestine Derailment.

When that engineer got off the train in Toledo, Ohio, the crew that took over and was operating the train at the time of the East Palestine Derailment included a conductor that had only "8 months on the railroad."

### E. Norfolk Southern Implemented a Dangerously Superficial 30-Second "Inspection" of 90 Safety Points for Each Train Car's Side

161. The crippling layoffs at Norfolk Southern resulting from PSR's implementation made providing proper inspections and train maintenance challenging at best, according to former employees. Meanwhile, the PSR-mandated goal to reduce the trains' terminal dwell time – a metric which Norfolk Southern reported to demonstrate its efficiency in moving its trains – meant that Norfolk Southern slashed the amount of time permitted to perform inspections.

162. Arouca told NTSB investigators that, prior to PSR, it was customary for inspections to be about "3 minutes, on average, per car." Arouca further explained that there are "***at least 90 points of inspection per side of a car***." Following the adoption of PSR, inspections were "whacked" by two-thirds according to Arouca, "forcing our guys to do these inspections in 30 seconds a side or 1 minute a car, or less" adding that it was "very frustrating." Arouca explained that cutting inspection times conformed to PSR, which was "built around the concept of terminal dwell," and which he described as "[g]et these cars in, get them out as

fast as possible. . . . [T]erminal dwell is what [management] live on." In fact, according to FE-10, anytime a car sat in a terminal area for too long it would cause management to "come down on [him]."

163. Fannon, in his interview with the NTSB, agreed that as a result of PSR and the impetus to drive down dwell time, train inspections, which were supposed to ensure that all cars on a given train were in good, safe, working order, were reduced from three minutes per car to just one minute per car, or ***thirty seconds per side***. According to Fannon: "It's hard to walk 50 feet and look at every aspect of a rail car in 1 minute . . . [and therefore the carmen] ***missed things. There's no way to do a proper inspection in that time frame***."

164. Cox contributed further color on inspecting a freight car in "30 seconds per side":

> So you got a 100-foot freight car and it is sitting on a track that is on top of loose walking ballast, stone. You're supposed to be watching where you're stepping, how you're stepping, you're supposed to be safeguarding your own safety. Walking around a freight car in a minute, let along inspecting one, you know, just think about that.

165. Arouca added: "It's not at all really feasible." According to Arouca, "if you ran you could do one [side] in 30 seconds, but you wouldn't be able to keep that pace ever."

166. Moreover, according to Cox and Arouca, there was a "mountain of evidence as it comes to, you know, ***forcing . . . these inspection times to get down and down and down and down***." The NTSB investigator asked whether inspections were cut short to avoid going over the allotted time:

> [NTSB]: Have there been instances where you've been told or some of your inspectors have been told while they're inspecting a train, and perhaps they're not meeting the time requirements that management is pushing for, been told to just stop inspecting it and let it go?
>
> MR. COX: Yes.

167. Cox then went on to describe an example where in "particular time crunches," carmen were told that "we're just going to have the crew take the air out of those cars so that we can switch them into the trains and you guys can get the inspections later." While the cars were switched out of the inbound train, the carmen on the first shift went home, and next shift began. Cox queried: "Do you think anyone told them that those cars in the outbound train needed a [regulation-required] mechanical inspection? No." Arouca further noted this pressure on reducing inspection times "was not commonplace in Norfolk Southern, obviously" before PSR.

168. Fannon, consistent with other NTSB witnesses, said that under PSR, inspection times for cars had been cut by two thirds, from "3 minutes or so a car . . . down to a minute." Fannon said that the new one-minute inspections "missed

things" and added that "***[t]here's no way to do a proper inspection in that time frame***."

169. FE-12 also noticed that after PSR was implemented, the number of cars that mechanical crews were expected to inspect increased from approximately 150-200 cars to 250-300 cars, yet the number of mechanical employees decreased.

170. FE-14 likewise reported that with PSR, the number of cars scheduled for an average train increased, the number of crewmembers required to perform inspections decreased, but no extra time was provided to complete inspections.

171. FE-4 stated that before PSR, when a car came into the railyard it was immediately inspected, cars would be switched, and then an outbound train inspection would occur. After the implementation of PSR, the inbound car inspection became more limited to enable employees to immediately switch the cars and conduct an FRA-mandated outbound inspection. Due to PSR, a crew of one or two mechanical crew members was expected to complete the same inspections that used to involve at least three mechanical crew members per shift. In addition, Norfolk Southern decreased the time allotted for inspections from 1.5 hours to 1 hour, with even fewer people conducting the inspections. FE-4 stated the yardmaster or mechanical staff kept track of how long the inspections took. FE-4 stated that the

one- or two-member crews "could not do effective inspections" due to the time constraints.

172. FE-11 stated that regardless of the size of the train, trainmasters were expected to move the trains out of railyards within two hours. FE-11 noted that in the past, when there were shorter trains, the expectation was that inspection and maintenance by a full three- or four-person crew of carmen would take under two hours. FE-11 stated that after the implementation of PSR, the trains lengthened to 200-220 cars, there were fewer carmen in the yards, and the crews were decreased to two people, but they still had the same amount of time to conduct the same inspection. FE-11 explained that with less time, there are fewer things you can find during an inspection.

173. FE-1 likewise stated that, following PSR's implementation, Norfolk Southern reduced the crews who were responsible for inspecting the train cars in the terminal from four or five people to two people. FE-1 added that if they could not find an available inspector, they would round up a manager who had previously been an inspector, or a conductor to run the inspection even though this person may not have been in the field for a while and may not know what to look for.

174. These accounts are corroborated by FE-7, who stated that:

> [A]fter the new focus on efficiency, only around one man-minute was allowed per car . . . [and] this reduced amount of time did not allow the carmen to adequately look at everything that needed to be inspected on the train.

This resulted in "shortcuts" being taken during the inspection of cars in order to meet the new time constraints. According to FE-7, prior to Defendants' increased emphasis on efficiency, there was no time limit on inspections, and that they usually lasted two-three minutes per car.

175. FE-7 described one such shortcut relating to the wheels. FE-7 explained that the carmen doing the inspections had to get a gauge to measure the wheels, but would sometimes skip this step if the wheels seemed visually close to satisfactory, since obtaining a gauge took time. FE-7 further explained that part of the reason the wheels were not inspected as carefully was because management told the carmen that the wayside detectors along the tracks would catch problems with the wheels. The wayside detectors, according to FE-7, when detecting sticky brakes or hot wheels, sent an alert to a team in Atlanta called the Wayside Desk. The Wayside supervisor would advise the dispatcher that was responsible for coordinating the movement of the trains of the level of the alert, and if it was critical, the conductor would be told to stop the train immediately. Although the Company was placing heavier reliance on the wayside detectors, FE-7 believed that the alerts

were not given the appropriate level of importance by dispatchers coordinating the response from the Wayside Desk and the technology did not always work correctly.

176. Furthermore, even if defects were flagged for repair in these rapid inspections, FE-1 stated that Norfolk Southern cut back on maintenance costs after implementing PSR. FE-1 recalled that there was not always someone available to fix mechanical issues and if there was, they were on a "very strict schedule." FE-1 stated that in order to maintain the schedule, Norfolk Southern used "close enough" maintenance: "if an engine rolled, stopped and its horn blew, the train was forced out and good luck to you."

177. Thus, the 30-second-per-side time constraints on train inspections and the resulting shortcuts taken to keep the trains operating on Norfolk Southern's precipitous schedule meant Norfolk Southern put dangerous trains into service.

### F. Norfolk Southern Exploited Regulatory Loopholes to Conduct Fewer Inspections of Freight Cars

178. The drive to reduce terminal dwell led to the "abus[e]" of "a massive loophole" in the FRA regulations – Appendix D to §215.13 of the Railroad Freight Car Safety Standards (49 C.F.R. Part 215) ("Appendix D") – in order to undertake fewer inspections than were required.

179. According to §215.13, when a freight car is placed in a train, "the freight car shall be inspected before the train departs" either "before or after the car is placed in the train." Section 215.13 additionally mandates that at a location where an "inspector designated" under §215.11 is "on duty for the purpose of inspecting freight cars," the inspection is required to be completed by that inspector. However, according to §215.13, if the "inspector designated" is "not on duty for the purpose of inspecting freight cars" the inspection shall be conducted in accordance with Appendix D. Appendix D provides a list of "imminently hazardous conditions" which are "readily discoverable" by a train crew member conducting an inspection in substitution of a designated inspector.

180. According to union official Arouca, this regulation offered Norfolk Southern a loophole that allowed for an "abbreviated pre-departure inspection" where there are no qualified carmen (or "designated inspectors") in a particular yard. To reduce terminal dwell by taking advantage of the "abbreviated pre-departure inspections," Arouca rhetorically asked: "[H]ow do you get to that point?" His answer: "Well, you get rid of all the carmen. You got to furlough the heck out of the craft itself, you know, shuttering yards, etc., etc." In other words, by firing the carmen – and thereby also cutting labor costs – the Company was not required to do the 90-item "full mechanical inspection," but rather was permitted to do a 12-item

inspection using the traincrews, who are not as qualified as the carmen to conduct inspections. "Unfortunately," as Arouca stated, "this exception to the rule has largely become the default rule in many respects." Critically, it has resulted in cars going "thousands and thousands of miles . . . without a mechanical inspection by a qualified mechanical inspector, a/k/a carman."

181. According to Cassity, "the intent of the regulations . . . [is] that the requirement for inspections, especially at originating terminals . . . where [trains are] created, is to be done by what's called a qualified mechanical inspector" or "carmen." Cassity testified that "the carman craft is being pretty much eliminated in the industry and we have more terminals than we've ever had with no carmen present."

182. Norfolk Southern, however, was able to maintain compliance with the federal regulations by heavily relying on the provisions of Appendix D, which allows for the crew of the train to perform an abbreviated inspection when a designated inspector "is not on duty for the purpose of inspecting freight cars." This, according to union officials, is not ideal for two reasons: (i) because the Appendix D inspections are simply "visual inspections" that do not entail review of the internal workings of each train car; and (ii) because the train crews, as opposed to the carmen,

"do not have the training, experience, or equipment to conduct a comprehensive car inspection."

183. Cassity stated that Norfolk Southern had been exploiting this loophole in the FRA regulations requiring qualified mechanical inspectors to perform car inspections prior to departure by furloughing carmen:

> And so now, because of the way the regulation is written, instead of carmen doing these inspections, the onus is passed on to the conductors to do it. The difference between the conductor and the [Qualified Mechanical Inspector] is the QMI is an apprenticeship program, it takes 4 years, maybe 3 years . . . to become a journeyman. It is an intensive, extensive training program . . . . The conductor, if they're lucky, might get a 45-minute program on a computer that tells them how to do a Class I inspection.

184. Greficz, one of the SMART union officials, described his frustration with the practice of relying on conductors for inspections that were intended to be a carman's responsibility since Norfolk Southern did not train the conductors to perform such inspections, nor provide the appropriate tools:

> We aren't on duty for the purpose of inspecting cars, so if I inspect a car as a conductor, it's on the rail, looks good, there's not stuff dragging or hanging down on the ground and it holds air and the little piston comes in and out, and that's like the in-depth training version that they give people. We don't have small gauges, we don't have flange gauges, we don't have mechanical tools that the mechanical people use to look at these trains, these train cars . . . . Now all the inspections are on us.

185. In other words, Norfolk Southern, after having greatly reduced its capacity to properly inspect its train cars under the regulations by combining



4879-1894-0589.v6

inspection territories and firing carmen, was able to tell the investing public that Norfolk Southern still operated "safely" in part because it was only technically in compliance with federal regulations.

186. Fannon also alluded to the fact that, as indicated by other NTSB witnesses, Norfolk Southern's termination of many of its carmen caused Norfolk Southern to conduct fewer and more cursory inspections of its cars:

> They combined territories to make these huge track inspection territories or car department inspection territories, they closed yards, and with the federal regulations, if there's no yard and no mechanical people, it don't have to be inspected there, it would run to the next mechanized point where a car would have to be inspected . . . .

187. Fannon, when questioned about this point by the investigators, told them that the train crews, who conduct inspections in lieu of carmen where no carman is present, were not trained in the same way, stating: "They're trained to look at something like that . . . it's different for a person that does it every day like a mechanical department carman and a conductor that does it very rarely."

188. FE-6, a conductor with more than a decade of experience at Norfolk Southern operating trains, corroborated this point. FE-6 explained that PSR-related job cuts forced conductors to make repairs that they were not trained to make and which were outside the scope of their duties. Asked if this presented a safety concern, FE-6 replied, "I would say so, if [they] were not trained."

189. FE-1 recalled instances when a manager who had previously been an inspector or a conductor was asked to run the inspection even though this person may not know what to look for.

190. FE-17 also recalled times that staffing shortages caused supervisors to perform inspections normally assigned to carmen. Despite understaffing issues, FE-17 stated that upper management "did not want to hear" about the yard not having enough manpower.

191. The reduced capacity of the inspection yards was exposed, with disastrous effect, during the East Palestine Derailment because, according to Fannon's interview with the NTSB, the train that caused that derailment should have been inspected prior to the crash per the requirements of §§215.11 and 215.13 of the Railroad Freight Car Safety Standards, but was not. In Fannon's words, the more lenient regulations that permitted fewer inspections resulted in the East Palestine Derailment:

> And this East Palestine derailment, the car came from a foreign railroad at St. Louis, an interchange, it went to Decatur, Illinois, they had issues there, the train wasn't inspected, they only had one carman working third shift when the train came in and departed and if the car was inspected under the old regulations, it would've been inspected in Decatur, Illinois. But yet, it got away and resulted in the East Palestine derailment . . . .

192. Cox also tied exploitation of federal regulations to limit car inspections directly to the East Palestine Derailment:

> And if I were to proffer an example that would link in the most recent disaster, one thing that a car inspector does when he's doing these inspections under [the federal regulations], it talks about a loose wheel bearing seal. What I would do, and I have done personally as an inspector in the field, when you see grease around those bearing seals, you'll get your gauge and you'll just give it a little pry to see if it's loose. If it is loose, that's allowing particulates into the bearing, it's allowing water into the bearing, and it's allowing the lubricants to escape. That bearing will fail, it will burn up, and you will be left with a disaster. Something that's visual criteria that a car inspector can make the difference.

### G. Norfolk Southern Took Other Shortcuts on Train Inspections and Maintenance

193. Faced with the reality of having far too few carmen and maintenance workers to perform thorough inspections, the Company engaged in other conduct to portray its operations as safe even after the implementation of PSR. Union officials and former Company employees provided numerous examples of these tactics.

194. In his interview with the NTSB, Arouca described how Norfolk Southern was openly flouting not only federal regulations, which required brake inspections every 1,000 miles (or 1,500 for extended haul trains), but also "wildly blowing" their own internal requirements that cars undergo a mechanical inspection every 3,500 miles. These requirements notwithstanding, Arouca showed the NTSB inspectors records that identified Norfolk Southern train cars that had gone "46,000

miles since last mechanical inspection; 44,000 miles; 19,000 miles . . . there was one 72[,]000 miles. I think there's 90,000 mile[s] in here somewhere." This, according to Arouca, was "***a bit of a smoking gun***."

195. FE-6 described a practice called "block swapping," which entailed breaking down an incoming train into three blocks without adding any new cars. Norfolk Southern could then append each "block" to a different train. "Block A" is sent to one city and "Block B" sent somewhere else. FE-6 stated that only a "roll-by inspection" would be performed for these blocks. According to FE-6, "block swapping" increased after Norfolk adopted PSR.

196. FE-12, a senior terminal trainmaster, stated that managers exerted so much pressure to comply with PSR's scheduling that he believes employees "bent the rules" to accomplish certain tasks. One responsibility of a trainmaster is to ensure employees are complying with the safety rules, which FE-12 felt he had sufficient time to complete when he worked at other railroad companies. But, under PSR at Norfolk Southern, FE-12 felt that there was not enough time to supervise safety compliance, and his managers told FE-12 that the main priority was to expedite trains arriving and departing from the yard.

197. FE-4 heard about Dwell Time Reports – reports that tracked the time that a train remained at a scheduled stop without moving – being sent to the division

level, and being discussed at a daily meeting about the schedule. FE-4 understood that Norfolk Southern leadership would implore all employees to reduce dwell time during these daily meetings. FE-4 said there was pressure from yardmasters and trainmasters to cut corners or "look the other way on things that would take time." FE-4 remembered being grilled regarding the cause of every delay.

198. As a result, FE-17 said that crews would "just [do] the basic checks" in order to push a locomotive out of the yard on time. FE-6 believed speed came at the expense of safety when it came to inspections.

199. FE-1 stated that Norfolk Southern leadership would track train delays using scanners placed just outside of the train yard, which recorded when a train departed.

200. FE-11, a locomotive engineer, stated that there was constant pressure from the "bosses" to get the trains out of the railyards within a two-hour window to avoid being "written up." FE-11 said that because of this pressure, carmen many times overlooked certain items. FE-11 stated that the superintendent and the trainmaster who were responsible for maintaining the track schedule at the railyard where he worked would write-up employees to enforce the practice of moving the trains out quickly.

201. Fannon informed the NTSB that Norfolk Southern "combined territories to make these ***huge track inspection territories or car department inspection territories***" in order to compensate for the fact that Norfolk Southern no longer had enough maintenance and inspection workers to man the previous number of territories.

202. FE-10 recalled times when a car needed a repair but there were not enough employees on the shift to cover the work. This is because, according to FE-10, Norfolk Southern only employed one engine maintainer for an entire territory who "***could not be in two places at once***."

203. Track inspections and maintenance similarly suffered under PSR. FE-19, a track inspections supervisor, said it became "physically impossible" for track inspectors to complete their assignments once territories were merged under PSR. FE-19's territory contained more than 20 tracks across 300 miles of territory. FE-19 recalled thinking, "how on earth am I going to inspect these yards?" FE-19's superiors (division engineers and chiefs), themselves former track inspections supervisors, told him to "just get the important stuff" because it was understood that track inspections supervisors could not complete all of the tasks they were assigned.

204. FE-19 believed that track inspections supervisors "pencil whipped" reports, meaning that they deliberately prepared fabricated forms. FE-19 explained

that track inspections supervisors would flag "phony" issues on their reports to make it look like inspections were being completed when, in reality, no inspection had been performed. FE-19 felt that if leadership actually scrutinized the timing of inspections, which were all recorded on a digital app, it would be apparent from the numbers that reports were fabricated. According to FE-19, PSR-related cuts made it "physically impossible" for track inspections supervisors to complete their rounds in the amount of time management allotted to them.

205. FE-16 stated that, after PSR was implemented, there was so much pressure amongst track maintenance crews to reach certain production measures that he could "guarantee" that "there were people taking shortcuts every day to get the simple jobs accomplished." FE-16 said that one shortcut involved using a "watchman" or "lookout" instead of coordinating with the dispatcher to obtain "track authority," which shut down a particular section of tracks for a certain period of time for maintenance. Using a watchman does not require the track to be shut down. However, FE-16 explained it should only be used when there is 1,000 feet of visibility in each direction and on tracks without curves, such that when an oncoming train is in the distance, the watchman can warn the workers and the crew can vacate the area with sufficient time. Following PSR, FE-16 stated that maintenance crews started to use watchmen for track repairs that necessitated track authority so that they

would be able to complete the work without tying up trains. FE-16 added that dispatchers were often reluctant to grant track authority and shut down the tracks for fear of being blamed for scheduling delays.

206. Even when track authority was obtained, FE-19 recalled that dispatch would always pressure supervisors to relinquish track authority as soon as possible so that the tracks could be opened again.

### H. Norfolk Southern Enacted Strategies to Avoid Addressing Train Defects in Order to Keep Its Trains Moving

207. Wayside detectors, or defect detectors, are deployed by rail companies to monitor trains as they are underway on the rails and identify poorly performing equipment or other mechanical defects. One type of wayside detector is the HBD, which are commonly combined with a Hot Wheel Detector. An HBD or Hot Wheel Detector uses infrared scanning technology to detect hot wheels or bearings that can arise from locked or sticking brakes.

208. Like other rail companies, Norfolk Southern employed wayside detectors, including HBDs, along its tracks to detect defects and potential problems with trains, and to communicate that information to Norfolk Southern employees.

209. However, under PSR, Norfolk Southern ignored and minimized the problems identified by the wayside detectors in an effort to increase efficiency. For

example, Pitts, a SMART union official, noted the disconnect between statements that Norfolk Southern was carrying out a safety culture versus its practices "[w]hen you're ***told to bypass wayside detectors***." He recounted to NTSB investigators that an engineer for a Norfolk Southern train was alerted by a wayside detector that the air pressure was going down, which would lead to issues with the brakes and other problems. Pitts stated that the crew called the dispatcher to inform them of their airflow problem and to let them know "we're going to go back and look at this," but they were told to proceed without checking:

> They start preparing to slow down, the chief comes over the radio . . . and says absolutely not. If it doesn't go into penalty or emergency, keep pulling the train. ***You got chiefs and dispatchers and people making decisions to bypass what we're being told with wayside detectors are issues in our train***, so that we can get trains from A to B. We can't, we can't pull them. That's just ***blatant violations*** . . . .

210. Additionally, FE-4 indicated that the distance between HBDs widened after the implementation of PSR to cut overall maintenance costs. Specifically, FE-4 recalled that the distance between detectors increased from 10 to 12 miles between each detector to 20 to 25 miles between each detector.

211. FE-15, a signal maintainer, discussed the East Palestine Derailment with other signal maintainers. FE-15 heard that the detectors were spaced too far apart.

212. Moreover, during the time period leading up to the East Palestine Derailment, the system for analyzing and communicating alerts generated by the wayside detectors to the train crews was deeply flawed.

213. According to rail workers who testified before the NTSB during its investigation of the East Palestine Derailment, wayside detectors used to sound directly on the train's radio as the train rolled past them. In explaining how wayside detectors used to work, Cassity, a union official, told the NTSB that as the head end of the train rolled over a wayside detector, an acknowledgement would sound on the radio saying "defect detector at milepost 1-2-3 and that would tell you it's working. And then as you go over, you're listening for it to say any defects[;] if it doesn't say anything and your rear end clears it, it would say Norfolk Southern, defect detector at milepost 1-2-3, no defects, no defects." The "primary point" from the perspective of the conductor on the train is that "it let you know [the detector] was working and it let you know that it found no defects." But as Cassity further explained, the wayside detectors were "***silenced***" on the train radios. As a result, said Cassity, "you don't know if it's working. . . . And so the theory is, as long as you're hearing nothing, then there's nothing wrong. The fact is, is that if the defect detector isn't working, you have no way of knowing that."

214. Greficz, who had worked at Norfolk Southern as a conductor since 2005 and was also interviewed by the NTSB, corroborated Cassity's statement with his personal experience:

> So we're going down the rail on a freight train and back when the detector spoke to us, the detector would come right over the radio, it would monopolize the radio channel and you couldn't key over it, you couldn't talk over, and it would say hot box detector milepost 1-2-3, hot wheel bearing detected, axle 7-7-6, and then it would repeat it.
>
> And then the two would look at each other, meaning the two crew members[,] and the engineer would look over at the conductor and say, well, what is that? Right away they have access to the paperwork. Oh, that's a chlorine car, that's a flammable car, or just a salt car, it doesn't matter what the car is, but that may change immediately how things are. You immediately start to slow the train down . . . .

Greficz further noted:

> We used to be given a hot bearing detector over the radio where you can get an axle count, as we spoke on. That doesn't happen anymore.
>
> That's all handled by the wayside desk, they monitor the ambient temperature of the equipment and if they deem, through their discretion, that the crew needs to know, then they notify us. At the current present time, the crews are only notified if there's a critical alarm over the radio.
>
> Critical alarm . . . was that – stop your train, there's an imminent issue you need to address now. ***But as far as the incidents where it's deemed nonessential, so to speak, the crews are not notified of how we were before, trending hot or an overheated axle. We only get the critical alarm***.[6]

---

[6] There was, according to Sloper, some variation in this policy of silencing wayside detectors. Sloper testified to the NTSB that, in addition to the critical alarm

215. Greficz said that at Norfolk Southern, notifications from the wayside detectors are transmitted to the Wayside Desk, headquartered in Atlanta. The Wayside Desk is responsible for analyzing the notifications to determine which are actionable such that the train crews should be alerted and the trains potentially stopped and inspected, and which are not actionable, in which case the train crew would not be notified.

216. FE-13 also noticed that the Wayside Desk contacted conductors less frequently after the Company adopted PSR. This decrease in radio alerts led FE-13 to believe that the Wayside Desk had not alerted conductors when they saw elevated readings that should have triggered a notification.

217. Because train crews depended on the Wayside Desk to alert operators of any issues, FE-3 worried about the effects of removing train crews from the equation. The Wayside Desk might determine that a problem was not serious enough to warrant delaying the train to dispatch a crew to investigate it, "pos[ing] a safety risk" for those aboard the train.

---

notification, train crews in some Norfolk Southern territories would also automatically receive "no defect" notifications, but nothing in between.

218. Sloper, who had 24 years of service as a conductor with Norfolk Southern, explained during his interview with the NTSB that his experience was that the wayside detectors were not completely silenced, but it was either "no defect" or a "critical alarm," and nothing in between:

> [W]e still get the no defect transmission over the radio.
>
> ***But the only other time that we – the only other transmission we ever hear other than no defects is critical alarm, there is no in between***, and it used to be – we used to get stopped for hot wheels, hot bearings, things all the time, it wasn't uncommon years ago, you know, every second or third or fourth trip, that you had to walk your train to look for a hot wheel. Now it's – I haven't walked a train for a hot wheel in, you know, a year and a half because there's somebody in Atlanta that's saying that wheel's not that hot.

219. Sloper explained that this meant that, unless a train was experiencing an emergency that rose to the level of requiring an immediate stoppage, whether to inform the train crew of a defect or rising temperature was within the discretion of the Wayside Desk in Atlanta. Moreover, according to Sloper, train crews were not even notified that the Wayside Desk in Atlanta had taken over the monitoring of the wayside detectors:

> They never notified us of it, they just – we started – we just started noticing like I haven't had a hot wheel detector come off and say I have a hot wheel, stop and inspect, in years, you know. And the only time that detector ever goes off is when it is the critical alarm, meaning, you know – they've taken it out of the discretionary hands of Atlanta and this detector is detecting something that is so critical that they want you

> to stop right now. But all of the – like I said, the discretion has been given to the desk in Atlanta.

220. In addition to his concern that train crews were not able to receive important information in real time, Cassity also indicated that there was a fear that the Wayside Desk prioritized keeping trains moving over safety concerns when determining what information to relay to the train crews, and which instructions to give as a result of certain alerts. Cassity stated the following to NTSB investigators:

> [I]n East Palestine, you had defect detector number 1, no issue; defect detector number 2, no issue[;] ***defect detector number 3 had a 65-degree [Fahrenheit] increase above ambient temperature. In my knowledge and experience in railroading, there's not a world, as an engineer or a conductor, that I don't want to know about that, I have to know about that. That is a significant increase in temperature***.
>
> But because the defect detector isn't talking, I don't know what's going on . . . . ***And so we had a 65-degree increase, but we're not going to tell them that there's something to be cautious of or on the lookout for or worth inspecting, we're just going to let them keep moving*** . . . . And I'm telling you now, 65 degrees, the sun didn't just rise and warm up that axle, that did not happen, something was wrong. . . . [O]f course, ***derailment [occurred] almost immediately after [reaching defect detector number 4]***.

221. NTSB investigators asked Cassity what he thought the train crew would have done if they had received the alert of the "65-degree" increase, to which Cassity responded: "They would have stopped." Cassity testified further:

> [W]ith the 65 degree increase, regardless of the size of my train, I want to know about it and I want to see what's going on because if something's wrong, it's much better to stop and inspect than it is to take

> the risk and the risk is far greater, and keep that train moving, than it is from stopping . . . . I mean, you know, where that magic number is . . . I don't know, to be honest with you, ***but to say that there was a 65-degree increase within 15, 20 miles of each other, that's a problem that . . . should be looked at before taking off***.

222. In fact, even when train crews did receive information and data generated by the wayside detectors, they were increasingly instructed to ignore that information, according to Cassity.

223. FE-7 voiced concerns regarding the proper communication of alerts from the Wayside Desk to the train crews, and stated that he believed that sometimes the alerts were not given the appropriate level of importance by the dispatchers. FE-7 explained that dispatchers communicated with the train crews, and if necessary, the chief dispatcher, to determine whether to stop a train for inspection and maintenance. FE-7 recalled that the questions asked following an alert along the rail lines were "[w]hen is the best time to deal with this?" and "where do we send the train?" rather than prioritizing immediate resolution of the issue. In fact, FE-7 noted that often the alerts were not relayed to the yard in time for yard workers to address the issue while the train was inbound into the yard, which compounded potential problems and delays when the train was outbound. As a result, FE-7 recalled the chief dispatcher in Atlanta sometimes giving the instruction to allow the train to run to the next stop, perhaps at a lower speed.

224. FE-6 similarly recalled receiving orders to just decrease speed when his train's journals "were trending hot" rather than stopping to conduct a full inspection.

225. FE-8 likewise stated that Norfolk Southern dispatchers pushed trains to get to their destinations on schedule even after being told that a detector alert had been received that required the crew to stop and inspect the train.

226. Former employees reported that Norfolk Southern kept track of delays in the daily train schedule very closely. FE-8 indicated that Norfolk Southern used a program called "Remedy" to track the detector alerts daily and the tickets created when maintenance was required. According to FE-8, Remedy was accessible by "supervisors and higher-ups," and was used to create a daily delay report that would be disseminated every morning to different departments. The VP of Engineering, different supervisors, and the heads of different departments would discuss the delay report on a daily basis during a remote meeting. FE-8 said his department received a lot of pressure from the "higher-ups" to look into delays reported in the daily reports.

227. FE-4 stated that due to pressure to stay on schedule, the desk operators in Atlanta "would tell you to wait till the next terminal for mechanical to inspect [any warm or hot bearings]," which could have been 25 miles away.

228. FE-11 described two examples of shortcuts that Norfolk Southern employees were forced to take in order to avoid disrupting the schedule. First, FE-11 stated that many times, trains that should have been stopped in order to let an over-heated wheel cool down were directed to continue on because there was pressure from the "***top down***" to keep trains moving. Second, FE-11 described that many times when trains had a stuck brake, the conductor or engineer would attempt to "set and release" the wheel's brake to correct the problem. If the wheel could then roll, the engineer was expected to move on with the train. FE-11 explained that the risk involved with the "set and release" practice was that sometimes the brakes may lack sufficient air pressure which could cause the brake to stick as the train began moving again, leading the wheel to lock up and slide down the rail instead of rolling, which increased the risk of a derailment.

229. FE-5 recalled one or two times when the Wayside Desk instructed his train to continue running to a further location even though an alert sounded that warranted stopping for an immediate inspection.

230. In the NTSB interview, Greficz further explained the problem with the "one-size-fits-all" method in which Norfolk Southern's Wayside Desk controls when to alert train crews of potential problems:

> [I]t used to be, we – the [detectors] would communicate directly with us, we'd know what's going on. So they modernized a few, so to speak, their [detectors] to where they're trending hot, you know, they got all the temperature settings and all this other stuff.
>
> We don't know any of that information in the field and there's no train-specific information, it's a one-size-fits-all shoe. So if Tim's operating a bomb train and he's trending hot, he still didn't hit that threshold, these people that aren't railroaders, they're running the railroad, they don't know that this guy's got Class 3 flammable or chlorine cars, they just say it doesn't meet the threshold.
>
> That's not the same as Rusty being on a grain train or a salt train that's trending hot that may not be, you know, as important, but again, it's – the push to run everything, the push to get everything out the door, the crew doesn't know anything, we have no information until it's absolutely too late.

A "bomb train," as Cassity later explained, is one that "meets a certain threshold for hazardous materials" in the train's consist. Specifically, a bomb train, or a "high hazard flammable train" refers to a single train transporting a continuous block of loaded tank cars with a flammable liquid, such as petroleum crude oil or ethanol, or a train with 35 or more tank cars loaded with flammable liquid dispersed throughout the train. But as Greficz summed up: "We [crews aboard the train] don't communicate with the [detectors], they don't communicate with us, we don't know anything unless it's like you've seen in East Palestine where 'critical alarm, you're train's about to fall off the rail.'"

### I. Norfolk Southern's Wayside Desk – Covering Its Entire Rail System – Was Staffed with a Lone Individual Working a 12-Hour Shift

231. Compounding the problem of train crews unable to monitor wayside detectors was the fact that the Wayside Desk was chronically undermanned. According to Rambo, who was working at Norfolk Southern's Wayside Desk during the East Palestine Derailment and who testified during the NTSB's subsequent investigation, there was only one employee who worked the Wayside Desk at a time, and that person was responsible for monitoring alerts from the entire Norfolk Southern system. Rambo, who, at the time of the East Palestine Derailment had worked on the Wayside Desk for over six years, noted that during a twelve-hour shift, it was ***typical to receive around 300 alerts***, which works out to an average of one notification every two minutes.

232. Rambo testified that, during shifts at the Wayside Desk, there was only ever one person working. Part of his job, he noted to NTSB investigators, was "prioritizing multiple alerts and alarms" if they came in at once so he would have "to multitask and juggle, you know, because working the desk, you can have multiple crews toning you up. You've got phone calls coming in. And then I'm look[ing] to the alerts that are coming in too at the same time . . . ."

233. During a typical day/shift, the Wayside Desk received about 300 alerts from across the Norfolk Southern network. According to Rambo, because only one person worked the Wayside Desk at any given time, "[i]f you get overwhelmed, say you have multiple alerts coming in," there was nobody else to assist with the work. However, if there was an "emergency," Rambo said that he could call his boss who would "step in."

234. Rambo stated that the 12-hour shifts at Norfolk Southern's Wayside Desk were without breaks:

> [NTSB]: Who covers for you when you need a break?
>
> [Rambo]: There was no one covering.
>
> [NTSB]: Okay. So how long do you get for a meal break?
>
> [Rambo]: We don't have them.

As a result, Rambo and other ATC analysts would need to leave the Wayside Desk unmonitored to use the restroom and obtain food:

> [NTSB]: . . . So when you have to take a break to use the restroom or eat your food, are those radio calls recorded and sitting in a queue like an answering machine?
>
> [Rambo]: No.

235. Previously, ATC analysts had employed two people at a time, one ATC analyst and one person in a "research role" who would be able to help when the ATC analyst was especially busy – Rambo referred to this as "getting pummeled" – to

"assist during a shift." According to Rambo, ATC analysts required the help of the person in the research role "fairly frequent[ly]" and "a few times per shift." However, "once job cuts came in" the research role was eliminated, and ATC analysts were not provided with any additional training or instruction to help them adjust to running the Wayside Desk in a solo capacity.

236. Thus, when the Wayside Desk received the initial alert that notified a "bearing spike of 103 degrees" on Train 32N, prior to the East Palestine Derailment, Rambo "didn't see it" because he was attending to "three other trains" that were generating alerts via wayside detectors.

237. Other former employees corroborated Rambo's experience. FE-8 was a system support engineer who worked with the Signal Help Desk at Norfolk Southern's Atlanta headquarters, which worked alongside the Wayside Desk. FE-8 corroborated Rambo, stating that the Wayside Desk was understaffed as Norfolk Southern employed only eight workers to cover a desk that required coverage 24 hours a day, all year long. Instead, FE-8's department was required at times to assist the Wayside Desk in monitoring detector hits. FE-8 received some on-the-job training, but admitted never feeling "comfortable" covering the Wayside Desk because it was a "different department" that required "different expertise." But, Norfolk Southern "didn't want to add workers" to the Wayside Desk.

238. FE-1 noted that the response time when contacting the dispatcher increased after PSR was implemented. FE-1 explained that before PSR, a dispatcher would respond almost immediately to calls; but, after PSR, it could take anywhere from 10 to 30 minutes for a response.

239. Fannon indicated to NTSB investigators that, as the frequency and rigor of inspections fell and trains started going "on the road" with defects that were no longer being caught, crews were more reliant on wayside or "hot box" detectors to ensure the safety of their trains. But Fannon noted that this reliance on the Wayside Desk was untenable:

> There's no alarm going off until it gets to a critical state and the alarm out in the field would go off. But this hot box detector desk is supposed to be watching this. ***Well, if they're busy doing something else, they may miss this one. So human error can still miss something, it's just that it's a global scale when you have one desk doing it for the entire system***.

### J. Norfolk Southern Disciplined and Retaliated Against Employees Who Voiced Safety Concerns

240. Norfolk Southern's implementation of PSR created a dangerous situation in which defects and potential safety issues were mounting, yet the Company was unable or unwilling to deal with them appropriately. Rather than remedy this situation, Norfolk Southern instead discouraged its employees from identifying defects in the first place.

241. The upshot of this, according to Cassity, a SMART representative, was that, since the implementation of PSR at Norfolk Southern, "if a conductor or an engineer brings up an issue or identifies a defect, ***all too often the instruction is for the crews to ignore it or to take it anyway***" – *i.e.*, the train crews were often instructed to take the trains on their scheduled routes even though the trains contained defects. According to Cassity, "this shift to efficient or timely movement at all costs . . . is now the priority and what used to be commonsense measures no longer matter in the industry anymore."

242. Norfolk Southern, according to Arouca and Cox, two other union officials, also put tremendous pressure on its craft employees to adhere to the new one-minute inspection requirement. Arouca showed NTSB inspectors a video that "one of our guys took showing a local manager ***threatening discipline if they don't get their inspection times down***." When asked what level the manager was at Norfolk Southern, Cox responded that it was the "[s]enior general foreman, the highest on-property manager you can get for mechanical operations." Cox further explained that the foreman in the video was saying that "***his bosses are telling him to do this***. So right there is ***an immediate link to railroad-wide policy***, not just some rogue single manager." As Arouca agreed when later referring to the video: "[I]t's really this ***top-down stress***."

243. Arouca further detailed that the union had posted it on Twitter and "intended to show it [to] Senate Commerce." But the employee who had taken the video had faced pressure as a result, and that "[s]omebody on the property asked him a question about it and ***he felt scared, and so he asked us to take it down***." Cox stressed the sensitive nature of the video, stating that "[t]he retaliatory nature of this industry cannot be underexaggerated [sic]."

244. In addition to instituting shorter and more limited inspections as a matter of policy, Cox and Arouca reported that Norfolk Southern was actively discouraging its workers from reporting the defects that they were able to identify. Cox said that as an example of a "link" to "business practices and the safety culture," carmen reported that management would not require them to work "extra overtime" if they "just stop[ped] loading the repair track with bad order cars. In other words, you know, play ball with us and we'll play ball with you."[7] Arouca characterized this as an incentive to "***stop finding defects***," and concluded, "***that's kind of messed up***."

[7] A "bad order" is a railcar marked by a carman as having a mechanical defect and which should not move until the necessary repairs are made. Bad orders are marked with "bad order tags."

245. FE-14 corroborated Cox and Arouca's statements, stating that there was a feeling amongst employees that management preferred that they ignore safety problems rather than find them. Prior to PSR, if people reported a safety issue, it would be checked out and employees were praised for flagging it. After the implementation of PSR, management would tell the employee that the issue is "not unsafe, just go" and employees were then punished for bringing it up.

246. When asked by the NTSB what happens when workers are injured working at the railroad, Cox responded that "particularly on the Norfolk and Southern line, if you experience an injury and it is reported, there will be a discipline hearing on you 100 percent of the time." The NTSB investigator sought confirmation:

> [NTSB]: If you report injury –
>
> [Cox]: A discipline hearing, yes.
>
> [NTSB]: – there will be a disciplinary hearing?
>
> [Cox]: There will be a disciplinary hearing. ***I've never known any railroad [that] is as flagrant about that than the Norfolk and Southern is***. And it's a blame, it's a finger-pointing mission, I guess would be the way – best way I could describe it."

Thus, in such "a finger-pointing mission," according to Cox, an injury is cast as "the employee's fault," while Norfolk Southern's response was that "it definitely wasn't the railroad's problem."

247. FE-19 also recalled Norfolk Southern's culture of pinning responsibility on employees – rather than processes – when incidents occurred. According to FE-19, Norfolk Southern's default was to blame employees' "shortcomings" for any safety incidents. And if someone complained, Norfolk Southern targeted them for reassignment. For example, FE-19 recalled employees mentioning to management that they were feeling fatigued from working extra hours due to all the layoffs and that a tired workforce might result in increased safety issues. Management turned "ferocious" toward the employees and went "into attack mode," rather than resolve the staffing shortages.

248. Cox, in his interview with the NTSB, also noted that, while there was a process in place for employees to report unsafe conditions or safety concerns, "there is very little engagement right now because of the retaliatory culture that I've alluded to previously." Expanding on this, Cox said that, because there is not an anonymous way to report safety concerns, if employees made a report they would be treated as a "thorn in the side" and that employees who spoke up would be subjected to increased scrutiny until they made "a mistake." He explained that ***reporting an unsafe condition "put a target on your back,"*** making it "incredibly easy for them to discipline you in the week following":

> All they have to do is walk around and make sure you miss a safety handhold or whatever. They write you up, you know, and say, well you missed all this stuff. You know, they're the ones forcing you to miss all of it or even often telling you to take the – rip the bad order tags off. I mean, it's really – that's why it's so hard, so rare to get a lot of this stuff out. These guys are very, very scared in a lot of respects.

As Cox summed it up, in Norfolk Southern's safety culture, carmen were "***[i]ncentivized to not find issues***."

249. Consistent with other witnesses, several of the SMART union officials testified to Norfolk Southern's retaliatory culture when dealing with its employees' safety concerns. Cassity explained that there was a constant pressure to complete tasks as quickly as possible, which effectively coerced employees to cut corners:

> [W]hen you're not running a fundamental railroad you have to find other ways to get people to comply and so the threat is if you don't do what I'm telling you, I'm going to fire you and if I tell you to do something that's not safe, I will now be more apt to do that out of concern that I'm going to lose my job if I don't.
>
> ***And so there's this constant pressure to get the train out of the yard, to get the cars switched out, there's this constant pressure with every task you're given that you almost have to cut corners because they want you to cut corners***, you know that, they won't say that, they won't put it in writing, but that's the expectation and the belief you're all under at all times that your job is to do it as quickly as possible and if you don't do that, then you know they're going to come after you and find a reason to fire you.

250. Cassity continued to explain that Norfolk Southern employees who wanted to "approach it from a more safety oriented approach, if you will, typically find themselves being targeted by the managers for termination or discipline."

251. Pitts characterized what Cassity described as "***[i]ntimidation***."

252. Issues with maintenance of train equipment were "not really discussed" according to FE-14. Management stressed keeping the train moving. FE-14 recalled that if an employee raised a problem, superiors reacted to it with "a nervous laugh." The next time the employee spoke out about it, "he or she was probably fired."

253. Cox had the following exchange with NTSB investigators:

> [NTSB]: And because of the safety culture issue, your experience has been – with the carmen have been, ***for fear of reprisal or retaliation from Norfolk Southern management, they would be hesitant to report safety issues to their managers. Is that what you're saying?***
>
> [Cox]: ***Absolutely, that's what I'm saying***.

Arouca agreed with the above exchange "100,000 percent." NTSB investigators again clarified, asking "would you say that . . . employees are disincentivized to . . . report injuries . . . because of fear of retaliation?" Both Cox and Arouca answered that this was "1,000 percent" accurate. FE-20 likewise said "Norfolk Southern is good at retaliations."

254. Even when carmen did identify defects, they would sometimes get pushback from supervisors. Cox said that he knew of instances when supervisors would question or even remove "tags" or "bad orders" – indicators that a car needed mechanical repair work – from cars after tags were placed by carmen:

> So there are instances where carmen have been harassed or told by the supervisor, oh, I don't see that as a defect, you need to go out there and remove the tags from the car. Or the supervisor, he'll go out in the yard and the tags will disappear from the car and the cars get released in the system.

255. FE-6 believed tagging a "bad order" became a bigger issue after PSR because it meant tying up a train and delaying its schedule. When an employee created a "bad order" tag, "the trainmaster would escort you the rest of the time in the yard" until the tag was removed, the problem remedied, and the train sent on its way. According to FE-6, these escorts were not meant to help, but rather "to intimidate you" to move faster.

256. FE-17 corroborated that employees were afraid to get involved in reporting problems because Norfolk commonly retaliated against employees who spoke up about safety issues. FE-17 believed Norfolk "marked" employees that complained about safety in order to somehow get back at them for voicing their concerns.

257. As the accounts of current and former employees of Norfolk Southern demonstrate, the Company's determination to put operating efficiency over safety went beyond ignoring commonsense measures, and veered into the creation of a retaliatory work environment where employees were punished when they raised potential safety issues or concerns.

258. According to FE-7, defects found during inspections, known as "bad orders" within the Company, were subject to goals such that "only a certain percentage of cars were supposed to be bad orders." FE-7 explained that the goal came from a Mechanical Administration Team in Atlanta via the Divisional Managers and Senior Foremen, and stated that there was pressure from the trainmaster to meet the goal. FE-7 further stated that there were constant conversations about bad orders, for which there were daily reports generated, and if the bad order percentage was too high, then yard supervisors had to attend numerous conference calls to explain themselves. FE-7 recalled that "the bad order goals and the pressure to reach the goals ***may have incentivized the carmen to walk past components of the cars that should have been repaired***." FE-7 indicated that there was an unofficial "naughty list" for carmen who spent too much time on inspections and went over the new time limits imposed by management.

259. FE-10, who worked in Ohio as a terminal supervisor from 2020 to 2022, described a similar reluctance about raising safety issues within Norfolk Southern. According to FE-10, "[i]t was not appropriate to bring up safety issues during the daily morning call" with the Divisions because it was outside his strict chain of command, and he likewise felt uncomfortable speaking about safety with his immediate supervisor who would "hold grudges" for bringing up such topics.

260. FE-1 stated that when it came to raising concerns about safety, people did not "dare say anything, but people may have dug their heels in if it was serious." Still, there were consequences for delaying a train, including for example, a Delay of Train Violation – a general reprimand that was not clearly defined. FE-1 recalled that management would closely watch employees to find a fault that would warrant issuing a Letter of Reprimand which would become part of an employee's permanent record. Multiple violations could result in termination. FE-1 said because of the fear of reprimands, "morale was miserable."

261. In instances where Norfolk Southern employees had spoken up about safety concerns or defects on cars, Cox recounted they were often "harassed" by their supervisor or told to "remove the tags" from the cars that indicated the car needed to be taken out of service for repairs. FE-7 also stated that ***"sometimes the supervisors would override the carmen when a carman had designated a car as a***

***bad order*"** and that "[m]any of the carmen would keep notes when this occurred so they had a 'CYA' record."

262. FE-17, a mechanical supervisor employed during the Class Period in Georgia, said it was commonplace for Norfolk Southern management to force locomotives to complete trips even if the cars needed "significant repairs." So long as a train was "capable of moving," orders from management were to "shoot it out" of the yard. According to FE-17, "all that mattered" was the number of trains pushed out each day.

263. Arouca told the NTSB that, in essence, Norfolk Southern's new safety policy was to simply tell its employees to "***stop finding defects***," and shared emails and videos with the NTSB of Norfolk Southern managers and supervisors pressuring their subordinates to decrease inspection times. This, according to Arouca, is a clear sign that the culture of intentionally ignoring safety concerns and punishing employees who speak up was orchestrated at the highest levels within the Company.

264. Norfolk Southern was thus able to maintain the façade of safety regarding its PSR efficiency objectives, not by actually practicing efficient and safe railroading, but by eliminating the ability and willingness of its staff to identify or acknowledge defects, and by knowingly sending dangerous trains out onto the tracks.

### K. Norfolk Southern Flouted FRA Regulations by Implementing a Purely Symbolic Risk Reduction Plan

265. As part of its efforts to ignore ongoing safety problems in furtherance of its PSR agenda, Norfolk Southern blatantly defied federal requirements that it work with the labor unions when developing safety plans required by the FRA.

266. Under 49 C.F.R. Part 271, the FRA requires all railroad operators, including Norfolk Southern, to compile and submit a Risk Reduction Program ("RRP"). The regulations mandate, in part, that Norfolk Southern engage in "proactive collaboration between labor and management." In adopting the requirement for the RRP, the Department of Transportation and the FRA noted the importance of labor and employee involvement in the process, stating:

> An RRP will affect almost all facets of a railroad's operations. To ensure all railroad employees an RRP directly affects have an opportunity to provide input on the development, implementation, and evaluation of a railroad's RRP, the rule requires railroads to consult in good faith, and use their best efforts to reach agreement with, such employees on the RRP plan contents and any substantive amendments to the plan.

267. Union officials Cox and Arouca noted that before PSR, these "labor-management safety committees" and related meetings had been "a great forum for employees to voice their issues." At Norfolk Southern, these committees had operated at a local level that included representatives from the local car shop, yard operation, track repair, and signal operation, and would discuss outstanding issues



4879-1894-0589.v6

in the yard. However, Norfolk Southern's implementation of PSR put a severe strain on labor's relationship with Norfolk Southern management due to management minimizing the Company's focus on safety.

268. When Norfolk Southern met with labor during the development of the RRP after the implementation of PSR, labor found it to be a distinctly one-sided affair.

269. Cassity, who had first-hand experience in negotiating with Norfolk Southern on behalf of labor during the creation of the Company's RRP, told the NTSB that, in defiance of the regulations, labor's consultation with management at Norfolk Southern was "laughable" and that "***Norfolk Southern was not willing to hear what labor had to say***." The unions, Cassity stated, "had very serious concerns with the language and the text of [the RRP] and the way it would be applied. ***All of that fell on deaf ears***."

270. In lieu of taking the RRP process seriously, and listening to and collaborating with the unions regarding safety concerns, Norfolk Southern "***did just enough to make it look as though they were again checking the boxes***." Cassity noted that Norfolk Southern's RRP following the implementation of PSR was "a pointless program because it does nothing."

271. Other union officials and former Norfolk Southern employees corroborated Cassity's statements regarding Norfolk Southern's RRP. Cox, in his interview with the NTSB, stated that Norfolk Southern submitted its RRP for approval to the FRA without consulting labor, and refused to allow labor to have any say in the development of the plan.

272. FE-4 also stated that Norfolk Southern employees from various crafts including maintenance, mechanical, transportation, conductors, trainmasters, and others, met for a Safety Committee Meeting in Portsmouth, Ohio every month. To cut costs, Norfolk Southern reduced the meetings to every 90 days because the Company did not want to pay employees to attend these meetings. FE-4 stated that Norfolk Southern employees raised a variety of issues during these meetings including the widening distances between hot boxes, staffing cuts, and the impacts on safety. However, FE-4 explained, everyone in attendance knew that the policies of upper management would not allow for any changes to address these larger issues.

273. According to Cox, "[w]hen precision scheduled railroading came down," the safety committees were "looked upon as a waste of resources." The result was that "[n]othing was fixed unless it actually got to the point that it broke." The elimination of these committees was characterized as "***utterly insane***" by Arouca given the "dangerous environment" in which railroad employees work and

the "unstoppable/immovable forces" involved. According to Fannon, Norfolk Southern "had a safety committee . . . that met monthly and all crafts and management [were] on these safety committees. [Norfolk Southern] disbanded them." He continued:

> So how can the company say safety is our main focus when safety is no longer having a meeting and you no longer had a local voice to tell the management hey, I got weeds here, I got bad footing there, I've got a derail or a switch hard to throw at an industry or they're doing this at an industry, there was nothing to tell NS, along with that, that was part of their issues with PSR was that they were spending too much money on safety committees and they disbanded them.

274. When the FRA required that these meetings take place as an aspect of Norfolk Southern's RRP, Norfolk Southern simply neglected to seek out any union input. Cox recalled that "I participated myself in these. They would have a[n] online conference meeting . . . and it wasn't a what should we do to implement this; it was this is what we're going to do." When the unions pushed back on this, Norfolk Southern's response, per Cox's statement, was "we've already submitted our structure for approval." This was characterized by Arouca as "box checking 101."

275. By submitting an RRP for approval by the FRA that, according to union leaders, included zero input from the unions that represented the employees who operated Norfolk Southern's trains, Norfolk Southern was able to achieve a regulatory rubber stamp of approval for its safety policies, even as it had actively

undermined the safety of those very union members and of its railroad operation in general.

## VIII. DEFENDANTS CONTINUED TO PLACE EFFICIENCY OVER SAFETY FOLLOWING THE EAST PALESTINE DERAILMENT AND ENGAGED IN FURTHER DECEPTION THAT RESULTED IN THE UNNECESSARY EXPLOSION OF TOXIC CHEMICALS

276. By implementing a severe form of PSR that – in truth – did not maintain safety as a priority, Defendants all but ensured that at least one of its over-long, overloaded, undermanned, under-inspected, and under-monitored trains would derail. On February 3, 2023, Norfolk Southern's policies that put short-term profits and efficiency above safety – or, as defendant Shaw admitted, manifested "a near-term focus solely on profits" – led to the East Palestine Derailment. Once the derailment occurred, the same policies that placed expediency and profits above safety were in effect as Norfolk Southern deceived emergency personnel, the Ohio governor, and the public about the risk that the vinyl chloride could combust. The truth, as Norfolk Southern knew, was that the cars carrying the vinyl chloride were stabilizing and had no risk of self-detonating from a runaway chemical process called polymerization: "***[C]onclusive***" scientific evidence proved the opposite. §VIII.K. Nevertheless, in a page from its PSR playbook, Norfolk Southern sought to clear the tracks and resume running its trains as quickly as possible. At the

expense of the East Palestine community and the residents of broader Ohio and Pennsylvania, Norfolk Southern falsely claimed that a controlled explosion of the vinyl chloride was necessary to prevent the cars from self-combusting.

### A. As Fires Erupted, Norfolk Southern Destroyed Evidence, and Instructed Local First Responders to Leave the Scene

277. On Friday, February 3, 2023, at about 8:54 p.m. local time, eastbound Train 32N derailed on main track 1 of the Norfolk Southern Fort Wayne Line of the Keystone Division in East Palestine, Ohio. The outside temperature was approximately 9°F.

278. Fire erupted as soon as the train crashed. A police detective arrived on the scene shortly after the crash and observed an "inferno." The initial fire was severe because several cars that broke open were carrying combustible liquids that spread, ignited and triggered fire. Aerial images from Friday night show the resulting fire:



279. Immediately after the derailment explosion, Norfolk Southern officials moved the locomotive from the crash scene and destroyed relevant evidence in the process.[8]

280. At approximately 11:45 p.m., one of Norfolk Southern's hazardous materials executives, Scott Deutsch, arrived on the scene. Around the same time,

---

[8] These facts came to light at a Senate hearing. An NTSB official testified that "video recorders in the locomotive cab are essential for helping investigators determine the cause of an accident and make more precise safety recommendations." The official testified that the locomotive had an inward-facing camera. "However, since the locomotive was put immediately back into service following the accident, the data was overwritten. That means the recorder only provided about 15 minutes of data before the derailment and five minutes after." Senator Cruz of Texas responded to these facts: "[A]nytime there is a locomotive involved in a serious derailment, ***it is lunacy that that video is not preserved*** and that locomotive is put into alternative service."

Norfolk Southern instructed all first responders – other than themselves and their agents – to leave the crash scene. And they did, leaving only Norfolk Southern personnel on the scene.

281. By late that evening or early Saturday morning, Norfolk Southern informed authorities that some of the cars contained hazardous and flammable materials including five cars that carried vinyl chloride. Vinyl chloride, also known as vinyl chloride monomer ("VCM"), is a hazardous and flammable chemical and known carcinogen. The cars carrying VCM were designed pursuant to Department of Transportation safety requirements. Among other things, the cars had pressure relief devices that would allow the vinyl chloride to "vent" through a large valve in the center of the cars. The pressure relief devices would vent pressure only if the pressure inside the vinyl chloride cars reached (conservatively) 247.5 pounds per square inch gauge (psig) because the cars were built to a specified "test pressure" of 300 psig – a pressure the chemical could generate only if it reached a temperature of more than 185°F.[9] The cars would burst only if the pressure exceeded 750 psig or about 310°F.

---

[9] The test pressure is the pressure at which the tank car was hydrostatically tested to withstand leakage at the time of construction.

282. All of the cars carrying vinyl chloride did "vent" immediately following the derailment because they were exposed to the heat from fires ignited by flammable liquids that were released at the time of the crash by other cars. The fires from these other cars "led to [the VCM five cars'] pressure relief devices venting pressure and re-closing after normal pressure was restored within the tank cars," which was "part of the normal functioning of [the] tank car's thermal protection system." "All vapor released through the pressure relief devices ignited, as is typical in most derailment scenarios involving flammable materials where sources of ignition are present."

283. It was cold in East Palestine that night. Ambient temperatures ranged from a low of 7°F-10°F.

**B. Norfolk Southern Tried to Quickly "Restore [T]rain [O]perations" While Experts at Oxy Vinyls – the Producers of the Vinyl Chloride – Swung into Action**

284. During the morning of Saturday, February 4, 2023, defendant Shaw and Norfolk Southern's top hazmat official, Robert Wood traveled by corporate jet from Atlanta to Pittsburgh, Pennsylvania. The rest of the Norfolk Southern team – Scott Deutsch (regional hazmat manager), Paul Williams (regional hazmat manager), Jon Simpson (hazmat manager) and Scott Gould (hazmat manager) – were already on

the scene. The Norfolk Southern team's command post was located alongside local responders at the East Palestine fire station.[10]

285. At 11:13 a.m. on Saturday, February 4, 2023, the Norfolk Southern team completed a written incident briefing report, stating one of the Company's immediate objectives: "***Restore train operations***."

286. Also during the morning of Saturday, February 4, 2023, officials from Norfolk Southern contacted the company that both manufactured and loaded the vinyl chloride onto the cars – OxyChem, who made the chemicals via its affiliate Oxy Vinyls LP, the largest manufacturer of vinyl chloride in the United States.

287. Oxy Vinyls responded quickly to Norfolk Southern's call. By approximately noon on Saturday, February 4, 2023, Oxy Vinyls activated its "special situations" team in Dallas – the team responsible for managing emergencies. Paul Thomas of OxyChem led the team of about nine other executives who were manufacturing directors or technical directors from Thomas's group.[11] They collected information on the derailment.

---

[10] The command scene moved to the local school after the Norfolk Southern team persuaded Governor DeWine to issue an urgent evacuation notice on Sunday night. §VIII.J.

[11] A Chemical Engineer, Thomas is VP of Health, Environment, Safety, and Security for OxyChem, reports to the president of the company and worked for the

### C. By Saturday, Fires "[R]educed in [I]ntensity" and the Vinyl Chloride Cars Began Cooling

288. Meanwhile, in the afternoon of February 4, in East Palestine, an NTSB official investigating the derailment addressed the public in a media briefing. Below is an image of the derailment site about the time that the NTSB addressed the public; train cars identified in this Complaint as Cars 1, 2, 3, and 4 travelled one after the other toward the front of the train travelling East:




289. Another image from Saturday afternoon shows the location of all of the cars, and the distance between the cluster of Cars 1-4 relative to the location of Car 5:

---

company for 29 years. He was responsible for OxyChem's vinyl chloride manufacturing facilities, a role that included emergency oversight.




290. These images agree with two points the NTSB official made at the Saturday afternoon media briefing. First, the NTSB official reported that there were still fires active in the derailment, but that overnight they had "***reduced in intensity***." Second, "at least" one of the vinyl chloride cars was still "releasing the contents of the car through a pressure relief device, as designed." The above image shows both that the fires had reduced in intensity and that at least one car (here, Cars 3 and 4) were venting vapor next to a car that was on fire, immediately following those two.

291. On Saturday, February 4, 2023 – from approximately 5:30 p.m. to 6:40 p.m. – one car's pressure relief device (Car 3, annotated above) vented then reclosed as is normal and typical. "This was the ***last time***" – the NTSB explained – that "***any*** of the vinyl chloride tank cars vented material through their pressure relief devices." Thus, the temperatures in the five vinyl chloride cars never again rose above approximately 185°F – the temperature necessary to cause the cars to vent.

### D. Vinyl Chloride Producer Oxy Vinyls Told Norfolk Southern that the Cars Carrying the Vinyl Chloride Faced "Extremely Low" Probability of Polymerization and Provided Norfolk Southern with a Way to Know "Exactly" What Was True

292. On Saturday, February 4, 2023 – at approximately 6:00 p.m. – Oxy Vinyls and Norfolk Southern's Contractor, Specialized Professional Services, Inc. ("SPSI"), held a conference call to discuss Oxy Vinyls' cars in the derailment. The call included the Oxy Vinyls' experts in vinyl chloride (Thomas, his "special situations" team and other managers) as well as Norfolk Southern representatives (including John Simpson, SPSI president Drew McCarthy and others from the Norfolk Southern team). Oxy Vinyls was "there to provide technical guidance on our products to help inform [Norfolk Southern's] decisions."

293. On that call, Oxy Vinyls' team of experts educated the Norfolk Southern team about the reasons why there was an ***"extremely low probability"*** that any of the Oxy Vinyls' tank cars carrying vinyl chloride were undergoing a runaway chemical reaction known as "polymerization." The Norfolk Southern team said that Car 3 had acted "abnormally" in venting periodically for up to 10 hours before venting for about an hour as shown in the above image. This observation led the Norfolk Southern team to speculate that Oxy Vinyls' product was undergoing polymerization; but they were wrong, as they quickly learned.

294. Even though Thomas had already concluded that there was an "extremely low probability" that any car was undergoing polymerization, Oxy Vinyls' team of experts instructed the Norfolk Southern team that there was a clear way to know for sure that the cars were not undergoing polymerization. Thomas told them, in substance, "I think it's extremely low probability that it's polymerization," and that "if you can take a ***temperature on the car, then you'll know exactly what's happening*** inside [the] car." Thomas told them:

> You know, I'm telling you, I think it's extremely low probability, but you need to know because you're going to have folks up there, so if it's – if you can ***go get a temperature, then you'll know what's happening***. It's a very exothermic reaction, extremely exothermic polymerization reaction, and so there's ***no way for that to be going on without it leaving a signature in temperature***, if you can get one. So that's kind of what I remember about Saturday evening**,** you know, and the conversations about that one car and then, you know – you know how you know if polymerization is going on, you got to get a temperature.

295. Oxy Vinyls' team also explained to Norfolk Southern's team that once polymerization starts, the temperature "continues to rise, ***it doesn't go in reverse***" – in other words, it "won't rise a few degrees" and "then start dropping."

296. In other words, as Thomas explained, Oxy Vinyls "made it clear" to the Norfolk Southern team, "based on ***our expertise of the chemical properties of our product***, that stabilized VCM would be unlikely to spontaneously polymerize under

the conditions described to us by Norfolk Southern and its contractors." "Polymerization of VCM is a very exothermic reaction" – Thomas recalled telling the Norfolk Southern team – "which generates significant heat resulting in increased pressure within its container," and that if "that pressure is not relieved, it can cause a failure of the container," but an "uncontrolled VCM polymerization reaction would have an ***obvious temperature rise that would continue throughout*** the duration of the exothermic reaction." "For this reason," according to Thomas, "we emphasized to Norfolk Southern and its contractors the importance of monitoring the temperatures of the rail cars."

297. Saturday was another cold day in East Palestine. Ambient temperatures ranged from a low of 7°F to a high of 32°F.

### E. The Oxy Vinyls Experts Told Norfolk Southern (Again) that the Vinyl Chloride Cars Were Not Undergoing a Runaway Chemical Reaction and Informed Norfolk Southern (Again) Exactly How to Know for Sure

298. By the morning of Sunday, February 5, 2023, emergency responders "mitigated" the fires around Cars 1-4, as NTSB officials explained, and this image from that morning shows:




299. That same morning officials from the Oxy Vinyls special situations team of experts and the Norfolk Southern derailment team had another call. For the first time, the Norfolk Southern team told Oxy Vinyls that they wanted to "vent and burn" the VCM cars – that is, blow them up.

300. Oxy Vinyls disagreed with Norfolk Southern's claim that the vinyl chloride that Oxy Vinyls itself manufactured was undergoing an irreversible runaway "polymerization" that could only be addressed by way of Norfolk Southern's "vent and burn." As Thomas would later explain, an Oxy Vinyls' VP of manufacturing told the Norfolk Southern team on the call "something to the effect, you know**,** polymerization's not occurring," he said, "let me be clear, polymerization is not occurring." Oxy Vinyls told the Norfolk Southern team:

> [I]f you're talking about a vent and burn decision, ***don't do it because of polymerization, because polymerization is not occurring***, that was the gist. So he was just trying to communicate vent and burn may have ***other motivators*** for it, but don't do it because of polymerization because it's not occurring and he was pretty absolute with that statement.

301. Thomas recalled additional details, stating:

> We had over 250 years of vinyl and PVC manufacturing experience on the phone, and so, we're just trying to pool all of that knowledge to help the individuals that are on the ground.
>
> * * *
>
> We didn't believe polymerization was going on, but more importantly, I think what we told them is how they could know for sure. Don't take my opinion for it when it's your safety at risk. You go prove to yourself if it's safe to get a temperature, as they well describe, you would know for sure because these reactions are extremely exothermic. And if you're talking about rupturing a railcar, you're talking about being at ***320 degrees***, and you can take that temperature ***anywhere on the railcar skin*** and know you've got a problem. So, it's a long way to go, and it will be very obvious if you have that reaction going on.

302. When the call ended, the Oxy Vinyls team of experts instructed an Oxy Vinyls process engineer named Steve Smith to go to East Palestine and provide technical support.

### F. Norfolk Southern Knew that the Five Vinyl Chloride Cars Would Not "Burst" Until They Reached over 300° Fahrenheit

303. Smith arrived at the crash site at approximately 2:00 p.m. on Sunday, February 5, 2023. Shortly thereafter, he had a meeting with SPSI in their trailer and

then had another meeting with Norfolk Southern and the NTSB in a nearby fire station. At both meetings, the parties had questions about polymerization, but Smith was getting up to speed on the situation and told everyone present that he was not an expert in polymerization and would need to communicate with the Oxy Vinyls experts in Dallas and get back to the people on the scene in that way.

304. In the presence of at least one witness from the NTSB, for example, Smith told representatives from the Norfolk Southern team that he could not substantively answer their questions about "polymerization" and "that he would need to speak with other [Oxy Vinyls] company representatives to address questions about polymerization." Specifically, at the early afternoon meeting, when "asked questions associated with the polymerization of VCM in the tank cars, the technical manager stated that he was not a polymerization expert and that he would need to speak with other company representatives to address questions about polymerization."

305. Smith made clear to Norfolk Southern, however, that temperature data were going to be important to the Oxy Vinyls team of experts in Dallas. He brought a document illustrating the vinyl chloride "curve" that illustrates the relationship between vinyl chloride's pressure and temperature.

306. Smith also put these data in the context of each of the five tank cars carrying the vinyl chloride. The tank cars were built to specifications particular to pressure tank cars as set forth in federal regulations, and the cars are commonly called "DOT 105's" because they meet DOT 105J300W specifications: These tank cars only "vent" pressure through their pressure relief devices after pressure reaches a (very conservative) pressure of 247.5 psig but were built to a "test pressure" of 300 psig per DOT 105 specifications, and would not burst until 750 psig, as noted below. And, as Smith explained to Norfolk Southern, in substance:

> [I]f you have pure vinyl and you heat it up, the vapor pressure of the vinyl is going to 185 degrees Fahrenheit, using the curves that I had at the time, and it's really between 185 and 190, but that at that temperature it's going to exert a pressure on the vapor side of 247.5 PSIG.

Smith added that was "the pressure" and "temperature" where the DOT 105 car's pressure relief devices would open as designed.

307. The Norfolk Southern team already knew these facts.

308. Norfolk Southern's hazmat team – including Deutsch – conducted a "training program" on the "DOT 105" car, meaning Deutsch was actually teaching others about the DOT 105 cars' specifications. The following is an image of Deutsch from late summer 2023. He is walking in front of Norfolk Southern's "safety train" – a train that has a handful of tank cars, including a "DOT 105" car – as he is training

first responders in the "Operations Awareness & Response" program, which Norfolk Southern launched in 2015:




309. Norfolk Southern's training materials further explain how the railroad industry identifies its tank railcars by type. Tank railcar names include the following information:



4879-1894-0589.v6

**5.1.1 Tank Car Specification Stencil**

The specification is stenciled on the side of car. A typical entry could be 111A100W1:




***Authorizing Agencies***

AAR — Association of American Railroads
CTC — Canadian Transport Commission
DOT — US Department of Transportation
TC — Transport Canada

***Tank Specification***

General Service
111, 115, 117
Pressure Tanks
105, 112, 114, 120

***Delimiter Letter***

A — No special feature
S — Equipped with head puncture protection
T — Thermal protection & head protection
J — Jacketed with Thermal protection & head protection
P — Existing nonpressure tank car that meets performance standards for a Class-117A
R — Existing nonpressure tank car that has been retrofitted to conform to the prescribed retrofit or Class-117A performance standards

***Tank Test Pressure***

Hydrostatic test pressure (not the Burst Pressure)

Test pressure is "not the Burst Pressure"

310. Railroads are required to keep a "consist" that records details about each rail car. This is one of the most important records that first responders wanted in the aftermath of the East Palestine Derailment. Deutsch and his colleagues at Norfolk Southern distributed the "consist" to local authorities prior to Saturday morning, February 4, 2023. The "consist" identified the fact that the five VCM cars were carrying VCM (the contents of the tank car) and that each tank car was "DOT 105J***300***W." The "300" figure immediately alerted the Norfolk Southern team that the "test pressure" of the VCM cars was 300 psig and the "DOT-105" told everyone



4879-1894-0589.v6

the exact department of transportation specifications, which state that each of the VCM tank cars had a "burst pressure" of 750 psig.[12]

311. These facts are important. They mean that "test" and "burst" pressure of tank cars were common knowledge in the rail industry, and that the Norfolk Southern team dealing with the East Palestine crash would have known – and did know – that each of the five VCM cars was a "DOT 105" tank car that was tested to relieve pressure through their safety valves at about 300 psig (equating to a temperature of over 185°F) and the car would not "burst" until it reached about 750 psig (for a corresponding critical temperature of about 310°F).

[12] Deutsch told investigators he obtained the "consist" Friday night, February 3, 2023. He said "we had the consist and [he] was looking at that" to see what cars were burning. He said that "our understanding from the consist" was that "we have five vinyl chloride cars in the derailment." He also told investigators that he did not know whether the five VCM cars were DOT 105s. Responding to a question about the insulation surrounding the tank cars, Deutsch said: "I didn't look this particular car up what they were, but they should – you know, that's probably correct. . . . Some don't have insulation; only have a thermal wrap and then the jacket. But I don't – too much going on, I didn't look if it's a 105 or whatever, you know." That statement was false. It was impossible to see the "consist" and ***not*** know each of the VCM cars was a DOT 105 that would not even release their safety valves until about 300 psig as that data is on the consist and, literally, painted on each car.

### G. In the Presence of the NTSB, Norfolk Southern Assured Oxy Vinyls that Norfolk Southern Would Convey Oxy Vinyls' Input to the NTSB

312. Before Norfolk Southern's meetings with Oxy Vinyls' representative Steve Smith and the NTSB on Sunday – at approximately 3:00 p.m. – the Norfolk Southern team had collected temperature/pressure data on one car (Car 1). That car had a pressure of 60 psig the prior day – corresponding to just over 90°F. The Norfolk Southern team "determined [Car 1] to be stable with a pressure [reading] of 60 psig." A member of the team (the SPSI president) said 60 psig was "not remarkable."

313. But Norfolk Southern had yet to collect the pressure and temperature data on the rest of the rail cars by the time Smith met with Norfolk Southern and the NTSB in the early afternoon on Saturday, February 4, 2023, at the fire station command center.

314. The NTSB asked how Oxy Vinyls would "convey information in relationship to the polymerization questions that were brought up"; Norfolk Southern (Paul Williams) stated that Oxy Vinyls "should communicate with SPSI then SPSI would get with Norfolk Southern and then Norfolk Southern would get with [NTSB]." Norfolk Southern**,** therefore, was intentionally inserting itself between Oxy Vinyls and the NTSB such that no information from Oxy Vinyls would

get to the NTSB without going through Norfolk Southern first. And, the NTSB ***expected*** Norfolk Southern to pass that information to it.

### H. The Norfolk Southern Team Got "[G]ood [T]emperature [R]eading[s]" on All Five Vinyl Chloride Cars' "[I]nternal [T]ank[s]" Starting at 4:00 P.M. on Sunday, February 5, 2023

315. By 4:00 p.m. on Sunday, February 5, 2023, the Norfolk Southern team was able to collect temperature data on all of the vinyl chloride cars. SPSI personnel distributed the data to Norfolk Southern personnel via radio, text message and at meetings. Norfolk Southern executive Deutsch sent the temperature data to the Norfolk Southern team on the ground and to Norfolk Southern's headquarters in Atlanta.

316. The Norfolk Southern team secured "good temperature reading[s]" on all five cars. The person overseeing this process (SPSI employee Ryan Tokarksi) explained how it worked:

> [T]here were various points in each car where a portion of the [exterior thermal insulation] jacket had been ripped open and ***we could get to the internal tank and get a good temperature reading*** on whether, you know, one tank had three jacket tears in it and we can get three different readings on it, or one had one and we could get a reading there. We kind of did that and hit the same spots every time and had an average of, you know, the temperature readings.

They used "a Draeger thermal imaging camera" and "handheld [infrared thermal equipment that], for lack of a better term, point-and-shoots, with a digital display."[13]

317. Tokarski sent all the temperatures to Norfolk Southern's Deutsch, who, in turn, circulated the data internally to his Norfolk Southern colleagues.

### I. Norfolk Southern Learned from Oxy Vinyls that the Car Temperatures Showed No Runaway Chemical Reaction Because "the [S]cience [I]s that [C]lear"

318. The Norfolk Southern team recorded the five VCM cars' temperatures. The following is an excerpt from a Norfolk Southern document prepared during the

---

[13] Norfolk Southern manager Deutsch said similar things:

> I believe on all the cars, maybe only one they used a thermal imaging camera and there [were] tears in the jacket so you can get to the internal steel. And they would shoot that [temperature with a thermal imaging gun] there because that's your best temperature because you can't go by the jacket, the insulation and all that. So they had tears in the jacket, so the actual tank was exposed and they shot the thermal imaging there to get their temperatures.

Counsel for Norfolk Southern has made similar statements, including that prior to the evening of February 5, "access to the vinyl chloride cars was limited . . . due to ongoing fires" but that "[a]round 4:00p.m. on February 5th, NS's emergency response contractors (SPSI) were able to enter the site and begin taking the temperature readings of the vinyl chloride cars. SPSI's temperature readings were taken with a handheld infrared temperature gauge, which displays a digital reading on the temperature gauge itself." Notably, Drew McCarthy (the President of SPSI) was not one of the individuals who was taking the cars' temperatures, as Tokarski explained, there were three people doing so: Last names Klepcic, Filby, and Herrera.

derailment by Robert Wood and teammate Jon Simpson (annotations are added here in red):

| | Car 1 | Car 2 | Car 3 | Car 4 | Car 5 | |
|---|---|---|---|---|---|---|
| **Tank Car pressures by the hour** | | | | | | |
| TIME | TILX402025 | OCPX80235 | OCPX80179 | GATX95098 | OCPX80370 | |
| 1600 | 65 | 65 | 65 | 67 | 135 | ← 4:00-5:00 pm, Sunday |
| 1700 | | | | | 138 | ← 5:00-6:00 pm, Sunday |
| 1800 | | | | | 136 | |
| 1900 | | | | | 136 | |
| 2000 | | | | | 130 | |
| 2100 | | | | | 130 | |
| 2200 | | | | | 130 | |
| 2300 | | | | | 131 | |
| 2400 | 65 | 65 | 65 | 67 | 139 | |
| 0100 | 65 | 65 | 65 | 67 | 129 | |
| 0200 | | | | | | |

319. The data demonstrate that the Norfolk Southern team was not concerned that Cars 1-4 experienced any kind of "polymerization" because they simply stopped taking those cars' temperatures after getting the 65°F-67°F temperature readings on them. Importantly, Cars 1-4 had lower temperatures than Car 1 had exhibited the prior day – about 90°F (or 60 psig) – when the Norfolk Southern team determined the car was "stable" and "not remarkable." §VIII.G. The Norfolk Southern team thus observed that ***none*** of those cars were experiencing a highly exothermic, runaway polymerization reaction. This conclusion makes sense for an additional reason. As the Norfolk Southern team knew, Cars 1-4 were supposed to have the temperatures they were showing (at 65°F-67°F), because at the

time Norfolk Southern took custody of the cars they had temperatures of 58.93°F-69.33°F. Therefore, the Norfolk Southern team stopped collecting temperatures from Cars 1-4 for ***seven hours*** after they got the initial reading.

320. But they continued to take the temperature of Car 5. Car 5 took longer to cool down than Cars 1-4 because it was resting immediately next to a "hopper car" that carried non-hazardous polyvinyl – plastic pellets. The following image from the NTSB (with annotations added here in red) shows Car 5 resting against the smoldering plastic pellets car:




321. The Norfolk Southern team understood that the hopper car containing plastic pellets generated radiant heat that slowed Car 5's cooling. This is "firefighting 101" as one Norfolk Southern-friendly witness explained: that hopper "car up against" Car 5, "there's going to be some heat transfer" though he could not say the exact amount, "there will be some heat transfer, absolutely." The Norfolk

Southern team understood at this time that Car 5 had a temperature that was elevated, relative to Cars 1-4 that were about 250 feet East of Car 5, for this reason.

322. Between approximately 5:00 p.m. and 5:30 p.m. on Sunday, Oxy Vinyls representative Smith spoke with Oxy Vinyls' special situations team in Dallas, to communicate the new temperature data on Car 5 – the first data point of 135°F and the second data point of 138°F – for a temperature rise of 3°F.

323. Oxy Vinyls' special situations team lead recalled the data. Thomas said:

> [T]he two data points that we had Sunday night was the 135 and 138. And so, you know, what we knew with the first two data points was that at 135 or 138, you know, shooting at the spot where he had, you know, felt the railcar, we felt confident we were on the skin. At that temperature, the pressure in that railcar is 121 pounds. So, safety valve on that car is 247, design is 300, and the burst pressure is 750. The point being, ***it's got a long, long ways to go from 135 degrees to present any threat*** of over pressurization, which was certainly a concern for everybody on the scene.

Smith then conveyed these facts to the Norfolk Southern team.

324. As Thomas further explained: "[W]e gave that information to Mr. Smith, and he went back and advised them" – the Norfolk Southern team, via SPSI, as Norfolk Southern told Smith to do in the presence of the NTSB (as noted above) – "again that polymerization wasn't occurring from our perspective, that you didn't have the temperature to support it." Thomas also stated that "[Smith] went back and

had a conversation with SPSI, you know, again reiterating, ***even based on the data*** that you've given us, ***we don't see any signs of polymerization*** in the – in the temperatures." Thomas reiterated: On Sunday evening, "[Smith] communicated the same things that – the highlights from our conversation, which were ***we don't see any sign in the temperature data of polymerization***, so that shouldn't be a concern."

325. Smith confirmed these facts, stating:

> So, primarily that conversation occurred Sunday evening after a call with our Dallas folks when we had communicated, we had talked about was there polymerization. And so, Sunday evening, the communication was we saw ***no, nothing that would cause us to believe that polymerization*** was occurring. There ***wasn't any type of temperature rise*** that you would anticipate seeing with polymerization.

326. The conversation that Smith had with the Norfolk Southern team was the ***third time*** that the experts at Oxy Vinyls – the special situations team in Dallas, led by Thomas – explained that "polymerization" was not occurring. Smith reflected:

> Three different occasions we expressed our belief that it wasn't occurring, but I think the more important thing is we told them how they could know for sure. We're participating in that event because we care, ***we got the highest levels of our company*** there because we care. We sent folks on the ground because we care, so you can't be absolute in those. We're there to provide input and they factored into the decisions, and we certainly respect their expertise in that.
>
> But on ***three different occasions*** we expressed we didn't believe it was, but I think more importantly we said, here's how you can know

> so that you can protect your folks. ***If you can get a temperature, it will tell you whether polymerization is occurring or not***.

Thomas added: "So, we said, look, if you can get temperature data, you will know for sure. You don't have to take my opinion for it. It's that clear. ***The science is that clear, right?***"

### J. Because the Science Proved "No" Runaway Chemical Reaction, Norfolk Southern Started Lying to Public Officials to Persuade Them It Was Occurring

#### 1. Norfolk Southern Lies to the Local Fire Chief

327. Between approximately 5:30 p.m.-6:00 p.m. on Sunday, representatives from the Norfolk Southern team (including Wood) told the local fire chief (Keith Drabick) about the 3°F temperature increase. Wood represented to Chief Drabick, in substance, that from "Saturday night to Sunday morning [Car 5's] shell temperature was about 135 degrees Fahrenheit, and then within an hour it increased to 138 Fahrenheit," and that Norfolk Southern supposedly "believed that these [VCM cars] were polymerizing inside, and eventually, if [they] did nothing, the cars would come apart in a violent explosion." Wood further represented that "we ***only had this much data on one car***, but we felt sure if the problem was going on in that one car, the other cars had been exposed to the same conditions, ***we felt the same thing was going on with them***." These statements were false: Wood knew that they had collected the temperatures of ***all*** cars and that four of the five were at 65°F-69°F

as his own notes prove, and the science was clear that it was impossible for Car 5's temperature to reverse (go down after going up) if it had been undergoing polymerization, as Oxy Vinyls informed Wood.

### 2. Norfolk Southern Lies to the NTSB

328. Shortly after 6:00 p.m. on Sunday, Wood repeated, in substance, the same things he told the local fire chief to the NTSB at an NTSB progress meeting starting at 6:00 p.m. NTSB's records of the meeting reflect that Wood – representing the Norfolk Southern team – represented to the NTSB, in substance, "the temperature in one car, as measured with a thermal camera on the tank shell, had risen to 138°F, whereas 185°F is the critical temperature for a runaway polymerization reaction, according to Oxy Vinyls." Yet Wood was on at least one telephone call with the special situations team at Oxy Vinyls: He knew that he was lying at the time he made his false report to the NTSB because Oxy Vinyls knew the cars had vented at about 185°F and told Wood and his team that the cars were ***not*** polymerizing. Wood further stated to the NTSB, in substance, that "[t]he temperature in one car had increased by 3°F in one hour, suggesting that the VCM lading was undergoing polymerization." He told the NTSB: "If a vent and burn is



4879-1894-0589.v6

not conducted, the likely outcome will be a violent explosion with tank car fragments traveling as much as 1⁄2 mile from the site."[14]

329. These were all lies: in truth, Wood's own notes demonstrated that Car 5's temperatures fell between 5:00 p.m.-6:00 p.m., and, as Wood knew having attended at least one call with Oxy Vinyls, it was impossible for "polymerization" to generate temperatures that declined.

### 3. Norfolk Southern Lies to Governor DeWine

330. Shortly before 7:30 p.m. on Sunday, February 5, 2023, Norfolk Southern spread its lies to Ohio Governor Mike DeWine. The Norfolk Southern team (including Wood) represented to the Governor at around "7:30 . . . that Sunday," that "concerns began to arise in regard to ***the temperature*** in ***one of*** the cars," as Governor DeWine recalled, "[b]ased on the conversations that I was hearing and information, it was clear that more assistance was needed in that East Palestine." The Governor continued:

> And so I activated the Ohio National Guard to go there, which they did very, very quickly. I was also informed on that call about ***the car*** where the temperature was . . . described as ***very volatile***. And ***at that moment***

[14] At the same NTSB meeting starting at 6:00 p.m. on Sunday, the Norfolk Southern team confirmed that a "sweep of the scene found ***no evidence*** that the five vinyl chloride tank cars had been mechanically breached."

> ***was in fact rising***. The fear was that this car might explode sending deadly shrapnel in all directions.

331. Norfolk Southern lied to the Governor: in fact, Car 5's temperature only rose 3°F from 4:00 p.m.-5:00 p.m.; it then ***fell 2°F*** from 5:00 p.m.-6:00 p.m., stayed at the same temperature for its next reading at 7:00 p.m, while falling a further 6°F by 8:00 p.m., as Norfolk's own data (¶318) prove.

332. Governor DeWine took swift action in response to Norfolk Southern's lies, activating the Ohio National Guard as noted. And the Governor issued an evacuation notice:

## East Palestine Urgent Evacuation Notice

*February 05, 2023*

(COLUMBUS, Ohio)—Following an evening briefing regarding the train derailment in East Palestine, Governor DeWine and Columbiana County officials are issuing an urgent warning to those living within a mile of the derailment. Within the last two hours, a drastic temperature change has taken place in a rail car, and there is now the potential of a catastrophic tanker failure which could cause an explosion with the potential of deadly shrapnel traveling up to a mile.

This urgent evacuation notice memorializes the fact that the Norfolk Southern team (including Wood) represented to the Governor at approximately 7:30 p.m., that there had been (in substance) "a ***drastic temperature*** change" in "***a*** rail car," namely Car

5. That was a lie: in fact, the supposed "drastic" increase was only 3°F from 4:00 p.m.-5:00 p.m., followed by a 2°F ***decline*** from 5:00 p.m.-6:00 p.m., and Norfolk Southern learned from Oxy Vinyls that it was scientifically impossible for polymerization to cause a temperature decline or "reverse," as specified above, meaning there was no way polymerization would cause a "catastrophic tanker failure," as Norfolk Southern falsely told Governor DeWine.

333. Again, Car 5 was literally touching a smoldering plastic pellet car that was transferring heat to Car 5 – as the Norfolk Southern team knew. Norfolk Southern's team admitted to a first responder that the temperature "got as high as 139 degrees Fahrenheit" on Car 5 at around midnight, Sunday. "At one point," Chief Drabick explained, "they just said that the temperature got as high as 139 degrees Fahrenheit." "They believed that [139°F] to be based upon, as they were down there moving stuff and getting a better handle on the situation itself and getting temperature readings, they did find a small spot – what was described to me as a small spot fire underneath of that particular car" – Car 5 – and that "[t]hey did extinguish that. And they did go back in 30-minute increments from there and get readings. ***The [temperature] readings did decrease***."

## K. By Monday Morning, Norfolk Southern Had "[C]onclusive" Scientific Verification that No Runaway Chemical Reaction Was Occurring

334. By Monday morning, February 6, 2023, there was ***conclusive scientific*** evidence that runaway polymerization was ***not*** occurring in any of the vinyl chloride cars. Oxy Vinyls' special situations team leader Thomas later explained why.

335. NTSB investigators first showed Thomas temperature data. The data underlay a temperature trend graph. The chart follows (the "Car 5" and "'Spot fire' extinguished" annotations are added here, the rest of the annotations are in the original):



336. NTSB investigators then asked Thomas about the chart. They asked him, "So, the temperature trend that we had on the screen earlier" – reproduced above – "what does that tell you about polymerization?"

337. Thomas responded that the data were conclusive that no polymerization was occurring. Thomas responded:

> Yeah. So, my understanding is that for that railcar on the west end [Car 5], one, our view when it was described, that railcar [Car 5] was leaning against the PVC car [the hopper car carrying plastic pellets] that had heat, smoldering fires going on and, you know, I think I read in [fire] Chief Drabick's notes that maybe around midnight is when they had that fire, or up near it. The temperature had dropped, the fires were up kind of near it, it heated up to 139, they put the fire out and it immediately dropped to, you know, back to 129.
>
> So, that trend of 12 degrees, you know, over 22 hours of monitoring, that also corresponds with a 20 PSI drop in pressure in the car, it's ***conclusive to all of us that polymerization was not going on*** in that car, and the location where they were taking the temperature on the skin is valid enough to draw that conclusion.

338. Everyone on the Norfolk Southern team had the conclusive scientific data ruling out "runaway polymerization" ***hours*** before the Company convinced public officials to authorize the detonation of the five cars. The following is just one example of the text messages that Norfolk Southern received Monday morning (red annotations added):




339. Yet the Norfolk Southern team – including Deutsch, Wood, and defendant Shaw – continued lying to public officials, fabricating "polymerization" fears on the basis of objectively spurious information.

### 1. Norfolk Southern Again Lies to the NTSB

340. Sometime during Monday morning, February 6, 2023, Norfolk Southern (via Wood) told the NTSB: "Throughout the evening of February 5 to morning of February 6, Norfolk Southern contractors monitored the temperature in

tank cars once per hour to determine whether they were nearing ***__the__*** ***__understood__*** ***critical temperature for runaway polymerization reaction of about 185° F***." This statement, again, refers to the false notion that Oxy Vinyls said that vinyl chloride would polymerize at 185°F, but they said no such thing. Wood also told the NTSB: "The highest temperature detected in one tank car was 139°F, suggesting the product was undergoing a polymerization reaction." Again, Oxy Vinyls instructed Norfolk Southern that polymerization was not occurring and informed Norfolk Southern of the method to know for sure that it was ***not*** occurring – take its temperature – as noted above. *See supra* ¶294.

### 2. Norfolk Southern Again Lies to Governor DeWine and the Local Fire Chief

341. On Monday, February 6, 2023 during the 11:00 a.m.-12:30 p.m. period, Governor DeWine, Chief Drabick, Norfolk Southern personnel – including Shaw, Wood, Deutsch, and SPSI president Drew McCarthy – met at the "command center." Shaw coordinated with his team and Governor DeWine and Chief Drabick on the vent and burn operations.[15]

---

[15] Senator Mullin raised this subject with Shaw at a hearing about the derailment:

> Senator Mullin. [Oxy Vinyls] are responsible for the content [vinyl chloride] and the car, correct, making sure it is operating properly? Mr. Shaw. Yes, sir. Senator Mullin. Were they considered in this

342. Chief Drabick provided details of his Monday meeting with Shaw. Chief Drabick later explained that on Monday, February 6, 2023, he and Governor DeWine walked "down to the Norfolk Southern center of the command center." "And as I walked in the room," Chief Drabick said, "I was met ***by the CEO*** and several other members and one of the members said I had ***13 minutes*** to make a decision of whether or not we were going to vent or burn because they were running out of daylight." The "CEO of Norfolk" Southern was there.[16]

343. Chief Drabick gave details on the representations that Shaw and his team made to convince him that the five VCM cars were supposedly undergoing

---

> decis[ion-]making, considering it was their car, their design, their responsibility? Were the[y] part of that decision[-]making on being able to vent it and burn it? Mr. Shaw. Senator, the customer [Oxy Vinyls] provided input. Senator Mullin. Were they [Oxy Vinyls] in the room when the [vent and burn] decision was being made? I have received reports that they weren't. So they weren't in the room? Mr. Shaw. No, sir, not to my knowledge.

[16] Additional sources confirm that Shaw was on the scene and coordinated with Governor DeWine, Chief Drabick and others to develop the vent and burn plan. The CFO of Norfolk Southern told investors on a public conference call that "in the 2 or 3 days following the incident, with Alan Shaw on the ground in East Palestine – Palestine, I apologize, Norfolk Southern coordinated with first responders, the Ohio and Pennsylvania Authorities, including the governors of those 2 states, as well as the Ohio Natural Guard to develop a plan to manually vent several railcars via a controlled breach. And that was under the supervision of experts and first responders."

polymerization as reflected in their temperatures, and would consequently explode. Chief Drabick said he "made the decision to go ahead and allow them to do [the vent and burn] ***based on the information that we had received from them in re[f]erence to the temperature fluctuation*** going back and forth and the process" – *i.e.*, polymerization – "that that product was going through." He further explained that the Norfolk Southern team said that "the ***urgency to get it done very soon [was] due to temperature changes***, weather changes [and] time of day changes," adding:

> We had to make that decision very quickly, and based on no objections or ulterior means of controlling it during that unified command meeting where we discussed it, the decision was made to go ahead and allow that [vent and burn] process to happen to prevent that catastrophic failure of the railcar.

344. Governor DeWine recalled substantially the same things. He "traveled to East Palestine" and "met with those on the ground" – he explained – including "[t]hose who had been working those who represented the railroad as well as the federal government," such as the NTSB. Governor DeWine further recalled that "[t]he risk of the car exploding was described to me as – a high probability that it could explode." Governor DeWine continued: "And while I pressed everyone to give me the information . . . the concern was that this would be a catastrophic – what was described as a catastrophic explosion of the car."

345. Governor DeWine and Chief Drabick were both key witnesses to the meeting with Shaw and others. Their recollections are similar. They demonstrate that at the February 6, 2023 meeting with Shaw and his team, that Shaw and his team represented to Governor DeWine and Chief Drabick, in substance, that the five VCM cars were undergoing "polymerization" as their "temperatures" supposedly showed and that there was a "high probability" that all five cars would explode on their own unless Norfolk Southern blew them up first in a "vent and burn."

346. But these were all lies, as Shaw and his team knew. Shaw – and his colleagues, Wood, Deutsch, and McCarty – were aware of Oxy Vinyls' input that the five VCM were ***not*** polymerizing and furthermore, that monitoring the cars' temperatures was the way that they would "***know for sure***" that the cars were not polymerizing because the temperatures would rise quickly and continue to rise if polymerization was occurring. *See supra* §§VIII.D.-E., I.

347. More and more data continued to show polymerization was not occurring. Shaw's team received data immediately before and during the meetings with Governor DeWine and Chief Drabick. The data showed the cars were not polymerizing, exactly as Oxy Vinyls instructed:




These (annotated) images from Deutsch's cellphone demonstrate that Car 5 at 126°F was cooler than a cup of coffee and that Cars 1-4 were cooler still. All of the cars' internal pressures were lower than the pressure easily contained by a bicycle's inner tube.

348. In fact, as the entire Norfolk Southern team knew – because Oxy Vinyls had shared the relevant vapor-pressure "curves" with them – the temperatures were less than half the temperatures necessary to cause the corresponding tank cars to explode. Car 5 was 59°F lower than the pressure necessary to vent the car and Cars 1-4 were approximately 120°F lower than the venting pressure.




349. With Shaw's authorization – immediately after the private meeting with Governor DeWine and Chief Drabick ended – Deutsch walked to a different room in the same building with Governor DeWine to address the public on behalf of Norfolk Southern.

### 3. Norfolk Southern Lies to the Public

350. At approximately 1:00 p.m. on Monday, February 6, 2023, Governor DeWine held a televised press conference. The conference was in the East Palestine school where he met with the Norfolk Southern team (including Shaw, Wood, and Deutsch, among others) and Chief Drabick and his team.

351. Governor DeWine made his remarks and instructed others to make their statements to the public. The Governor started the conference by saying that:

> [Pennsylvania] Governor Shapiro and I have been talking pretty much non stop for the last several hours. And we've been getting briefings and frankly are in a position where we had to weigh different risk[s] with no great choices. There's a concern the railroad has a serious concern ***which they can express to you*** about an explosion with one or more of these cars. They describe an explosion as potentially catastrophic. We are weighing that and have been weighing that potential versus a controlled release and ***they will explain to you*** in a moment what a controlled release is. We have decided that that controlled release will occur today at 3:30 [p.m.]. We are urging everyone in this area actually ordering them to leave.

352. Governor DeWine provided a map covering a one- by two-square mile area that was color-coded by degree of danger. He said that the "controlled release of the toxic chemicals also has the potential to be deadly if inhaled," and that those living in the "red area" are "***facing grave danger of death***" while those "living in the orange area are at ***risk of severe injury***, severe injury including skin burns, and serious lung damage," as reflected in an area map that Governor DeWine displayed at the conference (with red annotations added here):



4879-1894-0589.v6




353. Governor DeWine invited Norfolk Southern executive Deutsch to explain to the public what, exactly Norfolk Southern was going to do. Deutsch told the public:

> The process that we're going to do today, we're going to place a small shape charge, it's going to create a hole about two and a half to three inches in ***the*** tank ***car***. This will allow the material to come out of ***the*** tank ***car***. It'll go into a pit and trench that we have dug and set up for this operation. Inside that trench will be flares, lining that trench that then will light off the material. We're doing this so that we control ***this tank car*** that we have concerns with – these tank cars. This allows us to control that operation and not have ***the car react*** and do it itself. So that's what we're going to be doing later on today.

The "small shape charge" that Deutsch discussed comprised explosives that are also used in military operations. In effect, Norfolk Southern wanted to use military-grade explosives to make, in substance, not one but ***five*** vinyl chloride bombs that exposed the community to "grave danger of death" and "severe injury."

354. Governor DeWine then asked Norfolk Southern to explain why it wanted to explode the five cars during the day. Deutsch represented to the public in response:

> Part of the decision-making process that we followed was, if ***the*** car started to ***react again*** – the "cars" I keep saying "***car***." If they started to ***react on their own again***, we can't control that time of day when that would occur. That would in turn, we'd have to worry about an inversion and other things weather related. Okay, so we want to do it in the daylight, you know, close to, you know, prior to sunset as possible. And that's our plan, right now.

This response and the prior response are revealing, and materially false or misleading as Deutsch knew. Deutsch himself noted that he kept referring to one car because, as he knew, there ***was only one*** car that ever concerned Norfolk Southern, and that was "Car 5." And ***no car*** had ever polymerized; thus, Deutsch's fearmongering that the cars could "react ***again***" was materially false or misleading.

355. Governor DeWine also asked Norfolk Southern to explain to the public why Norfolk Southern wanted to blow up all five cars at all. Deutsch represented to the public in response:

> Okay, so our controlled explosion, as I was telling you will put a two and a half, three inch hole in the car. If we don't do that, ***the*** car could ***continue to polymerize*** and ***the*** entire car ***will break apart***. We can't control where that goes. So ***that's the reason*** for doing this. Get moving on this. So we don't have to run into that letting the car do it itself. We want to be able to control that situation. That's ***the safest***



4879-1894-0589.v6

> ***way*** is to control the situation. And that's what this operation we're going to take this afternoon.

These public statements are important for several reasons. First, they demonstrate "the reason" that Norfolk Southern purportedly needed to detonate the cars exposing people to "death" and "severe" injury was because of supposed polymerization. Second, Deutsch lied in telling the public that the five VCM cars would just "continue to polymerize" – even as he and others at Norfolk Southern knew or recklessly ignored, that the temperatures of the five VCM cars were not even close to "break[ing] apart."

### L. Norfolk Southern Intentionally Detonated Five Vinyl Chloride Tank Cars, Purposefully Creating a Deadly Chemical Mushroom Cloud that Spread for Miles

356. On February 6, 2023, defendant Shaw observed with Chief Drabick his team load Cars 1-5 with explosives called "shaped chargers," which have military applications. After an initial malfunction that required Norfolk Southern's contractors to fix the wiring, Norfolk Southern ordered the detonation of the cars, as pictured below.



357. In so doing they intentionally released deadly chemicals into the atmosphere and the community of East Palestine. These and other images provide a partial illustration of the scale of the chemical explosion:



358. Another image from farther away shows the chemical mushroom cloud expanding to cover miles:



359. The National Weather Service and television meteorologists reported that the plume was visible on satellite imagery and radar. A radar image further demonstrates the scale:




### M. Norfolk Southern Declared the Explosion a Success

360. A few hours after the Norfolk Southern intentionally detonated the five VCM cars and intentionally spread deadly chemicals into the air hovering above adjacent communities, Norfolk Southern issued this press release:

> The controlled breach of several rail cars has been ***completed successfully under the supervision of experts*** and first responders. Some of the material is now burning off consistent with expectations from the earlier models, and is expected to drain for a short number of hours. We have been, and will continue, monitoring air quality with the Ohio EPA. Remediation work at the site can now safely continue.

These statements are attributable to Shaw and his team in East Palestine because they were the only Norfolk Southern executives who supervised the detonations. The statements were also materially false or misleading because Shaw failed to

disclose that the detonations were not necessary and that the experts at Oxy Vinyls rejected the core reason supposedly driving Norfolk Southern to detonate the cars – namely, runaway polymerization.

### N. One Day After Turning Five Vinyl Chloride Tank Cars into a Deadly Chemical Explosion, Norfolk Southern Restored Train Service

361. On February 7, 2023, Norfolk Southern restored rail service through East Palestine. If Norfolk Southern had not detonated the five VCM cars then they would not have been able to restore service for an indefinite period of time. One of the individuals on the Norfolk Southern team (the SPSI president) later testified about transferring the VCM to other vehicles:

> [S]etting up such a transfer would have required trucks that were most likely ***not available anytime soon*** from anywhere around the country from a trucking standpoint, [which] would have been a logistical challenge, properly inhibiting the [VCM] stuff would have been a field challenge to properly inhibit it in the field.

### O. More Scientific Evidence Proved that Norfolk Southern's "Polymerization" Story Was False

362. Scientific testing confirmed that the VCM inside of the five trains never polymerized. On February 16 and 17, 2023, the NTSB gave Oxy Vinyls permission to take residual samples from each of the five trains after Norfolk Southern detonated them. The tests proved that none of the cars' vinyl chloride ever polymerized – even after Norfolk Southern detonated the cars. There is no evidence that Norfolk

Southern nor its agents asked for permission to do similar tests. They already knew the results: No polymerization.

### P. Norfolk Southern Continued Lying, Telling Senator Cruz that It Gave Authorities "the Best Information that We Had"

363. On March 22, 2023, the U.S. Senate held hearings on the East Palestine Derailment and Norfolk Southern's subsequent decision to arm and explode the five VCM cars. Shaw made materially false or misleading statements in response to Senator Cruz. The colloquy follows:

> CRUZ: Well, thank you. That is helpful and we will certainly commit to working with you to try – try to find a solution that enhances safety while at the same time protecting the interest of consumers.
>
> Mr. Shaw, you and I talked yesterday and you described that that Norfolk Southern was a proponent of venting and burning the vinyl chloride from ***all*** five tanks. At least one of the tanks was significantly injured. There has been disagreement as to whether the other four tanks were compromised or not.
>
> Will you commit to providing this Committee with any and all information you have as to the condition of all five of those tank cars?
>
> SHAW: Yes, we will be transparent with the Committee about our understanding of the conditions on the ground. ***My goal during the entire process was to provide unified command and the incident commander with the best information that we had***. And at that point, there was concern that these four cars had been in a pool fire and that the pressure relief valve had failed and ***there was concern about the pressure on the cars***.

> CRUZ: In terms of the decision to vent and burn the vinyl chloride which is what caused the massive plumes of smoke and the rather extraordinary site [sic] of an American city essentially on fire, among the decision makers that were engaged in that process, ***did anyone disagree*** with a recommendation to vent and burn the vinyl chloride from all five tank cars?
>
> SHAW: Sir, my understanding as ***unified command was aligned*** around that decision and that decision was based ***solely*** on the safety of that community.

364. Shaw's responses were materially false or misleading. In truth, Shaw's goal during the entire vent and burn process was to hide the fact that Oxy Vinyls helped Norfolk Southern prove, scientifically, that runaway polymerization was not occurring as evidenced by the temperatures of the five VCM tank cars. Shaw was aware of Oxy Vinyls' input and knew Oxy Vinyls was the most knowledgeable about its own product, and that the temperatures exhibited by the five VCM cars were not even close to requiring any pressure relief devices – much less at temperatures that would have represented any kind of "burst" risk to the tank cars, as Shaw knew or should have known.

### Q. NTSB Chairperson Homendy Concluded Norfolk Southern Had Facts Contradicting Its Private and Public Statements that the Five Vinyl Chloride Cars Were Undergoing a Runaway Chemical Reaction – and that the Cars' Intentional Detonation Was Unnecessary

365. On June 22, 2023, the NTSB conducted a hearing that Chairperson Homendy oversaw. A number of Norfolk Southern-friendly witnesses testified,

backpedaling from the statements they made to public officials (and the public) that the reason they blew up the five VCM tank cars was that the VCM tank cars were supposedly undergoing polymerization as evidenced by their temperatures.

366. NTSB Chair Homendy did not find the witnesses credible. The facts show that the Norfolk Southern witnesses could not (and did not) "believe" that the temperatures of the five VCM cars showed runaway polymerization that would lead to a catastrophic explosion. Chair Homendy testified about her conclusions at a later Senate hearing on March 6, 2024:

> [SENATOR] VANCE: Thank you, Madam Chair. And thanks, Chair Homendy, for being here and for all your work. I know a lot of folks have focused on the Alaska Airlines questions. I want to focus on the train derailment in East Palestine. And specifically, Madam Chair, I want to focus on this question of ***whether the controlled burn was actually necessary*** in East Palestine.
>
> To sort of recap for folks, the mushroom cloud, ***the chemical mushroom cloud*** that sort of captured headlines across the country was the result of a controlled burn. And what those of us who are sort of focused on this issue were told is that if you hadn't done the controlled burn, there would have been an uncontrolled explosion because the situation on the ground was just incredibly chaotic and dynamic. You had to do the controlled burn to prevent the uncontrolled explosion, and your team has done a very good job.
>
> I commend you and your team on actually looking into whether this was necessary. And you'll forgive me for requesting brief answers to questions because I have a lot of them, and I just want to walk through in detail what you folks have found. This is based on public reporting that me and my team have gone through. So, February 3, 2023, derailment of the train.

Is it true that Norfolk Southern's contractors monitored temperatures on one of the chemical tank cars from the afternoon of February 5 into the afternoon of February 6, which is when the controlled burn happened and communicated their initial readings to Oxyvinyls (ph), the shippers in charge of the vinyl chloride cars?

[CHAIR] HOMENDY: That's accurate, Senator.

[SENATOR] VANCE: Is it true that these readings indicated an initial temperature of 135 degrees Fahrenheit at 4 p.m. on February 5, which eventually declined to 126 degrees Fahrenheit at 9:30 a.m. on February 6, at which point it stabilized?

[CHAIR] HOMENDY: That's correct, Senator. It was ***stabilized well before the vent and burn many hours before***.

[SENATOR] VANCE: So, declining temperatures, you would think, and stabilized temperatures are consistent not with something that needs to be exploded, but with something that can be dealt with in a slightly ***less catastrophic way***. At least that's my read on it. But is it true that the chemical shipper Oxyvinyls concluded that the reported and stabilized tank car temperatures were too low for a runaway chemical reaction, meaning the sort of thing that would lead to an uncontrolled explosion?

[CHAIR] HOMENDY: That's correct. They had testified that ***polymerization was not occurring***. In order for polymerization to occur, which was the Norfolk Southern and their contractor's justification for the vent and burn, ***you would have to have rapidly increasing temperatures*** and some sort of infusion of oxygen, neither of which occurred.

[SENATOR] VANCE: Right. And just to be clear, you would need both of those things. It's not an either or. You need both of them to precipitate polymerization, which would lead to an uncontrolled situation. So, is it true that Norfolk Southern's contractors testified to the NTSB that they were not certain a chemical reaction was occurring in the derailed vinyl chloride tank car?

[CHAIR] HOMENDY: They testified to that, yes, sir.

[SENATOR] VANCE: Is it correct that the chemical shippers testified that there was no free radical agent or sufficient heat trajectory to justify Norfolk Southern contractors' assessment that a chemical reaction was occurring?

[CHAIR] HOMENDY: That's correct.

[SENATOR] VANCE: So, from this assessment, is it your understanding Norfolk Southern's contractors ***lacked scientific basis to support their conclusion that polymerization was occurring in the derailed VCM tank cars***?

[CHAIR] HOMENDY: ***Yes. In fact, they were informed by Oxyvinyls of the information*** that should have been taken by the contractors in their decision making. But yes, they did not have that. They lacked the scientific background to address that.

[SENATOR] VANCE: So, let me just go to sort of one final question here.

We combine all these facts together. Your reporting thus far concludes that Norfolk Southern's contractor's recommendation to conduct a controlled burn ***lacked*** sufficient scientific basis, disregarded available temperature data, and ***contradicted*** expert feedback from the shipping firm on site. Now, this was all told to the decision makers on the ground that they had to make a decision in less than 13 minutes to blow up all five of these toxic chemical cars without any other voices being included to offer a contrary opinion. Is that right?

[CHAIR] HOMENDY: ***That's correct***.

[SENATOR] VANCE: So, again, I appreciate your work on this, but just to sort of summarize, this is an extraordinary finding. We were told, effectively, that there were two bad options. The uncontrolled burn, or excuse me, the controlled burn or the uncontrolled explosion. And it seems, based on the data that we have, that there was not a ton of reason to do the uncontrolled burn.

And that, of course, ***is what spread toxic chemicals all over this community*** and the surrounding region. It's really an extraordinary finding. It goes to highlight the importance of your work. But I also have to note that residents on the ground talk about the fact that ***immediately after the uncontrolled burn, they moved the tank cars and train traffic was moving through their town*** and moving through their community.

I won't ask you to speak to motivations here, but when you have an ***unnecessary*** uncontrolled burn that ***poisoned a lot of people***, that then led to rapid transitive train traffic, a lot of people, including me, are wondering, did they do this not because it was necessary, but because it allowed them to move traffic and freight more quickly? And if so, that is an extraordinary thing that I think requires a lot of further work from this Committee and from others. But we will stop there because I see my time is up. Thank you to Chair Homendy.

[CHAIR] HOMENDY: May I add something to that?

[SENATOR] VANCE: Please.

[CHAIR] HOMENDY: Senator, it's even, you know, I would say the factual information in our docket shows that Oxyvinyls was on scene and providing information to Norfolk Southern and their contractors. On the 4th, 5th and 6th, they informed ***them that polymerization, they believed polymerization was not occurring*** and there was no justification to do a vent and burn. Rightfully, Norfolk Southern's contractors said, ruled out hot tapping and transloading because it would have been a potential safety issue for their employees.

But there was another option. ***Let it cool down***. It ***was*** cooling down. ***We know for a fact*** that when that pressure relief device went off, that it had to have been above 185 degrees. Later, much later, over the course of 22 hours, ***that tank car was cooling***, not to mention ***the other four tank cars*** that were only between 64 and 69 degrees. So, Oxyvinyls was on scene providing information to Norfolk Southern's contractor, who was in the room when the decision made was made.

> And when advice was given to the governor of Ohio, to the incident commander, they were ***not*** given full information because no one was told Oxyvinyls was on scene. ***They were left out of the room***. The incident commander didn't even know they existed. Neither did the governor. So, they were provided incomplete information to make a decision.

### R. Governor DeWine Confirmed that Norfolk Southern Lied About the Need for the Vent and Burn

367. On March 7, 2024 – one day after Chair Homendy's testimony quoted above – Governor DeWine issued a statement to the public:

> DeWine's press secretary Dan Tierney confirmed the third option was never presented to the governor.
>
> "NTSB Chair Homendy testified yesterday that ***neither*** Gov. DeWine ***nor*** incident command were ever presented with a scenario from experts that a controlled vent and release ***was unnecessary to prevent a catastrophic explosion***. They were also ***not presented with any scenario where, if officials did nothing, the train cars would not explode catastrophically***," Tierney said. "Gov. DeWine spent hours with incident command and Norfolk Southern contractors on the day of the release and ***asked numerous questions*** to understand the facts. No one – not one single expert – opined that day about there being any other scenario occurring besides either a catastrophic explosion or a controlled release to prevent such an explosion."

368. These facts show that Norfolk Southern's team at East Palestine misled Governor DeWine when they told him that there was a high probability that all five tank cars would explode because, as their temperatures supposedly showed, they were undergoing a runaway chemical reaction.

369. Ohio Senator Sherrod Brown learned about Chair Homendy's testimony of March 6, 2023 and he, too, issued a response the next day:

> "***This is outrageous***," he said. "This explosion – which devastated so many – ***was unnecessary***. The people of East Palestine are still living with the consequences of this ***toxic burn***. This is more proof that Norfolk Southern puts profits over safety and cannot be trusted."

## IX. NORFOLK SOUTHERN FACED WIDESPREAD PUBLIC SCRUTINY AND INVESTIGATIONS AS A RESULT OF THE EAST PALESTINE DERAILMENT

370. The derailment of Norfolk Southern's Train 32N on February 3, 2023 and the ensuing environmental disaster in the community of East Palestine captured the attention of the nation. Naturally, governmental action and oversight and private lawsuits followed. The NTSB, the FRA, and the Environmental Protection Agency ("EPA") immediately got to work determining the cause of the derailment, assessing the adequacy of safety policies at Norfolk Southern, and evaluating and assisting with the cleanup from the unnecessary vent and burn of vinyl chloride. Numerous legislatures, including the United States Senate and the state legislatures of Ohio and Pennsylvania, held hearings regarding the derailment. And communities who were impacted by the toxic chemicals released into their neighborhoods filed suit in order to hold Norfolk Southern accountable for the damage the Company had caused.

### A. The NTSB Initiated an Investigation of the East Palestine Derailment

371. Immediately following the East Palestine Derailment, NTSB investigators arrived at the scene to begin conducting an investigation to determine the probable cause of the derailment and to evaluate the emergency response efforts.

372. On February 23, 2023, the NTSB released their preliminary report assessing the cause of the East Palestine Derailment (the "NTSB Preliminary Report"). The NTSB Preliminary Report noted that, prior to the derailment, Train 32N passed three HBDs. At each of the three HBDs, a wheel bearing registered a sharply increasing temperature of 38°F, 103°F, and 253°F above ambient temperature.

373. The NTSB Preliminary Report noted that it was only at the third HBD that the crew on the train received an alert, as Norfolk Southern policy dictated that HBDs operate at thresholds that generate "non-critical alarms" if: (1) there is a reading of between 170°F and 200°F above ambient temperature; or (2) there are successive readings for the same axle that show an increase greater than or equal to 115°F. Per Norfolk Southern policy, "critical alarms" are only generated if there is a reading of greater than 200°F above ambient temperature. On the day of the East Palestine Derailment, even though the first two HBDs indicated a bearing was

drastically increasing in temperature, neither the increase nor the individual temperature reading at the second HBD was sufficient to register a "non-critical" alarm.

374. Upon receiving the "critical" alarm following the third HBD's reading, the NTSB Preliminary Report found that the crew "increased the dynamic brake application to further slow and stop the train." During deceleration, the train's automatic braking system also activated, which, the NTSB Preliminary Report noted, could indicate that a separation which disconnected the brake hoses between railcars had occurred. Following the application of the emergency braking system, Train 32N came to a stop.

375. The NTSB Preliminary Report noted that, in the days following the East Palestine Derailment, the cars that contained the vinyl chloride were vented and their contents burned due to an ongoing concern that rising temperatures could cause an explosion due to potential "polymerization" of the vinyl chloride.

376. On the day that the NTSB Preliminary Report was released, the NTSB held a press conference at which NTSB Chair Homendy spoke regarding the East Palestine Derailment, which she called "100% preventable." "We call these things accidents, but there is no accident," she said.

377. Following the release of their preliminary report, the NTSB conducted a full investigation into the cause of the East Palestine Derailment. The NTSB collected 279 separate exhibits and interviewed numerous Company, union, and government witnesses, and held hearings in East Palestine on June 22, 2023 and June 23, 2023. On February 7, 2023, the NTSB announced that it would conduct further proceedings to vote on the final findings and approve the final report from their investigation.

**B. The Federal Railroad Association Conducted a Detailed Assessment of the Safety Culture at Norfolk Southern**

378. Following the East Palestine Derailment, the FRA announced on March 8, 2023 that it would be conducting a Supplemental Safety Assessment of Norfolk Southern. The results of this assessment, which was conducted between March 15, 2023 and May 15, 2023, were released by the FRA in a 143-page report on August 9, 2023 (the "FRA Safety Assessment").

379. The FRA Safety Assessment analyzed the safety culture at Norfolk Southern by determining whether and to what extent Norfolk Southern's operation embodied the FRA's 10 key elements of a strong safety culture, which include: (i) leadership is clearly committed to safety; (ii) the organization practices continuous learning; (iii) decisions demonstrate that safety is prioritized over competing

demands; (iv) the reporting systems and accountability are clearly defined; (v) there is a safety conscious work environment; (vi) employees feel personally responsible for safety; (vii) there is open and effective communication across the organization; (viii) employees and the organization work to foster mutual trust; (ix) the organization responds to safety concerns fairly and consistently; and (x) safety efforts are supported by training and resources.

380. Norfolk Southern's performance in each of these key elements was judged on a sliding scale of "maturity levels" according to the Fleming Safety Culture Maturity Model ("FSCMM"), with Level 1 being the least safe and Level 5 being the most safe:




381. Of the ten "Key Elements" observed, the FRA ranked six of them at either "Level 1" or "Level 2" of the FSCMM.

382. Of particular note was the FRA's assessment of the third Key Element addressing whether decisions demonstrate that safety is prioritized over competing demands. This Key Element received a "Level 2" ranking from the FRA. The FRA's assessment of this element included a "detailed review of [Norfolk Southern's] Wayside Detector program." The FRA Safety Assessment noted that, with respect to the operation of the Wayside Detector program, "[c]lear, documented decision-making to ensure the safety of personnel, equipment, infrastructure, the public, and the environment in response to an alarm is a key component of prioritizing safety over competing demands," but that Norfolk Southern's "current procedures fall short of this standard."

383. In addition to analyzing the current safety culture at Norfolk Southern, the FRA Safety Assessment, in an apparent acknowledgment of the Company's adoption of PSR, noted that "[w]ithin the past five years, [Norfolk Southern] has undergone significant organizational and operational changes" and that "in recent years . . . has begun to operate increasingly longer trains." In addition, the Safety Assessment presented data showing that, during that same period, between 2018 and 2022, the rate of accidents per million train miles rose faster for Norfolk Southern than for any other Class I railroad:




### C. Following the East Palestine Derailment, the Environmental Protection Agency Has Closely Monitored the Cleanup of Toxic Chemicals Released During the Derailment and Subsequent Vent and Burn

384. Within hours of the East Palestine Derailment, the EPA deployed a team to support state and local emergency officials and aide in environmental response efforts to the crash.

385. On February 21, 2023, the EPA ordered Norfolk Southern to clean up environmental damage that was caused by the derailment pursuant to the Comprehensive Environmental Response, Compensation, and Liability Act, or CERCLA (also commonly known as "Superfund"). Throughout the course of the weeks and months that followed, the EPA has monitored the air quality in East

Palestine and overseen Norfolk Southern's cleanup activities. As of April, 2024, the cleanup, and the EPA's oversight of it, is still ongoing.

### D. The State Legislatures of Ohio and Pennsylvania Took Action Following the East Palestine Derailment

386. On March 10, 2023, the Pennsylvania Senate convened a hearing to discuss the East Palestine Derailment, which happened in Eastern Ohio, very near to the Pennsylvania border. Two members of the Veterans Affairs and Emergency Preparedness Committee, Senator Doug Mastriano and Senator Katie Muth, presided over the hearing. Witnesses included Shaw, as well as Robert Comer, a forensic railroad accident investigator with a 33-year career during which he had performed over 800 investigations. During his testimony, Mr. Comer raised important questions about the way in which Norfolk Southern was building its trains, as well as the consistency with which Norfolk Southern was performing inspections on rail cars.

387. The following month, on April 18, 2023, the State Senate of Ohio also convened a hearing to discuss the East Palestine Derailment. A panel of Ohio State Senators called Shaw to testify, and questioned him regarding a "wide range of topics related to the derailment and subsequent controlled chemical release" that continues to impact the community of East Palestine.

388. Subsequently, Ohio Attorney General Dave Yost filed a lawsuit against Norfolk Southern on March 14, 2023 alleging that the East Palestine Derailment resulted in "the release of over one million gallons" of toxins that were harmful to Ohio's ecosystems in the area surrounding East Palestine and which "recklessly endanger[ed] the health of Ohioans throughout the region." The Attorney General filed this suit to "recover response costs, redress damages to natural resources, and receive an order for injunctive relief, civil penalties, and damages."

### E. Private Citizens of East Palestine and the Surrounding Area Impacted by the Derailment Brought Suit Against Norfolk Southern

389. On February 9, 2023, less than a week after the East Palestine Derailment, Andrew Erdos, David Anderson, and Valley View MHP LLC, filed a class action suit on behalf of a putative class of individuals and corporations who suffered negative consequences to their health, property, or business due to the derailment and release of toxic chemicals into the surrounding community brought suit against the Company.

390. On April 9, 2024, it was reported that the Company agreed to settle the class action suit for $600 million.

### F. The United States Senate Commerce, Science, and Transportation Committee Held a Hearing on Improving Rail Safety in Response to the East Palestine Derailment

391. On March 22, 2023, the United States Senate Commerce, Science, and Transportation Committee held a hearing to discuss the East Palestine Derailment. Witnesses included Chair Homendy, Clyde Whitaker, the Ohio State Legislative Board Director for SMART, and defendant Shaw.

392. Chair Homendy opened her testimony to the Senate by proclaiming that the East Palestine Derailment was "***100 percent preventable***."

393. Whitaker testified to the Senate regarding Norfolk Southern's documented improper use of wayside detectors both prior to and following the East Palestine Derailment:

> Actions do speak louder than words, and ***I assure you that what you have heard and will hear from the railroads today are nothing more than words***. Their actions are what's experienced by men and women I represent, as well as what the people of East Palestine have been through. This is the reality of what happens when railroads are primarily left to govern and regulate themselves.
>
> To that point, ***on July 11, 2022, I filed a complaint with the FRA regarding an unsafe practice that was occurring on Norfolk Southern***. Despite existing operating rules to the contrary, ***[Norfolk Southern] was giving instructions to crews to disregard wayside detector failures and to keep their trains moving***. This meant that trains were not being inspected as intended and that the crews were not able to ascertain the integrity of such trains. This fact has remained in place ***even after East Palestine***, but these types of issues aren't just

> relegated to wayside detectors. It is a ***virus that has played the industry for some time with the inception of precision scheduled railroading***.

394. Whitaker discussed the impact that PSR and a focus on efficiency has had on the railroad industry, testifying that across the country "inspections and maintenance [are] being deferred to expedite the movement of trains" and that minimizing time has replaced safety as the goal of inspections. Together with the fact that "railroads [are] on a determined course to grow these trains to astronomical lengths," Whitaker drew a straight line from these polices to the East Palestine Derailment.

395. Senator Ted Cruz of Texas questioned Shaw about Norfolk Southern's use of the wayside detectors:

> [Question] Mr. Shaw, perhaps you didn't hear my question, so let me ask it again. The first hot-box measured 38 degrees above ambient temperature. As I understand, the ambient temperature was about 20 degrees, so that was roughly 58 degrees. Ten miles later, the second hot-box measured 103 degrees above ambient temperature. That's an increase of over 60 degrees in 10 miles. Why did Norfolk Southern not stop the train then and examine the bearing to make sure that it didn't melt the axle and that you didn't have a derailment? If you'd stop, then it would have prevented the derailment. So my question is why did the second hot-box reading not trigger action?
>
> [Answer] ***Senator, my understanding is that that second reading was still below our alarm threshold***, which is amongst the lowest in the industry. In response to this, the industry has agreed to work together to share best practices with respect to hot-box detectors, trending technology, and thresholds.

> [Question] So when you and I visited my office yesterday, you said your – your threshold is now 170 degrees above ambient temperature. As I understand at the time of the derailment, your threshold was 200 degrees above ambient temperature. So you're right, 103 was not 200 degrees.
>
> As you and I discussed, I've spoken with – ***with your competitors***, other Class 1 railroads who ***have indicated that trending technology and algorithms can measure significant changes in temperature and – and, in particular, can – can flag that when it goes from 38 degrees to 103 degrees, you need to stop and take a look at it***.

396. Whitaker followed up on this point, noting that the way in which Norfolk Southern's wayside detectors worked deprived the train crew of the information it needed, sending alerts instead to the Wayside Desk in Atlanta:

> I'd like to just make note that trending defect detector technology, from being in the cab of a locomotive, ***when we pass a defect detector, it trends to a [sic] office like Norfolk Southern and Atlanta Georgia***. It doesn't convey to the railroad crews, which is a problem in this incident, as well as many others. That still continue[s] to this day.
>
> What we need as a trained crew, which they say they listen, they haven't been listening for quite a while, we need to be notified whenever these trending detectors are seeing this car trend hotter that way we can keep a better eye on it or even stop, inspect that rail car.
>
> ***But as it stands right now, even after East Palestine, it's all about moving the train. That's all PSR is. That's all they care about***. So right now, they tell the train crew to stop your train, set your brakes in a full-service application, then release. And hopefully, that releases whatever the case may be.
>
> ***When the safest cause -- case should be we stop, and go back, and inspect. That's what the conductor is there for***. That's why a two-person crew is essential.

397. Whitaker further testified that the policy of instructing crews to ignore alerts generated by wayside detectors persisted even after the East Palestine Derailment. Whitaker described an incident near Cleveland several days after the East Palestine Derailment in which a crew operating a Norfolk Southern train, after receiving an all-clear directly from the defect detector, was later told by the dispatcher that there was a "report of a trending defect detector on the train" and was instructed to stop and inspect. However, ***"[i]mmediately after that, the chief dispatcher, which is the person that controls the whole railroad, told them to keep going***."

398. Whitaker stated that an eastbound train passing this train then informed the crew that the train was on fire.

399. Senator Edward Markey of Massachusetts asked Whitaker whether PSR was in conflict with safety as a priority in railroads:

> [Question] Mr. Whitaker, do you agree that the rail industry, including ***Norfolk Southern, has a business model that prioritizes profit over safety***?
>
> [Answer] Thank you for the question. ***Yes, that business model is precision scheduled railroading***.

400. Whitaker then testified that employees who stop work due to safety concerns "***would be retaliated against***" due to lack of legal "protections."

401. Senator J.D. Vance of Ohio then questioned Whitaker regarding visual inspections for railcars:

> [Question] So the railroad industry claims that visual inspections are nearly useless when it comes to journal bearings. Do you believe th[at] is true?
>
> [Answer] Thank you for the question. And I believe that visual inspection is one of the most important aspects of inspecting a railcar . . . .
>
> * * *
>
> [Question] Can you inspect a railcar adequately in 30 seconds, Mr. Whitaker? Any of your workers?
>
> [Answer] Absolutely not, sir. I would say [a] railcar would take at least three minutes or longer all in the name of safety . . . .

402. Senator Peters of Michigan stated on the record that he had in his possession documents that show that Norfolk Southern was currently operating "***dozens of railcars . . . that have gone over 5,000 miles without a Class 1 break inspection***," noting that "[t]hat's ***thousands of miles above what the Federal Railroad Administration regulations require***." Senator Peters also noted that there are "over 100 cars [that] have gone over ten thousand miles and in one case, 90,000 miles without a mechanical inspection."

403. Senator Maria Cantwell of Washington again asked Shaw about the sufficiency of 30-second-per-side inspections, introducing into the record a Norfolk

Southern document that mandated "0.5 minutes per car with one inspection" or in other words that Norfolk Southern employees have to "inspect one side of that car within 30 seconds." Senator Cantwell noted that "safety should not be on a timeline" and asked Shaw if he supported "getting rid of this notion that it's 30 seconds [to inspect one side of a car]." When Shaw noted that he was not familiar with the 30 second requirement, Senator Cantwell reminded him that "***it's clearly your document***."

404. Senator Cantwell then questioned Whitaker regarding Norfolk Southern's use of wayside detectors, and the fact that Train 32N was trending hot according to the wayside detectors prior to the East Palestine Derailment:

> [Question] Wait, wait, wait. You're saying ***they knew that this train had a weak spot? Is that what you're saying***?
>
> [Answer] Absolutely . . . . If they're trending defect detector according to the NTSB report that I've read, they've seen this car trend hotter and hotter over the course of three detectors, I believe. ***That information is going to somebody at Norfolk Southern and they're not conveying that information to the railroad crews***.

405. Whitaker later testified that, when car bearings are trending hotter, it is important to "stop [to] check it out. No matter if we don't even hit that threshold. Let's take the safest course of action."

# X. DEFENDANTS MADE MATERIALLY FALSE OR MISLEADING STATEMENTS AND OMISSIONS OF MATERIAL FACT

406. Throughout the Class Period, Defendants convinced the market that although they were applying the PSR rubric of doing more with less – longer, heavier trains running faster with fewer people operating and maintaining them – they still were maintaining a safe railroad. Defendants routinely remarked on the safety of their operation following their implementation of PSR, the virtues of running longer trains – a key aspect of Norfolk Southern's PSR implementation – and the quality of their training and qualification of their employees. In connection with Defendants' false or misleading statements, Defendants misrepresented or omitted material information concerning their inability and unwillingness to implement their version of PSR safely.

## A. False or Misleading Statements Regarding Norfolk Southern's Safe Implementation of PSR Principles

407. On October 28, 2020, Norfolk Southern filed with the SEC a Form 10-Q that reported its financial results for the quarterly period ended September 30, 2020 (3Q 2020). That same day, Norfolk Southern held an earnings call with investors to discuss its 3Q 2020 financial results. During the call, defendant Squires touted Norfolk Southern employees' "dedication to operating this railroad as

***efficiently and safely*** as possible while continuing to deliver for our customers during these unprecedented times."

408. On January 27, 2021, Norfolk Southern filed with the SEC a Form 8-K, which attached a copy of a press release the Company published that day announcing its financial results for the quarterly period ended December 31, 2020 (4Q 2020) and for the full fiscal year 2020 (FY 2020). The press release stated in pertinent part:

> "During a year of unprecedented market disruption and uncertainty, ***the Norfolk Southern team delivered record productivity levels while providing safe and reliable freight solutions*** for our customers," said James A. Squires, Norfolk Southern chairman, president and CEO.

409. That same day, Defendants hosted a conference call with investors, in which defendant Sanborn echoed Squires' sentiments regarding safety:

> During the fourth quarter, we saw volumes continue their climb from pandemic induced lows earlier in the year. So the mission of the operating team was handling more business while reducing resources and improving productivity. Our push for efficiency led to record train weight and record train length in the quarter. These larger trains, combined with our strategy of better matching train size and locomotive horsepower, drove us to record fuel efficiency and enabled us to get the job done with a smaller workforce and a record low count of locomotives. I also have to thank the people that make up our operations team and all crafts. We achieved these records due to their hard work and ***most importantly, we did so safely***.

410. On March 31, 2021, Norfolk Southern filed with the SEC its annual proxy statement ("2021 Proxy Statement"). Included in the 2021 Proxy Statement

was a letter to shareholders from the Company's Board which stated in pertinent part:

> The Board is committed to ***safety as a core value of Norfolk Southern, and we review safety topics regularly***. To allow us to delve into the topic on a deeper level and enhance our oversight of ***the Corporation's commitment to safety***, we formed a standing Safety Committee in 2020 to review, monitor, and evaluate the Corporation's compliance with safety programs and practices.

411. Included in the 2021 Proxy Statement was a section titled: "Corporate Responsibility Highlights," in which Norfolk Southern further stated: "***Safety is a way of life at Norfolk Southern, extending beyond our rail operations and into the communities where we live and work***. This commitment is reflected by the Board establishing a Safety Committee."

412. Defendant Squires reiterated this sentiment during Norfolk Southern's Annual Shareholders Meeting on May 13, 2021. During the meeting Squires remarked to investors that Norfolk Southern advanced its PSR strategy while continuing to operate safely:

> Thanks to the tireless efforts of [Norfolk Southern's] field employees and the dedication of our entire NS team we ***have continued operating safely and reliably throughout the COVID-19 pandemic***. Despite inherent challenges, we've advanced our long-term strategic goals to build a faster, more efficient and technologically innovative railroad. We've reduced our company's resource needs, exercise[d] strong financial discipline and achieved consistent operating ratio improvement. We're now accelerating our implementation of precision

> scheduled railroading principles to drive the productivity and efficiency of our organization even further, helping us better serve customers, support growth and drive long-term value.

413. During the same presentation, Squires thanked Norfolk Southern field employees for operating the Company "***as efficiently and safely as possible***."

414. On March 31, 2022, Norfolk Southern filed with the SEC its annual proxy statement ("2022 Proxy Statement"). Included in the 2022 Proxy Statement was a letter to shareholders from the Company's Board which stated: "***The Board is committed to safety as a core value of Norfolk Southern***, and we continue to use our Safety Committee to consider safety topics regularly."

415. Later, in its "ESG Highlights" section, the 2022 Proxy Statement stated: "***Safety is part of who we are. Safety is core to our business*** and essential to achieving operational excellence. From our Board of Directors' Safety Committee to our local safety and service committees, ***safety is top down-bottom up***."

416. On June 14, 2022, defendant Sanborn testified before the U.S. House of Representatives Subcommittee on Railroads, Pipelines, and Hazardous Materials of the Committee on Transportation and Infrastructure. Sanborn began her prepared testimony by describing Norfolk Southern and the other U.S. freight railroads as providing "the ***world's safest***, most productive and lowest-cost freight rail service." Sanborn further stated:

> The men and women of Norfolk Southern put their boots on every day and work hard to provide a safe, efficient, and reliable service product for our customers.
>
> * * *
>
> For Norfolk Southern – and I'm sure I can speak for all railroads here too – ***pursuing safe operations is not optional; it's a business imperative***. We have an obligation to operate safely for the benefit of our employees, our customers, and the communities where we operate.

417. In responding to the Representatives' written questions, defendant Sanborn affirmed: "At a fundamental level, precision scheduled railroading is about using assets in the most efficient manner possible ***without sacrificing safety***." And when Sanborn addressed a Representative's question about how Class I railroads balance safety, customer service, and stock performance, she responded that safety remains "paramount":

> ***None of the three elements listed – safety, customer service, or returning value to shareholders – has to come at the expense of the others***.
>
> ***Safety is paramount***. As I noted in my testimony, for Norfolk Southern, pursuing safe operations is not optional, it's an imperative. ***We know we have an obligation to operate safely*** for the benefit of our employees, our customers, and the communities where we operate. That means that if an operating practice is unsafe, we will change it. If an employee acts in an unsafe manner, that will be addressed. If we are bringing on new employees, we will not rush the process such that they are not properly trained to be able to safely do the work we need them to do. We work very hard to instill in our employees a high level of safety awareness in everything they do. We also spend enormous amounts of capital to expand and enhance the capacity and capability

of our network; ***virtually all of those investments directly or indirectly improve safety in some way***.

418. On July 27, 2022, Norfolk Southern filed with the SEC its 2Q 2022 Form 10-Q, reporting its financial results for the quarterly period ended June 30, 2022. That same day, Norfolk Southern issued a press release reporting its 2Q 2022 financial results and hosted an earnings call with investors. During the earnings call, defendant Sanborn reassured investors that "***all of our employees, tenured and new alike are laser-focused on running a safe operation***."

419. On January 25, 2023, just days before the East Palestine Derailment, Norfolk Southern filed with the SEC a Form 8-K, which attached a copy of a press release reporting the Company's fourth quarter and full year results for 2022. That same day, Norfolk Southern hosted an earnings call with investors. During the call, Executive VP & COO Paul Duncan, speaking on Norfolk Southern's behalf, told analysts: "Every conversation will begin with safety in 2023 and beyond. Operating safely is the right thing for our employees, customers, shareholders and the communities that we serve. This is an area where we have made great strides, but even one serious incident is too many."

420. Contrary to these statements, Norfolk Southern's operation during the Class Period was unsafe, and the implementation of PSR principles and other

policies, including increasing train length, adding tonnage, slashing the workforce, gutting training, and forgoing mandated inspections and maintenance, deprioritized safety and was in conflict with the safety of Norfolk Southern's operation such that Norfolk Southern's employees were not only incentivized to prioritize speed over diligence and safety, but faced negative consequences, including termination, for raising safety issues. Thus, the statements set forth above in ¶¶407-419 were materially false or misleading for the following reasons:

(a) Whitaker testified before the U.S. Senate that "Norfolk Southern has a business model that prioritizes profit over safety" and that "that business model is precision scheduled railroading."

(b) While testifying before the United States Senate Committee on Environment and Public Works on March 8, 2023, defendant Shaw admitted that Norfolk Southern's "near-term focus" leading up to the East Palestine Derailment was "solely on profits."

(c) Cox told the NTSB that safety was not the priority at Norfolk Southern following the implementation of PSR. Rather, the focus of the Company was on getting cargo to the destination "fast" and "by any way possible."

(d) Under PSR, Norfolk Southern implemented new time restrictions on car inspections that, according to Fannon, ***made it impossible to***

***conduct a proper inspection***. Fannon testified to the NTSB that "[i]t's hard to walk [the length of a car] and look at every aspect of a rail car in 1 minute . . . . There's no way to do a proper inspection in that time frame." According to FE-7, prior to Defendants' increased emphasis on efficiency, there was no time limit on inspections, and that they usually lasted two-three minutes per car. After PSR, FE-10 stated that he would be reprimanded if a train car sat in a terminal area for too long. Cox and Arouca described the pressure to minimize dwell time leading to Norfolk Southern "forcing . . . these inspection times to get down and down and down and down."

(e) Putting further pressure on inspectors, FE-14 and FE-11 both noted that Norfolk Southern expanded the length of the trains, decreased the number of inspectors, and still expected the inspections to be completed in the same amount of time or faster. With fewer members on the crew and less time to complete inspections on longer trains, FE-4 stated employees "could not do effective inspections."

(f) Norfolk Southern management, according to FE-7 began to discourage more thorough inspections after PSR in favor of relying on the wayside detectors to discover any problems with the wheels or brakes.

(g) Norfolk Southern actively discouraged workers from reporting defects that would slow down its operations, despite frequent statements to the public about its safety-conscious culture. Arouca, Cox, FE-14, Cassity, and Pitts recalled pressure and "***[i]ntimidation***" not to report unsafe conditions. Arouca told the NTSB that Norfolk Southern's new unofficial policy was to simply tell its employees to "stop finding defects." For example, FE-14 stated that prior to PSR, managers praised employees for reporting a safety issue, however, after the implementation of PSR, management would tell the employee that the issue is "not unsafe, just go." Cox said that the lack of an anonymous way to report safety concerns meant that employees who spoke up would be subjected to increased scrutiny until they made "a mistake."

(h) Contrary to Defendants' numerous statements indicating that safety was a high priority for the Company and its employees, along with the adoption of PSR, Norfolk Southern imposed retribution and discipline upon employees who voiced safety concerns. According to Cassity, since the implementation of PSR "if a conductor or an engineer brings up an issue or identifies a defect, all too often the instruction is for the crews to ignore it or to take it anyway." Cassity continued to explain that Norfolk Southern employees who wanted to "approach it from a more safety oriented approach, if you will, typically find

themselves being targeted by the managers for termination or discipline." Cox, when asked by the NTSB whether employees were disincentivized to report safety concerns and injuries for fear of reprisal or retaliation, answered "absolutely" and "1,000 percent." Cox noted that when employees did speak up, they were "harassed" by their supervisors or told to "remove the tags" from the cars that indicated that the car needed to be taken out of service for repairs. FE-14 recalled employees who raised safety issues more than once "w[ere] probably fired." FE-17 corroborated that employees were afraid to get involved in reporting problems because Norfolk Southern commonly retaliated against employees who spoke up about safety issues.

(i) Fannon informed NTSB investigators that, in order to cut costs, Norfolk Southern "went from an annual rules class to every three years" so that its employees would not lose "1 or 2 or 3 days of productivity," resulting in less discourse about safety among Norfolk Southern's workforce and leading to "everybody's perception that safety is not important at [Norfolk Southern]."

(j) Contrary to its statements regarding its commitment to safety, Norfolk Southern "disbanded" the local safety committees that met each month, and that included "all crafts and management." Cox corroborated that "[w]hen precision scheduled railroading came down," the safety committees were "looked upon as a waste of resources." Arouca described the elimination of these committees as

"***utterly insane***" given the "dangerous environment" in which railroad employees work and the "unstoppable/immovable forces" involved.

(k) According to FE-7, there was mounting pressure from the Transportation Department of Norfolk Southern to let trains run with known defects, with the intention of fixing the defect at the next waypoint, and that carmen at Norfolk Southern felt more and more pressure to not identify defects at all. FE-7 indicated that there was an unofficial "naughty list" for carmen who spent too much time on inspections and went over the new time limits imposed by management. Whitaker told the U.S. Senate that employees who stop work due to safety concerns would be "retaliated against."

(l) During the hearing of the Senate Commerce, Science, and Transportation Committee into the East Palestine derailment, Senator Peters of Michigan stated on the record that he had in his possession documents that show that Norfolk Southern was, at the time, operating "dozens of railcars . . . that have gone over 5,000 miles without a Class 1 inspection," which was "thousands of miles" outside of what the FRA regulations required. Senator Peters further noted that he was aware of "over 100" cars that had gone tens of thousands of miles without a mechanical inspection. FE-6 recalled engaging in "block swapping," a practice that he says increased after PSR, which entailed moving around railcars in such a way as

to avoid performing a full inspection, and instead performing a "roll-by inspection." Arouca showed NTSB inspectors records that identified Norfolk Southern train cars that had gone "19,000 miles," "44,000 miles," "46,000 miles," "72,000 miles," and "90,000 mile[s]" between inspections. This, according to Arouca, was "***a bit of a smoking gun***."

(m) Norfolk Southern's many statements that its implementation of PSR, of which a key component was increasing train length, was safe were materially misleading because Norfolk Southern was building its longer trains in an inherently careless and dangerous manner, and without regard for proper placement of cars on its increasingly long and heavy trains. Cassity testified to the NTSB that Norfolk Southern was building trains "nonchalantly" and that they weren't "paying attention to where the tonnage actually sits." Cassity testified that this poor train construction meant "it's extremely likely that you're going to have a lot of tonnage behind a lot of empties[,]" and that this was extremely likely to cause derailments in situations where the brakes were applied to stop the train quickly. Moreover, FE-12 and FE-13 explained that due to the length of the trains, if a conductor was located too far away from the engineer, they could lose radio signal, preventing them from communicating with one another. A loss of communication was particularly common for trains that had to use distributed power due to their excess length and

weight, according to Cassity. Furthermore, Greficz and FE-8 indicated that when a wayside detector would trigger an alert that a wheel or bearing was overheating, due to the extraordinary length of the trains, by the time that a conductor walked to the overheated wheel, the wheel may have cooled off, resulting in an inability to diagnose faults. The construction of long trains in such a way as to make a derailment likely is neither safe nor efficient.

(n) According to Sloper, the engineer who took Train 32N from Decatur, Illinois to Toledo, Ohio prior to the East Palestine Derailment expressed that "he didn't feel comfortable running" the train as it was "the largest and heaviest train that he had ever run." After informing the yardmaster of the concerns about the length and weight of the train combined with the relative inexperience of the engineer, the yardmaster forced the engineer to drive the train. The next crew of Train 32N, which was operating the train at the time of the East Palestine Derailment, included a conductor who had only "8 months on the railroad."

(o) Contrary to Defendants' statements, Norfolk Southern's apathy towards safety was evident in the way hazardous materials were transported. Norfolk Southern employees regularly ignored rules about placing hazardous materials too close to the engine. FE-6 described management ordering a train to make its scheduled trip despite warnings that hazmat cars were only four positions

from the engine – a violation of rules that ban hazmat within six cars of the engine. FE-5 also recalled Norfolk Southern trains coming into his train yard in Ohio from other locations sometimes did not conform to hazmat rules regarding car placement.

(p) Norfolk Southern's deliberate staffing cuts of the Wayside Desk and its disabling of wayside detector alerts to train conductors materially impeded the safety of the railroad. According to Rambo, the Norfolk Southern ATC analyst who was working the Wayside Desk the day of the East Palestine Derailment, Norfolk Southern, after instituting a round of job cuts, only employed enough ATC analysts to allow one to be on duty at any given time. Given the hundreds of alerts the Wayside Desk received in any given shift, and the reality of food and bathroom breaks, the Wayside Desk was significantly under-manned.

(q) Rambo's interview during the NTSB investigation into the East Palestine Derailment exposed that when the Wayside Desk received the initial alert that notified a "bearing spike of 103 degrees" on Train 32N, prior to the East Palestine Derailment, Rambo "didn't see it" because he was attending to "three other trains" that were throwing up alerts via wayside detectors. Rambo recalled that during a 12-hour shift, where there would be no breaks, it was ***typical to receive around 300 alerts***, which works out to an average of one notification every two minutes.

(r) Norfolk Southern increased the load and responsibility of the already over-worked Wayside Desk in order to prioritize speed. Greficz told the NTSB that Norfolk Southern altered its policy in order to keep wayside detectors from communicating directly with train crews in all but the most serious of situations, and that in all other cases the Wayside Desk was responsible for informing the train crews if there was an alert. According to Greficz, the Wayside Desk would make a determination as to whether to inform the train crew of these "nonessential" alerts. FE-3 said that the Wayside Desk might determine that a problem was not serious enough to warrant delaying the train to dispatch a crew to investigate it, "pos[ing] a safety risk" for those aboard the train. Pitts, FE-13, and FE-3 also reported concerns with how much crews aboard trains had to rely on safety decisions made by remote Wayside Desk employees. Cassity indicated fears that the Wayside Desk prioritized keeping trains moving over safety concerns when determining what information to relay to the train crews, and which instructions to give as a result of certain alerts. Cassity related it to the East Palestine Derailment, "[i]n East Palestine, you had defect detector number 1, no issue; defect detector number 2, no issue[;] defect detector number 3 had a 65-degree [Fahrenheit] increase above ambient temperature." According to Cassity, "there's not a world, as an engineer or a conductor, that I don't want to know about that, I have to know about

that. That is a significant increase in temperature." For instance, Whitaker described an incident near Cleveland several days after the East Palestine Derailment in which a crew operating a Norfolk Southern train, after receiving an all-clear directly from the defect detector, was later told by the dispatcher that there was a "report of a trending defect detector on the train" and was instructed to stop and inspect. However, "[i]mmediately after that, the chief dispatcher, which is the person that controls the whole railroad, told them to keep going."

(s) Moreover, Cassity told the NTSB that, even when train crews did receive alerts generated by the wayside detectors, they were increasingly being instructed to ignore that information. This policy was also noted by Whitaker in his testimony to the U.S. Senate, where he informed the committee that Norfolk Southern was "giving instructions to crews to disregard wayside detector failures and to keep their trains moving." Pitts recalled a dispatcher telling his crew to proceed without stopping to inspect an alert caught by a wayside detector that the train's air pressure was going down, which could lead to issues with the brakes and other problems. FE-4 stated that due to pressure to stay on schedule, the desk operators in Atlanta "would tell you to wait till the next terminal for mechanical to inspect [any warm or hot bearings]," which could have been 25 miles away. FE-11

stated that many times a train that should have been stopped was directed to continue on because there was pressure from the "***top down***" to keep trains moving.

(t) Even if a crew did stop to perform the inspection, the Company encouraged unsafe practices to keep the train moving. FE-11 described that many times when the train had a stuck brake, the conductor or engineer would attempt to "set and release" the wheel's brake to correct the problem. If the wheel could then roll, the engineer was expected to move on with the train. FE-11 explained that the risk involved with the "set and release" practice was that sometimes the brakes may lack sufficient air pressure which could cause the brake to stick as the train began moving again, leading the wheel to lock up and slide down the rail instead of rolling, which increased the risk of a derailment.

(u) In an effort to cut costs, Norfolk Southern cut personnel across the board amounting to a nearly 40% reduction, leading to what Greficz called a "self-imposed manpower shortage." The cuts resulted in extremely overworked and fatigued employees, imperiling the railroad's operations. Cox described Norfolk Southern's "forced overtime" of 16-hour days, 5 days a week. Other former employees, including FE-1, FE-2, FE-8, and FE-10, similarly recalled that Norfolk Southern's relentless furloughs across all departments meant that the remaining employees were expected by Norfolk Southern management to work extremely long

hours with no breaks to compensate for the lost manpower despite reports of fatigue. FE-11 and FE-5 stated that Norfolk Southern often manipulated the schedules to deny workers their FRA-mandated days off.

(v) Norfolk Southern disproportionately terminated carmen in order to exploit a loophole in FRA regulations and maintain the appearance of a safe operation while operating with a severely reduced workforce. According to Arouca, Cassity, Fannon, and Greficz, Norfolk Southern engaged in "abus[e]" of a "massive loophole" in FRA regulations by furloughing carmen, who had specialized training in inspections, such that the train's crew could conduct an abbreviated inspection as permitted in the absence of a qualified carmen by Appendix D. As Cassity explained, a conductor might get "a 45-minute program on a computer that tells them how to do a Class I inspection" whereas carmen receive several years of training. FE-6 felt similar concerns as carmen layoffs forced conductors to perform repairs and inspections which they were not trained to complete. Norfolk Southern was able to tell the investing public it still operated "safely" in part because the Company only technically complied with federal regulations, but not the spirit of them. Cox tied exploitation of federal regulations to limit car inspections directly to the East Palestine Derailment.

(w) Norfolk Southern made drastic spending cuts that threatened safety at every turn. On top of furloughing employees and cutting back on training, the Company cut costs in other unsafe ways. According to FE-2, Norfolk Southern ran longer trains and refused to spend money on replacement parts – forcing employees to take parts from other active locomotives. Additionally, FE-4 indicated that the distance between HBDs – the warning sensors along the track that check wheel temperatures – widened after the implementation of PSR to cut overall maintenance costs.

## B. False or Misleading Statements Regarding Employee Safety and Reportable Accidents

421. On February 4, 2021, Norfolk Southern filed with the SEC its annual report on Form 10-K for the fiscal year ended December 31, 2020 (the "2020 10-K"), which was signed by defendant Squires.

422. In a section describing "HUMAN CAPITAL MANAGEMENT," the 2020 10-K stated:

> ***Safety*** – We are dedicated to providing employees with a safe workplace and the knowledge and tools they need to work safely and return home safely every day. Our ***commitment to an injury-free workplace*** is illustrated by our "I am Coming Home" safety message, which is featured prominently in our yards, shops, and facilities and ***further reinforces the importance of working safely***.

423. On February 4, 2022, Norfolk Southern filed with the SEC its annual report on Form 10-K for the fiscal year ended December 31, 2021 (the "2021 10-K"), which was signed by defendant Squires.

424. The 2021 10-K repeated the 2020 10-K's statement regarding "Safety" found in the "HUMAN CAPITAL MANAGEMENT" section.

425. On April 27, 2022, Norfolk Southern hosted an earnings call with investors to discuss its 1Q 2022 financial results. On that call, defendant Sanborn reported on Norfolk Southern's safety record, telling investors that:

> ***We have seen improvement in both FRA train accidents per ton miles moved as well as the FRA injury index year-over-year***.
>
> However, we will not be satisfied as long as there is a single injury or accident, which is why we continue our efforts to get better in this area every day.

426. On February 3, 2023, Norfolk Southern filed with the SEC its annual report on Form 10-K for the fiscal year ended December 31, 2022 (the "2022 10-K"), which defendants Shaw and Squires signed.

427. In a section describing "HUMAN CAPITAL MANAGEMENT," the 2022 10-K stated:

> ***Safety*** – We are dedicated to providing employees with a safe workplace and the knowledge and tools they need to work safely and return home safely every day. ***Our commitment to an injury-free workplace*** is outlined in our Foundation of Safety policy which focuses on rules compliance, responsibility, relationships, and responsiveness.

***Our safety programs, practices, and messaging further reinforces the importance of working safely.***

428. For the reasons set forth above in ¶420, the statements in ¶¶421-427 were materially false or misleading when made. In addition to the reasons detailed above in ¶420, defendant Sanborn's statements in ¶425 regarding an "improvement" in "FRA train accidents per ton miles moved" were materially false or misleading when made as Norfolk Southern's implementation of PSR deprioritized safety in favor of cutting costs to such a degree that Norfolk Southern's employees faced negative consequences, including termination, for reporting safety concerns that, if unchecked, would lead to train accidents. Likewise, Defendants' statements in ¶¶422, 424, and 427 regarding Defendants' commitment to "working safely" were materially false or misleading because, as Squires and Shaw knew or should have known, Norfolk Southern actually punished employees who reported safety concerns and, in fact, punished employees who reported their own injuries. These facts contradict Squires' and Shaw's assurances that their "safety programs, practices, and messaging further reinforce[] the importance of working safely." The opposite was true. Thus, the statements in ¶¶421-427 were materially false or misleading for the following reasons:

(a) Following the implementation of PSR, Norfolk Southern employees recognized safety concerns and accidents were occurring, but were deterred by the Company from making reports. Norfolk Southern imposed retribution and discipline upon employees who voiced safety concerns or reported accidents or injuries. According to Cassity, since the implementation of PSR "if a conductor or an engineer brings up an issue or identifies a defect, all too often the instruction is for the crews to take it anyway." Cassity continued to explain that Norfolk Southern employees who wanted to "approach it from a more safety oriented approach, if you will, typically find themselves being targeted by the managers for termination or discipline." Cox, when asked by the NTSB whether employees were disincentivized to report safety concerns and injuries for fear of reprisal or retaliation, answered "absolutely" and "1,000 percent." Cox noted that when employees did speak up, they were "harassed" by their supervisors or told to "remove tags" from the cars that indicated that the car needed to be taken out of service for repairs. FE-14 recalled employees who raised safety issues more than once "w[ere] probably fired." FE-17 corroborated that employees were afraid to get involved in reporting problems because Norfolk Southern commonly retaliated against employees who spoke up about safety issues.

(b) Norfolk Southern actively discouraged workers from reporting defects that would slow down its operations, despite frequent statements to the public about its safety-conscious culture. Arouca, Cox, FE-14, Cassity, and Pitts recalled pressure and "***[i]ntimidation***" not to report unsafe conditions. Arouca told the NTSB that Norfolk Southern's new unofficial policy was to simply tell its employees to "stop finding defects." For example, FE-14 stated that prior to PSR, managers praised employees for reporting a safety issue, however, after the implementation of PSR, management would tell the employee that the issue is "not unsafe, just go." Cox said that the lack of an anonymous way to report safety concerns meant that employees who spoke up would be subjected to increased scrutiny until they made "a mistake."

(c) According to FE-7, there was mounting pressure from the Transportation Department of Norfolk Southern to let trains run with known defects, with the intention of fixing the defect at the next waypoint, and that carmen at Norfolk Southern felt more and more pressure to not identify defects at all. Whitaker told the U.S. Senate that employees who stop work due to safety concerns would be "retaliated against."

### C. False or Misleading Statements Regarding Norfolk Southern's Handling of Hazardous Materials

429. On June 14, 2022, before the U.S. House of Representatives Subcommittee on Railroads, Pipelines, and Hazardous Materials of the Committee on Transportation and Infrastructure, defendant Sanborn testified that "***[s]afety extends to hazardous materials too***."

430. For the reasons set forth above in ¶420, the statements in ¶429 were materially false or misleading when made. In addition to the reasons detailed above in ¶420, defendant Sanborn's statements in ¶429 regarding Norfolk Southern's safe handling of hazardous materials was false or misleading when made because after the implementation of PSR, Norfolk Southern's rush to maintain the train schedules resulted in violations of rules about placing hazardous materials too close to the engine. FE-6 described management ordering a train to make its scheduled trip despite warnings that hazmat cars were only four positions from the engine – a violation of rules that ban hazmat within six cars of the engine. FE-5 also recalled Norfolk Southern trains coming into his train yard in Ohio from other locations sometimes did not conform to hazmat rules regarding car placement. Moreover, after PSR's implementation, Norfolk Southern stopped holding critical annual trainings on transporting hazardous materials according to FE-1. After PSR, FE-1

stated that Norfolk Southern only provided the training every three years and would administer the same 12-question test on hazardous materials each cycle.

### D. False or Misleading Statements Regarding the Expansion of the Length of Norfolk Southern Trains

431. On April 27, 2022, Norfolk Southern filed with the SEC its 1Q 2022 Form 10-Q, reporting its financial results for the quarterly period ended March 31, 2022. That same day, Norfolk Southern issued a press release reporting its 1Q 2022 financial results and hosted an earnings call with investors. During that call, defendant Sanborn was asked by an analyst about the efficacy of Norfolk Southern's focus on increasing train lengths, and whether there were any downsides or "limit[s]" to train length that Norfolk Southern was considering. Sanborn answered:

> Ravi, thanks. I think ***train length really helps us right now***. It improves our lessons or labor intensity. Now, there's a point to which if you're unable to meet trains at multiple locations on a particular district, it could work against you, to your point. But I think where we are finding opportunities to move more traffic with one crew, that is really to our advantage.
>
> ***So I don't see it working against us both near term, nor do I see it working against us long term***. We want to be able to match our train size to our locomotive pulling capability. And as we invest in locomotives, and you've heard me talk about that in our prepared remarks, with DC to AC conversions, it's very helpful to us to improve train length.
>
> From the standpoint of what the STB might do, I don't know. I know that it is a topic that even FRA brings up from time to time. ***But***

***I truly believe that the technology that's brought to us with distributed power capability, makes it a very safe and effective operation.***

***I don't see a reason that we should expect or want or think necessary, any restrictions on train length, as long as we're continuing to move fluidly and not getting longer than the district that we need to run on.***

432. For the reasons set forth above in ¶420, the statements in ¶431 were materially false or misleading when made. In addition to the reasons detailed above in ¶420, defendant Sanborn's statements in ¶431 issued in response to questions about the limits of running such long trains were materially false or misleading because defendant Sanborn downplayed and omitted the grave safety risks that were associated with running longer trains. Thus, the statements in ¶431 were materially false or misleading for the following reasons:

(a) Norfolk Southern was building its longer trains in an inherently careless and dangerous manner, and without regard for proper placement of cars on its increasingly long and heavy trains. Cassity testified to the NTSB that Norfolk Southern was building trains "nonchalantly" and that they were not "paying attention to where the tonnage actually sits." Cassity testified that this poor train construction meant "it's extremely likely that you're going to have a lot of tonnage behind a lot of empties[,]" and that this was extremely likely to cause derailments in situations where the brakes were applied to stop the train quickly. Moreover, FE-12 and FE-

13 explained that due to the length of the trains, if a conductor was located too far away from the engineer, they could lose radio signal, preventing them from communicating with one another. A loss of communication was particularly common for trains that had to use distributed power due to their excess length and weight, according to Cassity. Furthermore, Greficz and FE-8 indicated that when a wayside detector would trigger an alert that a wheel or bearing was overheating, due to the extraordinary length of the trains, by the time that a conductor walked to the overheated wheel, the wheel may have cooled off, resulting in an inability to diagnose faults. Furthermore, FE-6 and FE-5 both recalled instances where they found hazmat cars within six cars of the engine, a clear violation of hazmat car placement rules.

(b) Under PSR, Norfolk Southern implemented new time restrictions on car inspections that, according to Fannon, ***made it impossible to conduct a proper inspection***. Fannon told the NTSB that "[i]t's hard to walk [the length of a car] and look at every aspect of a rail car in 1 minute . . . . There's no way to do a proper inspection in that time frame." According to FE-7, prior to Defendants' increased emphasis on efficiency, there was no time limit on inspections, and that they usually lasted two to three minutes per car. After PSR, FE-10 stated that he would be reprimanded if a train car sat in a terminal area for too

long. Cox and Arouca described the pressure to minimize dwell time leading to Norfolk Southern "forcing . . . these inspection times to get down and down and down and down."

(c) Norfolk Southern's expanded train lengths put train car inspectors under even more pressure to comply with the train schedule. FE-14 and FE-11 both noted that Norfolk Southern expanded the length of the trains, decreased the number of inspectors, and still expected the inspections to be completed in the same amount of time or faster. With fewer members on the crew and less time to complete inspections on longer trains, FE-4 stated employees "could not do effective inspections."

(d) According to Sloper, the engineer who took Train 32N from Decatur, Illinois to Toledo, Ohio prior to the derailment expressed that "he didn't feel comfortable running" the train as it was "the largest and heaviest train that he had ever run." After informing the yardmaster of the concerns about the length and weight of the train combined with the relative inexperience of the engineer, the yardmaster forced the engineer to drive the train. The next crew of Train 32N, which was operating the train at the time of the East Palestine Derailment, included a conductor who had only "8 months on the railroad."

### E. False or Misleading Statements Regarding Norfolk Southern's Capital Expenditures Related to Safety

433. On February 4, 2021, Norfolk Southern filed with the SEC its 2020 10-K, which was signed by defendant Squires. The 2020 10-K stated: "***Our capital spending and replacement programs are and have been designed to assure the ability to provide safe, efficient, and reliable rail transportation services***."

434. On February 4, 2022, Norfolk Southern filed with the SEC its 2021 Form 10-K, which was signed by defendant Squires. The 2021 10-K stated: "***Our capital spending and replacement programs are and have been designed to assure the ability to provide safe, efficient, and reliable rail transportation services***."

435. For the reasons set forth above in ¶420, the statements in ¶¶433-434 were materially false or misleading when made. In addition to the reasons detailed above in ¶420, Defendants' statements in ¶¶433-434 were materially false or misleading because Norfolk Southern's spending did not reflect a design to provide "safe" rail services. In fact, Norfolk Southern sacrificed safety to cut expenses. In accordance with its implementation of PSR, the Company cut costs wherever possible, even if it jeopardized the safe operation of the railroad, including by running fewer but longer and heavier trains, furloughing or terminating a massive percentage of the workforce including carmen and Wayside Desk employees,

eliminating the costs of training, and cutting the budgets for much-needed maintenance on the train cars. Thus, the statements in ¶¶433-434 were materially false or misleading for the following reasons:

(a) Whitaker testified before the U.S. Senate that "Norfolk Southern has a business model that prioritizes profit over safety" and that "that business model is precision scheduled railroading."

(b) While testifying before the U.S. Senate Committee on Environment and Public Works on March 8, 2023, defendant Shaw admitted that Norfolk Southern's "near-term focus" leading up to the East Palestine Derailment was "solely on profits."

(c) Norfolk Southern drastically cut the number of carmen and elongated the trains, putting the remaining carmen under immense pressure to conduct adequate inspections and comply with the train schedule. FE-14 and FE-11 both noted that Norfolk Southern expanded the length of the trains, decreased the number of inspectors, and still expected the inspections to be completed in the same amount of time or faster. With fewer members on the crew and less time to complete inspections on longer trains, FE-4 stated employees "could not do effective inspections."

(d) Fannon informed NTSB investigators that, in order to cut costs, Norfolk Southern "went from an annual rules class to every three years" so that its employees would not lose "1 or 2 or 3 days of productivity," resulting in less discourse about safety among Norfolk Southern's workforce and leading to "everybody's perception that safety is not important at [Norfolk Southern]."

(e) Contrary to its statements regarding its commitment to safety, Norfolk Southern "disbanded" the local safety committees that met each month, and that included "all crafts and management" to cut down on costs. Cox corroborated that "[w]hen precision scheduled railroading came down," the safety committees were "looked upon as a waste of resources." Arouca described the elimination of these committees as "***utterly insane***" given the "dangerous environment" in which railroad employees work and the "unstoppable/immovable forces" involved.

(f) Norfolk Southern's deliberate staffing cuts of the Wayside Desk and its disabling of wayside detector alerts to train conductors materially impeded the safety of the railroad. According to Rambo, the Norfolk Southern ATC analyst who was working the Wayside Desk the night of the East Palestine Derailment, Norfolk Southern, after instituting a round of job cuts, only employed enough ATC analysts to allow one to be on duty at any given time. Given the hundreds of alerts

the Wayside Desk received in any given shift, and the reality of food and bathroom breaks, the Wayside Desk was significantly under-manned.

(g) Rambo exposed that when the Wayside Desk received the initial alert that notified a "bearing spike of 103 degrees" on Train 32N, prior to the East Palestine Derailment, Rambo "didn't see it" because he was attending to "three other trains" that were throwing up alerts via wayside detectors. Rambo recalled that during a 12-hour shift, where there would be no breaks, it was ***typical to receive around 300 alerts***, which is an average of one notification every two minutes.

(h) In an effort to cut costs, Norfolk Southern cut personnel across the board amounting to a nearly 40% reduction, leading to what Greficz called a "self-imposed manpower shortage." The cuts resulted in extremely overworked and fatigued employees, imperiling the railroad's operations. Cox described Norfolk Southern's "forced overtime" of 16-hour days, five days a week. Other former employees, including FE-1, FE-2, FE-8, and FE-10, similarly recalled that Norfolk Southern's relentless furloughs across all departments meant that the remaining employees were expected by Norfolk Southern management to work extremely long hours with no breaks to compensate for the lost manpower despite reports of fatigue. FE-11 and FE-5 stated that Norfolk Southern often manipulated the schedules to deny workers their FRA-mandated days off.

(i) Norfolk Southern disproportionately terminated carmen in order to exploit a loophole in FRA regulations and maintain the appearance of a safe operation while operating with a severely reduced workforce. According to Arouca, Cassity, Fannon, and Greficz, Norfolk Southern engaged in "abus[e]" of a "massive loophole" in FRA regulations by furloughing carmen, who had specialized training in inspections, such that the train's crew could conduct an abbreviated inspection as permitted in the absence of a qualified carmen by Appendix D. As Cassity explained, a conductor might get "a 45-minute program on a computer that tells them how to do a Class I inspection" whereas carmen receive several years of training. FE-6 felt similar concerns as carmen layoffs forced conductors to perform repairs and inspections which they were not trained to complete. Norfolk Southern was able to tell the investing public it still operated "safely" in part because it only technically complied with federal regulations, but not the spirit of them. Cox tied exploitation of federal regulations to limit car inspections directly to the East Palestine Derailment.

(j) During the hearing of the U.S. Senate Commerce, Science, and Transportation Committee into the East Palestine Derailment, Senator Peters of Michigan stated on the record that he had in his possession documents that show that Norfolk Southern was, at the time, operating "dozens of railcars . . . that have gone

over 5,000 miles without a Class 1 inspection," which was "thousands of miles" outside of what the FRA regulations required. Senator Peters further noted that he was aware of "over 100" cars that had gone tens of thousands of miles without a mechanical inspection. FE-6 recalled engaging in "block swapping," a practice that he says increased after PSR, which entailed moving around railcars in such a way as to avoid performing a full inspection, and instead performing a "roll-by inspection." Arouca showed NTSB inspectors records that identified Norfolk Southern train cars that had gone "19,000 miles," "44,000 miles," "46,000 miles," "72,000 miles," and "90,000 mile[s]" between inspections. This, according to Arouca, was "***a bit of a smoking gun***."

(k) Rather than invest in safety, Norfolk Southern made drastic spending cuts that threatened safety at every turn. On top of furloughing employees and cutting back on training, the Company cut costs in other unsafe ways. According to FE-2, Norfolk Southern ran longer trains and refused to spend money on replacement parts – forcing employees to take parts from other active locomotives. Additionally, FE-4 indicated that the distance between HBDs – the warning sensors along the track that check wheel temperatures – widened after the implementation of PSR to cut overall maintenance costs.

### F. False or Misleading Statements Regarding the Quality of Norfolk Southern's Training Program

436. Norfolk Southern routinely misled investors as to the quality of its conductor and engineer training and the resulting qualifications of their train crews, concealing that the Company's crews were inexperienced and prone to make mistakes, especially given the burden of operating increasingly longer and heavier trains as a result of the implementation of PSR.

437. On April 28, 2021, Norfolk Southern released its SEC Form 10-Q, reporting its financial results for the quarterly period ended March 31, 2021 (1Q 2021). That same day, Norfolk Southern hosted an earnings call with investors discussing its 1Q 2021 financial results. During the call, defendant Sanborn stated the Company had reduced its trainmen and engineer ["T&E"] training program to a "much shorter period of time, about 8 weeks" but assured investors that "***there's still going to be a very safe employee, but we are able to condense the amount of sort of speed – I guess, improve the speed to market, if you will***."

438. Defendant Sanborn echoed these remarks during an earnings call with investors held on October 27, 2021 to discuss the Company's 3Q 2021 financial results. In response to a question about improving service to customers, defendant Sanborn assured investors that "[w]e have streamlined our process of hiring and also

our training process, taking advantage of technology to do so. ***Obviously, we're not going to compromise safety in anything . . . we do with that regard***."

439. Norfolk Southern attended the Stephens Investment Conference on December 1, 2021, where Norfolk Southern's current CFO, George, speaking on behalf of Norfolk Southern, praised the efforts that Norfolk Southern had taken to compress the training time for conductors to "about 10 weeks," saying that Norfolk Southern had done a "good job compressing" the training program. A few months later, on February 22, 2022, Defendants attended the Citi Global Industrial Tech and Mobility Conference, where defendant Shaw noted that "***[w]e streamlined the hiring process, still very focused on safety***."

440. Defendants attended the Bank of America Transportation, Airlines, and Industrials Conference on May 17, 2022, where defendant Shaw assured investors that "***it's going to take us 3 to 4 months to train crews because we're not going to cut corners on safety. That's really important for us. And we got to make sure that our conductors are well trained as they go out into the field***." Just a few days later, at the Wolfe Research Global Transportation & Industrials Conference on May 24, 2022, Shaw again told investors that Norfolk Southern's four-month training program for conductors was sufficient "to get a conductor trainee out on the ground, ***safely qualified to be productive and operate***."

441. On June 14, 2022, while testifying before the U.S. House of Representatives Subcommittee on Railroads, Pipelines, and Hazardous Materials of the Committee on Transportation and Infrastructure, defendant Sanborn stated that "the most important factor in achieving continuous safety improvement is the creation of a company culture that promotes safety through continuous education and reinforcement of safe behaviors."

442. On July 27, 2022, Norfolk Southern filed with the SEC a Form 8-K, which attached a copy of a press release the Company published that day announcing its financial results for the quarter ended June 30, 2022. The press release stated in pertinent part:

> We remain steadfast in our commitment to service recovery. In the quarter, we made considerable progress on staffing, and launched our TOP|SPG operating model, both of which are foundational to achieving our targeted service levels and long-term growth strategy. ***Already we are seeing visible upticks in qualified employees*** and train speeds as a result of these initiatives, and we expect to see further progress on service recovery in the months ahead.

443. On August 17, 2022, Shaw told investors, during the Deutsche Bank Transportation Conference, that "[w]e've got well over 800 in our training class now, again, it will take 4 or 5 months for those folks to ***become qualified to work productively and safely***."

444. For the reasons set forth above in ¶420, the statements in ¶¶436-443 were materially false or misleading when made. In addition to the reasons set forth in ¶420, the statements in ¶¶436-443 were materially false or misleading because, contrary to these statements, Norfolk Southern's training program during the Class Period and leading up to the East Palestine Derailment was inadequate, and Norfolk Southern's train crews were woefully underprepared. Thus, the statements in ¶¶436-443 were materially false or misleading for the following reasons:

(a) A number of former employees stated that when PSR was implemented, Norfolk Southern shortened training to dangerously brief periods of time. FE-5 said that when he started as a conductor around 2015 his on-the-job training lasted six months during which the Company had him shadow a conductor with at least a year of experience. Toward the end of 2019, Norfolk Southern cut the training time in half and began pairing trainees with conductors with far less than a year experience, sometimes only a few weeks. FE-5 described it as "the blind leading the blind." FE-1 noticed that conductors hired after 2019 received training that was only two or three months long as compared to his six months of training. FE-13 found that new conductors, who may have only received six to eight weeks of training, were "more clueless" about their positions. After completing their limited training program, engineers and trainmen were assigned to teams for on-the-

job training, but even this training was poorly executed. According to FE-4, due to staffing cuts, the conductor and engineer assigned to train the new employee were often too busy to provide any information, meaning that "the training [took] a back seat." FE-11 also said new trainees under PSR received less training than previous ones: 90 days to learn to drive in both east and west directions – as opposed to learning one direction at a time. FE-11 believes management took the position that the trainees were always going to be with someone else and would have maps, so they could "figure it out."

(b) Cassity informed the NTSB that Norfolk Southern's significantly reduced training programs resulted in numerous and repeated errors by new conductors. However, Cassity indicated that management held firm on the new training schedule when confronted, and that it was "almost impossible to convince management" that more training was needed.

(c) Pitts told the NTSB that a six-week training program was against written Company policy, and that management handed down "verbal instruction[s]" to promote trainees before their year of training was completed. He also noted that management did not "care whether [trainees were] trained fully or not" and that trainees need to be marked up because "we've got to get these trains across the road."

(d) Sloper stated that Norfolk Southern's priority in reducing its training program was simply to get new personnel "working on these trains and they don't care what you know or what you don't know." He told the NTSB that trainees were promoted before they were ready so that they were "just kind of learning on their own and it's dangerous and we're seeing the fruits of that right now."

(e) Norfolk Southern sacrificed continuing safety training for its employees as well. FE-7 indicated that safety meetings were eliminated and replaced with safety-training videos, which employees may have even fast-forwarded through. FE-1 recalled that upon starting at Norfolk Southern 20 years ago, employees were required to complete annual training that required two full days of class time and testing. Following PSR, FE-1 stated Norfolk Southern replaced class time with emails or videos and administered tests "just to appease the FRA."

(f) Norfolk Southern also cut imperative hazardous materials training sessions that FE-1 stated used to be held annually. Instead, FE-1 indicated Norfolk Southern only provided the training every three years and would administer the same 12-question test each cycle.

(g) Norfolk Southern exacerbated the problem posed by such a significant reduction in training time by forcing new conductors to run increasingly long and heavy trains, and, according to Cassity, many times new engineers would

find themselves responsible for trains far longer and heavier than any that they had encountered during their truncated training process, in violation of FRA regulations. Cassity noted that Norfolk Southern's "approach [to running longer trains] is that a train is a train no matter what and that's not true. Every train is different, it's a lot harder to operate a train that is bigger than any you've operated before." FE-13 learned from Norfolk Southern engineers that, like conductors, they also felt that they received inadequate training, specifically on operating distributed power trains, which were becoming more common as Norfolk Southern increasingly used lengthier trains. Cassity stated that Norfolk Southern provided "nothing more than a pamphlet" for operating these complex trains with distributed power.

(h) According to Sloper, the engineer who took Train 32N from Decatur, Illinois to Toledo, Ohio prior to the derailment expressed that "he didn't feel comfortable running" the train as it was "the largest and heaviest train that he had ever run." Despite the engineer himself and the crew voicing their concerns about the size of the train, the yardmaster ordered them to run the train and hope for the best. The next crew of Train 32N, which was operating the train at the time of the East Palestine Derailment, included a conductor who had only "8 months on the railroad."

### G. False or Misleading Statements Regarding the February 6, 2023 "Vent and Burn"

445. Norfolk Southern made several materially false or misleading statements preceding the February 6, 2023 "vent and burn" of five tank railcars carrying VCM. These statements concealed that the "vent and burn" was unnecessary because the information available to Defendants indicated that an uncontrolled VCM polymerization reaction was not occurring – and could not occur based on the science – in the VCM cars.

446. On Sunday, February 5, 2023, Norfolk Southern used Governor DeWine as a conduit to distribute materially false or misleading statements to the public. The Norfolk Southern team represented to Governor DeWine on Sunday evening that there was a concerning increase in temperature in one of the VCM cars. Governor DeWine took swift action in response to Norfolk Southern's lies, activating the Ohio National Guard as noted. And the Governor issued an evacuation notice that – ***unbeknownst to Governor DeWine*** – disseminated false information that Norfolk Southern gave to him, knowing Governor DeWine would have to provide that information to the public in explaining why they should evacuate their homes on a Sunday evening at about 8:00 p.m.:

# East Palestine Urgent Evacuation Notice

*February 05, 2023*

(COLUMBUS, Ohio)—Following an evening briefing regarding the train derailment in East Palestine, Governor DeWine and Columbiana County officials are issuing an urgent warning to those living within a mile of the derailment. Within the last two hours, a drastic temperature change has taken place in a rail car, and there is now the potential of a catastrophic tanker failure which could cause an explosion with the potential of deadly shrapnel traveling up to a mile.

447. This urgent evacuation notice memorializes the fact that the Norfolk Southern team represented to Governor DeWine that there had been (in substance) "a ***drastic temperature*** change" in "a" rail car, namely Car 5.

448. Norfolk Southern's conduit statements made through Governor DeWine described in ¶¶445-447 were false or misleading for the following reasons:

(a) There was not a "drastic" temperature change indicative of polymerization exhibited by any of the cars carrying vinyl chloride on the evening of February 5, 2023. According to Norfolk Southern's own data, only Car 5 had shown an elevated temperature, but Car 5's temperature had only risen 3°F, from 135°F to 138°F, from 4:00 p.m. to 5:00 p.m., and then ***fell 2°F*** from 5:00 p.m. to 6:00 p.m., where it held steady for its next temperature reading at 7:00 p.m. (¶318). As Defendants knew from information provided to them by experts in vinyl chloride

from its manufacturing company, VCM polymerization is "a very exothermic reaction" that "generates significant heat resulting in increased pressure within its container." An uncontrolled VCM polymerization reaction would show an "***obvious*** temperature rise that would ***continue throughout*** the duration of the exothermic reaction." Moreover, once polymerization starts, the temperature "continues to rise, ***it doesn't go in reverse***" – in other words, it "won't rise a few degrees" and "then start dropping." Thus, monitoring the car's temperature would indicate whether polymerization was occurring, according to experts in VCM, and because the temperatures gathered by Norfolk Southern for Car 5 indicated a modest increase of 3°F, followed by a decrease of 2°F the next hour, the temperature change was not "drastic," nor was polymerization occurring.

(b) The vinyl chloride was traveling in DOT 105 tank cars, which are designed to only "vent" pressure through their pressure relief devices after pressure reaches a (very conservative) pressure of 247.5 psig (approximately 180°F to 190°F) but would not burst until 750 psig (approximately 310°F). The last time that any of the vinyl chloride tank cars vented material through their pressure relief devices was from 5:30 p.m. to 6:40 p.m. on Saturday, February 4, 2023, meaning thereafter, all of the cars had temperatures below 180°F and well below the temperature at which they could burst. By the afternoon of Sunday, February 5,

2023, Cars 1-4 had temperatures ranging between 65°F to 67°F, which was well below Saturday's temperature recorded on Car 1 of 90°F, which Norfolk Southern considered "not remarkable" and "stable," and moreover, were temperatures within the range of temperatures recorded when Norfolk Southern first took possession of the cars to form the train. Accordingly, Norfolk Southern did not record the temperatures for Cars 1-4 for the next several hours. As for Car 5, its highest recorded temperature before Governor DeWine's evacuation notice was 138°F, more than 50°F below the temperature when the pressure relief devices engage, and more than 170°F below the temperature when the car could burst. Furthermore, the temperature next recorded an hour later showed that Car 5 had cooled 2°F by 6:00 p.m., indicating that polymerization was not occurring.

(c) Because there was not a significant temperature increase, and because Car 5's temperature was well below the temperature at which the car would even engage its safety valve, much less burst, there was not a "potential" for an explosion at Car 5 resulting in "deadly shrapnel." As Oxy Vinyls' personnel on the scene had informed Norfolk Southern, the 3°F rise in Car 5 was not "drastic" nor a cause for a concern of an explosion:

> [T]he two data points that we had Sunday night was the 135 and 138. And so, you know, what we knew with the first two data points was that at 135 or 138, you know, shooting at the spot where he had, you know,

> felt the railcar, we felt confident we were on the skin. At that temperature, the pressure in that railcar is 121 pounds. So, safety valve on that car is 247, design is 300, and the burst pressure is 750. The point being, it's got a long, long ways to go from 135 degrees to present any threat of over pressurization, which was certainly a concern for everybody on the scene.

449. On February 6, 2023, at approximately 1:00 p.m., Norfolk Southern made materially false or misleading statements to the public at a news conference that Governor DeWine hosted. With defendant Shaw's knowledge and approval – given just moments before he addressed the public – Norfolk Southern executive Deutsch told the public:

> The process that we're going to do today, we're going to place a small shape charge, it's going to create a hole about two and a half to three inches in ***the tank car***. This will allow the material to come out of ***the tank car***. It'll go into a pit and trench that we have dug and set up for this operation. Inside that trench will be flares, lining that trench that then will light off the material. We're doing this so that we control ***this tank car*** that we have concerns with – ***these tank cars***. This allows us to control that operation and not have ***the car react*** and do it itself. So that's what we're going to be doing later on today.

450. Governor DeWine then asked Norfolk Southern to explain why they wanted to explode the five cars during the day. Deutsch represented to the public in response:

> Part of the decision-making process that we followed was, if ***the*** car started to ***react <u>again</u>*** – the "cars" I keep saying "***car***." If ***they*** started to ***react on their own <u>again</u>***, we can't control that time of day when that would occur. That would in turn, we'd have to worry about an inversion and other things weather related. Okay, so we want to do it

> in the daylight, you know, close to, you know, prior to sunset as possible. And that's that's our plan, right now.

451. Governor DeWine also asked Norfolk Southern to explain to the public why Norfolk Southern wanted to blow up all five cars at all. Deutsch represented to the public in response:

> Okay, so our controlled explosion, as I was telling you will put a two, three inch hole in the car. If we don't do that, ***the*** car could ***continue to polymerize*** and ***the*** entire car ***will break apart***. We can't control where that goes. So ***that's the reason*** for doing this. Get moving on this. So we don't have to run into that letting the car do it itself. We want to be able to control that situation. That's ***the safest way*** is to control the situation. And that's what this operation we're going to take this afternoon.

452. These public statements regarding the purported justification for a "controlled" explosion of the five VCM cars in ¶¶449-451 were materially false or misleading for the following reasons:

(a) Deutsch knew, as revealed by his repeated use of the singular "car," that Cars 1-4 had temperatures that were stable and of no concern to Norfolk Southern. There was only one car that concerned Norfolk Southern – namely Car 5. And ***no car*** had ever polymerized; thus, Deustch's fearmongering that the cars could "react ***again***" was materially false or misleading, as he knew.

(b) Contradicting Norfolk Southern's claims to the public, the science, according to the Oxy Vinyls team on the ground in East Palestine, was clear:

the temperature readings from the cars containing vinyl chloride ***indicated there was no risk of polymerization***, and thus the "reason" that Norfolk Southern put forward for setting the charges and detonating the cars had no basis.

(c) On a 6:00 p.m. call on February 4, 2023, a team of experts at Oxy Vinyls told Norfolk Southern that there was an "***extremely low probability***" that any of the Oxy Vinyls tank cars carrying vinyl chloride were undergoing polymerization.

(d) The Oxy Vinyls experts explained to Norfolk Southern that, if a reaction were to occur, they would observe a steady and continuous rise in the temperature of the cars carrying vinyl chloride. The Oxy Vinyls experts made it clear that any drop in temperature would indicate that no reaction was occurring – "***it doesn't go in reverse***." In other words, it "won't rise a few degrees" and "then start dropping."

(e) Following the collection of temperature data from the cars, the Oxy Vinyls scientists on the ground in East Palestine confirmed that there was little, if any, danger of polymerization. On the evening of February 5, 2023, the Oxy Vinyls personnel did not "***see any signs of polymerization in the – in the temperatures***." Indeed, that evening Car 5 – the only car that showed an elevated temperature – had gone up 3°F and then dropped 2°F in a matter of hours – exactly what Oxy Vinyls said would ***not*** happen if polymerization was occurring.

(f) The next day, it was even more certain that there was no danger of polymerization. Deutsch's cellphone contained images of notes from Monday, February 6, 2023 showing that Car 5 had a reading of 126°F, which was lower than the previous day and cooler than a cup of coffee, while Cars 1-4 were cooler still.

(g) Norfolk Southern knew for a fact that these temperatures did not pose a danger of a runaway chemical reaction because Oxy Vinyls had shared with them the relevant vapor-pressure "curves." Those curves indicated that Car 5, which was the hottest of all the cars carrying vinyl chloride, was ***59°F cooler*** than was necessary to cause sufficient pressure to vent the car. What is more, Car 5, at 126°F, was more than ***180°F cooler than 310°F – the temperature required to generate pressures sufficient to burst the car***.

453. On February 6, 2023, a few hours after Norfolk Southern intentionally detonated the five VCM cars and intentionally spread deadly chemicals into the nearby community and environment, Norfolk Southern issued this press release:

> The controlled breach of several rail cars has been ***completed successfully under the supervision of experts*** and first responders. Some of the material is now burning off consistent with expectations from the earlier models, and is expected to drain for a short number of hours. We have been, and will continue, monitoring air quality with the Ohio EPA. Remediation work at the site can ***now safely continue***.

These statements are attributable to Shaw and his team in East Palestine because they were the only Norfolk Southern executives who witnessed the detonations. These public statements regarding the purported success for detonating the five cars in ¶453 were materially false or misleading for the following reasons:

(a) Because defendant Shaw and his team voluntarily chose to make a statement about the detonations, they owed a duty to disclose that the detonations were not necessary because the VCM cars' temperatures were stable and decreasing.

(b) Norfolk Southern had ignored the Oxy Vinyls experts, who rejected the reason supposedly driving Norfolk Southern to detonate the cars – namely, runaway polymerization.

(c) Though Norfolk Southern claimed it detonated the five VCM cars to facilitate safety in the "[r]emediation work," Norfolk Southern knew that because there was no risk of polymerization, the VCM cars posed no safety risks to continuing remediation work. Rather, as Norfolk Southern concealed, its purpose in conducting the vent and burn was to resume train traffic.

## XI. ADDITIONAL INDICIA OF SCIENTER

454. In addition to the facts alleged above, numerous additional facts when considered collectively and holistically together with the other allegations in this Complaint create a strong inference that Defendants knew or were deliberately

reckless in not knowing that they had employed devices, schemes, and artifices to defraud, made material misrepresentations and omissions, and engaged in acts, practices, and a course of business that operated as a fraud or deceit on Norfolk Southern's investors.

### A. The Individual Defendants Closely Monitored PSR's Impact at Norfolk Southern's Railyards

455. Defendants, according to their own statements to various government bodies and television interviews, personally kept close tabs on Norfolk Southern's railyards and employees. Rather than simply monitor the implementation of PSR at a high level, and from the corporate headquarters in Atlanta, Georgia, Defendants made clear that they had intimate knowledge of the conditions on the ground at Norfolk Southern railyards and aboard its trains, and were in frequent contact with front-line Norfolk Southern employees.

456. When questioned by NTSB examiners, defendant Shaw was adamant that he had first-hand knowledge of what went on in Norfolk Southern's train yards, and that it was commonplace for Norfolk Southern employees to express any concerns they had to him directly:

> [Question] Well, when [craft employees] do express their concerns, ***does it make it up to your level*** or is it filtered by others? . . . .

> [Answer] Well, a lot of them will ***express their concerns directly to me***, right? I'm approachable, I'm authentic, ***I'm out in the field a lot***, I'm wearing jeans . . . .
>
> And ***I'm in the crew rooms***. And so they've got direct feedback or ***they get direct input to me, they got my phone number***.

457. Shaw gave a similar account of his on-the-ground knowledge during his testimony to the U.S. Senate Commerce, Science, and Transportation Committee on March 23, 2023, and made it clear that his engagement with employees regarding railyard safety conditions ***started at the beginning of his tenure as CEO***. Upon questioning by Senator Raphael Warnock of Georgia regarding railyard safety conditions, Shaw gave the following testimony:

> Senator, our policies are there to promote the safety of train operations. I, too, have been fully engaged with our valuable craft colleagues. ***My first day as CEO, I went out into the field and I walked into the crew room and I've engaged with our employees*** . . . .

458. Shaw also touted to the public that he took a hands-on approach to leading the Company. During an interview on *Mad Money with Jim Cramer* that aired on December 7, 2022, Shaw told the host: "I get out on the field a lot and I spend a lot of time with our craft employees."

459. Defendant Squires echoed Shaw's approach, saying in a March 2021 interview with *Fortune* that "staying very close to your people" was the most important leadership lesson he learned during the pandemic. Squires highlighted

that "during the course of 2020 [he] had over 300 meetings, one-on-one meetings, with [Norfolk Southern's] top 140 leaders and [he] continued that during 2021 as well." These meetings were "really important" to defendant Squires because he wants employees to know that he "understands what they're doing." That, according to defendant Squires, is "our formula at Norfolk Southern."

460. Defendant Sanborn, likewise, gave congressional testimony in which she stated that she was a hands-on manager, and that she spent time in railyards during the Class Period and had first-hand knowledge of the conditions in railyards. During a remote hearing of the U.S. House Committee on Transportation and Infrastructure on June 14, 2022, Sanborn testified:

> I would agree that [sic] and involve myself in listening to employees. In fact, in the last 30 days, I have been in Roanoke, Virginia; Cincinnati, Ohio; Pittsburgh, Pennsylvania; and I will be in the yard in Atlanta here on Thursday and ***listening to our employees and what they have to say around safety and concerns that they have***.

### B. Norfolk Southern Monitored Train Length and Train Speed as Key Risk Indicators

461. FE-21, a manager in the ERM Department of Norfolk Southern during the Class Period, explained that Norfolk Southern's risk management program used a "risk taxonomy" which divided risks into categories of tiers. Level 1 consisted of five categories including "strategic risk," "operational risk," "legal compliance risk," "financial risk," and "technology risk." Within Level 1 risks, there were about 20

total Level 2 “risk themes.” For example, under the Level 1 Operational Risk, the Level 2 risk themes included Norfolk Southern’s people risk, safety risk, and service resiliency risk. Within the Level 2 risk themes, there were about 60-75 Level 3 “risk drivers,” such as train length and train speed, which each had Key Risk Indicators (“KRIs”). FE-21 gathered these key metrics and applied “tolerance levels” to each.

462. FE-21 recalled that train length was a Level 3 Risk Driver that fell under multiple Level 1 Risks such as train operations, which included safety and strategic initiatives which focused on the risks related to the Company’s strategic goals.

463. FE-21 stated that the concept of increasing train lengths triggered multiple operational risks. However, FE-21 recalled that there was a refrain to operate longer and leaner and operate longer and faster trains. FE-21 stated management did not seem to be concerned with “how long is too long” or “how fast is too fast” to run a train.

464. FE-21 stated that information regarding the KRIs was intended to be included in quarterly presentations to the Board and the Audit and Risk Committee. The presentations would indicate when the threshold of a particular Level 3 Risk Driver was exceeded.

465. FE-21 also noted that the same information was also available on a live dashboard at Norfolk Southern.

### C. Defendants Shaw and Sanborn Received Regular Updates Regarding Operations and Safety Issues

466. FE-18 confirmed that during the Class Period Norfolk Southern held daily conference calls with high-level executives to discuss daily operations and safety issues. The calls were attended by Assistant Superintendents, Superintendents, General Managers, Assistant VPs, and other high-ranking employees. FE-18 recalled that defendant Shaw or Paul Duncan (Norfolk Southern's COO at the time), or both, attended the calls once or twice a week. Defendant Sanborn also attended some of the calls during her tenure.

467. FE-18 explained that these calls presented the opportunity to discuss any operation or safety issues that occurred over the previous 24-hour period. If there had been a derailment or issues with safety and training, it was the time to discuss it with leadership.

468. FE-22, a Director in Norfolk Southern's Marketing Department when defendant Shaw was the CMO, recalled delivering daily reports to defendant Shaw regarding the movement of customers' train cars and estimated revenues. FE-22 explained that the marketing department generated these daily reports from a database called Traffic History, which tracked in real time: each car, the customer, the commodity loaded in the car, whether it was a hazmat car, the origin and

destination, and if the car had moved contrary to its planned route (such as if the car was bad order tagged). FE-22 further explained that Norfolk Southern used a second database called Revenue History to track the volume by terminal and each customer and their cars to estimate revenues. As with Traffic History, FE-22 generated reports from Revenue History on a daily basis. FE-22 stated that the C-Suite executives (the Company's top management positions) paid attention to these reports, and recalled instances when defendant Shaw would call down to advise them that he had not yet received the report and requested that they forward it.

469. FE-22 stated that defendant Sanborn received similar daily reports as the COO. FE-22, as a member of defendant Shaw's reporting group, had to work with defendant Sanborn's reporting group to reconcile any discrepancies with the various reports before they were circulated to executive management.

470. In addition to daily reports, FE-22 reported that Norfolk Southern held annual meetings each February for upper-level management, including directors and above, in various cities, such as Atlanta, Norfolk, or Roanoke.

471. FE-22 explained that there were multiple days' worth of meetings, such as the CEO Annual Meeting, which was hosted by the CEO, and the CMO Annual Meeting, hosted by the CMO. FE-22 stated that the CEO Meetings were focused on

goals and objectives, safety numbers and bonuses. The CMO Meetings covered similar topics, but with more of a focus on revenues.

### D. Defendants Were Contacted by the FRA Numerous Times During the Class Period Regarding the FRA's Concerns with Respect to Norfolk Southern and the Class I Railroads as a Whole

472. During the Class Period, Defendants paid close attention to the safety of Norfolk Southern's operation due to the fact that they were routinely informed of actual and potential safety deficiencies and regulatory violations that emanated directly from the Company's adherence to PSR. The FRA kept Defendants apprised of these concerns through a series of letters sent by FRA Administrator Bose, many of which were addressed directly to either defendant Squires or defendant Shaw. Additionally, the FRA audited Norfolk Southern's compliance with safety regulations during the Class Period.

#### 1. FRA Administrator Bose Sent a Series of Letters Relaying Safety Concerns to Defendants Norfolk Southern, Squires, and Shaw During the Class Period

473. During the Class Period, Bose addressed a letter directly to Squires on October 28, 2021 (the "October 2021 Bose Letter") regarding a recent series of serious injuries that Norfolk Southern employees had suffered over the seven preceding months, noting that Norfolk Southern "had five conductors/brakemen

suffer amputations and crushing injuries" during that time.[17] Bose informed Squires that, as a result of these injuries, the FRA expected Norfolk Southern "to take appropriate action to mitigate the likelihood of such injuries from occurring in the future," including "incorporat[ing] any lessons-learned regarding the causations of these injuries into [***Norfolk Southern's***] ***conductor training program***." In particular, Bose instructed Squires that Norfolk Southern "***should consider any potential relationship between recent changes to the duration of its conductor training***, and the frequency and severity of conductor incidents and injuries."

474. The FRA's Safety Assessment later published on August 9, 2023, indicates that Norfolk Southern received the October 2021 Bose Letter and responded to it on November 8, 2021.

475. On March 28, 2022, Squires received another letter from Administrator Bose (the "March 2022 Bose Letter"), this time documenting concerns regarding rail workers' fatigue at Class I railroads and railroad attendance policies that could "have a negative effect on employee rest, and thus safe railroad operations." Bose followed the March 2022 Bose Letter with another letter dated June 10, 2022 (the "June 2022

[17] At this point in time, Bose was still a Deputy Administrator with the FRA. He was promoted to Administrator sometime between October 28, 2021 and March 28, 2022, when he sent an additional letter to Squires.

Bose Letter"), this time addressed to "Fellow Rail Safety Stakeholders" and relating to policies for attendance and sleeping while rail workers are away from home that "may increase fatigue." Bose noted that the FRA would be working with railroad and labor leadership to find a solution to this problem, and "urge[d] railroads to consider the potential for increasing fatigue when employees have extended stays at [away-from-home-terminal] locations."

476. Bose's next letter to Norfolk Southern was dated September 26, 2022 (the "September 2022 Bose Letter"), and this time was addressed to Shaw, the newly-minted CEO. This letter informed Shaw that the FRA saw "evidence that railroads [were] curtailing mechanical and brake safety inspections by maintenance-of-equipment personnel, specifically carmen, while increasing reliance on inspections by railroad workers from other crafts (*e.g.*, train and yard crews)."[18] While Bose noted there are "certain circumstances" allowing for train and yard crews to complete inspections, he reminded Shaw that FRA regulations regarding inspections are meant "to ensure rail equipment periodically undergoes comprehensive inspection by individuals specially trained in the maintenance and

[18] This concern is consistent with statements made by labor leaders to the NTSB regarding the improper use of Appendix D. *See supra* ¶¶178-187.

repair of the equipment (*i.e.*, maintenance-of equipment personnel), who can properly determine whether the equipment is safe to operate." Bose informed Shaw that the "repeated performance of inspections, by employees or contractors who do not possess the same specialized training and experience as maintenance-of-equipment employees, raises concerns about the adequacy of the inspections." Bose concluded the letter by requesting Shaw's "cooperation in ensuring that rail equipment receives proper attention from maintenance-of-equipment employees to perform mechanical inspections."

477. Bose further warned against practices designed to avoid inspections by maintenance of-equipment employees. Specifically, Bose referred to the practice of manipulating the stopping point of a train outside of a yard in order to take advantage of loopholes that allow the train operators, such as conductors, to perform an inspection instead of the inspectors with specialized training:

> For example, FRA is aware that railroads may be intentionally holding trains outside of yards to have operating crews perform required mechanical inspections when maintenance-of-equipment employees are otherwise assigned to do so at yard locations. FRA is also aware of trains being held in "lost" or ghost" tracks, where trains are physically on tracks within a yard, but not recorded in terminal data systems. Trains held on these "lose" or "ghost" tracks are treated essentially the same as trains held outside of a yard, because they are inspected by other than maintenance-of-equipment personnel stationed within the yard.

478. Bose additionally condemned Norfolk Southern's reliance on train operating crews to complete inspections outside of the train yards when inspectors with specialized training are available to perform the inspections within the yard:

> Moreover the use of train crews to conduct inspections even when qualified maintenance-of-equipment personnel are available in a yard may violate FRA rules concerning the qualifications for performing required mechanical tests and inspections, notably the Class I brake test and inspection requirements . . . and may add to the fatigue experienced by train crews, by adding the burden of completing the trains' mechanical inspections, given crew shortages and longer hours, subject to the hours-of-service limits.

479. Bose recognized that some yards may be constrained by their size to receive trains for the required inspections, but he said that that "should not be used to minimize proper train maintenance and inspection or manage terminal dwell data."

480. The FRA Safety Assessment noted that Norfolk Southern responded to the September 2022 Bose Letter on November 11, 2022. Norfolk Southern's letter stated that it had "long standing processes and rules in place for mechanical and brake safety inspections that comply with applicable federal rules, and . . . employ the appropriate personnel to conduct those inspections."

481. On January 5, 2023, Bose sent a third letter, addressed to several railroad CEOs including Shaw (the "January 2023 Bose Letter") in which he

informed the CEOs that the FRA would be conducting audits of the railroads' compliance with 49 C.F.R. §§240 and 242, which codify requirements for the training, qualification, and certification of locomotive engineers and conductors. The FRA's audits would "include a focus on determining whether such programs provide locomotive engineers and conductors the knowledge, skill, and ability to discharge their responsibilities safely – a cornerstone for the safety of rail operations." Bose wrote that the FRA had reviewed several programs submitted by railroads,[19] and had taken "a collaborative approach" by providing the railroads "specific, detailed comments regarding compliance with the regulation," but that "in some cases, the revisions to a program barely made incremental progress toward correcting the deficiencies that [the] FRA took great care in detailing in successive letters to the railroad." The January 2023 Bose Letter advised the recipients, including Shaw, that the FRA was "committed to pursuing enforcement action" for failures in addressing deficiencies identified by the FRA.

---

[19] This appears to be a reference to 49 C.F.R. §§240.103 and 242.103, which require that each railroad submit written requests for approval of its programs that conform to the training, qualification, and certification requirements for both locomotive engineers and conductors.

482. The FRA Safety Assessment later noted that, in conjunction with the January 2023 Bose Letter, the FRA sent Norfolk Southern a follow-up letter on June 14, 2023 informing Norfolk Southern that "it must take immediate action to address ***grave deficiencies in its conductor certification program***."

### 2. The FRA Conducted a System-Wide Special Audit of Norfolk Southern's Compliance with FRA Regulations During the Class Period

483. Following the same series of accidents that prompted the October 2021 Bose Letter, the FRA conducted a system-wide special audit of Norfolk Southern from January 2022 through early May 2022 (the "FRA Special Audit"), the results of which were released by the FRA on July 8, 2022. The FRA Special Audit uncovered a number of violations of federal regulations, including:

- Violations of 49 C.F.R. §217.9 – Program of Operational Tests and Inspections; Recordkeeping. The FRA noted that Norfolk Southern "fail[ed] to properly administer and implement the program of operational testing" and that this could "diminish the capacity [of Norfolk Southern] to correct accident/incident and injury trends."
- Violations of 49 C.F.R. §243, *et seq.* – Training, Qualification, and Oversight for Safety-Related Railroad Employees. The FRA noted that Norfolk Southern "did not provide a digital or hardcopy document of the tasks . . . associated with on-the-job training (OJT) . . . [which left] new hires without a reference for the steps necessary to adequately perform their OJT exercises."
- Violations of Federal Regulations regarding inspections of Norfolk Southern's Motive and Power Equipment, and specifically "inadequate communication between the [Norfolk Southern] transportation and

> mechanical departments" causing defects found by transportation crews to go unattended, especially with respect to Norfolk Southern's fleet of locomotives.

484. Norfolk Southern was provided with a copy of the report generated during the FRA Special Audit. Norfolk Southern reviewed the report and provided comments to the FRA.

### E. Norfolk Southern Tied Executive Compensation to Achieving the Company's PSR Goals

485. During the Class Period, Norfolk Southern established performance-based incentive payouts to encourage executives to press PSR's implementation at the expense of safety by tying incentive-based compensation to key PSR-related metrics like the OR and operating income. Defendants Squires, Shaw, and Sanborn were recipients of these incentive plan cash pay-outs.

486. For 2019, the Company changed the performance metrics it used for determining annual cash incentives to executives. To propel the Company's PSR implementation, Norfolk Southern made 60% of executives' annual cash incentive dependent upon the Company's operating income, and 40% dependent upon OR. The Company, according to its 2021 Proxy Statement, chose these metrics "because it believed that use of such metrics encourages employees to do all they can individually and as a team to increase revenue, improve efficiency, and reduce expenses," leaving safety unaddressed.

487. In 2020, the Company maintained its focus on PSR metrics as the two drivers of performance-based compensation for its executives, but reversed the mix so that executives' cash incentive was based 60% on the OR while 40% would be based on operating income. This change in the metrics' weighting, according to the Company's 2021 Proxy Statement, was to "assist in driving the Corporation towards our 2021 goal of an operating ratio of 60% or better."

488. In 2021, the OR continued to represent 60% of the annual performance-based cash incentive for executives, with the remaining 40% split evenly between the operating income and the Company's performance related to "strategic objectives," which included items like "driving productivity and efficiency," "achieving operational excellence," and "accelerating digital transformation." With OR determining the majority of executives' cash incentive, the focus on PSR initiatives persisted. When discussing its corporate performance results for 2021, the 2022 Proxy Statement specifically recognized that its incentive structure had resulted in "***record performance for train length and weight [and] gross ton-miles per employee***." Likewise, in 2022, although the mix again shifted slightly, OR maintained dominant importance, representing 50% of the annual performance-based cash incentive, while operating income represented 30%, and "strategic objectives" represented 20%.

489. Notably, following the East Palestine Derailment, Defendants acknowledged their misaligned corporate incentives. During his interview with the NTSB, Shaw responded to a question about actions the Company had taken for the "message getting out" that safety "should be number one" among the Company's priorities. Shaw responded that "***we changed our comp plan this year for management and we included safety metrics***, so that's another demonstration of the way that we're focused on it." Indeed, Norfolk Southern's Board excised OR from the metrics considered for executive incentives for 2023, while giving 5% weight to each of two new safety metrics – FRA reportable injury rate and FRA reportable train accident rate – in order to "support our focus on providing safe and reliable service."

490. Thus, throughout the Class Period, Norfolk Southern executives were keenly motivated to closely monitor and enhance the Company's OR and operating income, as well as any policies or procedures that would increase those metrics. By maintaining a façade that the Company could simultaneously incorporate PSR and uphold the Company's safety culture, while in truth excising safety accomplishments from the compensation formula and, instead, slashing safety measures to achieve Norfolk Southern's OR target (and thereby creating the

conditions for the East Palestine Derailment), Squires, Shaw, and Sanborn reaped substantial cash benefits.

491. Further evidence of the Company's 180-degree-turn away from the unsafe PSR policies it pushed during the Class Period has emerged through a contentious 2024 proxy battle against Ancora, one of the Company's largest shareholders. As part of the campaign literature it disseminated, Norfolk Southern distinguished its own plan for 2024, which targets a gradual decrease in OR, against Ancora's, which targets rapidly decreasing the OR to below 60% – a policy Norfolk Southern itself explicitly endorsed when it enacted PSR, but now hypocritically attacks as "reckless." The Company says in a letter to shareholders:

> ***Targeting a 60% operating ratio (~$1.2 billion of improvement) in 13 - 14 months would*:**
>
> - **Require ~1,500 – 2,000 employee furloughs** in the first year, despite Ancora's assertion that they would not furlough;
> - Which would **compromise and reverse our safety improvements; and**
> - **Result in increased scrutiny and punitive action from regulators, including the STB and FRA**.
>
> ***This reckless approach would also lead to*:**
>
> - **Poor service**;

- **Missed growth opportunities** (particularly during economic recoveries); **and**

- **Damaged relationships with customers**.

(Emphasis in original.)

### F. High-Level Departures During the Class Period Support an Inference of Scienter

492. In 2022, Norfolk Southern terminated two executives as the Company began to recognize the culture and safety issues wrought by its single-minded focus on efficiency and PSR's implementation – COO Sanborn and Hunt Cary, VP of Transportation.

493. On November 14, 2022, nearly two months before the East Palestine Derailment and just over two years after her appointment, Norfolk Southern announced Sanborn's departure, which came on the heels of two other derailments of Norfolk Southern's trains caused by overheated bearings, one on July 12, 2022 near Warner Robbins, Georgia and one on October 8, 2022 near Sandusky, Ohio. During Shaw's interview with NTSB investigators following the East Palestine Derailment, Shaw explained his decision to oust Sanborn by highlighting that her replacement, Paul Duncan, would better prioritize safety, and noted that as soon as Duncan became COO, all of Norfolk Southern's signs that depicted safety as the

fourth priority were taken down, and that Duncan "really stressed the importance of safety."

494. Earlier in the year, on April 4, 2022, Norfolk Southern announced that Hunt Cary was stepping down as VP of Transportation. During Shaw's interview with NTSB investigators following the East Palestine Derailment, Shaw explained his decision to remove Cary, saying that he "wasn't happy with the leadership" exhibited. Shaw noted that, in making executive staffing decisions, especially with respect to the role of VP of Transportation, his "focal point [was] safety, service, productivity and growth" and he highlighted that a quality he was "looking for" was a person able to "engag[e] with [Norfolk Southern's] employees."

495. These changes Norfolk Southern and Shaw made to the executive team during the Class Period demonstrate Shaw's and the Company's knowledge that Norfolk Southern had been discounting safety, and that changes were necessary. However, as alleged above, notwithstanding these changes, Norfolk Southern persisted in its unsafe application of PSR even after Sanborn's departure, culminating in the East Palestine derailment and subsequent vent and burn of vinyl chloride, as well as two additional derailments less than a month apart after East Palestine.

### G. Norfolk Southern Holds Its Executives Accountable for the Impaired Safety Measures that Led to the East Palestine Derailment

496. It was certainly the opinion of Norfolk Southern's Board that maintaining awareness of safety conditions preventing derailments, like the one in East Palestine, fell squarely within the purview of the Company's executives, including the Individual Defendants.

497. The Board held the executive officers of Norfolk Southern financially responsible for the disaster in East Palestine. Director John R. Thompson, chair of the Capital Management and Compensation Committee, stated in the 2024 Proxy Statement that the executive incentive compensation for 2023 "***exclude[d] the costs associated with East Palestine, and applied negative discretion to reduce . . . incentive payouts to zero***." Thus, while under the existing incentive policies Shaw collected $594,000 in awards for 2023, he received no incentive award.

498. Moreover, the Board, beginning in 2023 and going forward, adopted the following policy:

> In January 2024, we adopted a ***supplemental clawback policy*** that provides the Committee the ***discretion to recoup incentive compensation in all forms*** including time-and performance-based awards received by a current or former Vice President, Senior Vice President, Executive Vice President, President/CEO or other Executive Officer during the three-year period prior to which the Board or the Committee determines that Detrimental Conduct (as defined below) has

> occurred. "Detrimental Conduct" occurs when a Vice President or more ***senior officer engages in conduct that constitutes*** (a) gross negligence (including gross negligence in supervising the work of others), (b) fraud, (c) intentional misconduct, or (d) violation of a written Company policy that ***results in a material risk management, operational, safety, or reputational failure***.

499. In other words, the Board sent the message loud and clear that it was holding executives, including Shaw, accountable for the safety failures that resulted in the East Palestine Derailment, and any other such failures going forward.

### I. The Norfolk Southern Team, Which Included Defendant Shaw, that Responded to the East Palestine Derailment Knew that the Cars Carrying Vinyl Chloride Posed No Danger of Polymerization

500. At approximately 11:45 p.m. the evening of the East Palestine Derailment, one of Norfolk Southern's hazardous materials executives, Deutsch, arrived on the scene. Around the same time, Norfolk Southern instructed all first responders – other than themselves and their agents – to leave the crash scene. And they did, leaving only Norfolk Southern-controlled witnesses on the scene.

501. During the morning of Saturday, February 4, 2023, a Norfolk Southern corporate jet took off from Atlanta, Georgia and landed in Pittsburgh, Pennsylvania carrying a group that would have included Norfolk Southern CEO Shaw and his top hazmat official, Wood.

502. Oxy Vinyls experts held a conference call with the Norfolk Southern team on the evening of February 4, 2023, to discuss Oxy Vinyls' cars in the derailment. Norfolk Southern personnel on that call included John Simpson (hazmat manager) and Drew McCarthy (SPSI President). During that call, Oxy Vinyls told Norfolk Southern that there was an "***extremely low probability***" that any of the tank cars carrying vinyl chloride were undergoing a runaway polymerization reaction.

503. Moreover, the Oxy Vinyls team instructed the Norfolk Southern team that there was a clear way to know for sure that the cars were ***not*** undergoing polymerization, telling Norfolk Southern "if you can take a ***temperature on the car, then you'll know exactly what's happening*** inside [the] car." For this reason, Oxy Vinyls "emphasized to Norfolk Southern and its contractors the importance of monitoring the temperatures of the rail cars."

504. On the morning of February 5, 2023, Oxy Vinyls held another call with the Norfolk Southern team including Gould, where Norfolk Southern personnel voiced for the first time their desire to "vent and burn" the VCM cars – that is, blow them up. Oxy Vinyls told the Norfolk Southern team that polymerization in the VCM cars was "***not occurring***."

505. Starting at 4:00 p.m. on Sunday, February 5, 2023, Norfolk Southern was able to collect the temperature data on all of the VCM cars. The data was

distributed amongst Norfolk Southern's team in East Palestine – which worked together in a single room. The data was also sent by Deutsch to Norfolk Southern's headquarters in Atlanta, Georgia.

506. Based on the temperature readings, it was conveyed to the Norfolk Southern team by Oxy Vinyls experts that "polymerization wasn't occurring from our perspective." Moreover, the temperature readings were well below the levels at which the DOT-105 cars would burst.

507. By Monday, February 6, 2023, there was conclusive scientific data that there was no risk of a runaway polymerization reaction. Everyone on the Norfolk Southern team had access to this data hours before they used fearmongering (and defrauded) public officials into authorizing them to blow up five tank cars of vinyl chloride.

## XII. LOSS CAUSATION

508. Defendants' materially false or misleading statements and omissions and fraudulent scheme alleged above in §§VI-VIII and X directly and proximately caused the damages suffered by Plaintiffs and other Class members. As alleged above, during the Class Period, Defendants publicly issued materially false or misleading statements and omissions of material fact regarding Defendants' purportedly safe implementation of PSR, Norfolk Southern's reportable accidents,

how the Company handled hazardous materials, Norfolk Southern's expanded train length, Norfolk Southern's expenditures related to safety, the quality of training and qualification of Norfolk Southern's employees, and the "vent and burn" on February 6, 2023. Defendants also engaged in a fraudulent scheme or course of conduct which had the effect of creating a materially false or misleading impression of the safety of Norfolk Southern's operations. Defendants further engaged in a fraudulent scheme or course of conduct that had the effect of creating a materially false or misleading impression that polymerization was occurring in the VCM cars that necessitated a "vent and burn."

509. Defendants' materially false statements and omissions and fraudulent scheme inflated the price of Norfolk Southern common stock and maintained that price at a higher level than would have resulted from the disclosure of the true condition of Norfolk Southern's operations, which, as discussed above, involved favoring the Company's bottom line over safety practices and protocols, and the safety of the communities in which Norfolk Southern operated. Plaintiffs and other Class members purchased or otherwise acquired Norfolk Southern common stock at prices that were artificially inflated by Defendants' misrepresentations and omissions of material fact and fraudulent scheme. Had Defendants been truthful about these matters during the Class Period, Plaintiffs and other Class members

would not have purchased or otherwise acquired their shares of Norfolk Southern common stock at the artificially inflated prices at which they were offered.

510. The Class Period inflation in Norfolk Southern's common stock price was removed when the foreseeable risks and relevant truth concealed by Defendants' material misstatements and omissions and fraudulent scheme were revealed to the market. As discussed below, this occurred through a series of events between February 3, 2023 and March 6, 2023, which partially corrected Defendants' material misstatements and omissions and through which the risks concealed by Defendants' misstatements and omissions and fraudulent scheme materialized. These events gradually revealed Defendants' deliberate disregard of safety in pursuit of operating efficiency and the increased costs and reduced earnings that would result from Norfolk Southern needing to attain the level of safety that Defendants falsely claimed Norfolk Southern had been maintaining during the Class Period and to remediate the effects of the East Palestine Derailment and "vent and burn." As the relevant and true facts became known and the risks previously concealed by Defendants' material misstatements and omissions and fraudulent scheme materialized through these disclosures, the artificial inflation was removed from the price of Norfolk Southern's common stock, causing damages to Plaintiffs and other Class members. The timing and magnitude of the declines in Norfolk Southern's

common stock negate any inference that the losses suffered by Plaintiffs and other members of the Class were caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to the Defendants' fraudulent conduct.

511. Beginning after the close of trading on February 3, 2023, the East Palestine Derailment, which occurred at approximately 9:00 p.m., partially revealed the risks and true conditions concealed by Defendants' material misstatements and omissions and fraudulent scheme. The East Palestine Derailment occurred as a direct result of Defendants' undisclosed policies and practices that undermined safety when Norfolk Southern implemented PSR, as discussed above in §VII, including Norfolk Southern's use of longer, heavier trains operated by less experienced employees, and which had undergone fewer and briefer inspections, and were operated with fewer safety measures in place, such as directing notifications from wayside detectors to the solo-staffed Wayside Desk rather than to the crews operating the trains.

512. News of the East Palestine Derailment was widely reported over the weekend of February 4-5, 2023. For example, on February 4, 2023, the *Associated Press* reported that "[a] freight train derailment in Ohio near the Pennsylvania state line left a mangled and charred mass of boxcars and flames Saturday as authorities

launched a federal investigation and monitored air quality from the various hazardous chemicals in the train." The article stated: "[S]urveillance from the air showed 'an entanglement of cars' with fires still burning and heavy smoke continuing to billow from the scene as officials tried to determine what was in each car from the labels outside." *The Washington Post* similarly reported on February 4, 2023: "A fire continued to burn Saturday in Northeastern Ohio, after the derailment of a train carrying hazardous chemicals forced officials to order more than 1,500 residents to evacuate their homes." The article stated: "Twenty hours after the Friday night crash, the presence of the chemicals made it too risky for emergency responders to get close enough to put out the fire, local and federal officials said."

513. On Sunday, February 5, 2023, Ohio Governor Mike DeWine ordered the immediate evacuation of those within a one-mile radius of the derailment site, warning of "the potential of a catastrophic tanker failure which could cause an explosion with the potential of deadly shrapnel traveling up to a mile."

514. On Monday, February 6, 2023, Norfolk Southern engaged in the vent and burn of five tankers filled with vinyl chloride, releasing massive volumes of toxic chemicals into the air. As reported by *Politico*: "Officials warned the controlled burn would send phosgene and hydrogen chloride into the air. Phosgene

is a highly toxic gas that can cause vomiting and breathing trouble and was used as a weapon in World War I." The article stated:

> Scott Deutsch of Norfolk Southern Railway earlier said doing this during the daytime would allow the fumes to disperse more quickly and prevent the rail cars from exploding and sending shrapnel and other debris from flying through the neighborhood.
>
> * * *
>
> About three hours into the procedure, Norfolk Southern Railway issued a statement saying that experts and first responders had breached the rail cars, chemicals were burning off and the cars were expected to drain for several more hours.

News reports showed black plumes of smoke rising from the site as a result of the controlled detonation.

515. As a result of this partial corrective disclosure and materialization of the risks concealed by Defendants' misstatements and omissions, the price of Norfolk Southern's common stock declined $5.66 per share, over 2%, from a closing price of $252.12 per share on February 3, 2023, to a closing price of $246.46 per share on February 6, 2023, thereby removing a portion of the artificial inflation in the price of Norfolk Southern common stock.

516. Securities analysts attributed Norfolk Southern's stock price decline on February 6, 2023 to the news of the East Palestine Derailment. For example, in a report on February 6, 2023, J.P. Morgan analysts stated: "We believe [Norfolk

Southern] is underperforming the U.S. rails (-160bps) on this news given the uncertain outcome and high profile headlines."

517. While this disclosure partially revealed Norfolk Southern's prioritization of efficiency and profits to the detriment of safety, the price of Norfolk Southern stock remained inflated, including because Defendants continued to mislead the market by falsely claiming that the vent and burn had been necessary to "***prevent***" the VCM rail cars' explosion.

518. On February 7, 2023, multiple media outlets reported that Governor DeWine stated that he "fully expects the Norfolk Southern Railway, which had a massive car derailment in East Palestine that resulted in evacuations and the release of toxic chemicals, to pay the cost of the incident." For example, a February 7, 2023 article by the Wheeling, West Virginia *Intelligencer* quoted Governor DeWine as stating: "They're the ones who created the problem . . . . It's their liability. They're the ones who ought to pay for it." According to the article, Governor DeWine added: "I don't know if we have a problem yet so I don't want to anticipate. But if there is a problem, certainly we will do everything in our power to deal with that. Again, we don't want to cross that bridge yet." A February 7, 2023 article on Trains.com similarly reported: "Ohio Gov. Mike DeWine said today (Tuesday, Feb. 7) that he

expects Norfolk Southern to pay for the costs related to the derailment and fire in the community on the Ohio-Pennsylvania state line."

519. On February 8, 2023, officials in Ohio and Pennsylvania announced that the evacuation order for residents in the immediate vicinity of the East Palestine Derailment had been lifted. Media outlets reported that numerous residents described hazardous air quality and other health and environmental concerns following their return. Additionally, media outlets reported on February 8, 2023 that the residents of East Palestine who were displaced by the derailment had filed a class action lawsuit. According to an article by *The Beaver County Times*, the "residents allege that crews from Norfolk Southern did not take the proper care to ensure their train cars carrying hazardous materials were safe and caused residents to be 'involuntarily displaced.'" The article added: "Throughout the lawsuit, the plaintiffs point to the dangers around the toxic vinyl chloride on the train."

520. On February 9, 2023, market commentators began to question whether Defendants' PSR strategy was to blame for the East Palestine Derailment. For example, a February 9, 2023 *Yahoo! Finance* article reported that "[t]he derailment was reportedly due to a mechanical problem, but some are blaming the incident on weak safety regulations and ***the company's cost-cutting measures***." The article stated:

> Safety concerns have also grown amid Norfolk Southern's implementation of "***precision scheduled railroading***," an operations policy criticized as a corporate money grab. To cut costs, the company has slashed jobs by more than a fifth since 2017, ignoring concerns that understaffing could impact railway safety . . . .

Similarly, a February 9, 2023 article on PBS.org titled: "Ohio derailment that released toxic chemicals raises railroad safety questions," stated that the East Palestine Derailment "has highlighted the potentially disastrous consequences of train accidents and raised questions about railroad safety." The article noted: "Rail unions believe the industry has gotten riskier in recent years after widespread job cuts left workers spread thin," and quoted Greg Regan, president of the AFL-CIO's Transportation Trades Department coalition, as stating: "They're really just trying to squeeze as much productivity out of these workers as they can . . . . And when you're focused on timing and rushing, unfortunately sometimes things can fall through the cracks."

521. As a result of this partial corrective disclosure and materialization of the risks concealed by Defendants' misstatements and omissions, the price of Norfolk Southern's common stock declined $7.64 per share, over 3%, from a closing price of $244.98 per share on February 8, 2023, to a closing price of $238.98 per share on February 9, 2023, thereby removing a portion of the artificial inflation in the price of Norfolk Southern common stock.

522. On February 10, 2023, the EPA sent a letter to Norfolk Southern stating that the EPA "has documented the release or threat of release of hazardous substances, pollutants or contaminants into the environment from the East Palestine Train Derailment Site." The EPA's letter stated: "Cars containing vinyl chloride, butyl acrylate, ethylhexyl acrylate, and ethylene glycol monobutyl ether are known to have been and continue to be released to the air, surface soils, and surface waters." Additionally, the EPA's letter stated:

> Based on information presently available to EPA, EPA has determined that Norfolk Southern Railway Company . . . may be responsible under CERCLA for cleanup of the Site or costs EPA has incurred in cleaning up the Site.

523. The EPA's letter further stated:

> By this letter, EPA notifies you of your potential liability with regard to this matter and encourages you, as a PRP [potentially responsible party], to agree to reimburse EPA for costs incurred to date and to voluntarily perform or finance the response activities that EPA has determined or will determine are required at the Site.

524. Media outlets reported on the EPA's letter beginning on Saturday, February 11, 2023. On February 13, 2023, NPR reported that the EPA's February 10, 2023 letter "document[ed] contaminants that could have been released into the environment, including three that had not previously been reported" and "notified the company that it is potentially liable for the cleanup costs under the federal Superfund program."

525. As a result of this partial corrective disclosure and materialization of the risks concealed by Defendants' misstatements and omissions, the price of Norfolk Southern's common stock declined $7.33 per share, over 3%, from a closing price of $242.61 per share on February 10, 2023, to a closing price of $235.28 per share on February 14, 2023, thereby removing a portion of the artificial inflation in the price of Norfolk Southern common stock.

526. Market commentators attributed the declines in Norfolk Southern's stock price to the EPA's announcement. For example, in an analyst report on February 13, 2023, J.P. Morgan stated: "The environmental concern surfaced again on February 13 after the U.S. Environmental Protection Agency (EPA) notified Norfolk in a letter dated February 10 that the railroad may be responsible under the Federal 'Superfund' law for cleanup costs at the derailment site." The report noted that Norfolk Southern's stock had declined as much as 5% pre-market, and "still lagged peers by -150bps." The analysts stated: "We believe [NS] lagged the group primarily on the negative headline of the EPA letter and lingering concerns from residents over the environmental impact of the derailment." The report added that "[Norfolk Southern] has underperformed more than expected after the derailment and recent EPA news, implying a total derailment cost of ~$2.7B based on our estimates. However, we believe NS could remain susceptible to further headlines

on the derailment until water quality tests come back within the next week." Similarly, a *SeekingAlpha* article on February 13, 2023 titled: "Norfolk Southern trades lower after EPA warns on heavy derailment clean up costs," stated that the Company's stock "traded lower on Monday [February 13] after the Environmental Protection Agency sent the company a general notice of potential liability and said it may be responsible for clean-up costs at the train derailment site in East Palestine, Ohio."

527. Commenting on the continued stock price decline on February 14, 2023, an *Investor's Business Daily* article titled: "Norfolk Southern Stock Slips Amid Ohio Chemical Spill Disaster, Growing Health Concerns and Lawsuits," reported that "Norfolk Southern stock continued to slump Tuesday [February 14] as the cleanup of hazardous materials from a Feb. 3 train derailment in East Palestine . . . is still underway and lawsuits begin to pile up." The article cited the fact that "[t]he EPA has said Norfolk Southern 'may be responsible' for the cleanup and 'costs EPA has incurred in cleaning up the site,'" and noted that in addition to a previously-reported lawsuit by residents of East Palestine, "[a]nother class action lawsuit seeks damages for costs associated with the evacuation." The article also discussed growing concerns about PSR and whether it was the cause of the East Palestine Derailment, stating:

> [R]ail labor unions have argued "Precision Scheduled Railroading" (PSR) could be at fault in the derailment. The rail industry has adopted PSR to increase efficiency and reduce the size of overall freight car fleets as they move cargo on fewer, but longer trains.
>
> However, rail labor leaders have argued this practice has cut jobs and made trains less safe, with fewer workers and less time to conduct safety checks on additional rail cars.

528. On February 15, 2023, news reports emerged that Ohio Attorney General Dave Yost was considering taking legal action against Norfolk Southern over the derailment. The news reports quoted a February 15, 2023 letter from Attorney General Yost to Norfolk Southern in which he stated: "The pollution, which continues to contaminate the area around East Palestine, created a nuisance, damage to natural resources and caused environmental harm."

529. On February 15, 2023, U.S. Senators Sherrod Brown, J.D. Vance, Robert P. Casey, Jr., and John Fetterman sent a letter to NTSB Chair Homendy raising concerns about rail safety in light of the East Palestine Derailment. In the letter, the Senators "note[d] several factors and concerns that we have heard from our constituents, outside experts, and representatives of railroad workers." The Senators asked a series of questions, including several questions which directly implicated Norfolk Southern's PSR practices.

530. Additionally, on February 15, 2023, U.S. Senators Marco Rubio and J.D. Vance issued a press release regarding a letter they sent to Department of Transportation Secretary Pete Buttigieg. In the press release, the Senators stated:

> The release of vinyl chloride and other chemicals into the air and ground surrounding East Palestine, Ohio raises serious environmental concerns and has long-term implications for the town and those living in the region. As investigators look into the cause of the February 3, 2023 derailment, additional questions are being raised regarding the U.S. Department of Transportation's (DOT) regulatory oversight and ***Norfolk Southern Railway's business practices***.

531. In the letter, the Senators stated: "Current and former rail workers, industry observers, and reform advocates have pointed to precision-scheduled railroading (PSR), by which rail companies such as Norfolk Southern increase efficiency and drive down costs by moving more freight with fewer workers, as a potential contributor to the accident." The Senators asked Secretary Buttigieg a number of questions about the impact of PSR on the safety of Norfolk Southern's and other rail companies' operations, including: (1) "What effects has the widespread adoption of precision-scheduled railroading, which results in freight trains miles-long moving, on average, at faster speeds, had on the working quality of our nation's steel rail?"; and (2) "What effects has the widespread adoption of precision-scheduled railroading had on the rate of axle bearings overheating

(frequently referred to as a 'hot box'), both in the frequency of their occurrence and the capacity of rail inspectors to catch them?"

532. On February 16, 2023 media outlets reported that another Norfolk Southern train had derailed in Van Buren Township in Michigan. A local Detroit news outlet stated:

> The first reports of the derailment came before 8:45 a.m. Thursday from the train tracks in the area of Huron River Drive between Martinsville and Haggerty roads. Aerial video showed several train cars off the tracks. The tracks were damaged, and several sets of wheels became disconnected from cars.

According to the article: "A representative with Norfolk Southern told Local 4 that there were no hazardous materials spilled in the crash, and there were no reports of injuries."

533. Later on February 16, 2023, CNN reported: "The head of the US Environmental Protection Agency told CNN the agency plans to hold the train company Norfolk Southern accountable as investigations continue into the derailment of a train carrying hazardous chemicals earlier this month in a small Ohio town." The article stated: "The EPA issued a notice of accountability to the company, EPA Administrator Michael S. Regan told CNN on Thursday, adding that the company has signed it, indicating that it will responsible for the cleanup." The

article also referenced accounts by residents of East Palestine of the environmental and health impacts from the derailment.

534. On the heels of the Michigan derailment, White House Press Secretary Karine Jean-Pierre vowed federal action against Norfolk Southern for its role causing the crisis in East Palestine, Ohio. During the daily White House press briefing, Jean-Pierre promised "to hold Norfolk Southern accountable." News outlets, including *Bloomberg* and *Axios*, ran the Administration's statements aimed at Norfolk Southern.

535. Additionally, on February 16, 2023, SMART issued a statement regarding the East Palestine Derailment, "***calling for an end to the business practice of Precision Scheduled Railroading (PSR)***." The statement highlighted the impact of PSR on safety:

> PSR, which has proliferated industry-wide amongst the nation's Class 1 freight railroads, is highlighted by an emphasis on reducing staffing and maximizing profits. In the wake of this trend, our nation's rail carriers have famously reduced their head counts, lengthened trains, and relaxed safety inspections on locomotives, rolling stock (rail cars) and tracks alike. All of this has been done in the name of reducing the only metric valued by PSR: operating ratio. In the name of improved operating ratios, the car departments and track maintenance departments have been ordered to do more with less. Reduced staffing levels and the increased number of cars per train have made it impossible for these railroad professionals to properly inspect equipment to ensure its safety. As an example, car inspections that used

> to be done with an industry standard of 3-4 minutes per car have been reduced to 60-90 seconds.

536. The statement quoted SMART Transportation Division President Jeremy Ferguson as stating:

> "***It is time for the federal government to step in and levy significant penalties on these companies until they feel the same level of pain as we saw in the makeshift shelters of East Palestine. This, and only this will refocus the shareholders and executives of these companies on the safety of SMART's members and the American public***."

(Emphasis in original.)

537. On February 17, 2023, U.S. Senator Maria Cantwell, Chair of the Senate Committee on Commerce, Science, and Transportation, sent a letter to seven of the largest railroad company CEOs, including Norfolk Southern, requesting information and documents about safety practices involved in rail transportation of hazardous materials. In the letter to Norfolk Southern, Senator Cantwell requested a response to a number of questions regarding the impact of PSR on the safety of the rail company's operations.

538. As a result of this partial corrective disclosure and materialization of the risks concealed by Defendants' misstatements and omissions, the price of Norfolk Southern's common stock declined $10.14 per share, over 4%, from a closing price of $238.29 per share on February 15, 2023, to a closing price of

$228.15 per share on February 17, 2023, thereby removing a portion of the artificial inflation in the price of Norfolk Southern common stock.

539. Market commentators attributed the declines in Norfolk Southern's stock price on these dates to the extensive news released regarding the safety of Norfolk Southern's operations and the impact of PSR, including the news of the Michigan derailment. For example, on February 16, 2023, *MT Newswires* stated in an article titled: "Norfolk Southern Shares Under Pressure After Second Train Derailment in Two Weeks," that "Norfolk Southern's (NSC) shares were down more than 3% in afternoon trading . . . after a company train derailed in Van Buren Township, Michigan." On February 17, 2023, *The Wall Street Journal* also connected the Michigan crash to "the aftermath of a train derailment in Ohio" and attributed Norfolk Southern's poor share performance that week in part to the events in Michigan.

540. In a February 16, 2023 article, *Bloomberg* attributed Norfolk Southern's stock price decline to the statements from the White House promising to hold Norfolk Southern accountable. According to *Bloomberg*, shares in "Norfolk Southern Corp. f[e]ll[] as much as 2.8% on Thursday after the White House said the railroad operator will be held accountable in the wake of an Ohio train derailment." *Bloomberg* further reported that Norfolk Southern had been the worst performer in

the Dow Jones Transportation Average since February 3 and, connected the crash to Norfolk Southern's poor safety record. The article further noted that the Senate was mulling new rail safety measures in the wake of the East Palestine Derailment.

541. On February 18, 2023, *The Washington Post* published an article titled: "Before Ohio derailment, Norfolk Southern lobbied against safety rules," which noted "[a] train hauling hazardous materials derailed Thursday near Detroit, but none spilled." The article detailed Norfolk Southern's efforts to deregulate the rail industry prior to the two derailments. Referring to the extensive commentary criticizing Norfolk Southern and its PSR practices, the article stated: "A J.P. Morgan analysis found the derailment 'continues to weigh on the (railroad's) share price after an increasing amount of critical commentary from unions, elected officials, regulators, and the White House.'"

542. The price of Norfolk Southern stock remained inflated, however, as Defendants continued making materially false or misleading statements. For instance, on February 22, 2023, during an investor conference organized by Barclays Bank PLC, Norfolk Southern commented on the East Palestine Derailment, stating

> safety really is our #1 priority in Norfolk Southern. And you can see the progress we've made over the past decade on far fewer derailments than we've ever had. And even all of our safety metrics have gone in the right direction. It is – it has been and it will be a top priority for this company.

543. Soon after those assurances, on Saturday, March 4, 2023, yet another Norfolk Southern freight train derailed, this time near Springfield, Ohio, further revealing the extent of Norfolk Southern's safety lapses. About 20 of the train's 212 cars derailed but officials said no hazardous materials spilled and no injuries were reported.

544. Before the market opened on Monday, March 6, 2023, the Company announced a six-point plan to improve operational safety "based on the preliminary findings of the National Transportation Safety Board (NTSB) following the East Palestine, Ohio, derailment." The Company's plan included, *inter alia*, adding about 200 temperature sensors along its tracks where existing sensors are at least 15 miles apart, reviewing the temperature levels that trigger alerts to train crews, and adding more acoustic sensors that analyze vibrations for potential problems.

545. As a result of this partial corrective disclosure and materialization of the risks concealed by Defendants' misstatements and omissions, the price of Norfolk Southern's common stock declined $13.21 per share, nearly 6%, from a closing price of $228.39 per share on Friday, March 3, 2023, to a closing price of $213.75 per share on Tuesday, March 7, 2023, thereby removing a portion of the artificial inflation in the price of Norfolk Southern common stock.

546. Market commentators attributed the declines in Norfolk Southern's stock price to the news of the third derailment. For example, on March 6, 2023, CNBC reported: "Shares of Norfolk Southern fell about 2% Monday after another one of the freight railroad company's trains derailed over the weekend in Ohio." The article noted: "The derailment marks the third incident for the freight railroad in a little over a month. That included the toxic disaster in East Palestine, Ohio." In addition, in an article titled: "Another Norfolk Southern Train Derailed in Ohio. What the Stock Market Fears Happens Next," *Barron's* reported on March 6, 2023, that "expensive safety regulations could be coming for the train industry," citing Norfolk Southern's second train derailment in Ohio and third nationally in as many months. The article stated that even prior to the latest incident, "some politicians were calling for regulatory changes to the trail industry," with *Barron's* warning that "[t]hese regulations wouldn't be cheap." The article attributed Norfolk Southern's stock price decline to uncertainty over "[w]hat happens next" in the aftermath of its multiple derailments.

547. On March 7, 2023, after market hours, the NTSB announced that it would open a "a special investigation of Norfolk Southern Railway's organization and safety culture." In a press release, the NTSB stated: "Given the number and significance of recent Norfolk Southern accidents, the NTSB also urges the company

to take immediate action today to review and assess its safety practices, with the input of employees and others, and implement necessary changes to improve safety." As noted in the press release, one of the key events driving the special investigation, was that "[o]n Feb. 3, a Norfolk Southern freight train carrying hazardous materials derailed in East Palestine, Ohio," which "resulted in a ***significant fire and hazardous materials release***." In addition to the February 3, 2023 East Palestine Derailment and March 4, 2023 Springfield derailment, the NTSB revealed that "[o]n March 7, a Norfolk Southern employee was killed during a movement in Cleveland, Ohio." The NTSB stated:

> The NTSB is concerned that several organizational factors may be involved in the accidents, including safety culture. The NTSB will conduct an in-depth investigation into the safety practices and culture of the company. At the same time, the company should not wait to improve safety and the NTSB urges it to do so immediately.

548. On March 7, 2023, Norfolk Southern issued a press release regarding the fatal accident involving one of its workers in Cleveland, Ohio. The press release quoted defendant Shaw as stating: "Moving forward, we are going to rebuild our safety culture from the ground up. We are going to invest more in safety. This is not who we are, it is not acceptable, and it will not continue."

549. Additionally, on March 8, 2023, the Department of Transportation announced that it would "conduct a 60-day supplemental safety assessment of Norfolk Southern Railway following multiple safety incidents."

550. As a result of the above disclosures and materializations of the risks concealed by Defendants' fraud, Norfolk Southern's stock price declined precipitously, wiping out billions in the Company's market capitalization and causing Plaintiffs and other Class members' significant damages.

551. On October 25, 2023, *Reuters* issued a report titled: "Norfolk Southern profit slumps, takes $163 mln charge on Ohio derailment." *Reuters* reported that "third-quarter profit slumped 41% on Wednesday as the company took another hefty charge related to the Eastern Ohio freight train derailment." *Reuters* further stated: "The derailment of one of [Norfolk Southern's] freight trains carrying hazardous materials in February led to a lawsuit by the U.S. Justice Department seeking to ensure that the company paid the full cost of the cleanup and any future long-term impact." Consequently, *Reuters* further explained, Norfolk Southern "took a $163 million hit in the quarter following a $416 million charge on its quarterly statement in the second quarter and a $387 million charge in the first."

552. As *The Wall Street Journal* also reported on October 25, 2023, Norfolk Southern "said it is continuing efforts to clean-up East Palestine, Ohio, after a

derailment earlier this year" in explaining why it "expects full-year revenue to decline 4%." Following this additional news, the Company's stock price immediately declined from a closing price of $196.24 per share on October 24, 2023, to a closing price of $185.79 per share on October 25, 2023, or a decline of $10.45 per share.

## XIII. THE FRAUD ON THE MARKET PRESUMPTION APPLIES

553. At all relevant times, the market for Norfolk Southern's common stock was an open and efficient market for the following reasons, among others:

(a) Norfolk Southern's stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated stock market;

(b) As a registered and regulated issuer of securities, Norfolk Southern filed periodic public reports with the SEC, in addition to the Company's frequent voluntary dissemination of information;

(c) Norfolk Southern regularly and publicly communicated with investors via established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d) Norfolk Southern was followed by securities analysts employed by major brokerage firms who wrote reports that were distributed to those brokerage firms' sales forces and certain customers, and which were publicly available and entered the public marketplace.

554. As a result of the foregoing, the market for Norfolk Southern common stock promptly digested current information regarding Norfolk Southern from all publicly available sources, and the prices of Norfolk Southern common stock reflected such information. Based upon the materially false or misleading statements and omissions of material fact alleged herein, Norfolk Southern common stock traded at artificially inflated prices during the Class Period. Plaintiffs and the other members of the Class purchased Norfolk Southern common stock relying upon the integrity of the market price of Norfolk Southern's common stock and other market information relating to Norfolk Southern.

555. Under these circumstances, all purchasers of Norfolk Southern's common stock during the Class Period suffered similar injuries through their purchases of Norfolk Southern's common stock at artificially inflated prices, and a presumption of reliance applies.

556. Further, at all relevant times, Plaintiffs and other members of the Class reasonably relied upon Defendants to disclose material information, as required by

law, in the Company's SEC filings. Plaintiffs and the other members of the Class would not have purchased or otherwise acquired Norfolk Southern common stock at artificially inflated prices if Defendants had disclosed all material information, as required. Thus, to the extent that Defendants concealed or improperly failed to disclose material facts concerning the Company and its operations, Plaintiffs and the other members of the Class are entitled to a presumption of reliance in accordance with *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153 (1972).

## XIV. CLASS ACTION ALLEGATIONS

557. Plaintiffs bring this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3) on behalf of themselves and all other persons who purchased or otherwise acquired Norfolk Southern common stock during the Class Period, between October 28, 2020 and March 3, 2023, inclusive. Excluded from the Class are Defendants and their immediate families, directors and officers of Norfolk Southern and their immediate families, and each of the foregoing persons' legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

558. The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. During the Class Period, Norfolk

Southern had more than 227 million shares of common stock outstanding, owned by hundreds of thousands of persons. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery and procedure, Plaintiffs believe that the proposed Class numbers in the thousands and is geographically widely dispersed. Record owners and other members of the Class may be identified from records maintained by the Company or its transfer agent and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions.

559. Plaintiffs' claims are typical of the claims of the other members of the Class. All members of the Class were similarly affected by Defendants' alleged conduct in violation of the Exchange Act as complained of herein. Plaintiffs have no interests that are adverse or antagonistic to the interests of other Class members.

560. Plaintiffs will fairly and adequately protect the interests of the other members of the Class. Plaintiffs have retained counsel competent and experienced in class and securities litigation.

561. There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class that predominate over questions that may affect individual Class members include:

(a) Whether Defendants violated the Exchange Act by their acts and omissions as alleged herein;

(b) Whether Defendants' statements misrepresented and/or omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

(c) Whether Defendants knew or recklessly disregarded that their statements were false or misleading;

(d) Whether and to what extent the price of Norfolk Southern common stock was artificially inflated;

(e) The extent of damage sustained by Class members and the appropriate measure of damages;

(f) Whether reliance may be presumed pursuant to the fraud-on-the-market doctrine and/or the *Affiliated Ute* presumption; and

(g) Whether the Individual Defendants were controlling persons of the Company.

562. There is a presumption that each of the members of the Class relied on the misrepresentations and omissions alleged herein, pursuant to the fraud-on-the-market theory as well as under *Affiliated Ute*, 406 U.S. 128 where the acts complained of are predicated upon omissions of material facts.

563. The misconduct alleged herein operated as a fraud on the market as it impacted the market price of Norfolk Southern common stock, including because:

(a) Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b) the omissions and misrepresentations were material;

(c) the Company's stock traded in an efficient market; and

(d) Plaintiffs and other members of the Class purchased Norfolk Southern common stock between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

564. A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## XV. THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE ARE INAPPLICABLE

565. The Private Securities Litigation Reform Act of 1995's statutory safe harbor and/or the bespeaks caution doctrine applicable to forward-looking statements under certain circumstances do not apply to any of the materially false or misleading statements alleged herein.

566. None of the statements complained of herein was a forward-looking statement, nor were they identified as "forward-looking statements" when made. Rather, each was a historical statement or a statement of purportedly current facts and conditions at the time each statement was made.

567. To the extent that any of the materially false and/or misleading statements alleged herein, or any portion thereof, can be construed as forward-looking, any such statement was not accompanied by meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statement.

568. To the extent that the statutory safe harbor does apply to any forward-looking statement alleged herein, Defendants are liable for any such statement because at the time such statement was made, the particular speaker actually knew that the statement was false or misleading, and/or the statement was authorized and/or approved by an executive officer of Norfolk Southern who actually knew that such statement was false when made.

# XVI. CLAIMS FOR RELIEF

## COUNT I

### For Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Against All Defendants

569. Plaintiffs incorporate all prior allegations by reference.

570. During the Class Period, Defendants disseminated or approved the false statements specified above, which they knew or recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

571. Defendants violated §10(b) of the Exchange Act and Rule 10b-5 in that they:

(a) employed devices, schemes, and artifices to defraud;

(b) made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Plaintiffs and others similarly situated in connection with their purchases of Norfolk Southern common stock during the Class Period.

572. Each defendant, including Norfolk Southern, engaged in a scheme to defraud in violation of Rules 10b-5(a) and (c). Defendants Squires, Shaw, and Sanborn planned and pressured other executives to execute a company-wide policy and practice of elevating efficiency above safety while covering up the conduct through materially false or misleading statements as alleged above. Furthermore,

defendant Shaw violated Rules 10b-5(a) and (c) in orchestrating or at least authorizing the "vent and burn" scheme wherein several Norfolk Southern employees and agents engaged in fraudulent acts, including, but not limited to, giving materially false or misleading information to government officials over the February 3-6, 2023 period, knowing that government officials – including Governor DeWine and the NTSB – would (unknowingly) convey materially false or misleading information to the market as specified above in detail, and would authorize the "vent and burn" of February 6, 2023 on the basis of materially false or misleading information as specified above in detail.

573. Norfolk Southern also is liable under Rules 10b-5(a), (b), and (c) for the conduct of its agents – including Wood, Deutsch, and SPSI – who furnished materially false or misleading information to Governor DeWine and NTSB that, in turn, was published to the market and also resulted in the "vent and burn" on February 6, 2023, on the basis of materially false or misleading information as specified above in detail.

574. Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Norfolk Southern common stock. Plaintiffs and the Class would not have purchased Norfolk Southern common stock at the prices they paid, or at all, if they had been aware that the market

prices had been artificially and falsely inflated by Defendants' misleading statements.

575. As a direct and proximate result of these Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their purchases of Norfolk Southern common stock during the Class Period.

## COUNT II

### For Violation of Section 20(a) of the Exchange Act Against the Individual Defendants

576. Plaintiffs incorporate all prior allegations by reference. This Count is asserted against Individual Defendants Squires, Shaw, and Sanborn for violations of §20(a) of the Exchange Act, 15 U.S.C. §78t(a).

577. During the Class Period, the Individual Defendants were and acted as controlling persons of Norfolk Southern within the meaning of §20(a) of the Exchange Act. By virtue of their high-level positions at Norfolk Southern, the Individual Defendants had the power and ability to control, and actually did control, directly or indirectly, the day-to-day actions of Norfolk Southern and its employees, including the content and dissemination of the various statements which Plaintiffs contend are materially false and/or misleading. By virtue of their power and control over Norfolk Southern and its employees, the Individual Defendants were provided with, or had unlimited access to, copies of the Company's reports, press releases,

public filings, and other statements alleged by Plaintiffs to have been misleading prior to the Company issuing those statements, and therefore had the ability to prevent the issuance of the statements and/or cause the statements to be corrected.

578. As senior officers and/or directors of Norfolk Southern, and as described above in §III, each of the Individual Defendants had direct involvement in the day-to-day operations of Norfolk Southern and the power to control or influence the events giving rise to the securities violations as alleged herein. Defendants Squires and Shaw signed the Company's SEC filings during the Class Period, and all Individual Defendants were directly involved in providing false information and certifying and approving the false statements disseminated by Norfolk Southern during the Class Period. As a result, the Individual Defendants as a group, and individually, were controlling persons of Norfolk Southern within the meaning of §20(a) of the Exchange Act.

579. As set forth above, Norfolk Southern and the Individual Defendants violated §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder by their acts and omissions as alleged in this Complaint.

580. By virtue of the Individual Defendants' status as controlling persons, and/or their participation in the underlying violations of §10(b) and Rule 10b-5, the Individual Defendants are liable pursuant to §20(a) of the Exchange Act, jointly and

severally with, and to the same extent as Norfolk Southern is liable under §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, to Plaintiffs. As a direct and proximate result of the Individual Defendants' wrongful conduct, Plaintiffs suffered damages in connection with their purchases of Norfolk Southern common stock during the Class Period.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray for relief and judgment, as follows:

A. Determining that this action is a proper class action, and certifying Plaintiffs as Class representatives under Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure and Plaintiffs' counsel as Class Counsel;

B. Awarding compensatory damages and equitable relief in favor of Plaintiffs and other members of the Class against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C. Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D. Such other and further relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury.

DATED: April 25, 2024

ROBBINS GELLER RUDMAN
& DOWD LLP
ASHLEY M. PRICE (CA 281797)
(admitted *pro hac vice*)
JACK ABBEY GEPHART (CA 345398)
(admitted *pro hac vice*)

s/ Ashley M. Price
ASHLEY M. PRICE

655 West Broadway, Suite 1900
San Diego, CA 92101-8498
Telephone: 619/231-1058
619/231-7423 (fax)
aprice@rgrdlaw.com
jgephart@rgrdlaw.com

ROBBINS GELLER RUDMAN
& DOWD LLP
JASON C. DAVIS (CA 253370)
(admitted *pro hac vice*)
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA 94104
Telephone: 415/288-4545
415/288-4534 (fax)
jdavis@rgrdlaw.com

*Counsel for Co-Lead Plaintiff the Ironworkers Funds and Co-Lead Counsel for the Class*

HERMAN JONES LLP
JOHN C. HERMAN
(Georgia Bar No. 348370)
3424 Peachtree Road NE, Suite 1650
Atlanta, GA 30326
Telephone: 404/504-6500
404/504-6501 (fax)
jherman@hermanjones.com

*Counsel for Co-Lead Plaintiff the Ironworkers Funds and Co-Liaison Counsel*

MURRAY MURPHY MOUL + BASIL LLP
JOSEPH F. MURRAY (OH 0063373)
(admitted *pro hac vice*)
1114 Dublin Road
Columbus, OH 43215
Telephone: 614/488-0400
614/488-0401 (fax)
murray@mmmb.com

*Counsel for Bucks County Employees Retirement System and the Ironworkers Funds*

DATED: April 25, 2024

KESSLER TOPAZ MELTZER
& CHECK, LLP
JOHNSTON DE F. WHITMAN, JR. (PA207914)
(admitted *pro hac vice*)
NATHAN A. HASIUK (PA314644)
(admitted *pro hac vice*)
AUSTIN W. MANNING (PA327640)
(admitted *pro hac vice*)
VANESSA M. MILAN (PA329312)
(admitted *pro hac vice*)
DYLAN J. ISENBERG (PA333996)
(admitted *pro hac vice*)

s/ Johnston De F. Whitman, Jr.
JOHNSTON DE F. WHITMAN, JR.

280 King of Prussia Road
Radnor, PA 19087
Telephone: 610/667-7706
610/667-7056 (fax)
jwhitman@ktmc.com
nhasiuk@ktmc.com
amanning@ktmc.com
vmilan@ktmc.com
disenberg@ktmc.com

*Counsel for Co-Lead Plaintiff AkademikerPension and Co-Lead Counsel for the Class*

CAPLAN COBB LLC
MICHAEL A. CAPLAN
(Georgia Bar No. 601039)
CAMERON B. ROBERTS
(Georgia Bar No. 599839)
75 Fourteenth Street, NE, Suite 2700
Atlanta, GA 30309
Telephone: 404/596-5600
404/596-5604 (fax)
mcaplan@caplancobb.com
croberts@caplancobb.com

*Counsel for Co-Lead Plaintiff AkademikerPension and Co-Liaison Counsel*