**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | |
|---|---|
| BUCKS COUNTY EMPLOYEES RETIREMENT SYSTEM, Individually and on Behalf of All Others Similarly Situated,<br><br>     Plaintiff,<br><br> vs.<br><br>NORFOLK SOUTHERN CORPORATION, et al.,<br><br>     Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) |

Civil Action No. 1:23-cv-04175-SDG

<u>CLASS ACTION</u>

**PLAINTIFFS' MEMORANDUM OF LAW IN**
**OPPOSITION TO DEFENDANTS' MOTION TO**
**DISMISS THE CONSOLIDATED COMPLAINT**

4895-0525-1283.v3

**TABLE OF CONTENTS**

**Page**

I.    INTRODUCTION ....................................................................................1

II.   STATEMENT OF FACTS: NORFOLK TOUTS A NEW, SAFE
      BUSINESS MODEL BUT PRIVATELY DEPRIORITIZES SAFETY ........5

      A.    Norfolk Ran Dangerous, "[I]nsanely Long" Trains ............................5

      B.    Norfolk Jettisoned Safety Personnel and Slashed Training ..................6

      C.    Norfolk Significantly Cut Car Inspection Times ..................................7

      D.    Norfolk Intimidated Employees Who Raised Safety Issues .................8

      E.    Disregarding Safety, Norfolk Blew Up Railcars Containing
            Deadly Chemicals to Quickly "Restore" Operations ...........................8

III.  LEGAL STANDARD ..............................................................................9

IV.   DEFENDANTS' FALSE OR MISLEADING STATEMENTS.....................9

      A.    Defendants Falsely Stated They Would Never Sacrifice Safety
            When Implementing Norfolk's PSR Business Model .........................9

            1.    Norfolk's PSR Reality Contradicts the Safety Statements .........9

            2.    Evidence Available Before the Detonation Contradicts
                  the Detonation Statements and Supports Scienter ....................13

                  a.    The February 5, 2023 Evacuation Notice ........................14

                  b.    The February 6, 2023 Statements ..................................17

      B.    Defendants Were Obligated to Speak Truthfully and
            Completely Regarding Norfolk's Unsafe Operations ..........................20

      C.    Defendants' Safety-Related Statements Are Not Puffery ...................21

4895-0525-1283.v3

**Page**

D.  Defendants' Safety-Related Statements Are Not Inactionable Opinions ...............................................................................24

V.  TAKEN COLLECTIVELY, THE FACTS ALLEGE SCIENTER ..............25

A.  Defendants Knew or Recklessly Ignored Facts Contradicting Their Public Statements .......................................................25

B.  The Inference of Scienter Is More Cogent and Compelling Than Any Competing Inference ..................................................33

VI.  FORMER EMPLOYEES AND NTSB WITNESSES SUPPORT PLAINTIFFS' SCIENTER ALLEGATIONS...............................................34

VII.  PLAINTIFFS HAVE STANDING TO REPRESENT THE CLASS ...........36

VIII. PLAINTIFFS ADEQUATELY ALLEGE SCHEME LIABILITY ..............37

IX.  THE LIMITED LOSS CAUSATION DEFENSE FAILS ...........................38

X.  CONTROL PERSON LIABILITY .................................................................40

XI.  CONCLUSION AND LEAVE TO AMEND .................................................40

4895-0525-1283.v3

## TABLE OF AUTHORITIES

**Page**

**CASES**

*Abato v. Marcam Corp.*,
162 F.R.D. 8 (D. Mass. 1995)..................................................................37

*Abrams v. MiMedx Grp., Inc.*,
37 F. Supp. 3d 1271 (N.D. Ga. 2014)........................................................25

*Barnes v. Edison Int'l*,
2021 WL 2325060 (C.D. Cal. Apr. 27, 2021),
*aff'd*, 2022 WL 822191 (9th Cir. Mar. 18, 2022)....................................23

*Bricklayers & Masons Loc. Union No. 5 Ohio Pension Fund v.*
*Transocean Ltd.*,
866 F. Supp. 2d 223 (S.D.N.Y. 2012) .......................................................12

*Carpenters Health & Welfare Fund of Phila. v.*
*Coca-Cola Co.*,
2002 WL 34089163 (N.D. Ga. Aug. 20, 2002)..........................................30

*Carvelli v. Ocwen Fin. Corp.*,
934 F.3d 1307 (11th Cir. 2019) ................................................................22

*Constr. Laborers Pension Tr. for S. Cal. v. CBS Corp.*,
433 F. Supp. 3d 515 (S.D.N.Y. 2020) .......................................................21

*ECA Loc. 134 IBEW Joint Pension Tr. of Chi. v.*
*JPMorgan Chase, Co.*,
553 F.3d 187 (2d Cir. 2009) .....................................................................21

*Fernau v. Enchante Beauty Prods., Inc.*,
847 F. App'x 612 (11th Cir. 2021)............................................................40

*FindWhat Inv. Grp. v. FindWhat.com*,
658 F.3d 1282 (11th Cir. 2011) ................................................................12

*Freudenberg v. E*Trade Fin. Corp.*,
712 F. Supp. 2d 171 (S.D.N.Y. 2010) .......................................................34

4895-0525-1283.v3

**Page**

*Harrison v. Legacy Hous., LP, GPLH, LC,*
  324 F. Supp. 3d 1288 (M.D. Ga. 2018) ............................................................14

*In re Am. Express Co. Sec. Litig.,*
  2008 WL 4501928 (S.D.N.Y. Sept. 26, 2008),
  *aff'd sub nom. Slayton v. Am. Express Co.,*
  604 F.3d 758 (2d Cir. 2010) .........................................................................35

*In re ChinaCast Educ. Corp. Sec. Litig.,*
  809 F.3d 471 (9th Cir. 2015) ........................................................................19

*In re ChoicePoint, Inc. Sec. Litig.,*
  2006 WL 8429145 (N.D. Ga. Nov. 21, 2006) ..............................................12, 15

*In re Countrywide Fin. Corp. Deriv. Litig.,*
  554 F. Supp. 2d 1044 (C.D. Cal. 2008) .......................................................27, 28

*In re Ebix, Inc. Sec. Litig.,*
  898 F. Supp. 2d 1325 (N.D. Ga. 2012).........................................................25, 39

*In re Egidi,*
  571 F.3d 1156 (11th Cir. 2009) .......................................................................16

*In re Eletrobras Sec. Litig.,*
  245 F. Supp. 3d 450 (S.D.N.Y. 2017) ..............................................................33

*In re Equifax Inc. Sec. Litig.,*
  357 F. Supp. 3d 1189 (N.D. Ga. 2019).......................................................*passim*

*In re Flowers Foods, Inc. Sec. Litig.,*
  2018 WL 1558558 (M.D. Ga. Mar. 23, 2018)..............................................30, 39

*In re HD Supply Holdings, Inc. Sec. Litig.,*
  341 F. Supp. 3d 1342 (N.D. Ga. 2018).......................................................13, 29

*In re Immucor, Inc. Sec. Litig.,*
  2011 WL 2619092 (N.D. Ga. June 30, 2011).....................................................22

4895-0525-1283.v3

**Page**

*In re Internap Network Servs. Corp. Sec. Litig.*,
2012 WL 12878579 (N.D. Ga. Aug. 23, 2012) ............................................36, 37

*In re Jan. 2021 Short Squeeze Trading Litig.*,
620 F. Supp. 3d 1231 (S.D. Fla. 2022) ............................................................31

*In re Jiangbo Pharms., Inc., Sec. Litig.*,
884 F. Supp. 2d 1243 (S.D. Fla. 2012),
*aff'd sub nom. Brophy v. Jiangbo Pharms., Inc.*,
781 F.3d 1296 (11th Cir. 2015) ......................................................................32

*In re Massey Energy Co. Sec. Litig.*,
883 F. Supp. 2d 597 (S.D.W. Va. 2012)................................................12, 23, 35

*In re Netbank, Inc. Sec. Litig.*,
2009 WL 2432359 (N.D. Ga. Jan. 29, 2009)....................................................28

*In re Norfolk S. Corp. Bond/Note Sec. Litig.*,
2024 WL 3579096 (S.D.N.Y. July 26, 2024)................................................*passim*

*In re PDI Sec. Litig.*,
2006 WL 3350461 (D.N.J. Nov. 16, 2006) ......................................................17

*In re Retek Inc. Sec. Litig.*,
2007 WL 14352 (D. Minn. Jan. 3, 2007)..........................................................17

*In re Secure Computing Corp. Sec. Litig.*,
184 F. Supp. 2d 980 (N.D. Cal. 2001)..............................................................16

*In re St. Jude Med., Inc. Sec. Litig.*,
836 F. Supp. 2d 878 (D. Minn. 2011)...............................................................23

*In re Vale S.A. Sec. Litig.*,
2020 WL 2610979 (E.D.N.Y. May 20, 2020)................................................21, 23

*In re ValuJet, Inc.*,
984 F. Supp. 1472 (N.D. Ga. 1997)..........................................................12, 23, 31

4895-0525-1283.v3

**Page**

*Lorenzo v. SEC*,
   587 U.S. 71 (2019)..............................................................................16, 37

*Luczak v. Nat'l Beverage Corp.*,
   812 F. App'x 915 (11th Cir. 2020) ........................................34, 35, 39

*Maverick Fund, Ltd. v. Mohawk Indus., Inc.*,
   2023 WL 2887603 (N.D. Ga. Mar. 31, 2023) .................................25, 26, 29, 38

*McCone v. Thorpe*,
   828 F. App'x 697 (11th Cir. 2020) ....................................................32

*Mizzaro v. Home Depot, Inc.*,
   544 F.3d 1230 (11th Cir. 2008) .......................................16, 19, 26, 28

*Mogensen v. Body Cent. Corp.*,
   15 F. Supp. 3d 1191 (M.D. Fla. Mar. 19, 2014)................................35

*N.J. Carpenters Health Fund v.*
   *Royal Bank of Scot. Grp., PLC*,
   709 F.3d 109 (2d Cir. 2013) ..............................................................27

*Next Century Commc'ns Corp. v. Ellis*,
   318 F.3d 1023 (11th Cir. 2003) ........................................................23

*Omnicare, Inc. v. Laborers Dist. Council*
   *Const. Indus. Pension Fund*,
   575 U.S. 175 (2015)....................................................................24, 25

*Phila. Fin. Mgmt. of S.F., LLC v. DJSP Enters., Inc.*,
   572 F. App'x 713 (11th Cir. 2014) ....................................................22

*Plymouth Cnty. Ret. Sys. v. Carter's, Inc.*,
   2011 WL 13124501 (N.D. Ga. Mar. 17, 2011) .................................35

*Ravens v. Republic N.Y. Corp.*,
   2002 WL 1969651 (E.D. Pa. Apr. 24, 2002).....................................17

4895-0525-1283.v3

**Page**

*Ret. Plan v. Fleetcor Techs., Inc.*,
2018 WL 4293143 (N.D. Ga. May 15, 2018)........................................26, 28, 35

*Ret. Sys. v. Energy Transfer LP*,
532 F. Supp. 3d 189 (E.D. Pa. 2021)..................................................................29

*Ret. Sys. v. Southern Co.*,
2018 WL 1558577 (N.D. Ga. Mar. 29, 2018) .....................................................29

*Robbins v. Kroger Props., Inc.*,
116 F.3d 1441 (11th. Cir. 1997) .........................................................................39

*SEC v. Curshen*,
888 F. Supp. 2d 1299 (S.D. Fla. 2012)................................................................38

*SEC v. Intelliquis Int'l Inc.*,
2003 WL 23356426 (D. Utah Dec. 11, 2003) .....................................................22

*Southland Sec. Corp. v. INSpire Ins. Sols., Inc.*,
365 F.3d 353 (5th. Cir. 2004) .............................................................................17

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
551 U.S. 308 (2007)......................................................................................*passim*

*Theodore v. Purecycle Techs., Inc.*,
2022 WL 20157415 (M.D. Fla. Aug. 4, 2022).....................................................19

*Tracy v. Elekta, Inc.*,
667 F. Supp. 3d 1276 (N.D. Ga. 2023)..................................................................9

*Tung v. Dycom Indus., Inc.*,
454 F. Supp. 3d 1244 (S.D. Fla. 2020)................................................................35

*Upton v. McKerrow*,
887 F. Supp. 1573 (N.D. Ga. 1995).............................................................36, 37

4895-0525-1283.v3

**Page**

*Wang Yan v. ReWalk Robotics Ltd.*,
　391 F. Supp. 3d 150 (D. Mass. 2019),
　*aff'd on other grounds*, 973 F.3d 22 (1st Cir. 2020) ...........................................37

*Ward-Richardson v. FCA US LLC*,
　690 F. Supp. 3d 1372 (N.D. Ga. 2023).............................................................32

**STATUTES, RULES, AND REGULATIONS**

Federal Rules of Civil Procedure
　Rule 12(b)(6)...............................................................................................9
　Rule 15(a)(2)...............................................................................................40

17 C.F.R.
　§240.10b-5 .................................................................................................36
　§240.10b-5(a).................................................................................16, 37, 40
　§240.10b-5(b)...............................................................................................37
　§240.10b-5(c).................................................................................16, 37, 40

4895-0525-1283.v3

## I.    INTRODUCTION

The Complaint pleads in exacting detail how Defendants misled investors about the purported safety of Norfolk Southern Corporation's ("Norfolk" or the "Company") operations while implementing its version of the cost-cutting strategy, Precision Scheduled Railroading ("PSR").[1]  Despite repeated claims that Norfolk implemented PSR "without sacrificing safety," Defendants systematically dismantled critical safety measures in pursuit of profits, culminating in the derailment of Norfolk's Train 32N on February 3, 2023 in East Palestine, Ohio (the "Derailment") and the unnecessary detonation of five railcars containing toxic chemicals (the "Detonation").

In truth, as recounted by 22 former Norfolk employees and in formal statements to the National Transportation Safety Board ("NTSB"), Norfolk's PSR was anything but safe.  Norfolk slashed its workforce – including critical safety and training personnel – by 40%; rushed new employee training; minimized or sidestepped mandatory inspections; ran trains stretching for miles using overworked and

---

[1]  "Defendants" are Norfolk, Alan H. Shaw, James A. Squires, and Cynthia M. Sanborn.  All capitalized terms not otherwise defined herein have the same meaning as set forth in the Consolidated Complaint (ECF 82) ("Complaint"), all "¶_" and "¶¶_" citations herein are to the Complaint, all "Motion" or "MTD" references are to Defendants' Motion to Dismiss the Complaint (ECF 99), and "PEx. _" citations are to Plaintiffs' exhibits attached to their concurrently filed declaration in support of Response to Defendants' Request for Judicial Notice and Plaintiffs' Request for Judicial Notice in Support of Their Opposition to Defendants' Motion to Dismiss the Consolidated Complaint ("Plaintiffs' RJN").  Additionally, unless otherwise noted, all emphasis is added and internal citations are omitted.

- 1 -

4895-0525-1283.v3

inexperienced crews; and intimidated employees who expressed safety concerns. The Derailment inevitably resulted from these unsafe practices: the inexperienced engineer running Train 32N from Decatur, Illinois to Toledo, Ohio[2] was rebuffed when he expressed concerns regarding the length and weight of the train; and the lone Wayside Desk employee missed the initial alert from Train 32N because he was attending to "three other trains."

After the Derailment, Norfolk again prioritized profits over safety by fabricating a runaway chemical reaction (disproven by contemporaneous data) to justify the Detonation, which Norfolk knew would release toxic chemicals into the East Palestine community. Defendants fed false information to public officials about a nonexistent "drastic temperature change" in railcars storing toxic chemicals, causing unnecessary panic, and then falsely claimed "success[]" in mitigating the nonexistent threat – actions the NTSB found "unjustified."

To support their dismissal arguments, Defendants disregard the Complaint's particularized allegations. Defendants claim that the Complaint describes only "purported safety issues," MTD at 3, 16, but Shaw admitted that, prior to the Derailment, Norfolk's "near-term focus" was "*solely* on profits." In fact, the Federal Railroad Administration ("FRA") found that between 2018 and 2022, the rate of

---

[2]   Train 32N, carrying exactly the same consist, derailed while under the control of the crew that boarded the train in Toledo, Ohio.

4895-0525-1283.v3

accidents rose faster for Norfolk than at any other Class I railroad.  These findings corroborate the firsthand accounts of the former employees and NTSB witnesses regarding Norfolk's Company-wide disregard for safety in pursuit of profits.

Defendants' other arguments fare no better.  Their attempt to spin the Detonation as an "emergency response," MTD at 7, 38, does not square with their deliberate efforts to mislead the public that the cars could "continue to polymerize" and "explode sending deadly shrapnel in all directions."  There was no such risk, as Defendants knew and as the NTSB has now conclusively determined.

Unable to contend with Plaintiffs' actual allegations, Defendants raise a series of unpersuasive arguments.  For example, they suggest that their statements touting safety are mere "puffery."  However, all of Defendants' safety statements were made in the context of Norfolk's PSR implementation and falsely assured that the improvements to efficiency did not "come at the expense" of safety.  Another court recently disposed of these same arguments because "a reasonable investor would want to know that the implementation of [PSR] was making the Company's operations less, not more, safe." *In re Norfolk S. Corp. Bond/Note Sec. Litig.*, 2024 WL 3579096, at *16 (S.D.N.Y. July 26, 2024).  Defendants' related refrain that their safety statements were not objectively verifiable falls flat as Shaw admitted that "***safety was fourth on [the] list***" of PSR principles, *i.e.*, safety was not a top priority.

As for scienter, Defendants cannot credibly claim they believed Norfolk's

- 3 -

operations were "safe" when the FRA expressly warned Defendants about PSR's negative impact on safety; they were financially incentivized to implement PSR; and Defendants repeatedly touted their direct knowledge of working conditions based on their own interactions with Norfolk employees, whom Shaw acknowledged were "really, really frustrated that safety was fourth" on Norfolk's list of PSR principles.

Also contrary to Defendants' arguments, Plaintiffs have standing to prosecute the Detonation scheme, which is undivorceable from Defendants' broader scheme to implement PSR at the expense of safety.  The Detonation showed PSR in action, as Norfolk's primary concern was to quickly "[r]estore train operations."  Norfolk could have simply let the railcars "cool down" and moved them, but the equipment required was "not available anytime soon," and waiting would impact Norfolk's bottom line. Shaw and Norfolk's agents thus lied to public officials and the public to scare them into thinking an immediate "controlled" Detonation was the "safest way" to prevent the cars from violently self-detonating.  Federal investigations unveiled "conclusive" scientific evidence and direct input from the chemical's manufacturer that Shaw and Norfolk received *prior* to the Detonation.  As such, they are liable for the scheme and related false statements.

Finally, Defendants' limited challenge to loss causation is similarly without merit.  The post-Detonation disclosures partially revealed the risks that Defendants concealed – *i.e.*, that Norfolk prioritized profits over safety, including by deliberately

- 4 -

conducting an unnecessary chemical explosion to get its trains moving again while East Palestine residents saw their community engulfed in toxic flames and smoke.

Defendants' Motion should be denied in its entirety.

## II. STATEMENT OF FACTS: NORFOLK TOUTS A NEW, SAFE BUSINESS MODEL BUT PRIVATELY DEPRIORITIZES SAFETY

PSR emphasizes speed and cost cutting. ¶1. For years, as competing Class I railroads adopted PSR, Norfolk resisted, calling it a "short-term, cut-to-the-bone strategy that could cause Norfolk to lose substantial revenue." ¶¶73, 77. In 2019, Norfolk reversed course, unveiling its PSR-based operating plan, which, as would later be revealed, prioritized reducing its operating ratio ("OR") – operating expenses divided by operating revenues – ahead of safety by running fewer, longer trains while slashing its workforce and safety training programs. ¶¶75, 79-80. Shaw later admitted that, during the Class Period, Norfolk's "near-term focus" was "*solely* on profits." ¶¶193, 276.[3] This concerted prioritization of profit over safety led to the Derailment of Train 32N on February 3, 2023, and the subsequent decision to detonate the derailed cars to restore train operations, endangering thousands.

### A. Norfolk Ran Dangerous, "[I]nsanely Long" Trains

Norfolk built trains to "astronomical lengths" during the Class Period – miles

---

[3] Norfolk's PSR principles for employees listed "safety" as the fourth out of five priorities, which Shaw admitted after the Derailment "should not have been in this order" as it "sends a really bad message to people." ¶107.

4895-0525-1283.v3

long – with no regard for proper train car placement.  ¶¶122-140.  Norfolk often placed loaded cars behind empty cars, increasing the "likelihood that those cars will come crashing forward when the brakes are applied" and cause a derailment.  ¶125. Union officials compared the Company's construction of trains to a "Slinky" with a "10-pound weight" tied to the end.  ¶124.  Longer trains are also more "complicated to operate" and require *more* training to run safely.  ¶¶123, 129, 155-156.  Yet Norfolk dramatically *reduced* both training staff and the amount of training, particularly for conductors.  ¶¶141-160.  Notably, the engineer operating Train 32N prior to the Derailment expressed concern because he had "never run a train that was that long or heavy before."  ¶¶139-140, 160.

### B.    Norfolk Jettisoned Safety Personnel and Slashed Training

Norfolk, under PSR, eliminated nearly 40% of its workforce, creating a "self-imposed manpower shortage."  ¶¶109, 111.  Thus, during the Class Period, Norfolk's workforce was exhausted and overworked.  ¶¶109-121.  Former employees recalled "100-hour weeks," "working 12-16 straight days," and "managers frequently manipulat[ing] the schedules to deny employees their day off."  ¶¶117, 119-120. Norfolk also laid off many of its car inspectors and decreased the car inspection time, leaving fewer inspectors to inspect longer trains in less time.  ¶¶171, 173-174.  One union official called the Derailment "inevitable" due to the lack of manpower.  ¶121.

Notably, Norfolk's Wayside Desk, responsible for monitoring safety alerts

4895-0525-1283.v3

generated by "wayside detectors," was staffed by a single person responsible for triaging the approximately 300 alerts received during a typical 12-hour shift. ¶¶231-235. On the day of the Derailment, the Wayside Desk operator missed the initial alert from Train 32N indicating a trending rise in temperature in a wheel bearing because he was busy attending to "three other trains." ¶236. When Train 32N set off the next detector it was too late; the train derailed seconds later. ¶¶4, 373-374.

Additionally, training of new employees got "progressively worse" under PSR. ¶151. Norfolk reduced conductor training from six months to "sometimes only a few weeks." ¶¶146, 150-154. Trainees were promoted before they were qualified, as management emphasized that they would learn from other (also underqualified) employees or "just kind of learn[] on their own." ¶¶141, 146, 149. One former employee described this as "the blind leading the blind." ¶146.

## C.    Norfolk Significantly Cut Car Inspection Times

To compensate for its reduced workforce and minimize the time trains "dwell[ed]" in the railyard, Norfolk reduced inspection times from 3 minutes per car to 1 minute per car, or 30 seconds per side. ¶¶161-165, 168, 174, 177. Union officials reported that 30-second inspections were not "really feasible" and that inspectors would "miss[] things" because of "shortcuts." *Id.* Moreover, Norfolk's depleted roster of qualified inspectors allowed the Company to exploit a "loophole" in federal regulations allowing for abbreviated 12-point inspections by a far less qualified crew

member when no qualified inspectors were available to perform the standard 90-point inspection.  ¶¶179-180, 187-189.  Train 32N was inspected under these less rigorous standards prior to its Derailment.  ¶¶191-192.

### D.   Norfolk Intimidated Employees Who Raised Safety Issues

Through "[i]ntimidation," Defendants fostered a Company-wide culture of retaliation against employees who voiced safety concerns.  ¶¶242, 251.  Former employees and union officials described how management forced employees to ignore safety problems by threatening termination.  ¶¶249-250, 256.  Car inspectors were "[i]ncentivized to not find issues," and supervisors were known to remove "bad order tags" that indicated a particular car needed a repair.  ¶¶248, 254, 258, 263.

### E.   Disregarding Safety, Norfolk Blew Up Railcars Containing Deadly Chemicals to Quickly "Restore" Operations

Some of Train 32N's cars that derailed in East Palestine carried the toxic chemical vinyl chloride monomer ("VCM").  ¶¶277-287, 361.  Unwilling to wait to clear the VCM cars from the tracks through conventional means, Norfolk and Shaw chose to detonate the VCM cars in a "vent and burn" operation – *i.e.*, they used explosives to blow up the cars.  ¶¶298-302, 361.  They claimed this was necessary to prevent the VCM cars from catastrophically self-combusting due to a "polymerization reaction."  ¶¶293-294.  Yet scientific evidence conclusively showed Norfolk and Shaw that the cars were not polymerizing.  ¶¶303-326.  After lying to first responders, government officials, and the public about the specter of a "polymerization reaction,"

- 8 -

4895-0525-1283.v3

Defendants detonated the VCM cars on February 6, 2023, emitting a cloud of toxic chemicals into the air and surrounding community. ¶¶356-359.  Norfolk reopened the rails the very next day.  ¶361.

Government investigations followed as even more Norfolk trains derailed. ¶¶370-405, 522-549.  As the dangerous business practices came to light, Norfolk's stock price predictably fell, injuring thousands of investors.  ¶¶508-550.

## III.    LEGAL STANDARD

"A complaint should be dismissed under Rule 12(b)(6) only where it appears that the facts alleged fail to state a 'plausible' claim for relief." *In re Equifax Inc. Sec. Litig.*, 357 F. Supp. 3d 1189, 1214 (N.D. Ga. 2019).  A motion to dismiss must be denied where the allegations, "'accepted as true,'" allow "the court to draw the reasonable inference that the defendant is liable for the conduct alleged." *Tracy v. Elekta, Inc.*, 667 F. Supp. 3d 1276, 1281 (N.D. Ga. 2023) (Grimberg, J.).

## IV.    DEFENDANTS' FALSE OR MISLEADING STATEMENTS

### A.    Defendants Falsely Stated They Would Never Sacrifice Safety When Implementing Norfolk's PSR Business Model

#### 1.    Norfolk's PSR Reality Contradicts the Safety Statements

"To show falsity, one typically juxtaposes an alleged misrepresentation to a contrary true fact." *Equifax*, 357 F. Supp. 3d at 1216.  Here, while Defendants repeatedly touted the purported benefits of PSR and Norfolk's dedication to safety,

4895-0525-1283.v3

¶¶407-419, 422, 424-425, 427, 429, 431, 433-434, 437-443, Norfolk was systematically undermining safety through its "cut-to-the-bone" PSR business model. Because PSR "was in fact making the Company's operations *less* safe and *more* risky," all of the statements Defendants made about running the Company safely while implementing PSR are actionable under the securities laws, as was held in *Norfolk Bond*. 2024 WL 3579096, at *15-*16 (emphasis in original).

*Norfolk Bond* rejected Defendants' falsity arguments as to substantially similar and, in some cases, the same safety statements at issue in this case. *Compare, e.g.*, *id.* at *5, *15-*16 ("'[c]apital spending and replacement programs are and have been designed to assure the ability to provide safe, efficient, and reliable rail transportation services'"), *with, e.g.*, ¶¶433-434 (same); *see also Norfolk Bond*, 2024 WL 3579096, at *5, *15-*16 (sustaining the same or similar statements pled in ¶¶411, 415, 422, 424-425, 427).

Defendants' arguments on falsity fail here as well. As in *Norfolk Bond*, the Complaint alleges Defendants repeatedly stated they were implementing PSR "***without sacrificing safety***"; that efficiency did not "***come at the expense***" of safety; and that safety was a "***business imperative***." ¶¶416-417. They said Norfolk organized its "***capital spending***" budget to make the railroad "***safe***." ¶¶433-434.

The Complaint alleges, in painstaking detail, numerous "'contrary true fact[s]'" that demonstrate why each of the 30 safety-related statements was materially false

- 10 -

4895-0525-1283.v3

when made. *Equifax*, 357 F. Supp. 3d at 1216; *accord Norfolk Bond*, 2024 WL 3579096, at *12 ("'contrary facts'" allege falsity). In truth, first-hand accounts of former employees and NTSB witnesses tell how Norfolk: (i) drastically cut its staff of engineers, conductors, and personnel responsible for maintaining safe operations, ¶¶109-121; (ii) constructed and ran dangerously long trains, ¶¶122-140; (iii) reduced training time (for certain employees by more than half), including training for handling hazardous materials, resulting in an increasingly inexperienced and underqualified workforce that was more prone to mistakes, ¶¶141-160; (iv) shortened inspection times such that there was "no way to do a proper inspection," ¶¶161-177; (v) exploited loopholes to reduce the number of full inspections required, ¶¶178-192; (vi) undermined the effectiveness of alert systems, ¶¶207-230; (vii) staffed just one employee on the Wayside Desk, ¶¶231-239; and (viii) retaliated against employees who raised safety concerns, ¶¶240-263.

These facts collectively demonstrate "'company-wide' safety issues arising in conjunction with the implementation" of PSR such that Defendants' statements about safety were materially false or misleading when made. *Norfolk Bond*, 2024 WL 3579096, at *14 (recommending denial of motion to dismiss on falsity grounds). Moreover, the fact that Norfolk operates in "a dangerous industry subject to extensive safety regulatory oversight" and that its "undisclosed safety issues [had] garnered regulatory attention" further demonstrates materiality. *Id.* at *16 & n.18.

- 11 -

4895-0525-1283.v3

Courts in this Circuit agree. Statements "touting the strength or quality of an important business operation are false, and thus actionable, when those operations are, in reality, deficient." *Equifax*, 357 F. Supp. 3d at 1219-20 ("Given the dangerously deficient state of Equifax's cybersecurity . . . it was false, or at least misleading, for Equifax to tout its advanced cybersecurity protections."); *see also In re ChoicePoint, Inc. Sec. Litig.*, 2006 WL 8429145, at *2, *6 (N.D. Ga. Nov. 21, 2006) (statements that "'[p]rotecting privacy is always a ChoicePoint priority'" were false where "[d]efendants knew of . . . inadequate security procedures"); *In re ValuJet, Inc.*, 984 F. Supp. 1472, 1477-78 (N.D. Ga. 1997) (statements about "operational integrity" and "safety" were false given "numerous safety-related incidents" and "heightened" regulatory scrutiny of the company's operations).[4]

Defendants incorrectly argue that Plaintiffs did not allege that the verifiable facts included in certain statements were false or misleading. MTD at 14 nn.10-11. These statements are still false because Defendants ignore that they "'may not deal in half-truths.'" *FindWhat Inv. Grp. v. FindWhat.com*, 658 F.3d 1282, 1305 (11th Cir.

---

[4] *See also, e.g.*, *Bricklayers & Masons Loc. Union No. 5 Ohio Pension Fund v. Transocean Ltd.*, 866 F. Supp. 2d 223, 243 (S.D.N.Y. 2012) ("a reasonable investor would assume that [defendants'] safety and training measures were . . . adequate, when, in fact, the measures were insufficient"); *In re Massey Energy Co. Sec. Litig.*, 883 F. Supp. 2d 597, 617 (S.D.W. Va. 2012) (sustaining "statements professing that safety was the 'first priority every day'" based on allegations that "'production, not safety, was the first priority'").

4895-0525-1283.v3

2011); *see also In re HD Supply Holdings, Inc. Sec. Litig.*, 341 F. Supp. 3d 1342, 1352 (N.D. Ga. 2018) (once a defendant has "voluntarily reveal[ed] one fact about its operations," it undertakes "a duty . . . to disclose such other facts . . . necessary to ensure that what was revealed [was] not 'so incomplete as to mislead'"). For example, Defendants misled investors by concealing that Norfolk's "record productivity," ¶408, came at the expense of safety, such as by, *inter alia*, skipping necessary inspections, ¶¶161-177. The safety statements are actionable.[5]

### 2. Evidence Available Before the Detonation Contradicts the Detonation Statements and Supports Scienter

Norfolk purposely detonated five railcars containing deadly chemicals to "[r]estore train operations" as quickly as possible, ¶¶285, 361, and lied about it to public officials and the public, saying the Detonation was urgently necessary as "the safest" option, ¶¶353-355, due to an entirely fabricated "polymerization" chemical reaction, ¶¶276-369. Following a thorough review of all the facts, the Chair of the NTSB testified: "[T]here was *no justification*" for the Detonation instead of just letting the cars "cool down." ¶366. *See also* PEx. A at xi.[6]

---

[5] These particularized facts demonstrating the "company-wide" deprioritization of safety in furtherance of PSR also support scienter. *See infra* §V.

[6] The NTSB's final Railroad Investigation Report, issued on June 25, 2024 (filed herewith as Plaintiffs' Exhibit A), confirms Plaintiffs' allegations, noting: "[P]olymerization was not occurring . . . contrary to the representation by Norfolk Southern Railway and its contractors" and "the vent and burn procedure was not necessary to prevent a polymerization-induced tank rupture." *Id.* at 169.

- 13 -

To avoid responsibility for yet another consequence of their unsafe PSR business strategy, Defendants generally dispute their liability, MTD at 17-23, 36-39, as to the February 5-6, 2023 railcar Detonation statements (the "Detonation Statements"), ¶¶330-332, 350-355, 360. Those arguments are meritless.

### a.    The February 5, 2023 Evacuation Notice

On February 5, 2023, at approximately 7:30 p.m., Governor DeWine of Ohio issued a press release titled "East Palestine Urgent Evacuation Notice" based on these false facts Norfolk furnished to the Governor: In "the last two hours, a ***drastic temperature change*** has taken place in a rail car" that created the potential for "catastrophic tank[] failure." ¶332. Defendants' arguments about this statement fail "constantly [to] assum[e] the plaintiff's allegations to be true." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 326-27 (2007).

The facts allege falsity and scienter as to the evacuation notice. ***First***, Norfolk's agents, including Robert Wood, told Governor DeWine that the car's temperature was "very volatile" and "was in fact rising," such that the car was about to explode. ¶330. *See Harrison v. Legacy Hous., LP, GPLH, LC*, 324 F. Supp. 3d 1288, 1298 (M.D. Ga. 2018) (an agency relationship makes a principal bound by an agent's acts within the scope of his authority). Yet Wood's ***own notes***, ¶318, show the car's temperature rose just 3°F from 4:00 p.m. to 5:00 p.m.; ***fell*** 2°F from 5:00 p.m. to 6:00 p.m.; and held steady from 6:00 p.m. to 7:00 p.m., ¶¶318, 330-332. According to OxyVinyls, the

- 14 -

4895-0525-1283.v3

chemical shipper, temperatures would have had to ***continuously*** rise (and never fall) to show polymerization, and a 3°F increase in temperature did "nothing" to suggest polymerization. ¶¶295, 323-325.  Though there was no "drastic temperature change" and thus no risk of polymerization, ¶332, Governor DeWine nonetheless ordered an evacuation on the basis of Wood's false statements that the temperature was "very volatile" and "was in fact rising," such that the car was about to explode, ¶330.[7]

***Second***, ample facts raise a "'strong inference'" of Wood's scienter. *Tellabs*, 551 U.S. at 324.  Wood "personally oversaw" the crash site along with Shaw and regional hazardous materials manager Scott Deutsch and "at least, had access to facts," including his own notes and his discussions with OxyVinyls, ¶¶284, 318, 327-328, raising a strong inference that he was "at least severely reckless" in furnishing false information to Governor DeWine. *Equifax*, 357 F. Supp. 3d at 1239.  Similar to those who "warned" the defendants of facts contrary to the disputed statements in *ChoicePoint*, 2006 WL 8429145, at *7, here, OxyVinyls repeatedly told the Norfolk team (including Wood) the truth, which Wood's notes reflected but the evacuation notice contradicts.  ¶¶306, 322-326.

Moreover, the foregoing facts demonstrate with particularity that Governor

---

[7]   This was not the last time that Defendants "delayed or failed to provide critical investigative information" and "manufacture[d] their own evidence," which the NTSB reported was its experience in the subsequent investigation.  PEx. B at 1-2.

DeWine served as a "conduit" for Wood's falsehoods.[8]   Contrary to Defendants'

assertions, MTD at 20, the Complaint states exactly how and when Wood provided

Governor DeWine with the false information included in the evacuation notice.  *See*

¶330 (relaying the Governor's own recollections of the meeting in which Norfolk's

agents, including Wood, provided him with the false information he then relayed to

the public).  *See also Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230, 1254 (11th Cir.

2008) (agent's act of "furnish[ing]" false information is a basis for corporate liability);

*In re Secure Computing Corp. Sec. Litig.*, 184 F. Supp. 2d 980, 990 (N.D. Cal. 2001)

(finding primary liability where plaintiffs alleged the "specific place and time" in

which the false statement was provided to defendants' conduit).[9]  And the idea that

Wood did not "intend" Governor DeWine to tell the public ***why*** the evacuation was

---

[8]   Defendants have not substantively challenged either falsity or scienter with respect to the February 5, 2023 evacuation notice, ¶446, submitting – in mere conclusory fashion – that the Complaint has not "alleged any actionable misstatements or omissions" related to the vent and burn, MTD at 17, 19.  Instead, Defendants argue only that Governor DeWine was not a proper "conduit" for Wood's false statements. MTD at 19-21, 37-38.  Defendants have therefore waived any arguments of falsity and scienter with respect to the evacuation notice.  *See In re Egidi*, 571 F.3d 1156, 1163 (11th Cir. 2009) ("Arguments not properly presented in a party's initial brief or raised for the first time in the reply brief are deemed waived.").

[9]   Wood's deceptive conduct is also actionable under SEC Rules 10b-5(a) and (c). *Infra* §VIII.  *See also Lorenzo v. SEC*, 587 U.S. 71, 78-81 (2019) (discussing "broad" reach of Rules 10b-5(a) and (c) to include "dissemination" of false statements; ¶573 (alleging Norfolk's liability for Wood's deceptive conduct under all subsections).

ordered is belied by Plaintiffs' allegations and common sense. MTD at 20-21.[10] Norfolk's agents, including Wood, were advising Governor DeWine on matters of public safety during a crisis – and the Governor immediately relayed that false information to the public. ¶¶330-332; *see also* ¶344. Where, as here, it is self-evident, based on the context in which the information was conveyed to the alleged conduit, that the intent was for the information to be disseminated, the requisite intent is demonstrated. *See In re Retek Inc. Sec. Litig.*, 2007 WL 14352, at *7 (D. Minn. Jan. 3, 2007) (finding "no reason to dismiss the claims based on" statements given to analysts acting as conduits, without discussing whether plaintiffs had alleged intent).

### b. The February 6, 2023 Statements

On February 6, 2023, Shaw was "in the room" when he and his team lied to local public safety officials and told them they had just "13 minutes" to greenlight Norfolk's plan to blow up a railcar because that car "***was*** going through" polymerization. ¶¶342-343; *see also* ¶¶344-345. Together, they concealed OxyVinyls' expert input and the declining temperature data from the Governor, the NTSB, and the local fire chief. *E.g.*, ¶¶334-338, 346-347; *see also id.*, §§VIII.D.-E.

---

[10] Defendants cite inapplicable cases. *See, e.g.*, *Southland Sec. Corp. v. INSpire Ins. Sols., Inc.*, 365 F.3d 353, 373 (5th. Cir. 2004) (underlying statements not actionable); *Ravens v. Republic N.Y. Corp.*, 2002 WL 1969651, at *12 (E.D. Pa. Apr. 24, 2002) (no facts that defendants in any way "participated in" the underlying conduct); *In re PDI Sec. Litig.*, 2006 WL 3350461, at *20 (D.N.J. Nov. 16, 2006) (conduit liability not pled because no allegations that defendants' statements were "a basis for the somber findings made by the analysts").

Deutsch left the meeting and immediately told the public that Norfolk needed to detonate the cars so they would not "continue" polymerizing "again."  ¶¶354-355. These statements were all false, as Shaw and Deutsch knew.  ¶¶334-338, 346-347.

The Complaint sufficiently alleges falsity by juxtaposing facts demonstrating the statements were false.  *Equifax*, 357 F. Supp. 3d at 1216.  Perhaps recognizing as much, Defendants try to change the statements, suggesting Shaw's and Deutsch's statements to public officials (as at the private meetings) and Deutsch's follow-on statement to the public merely concerned some hypothetical scenario.  MTD at 22, 36-37.  That is false.  Again, Shaw and Deutsch misrepresented to public officials that the cars "[were] going through" a runaway chemical reaction, ¶¶343-345, and Deutsch immediately told the public that the cars would "react ***again***" or "react on their own ***again***" or "***continue*** to polymerize" and "break apart" – "[s]o ***that's the reason*** for doing this . . . the ***safest*** way," ¶¶353-355.  The Complaint – based on internal documents, interview quotes and testimony, and NTSB factual summaries, *see* ¶¶312-349 – adduces input from OxyVinyls and scientific evidence that the cars: (i) had not reacted; (ii) were not polymerizing; (iii) were cooling to well within the relevant pressure limits; and (iv) were not even close to breaking apart, ¶¶334-338, 346-347.  *See also id.*, §§VIII.D.-E, I.

Shaw's and Deutsch's scienter is straightforward.  They both received temperature data and related "input" from OxyVinyls that the cars were not

- 18 -

undergoing polymerization.  ¶¶334-338, 346-347.  Additionally, Deutsch texted the Norfolk team that the Detonation's deadly mushroom cloud was "cool."  PEx. C at 2-3.  This callous disregard for the Detonation's impact on human life in the pursuit of maximum profit supports scienter.[11]

Defendants' argument that the Complaint fails to allege that Shaw approved Deutsch's false public statements about why the Detonation was supposedly necessary, and, by implication, that neither Norfolk nor Shaw can be held accountable, fails for three reasons.  MTD at 37-38.  ***First***, as Plaintiffs alleged, Shaw ***was*** aware of, and ***did*** approve, Deutsch's comments during the press conference.  *See* ¶¶341-349 (specifying the "private meeting" and "Shaw's authorization").  ***Second***, Defendants misinterpret basic agency principles as applied to Deutsch and Norfolk.  MTD at 37.  "Corporations, of course, have no state of mind of their own," so "the scienter of their ***agents*** must be imputed to them."  *Mizzaro*, 544 F.3d at 1254.  Here, in his capacity as an agent of Norfolk, Deutsch gave false information to Governor DeWine and the public.  His conduct and scienter are imputed to Norfolk.  *See In re ChinaCast*

---

[11]  Plaintiffs sufficiently allege falsity and scienter as to the February 6 press release (attributable to Shaw, Wood, and Deutsch) for substantially the same reasons as the other two Detonation Statements: the press release said the Detonation was done "***under the supervision of experts***," ¶453, but the only polymerization "experts" (OxyVinyls) rejected the underlying premise of the Detonation and did not supervise it, ¶¶322-326.  Here, Defendants "voluntarily undert[ook] to" talk about experts' roles and thus assumed a duty to "disclose all material information."  *See Theodore v. Purecycle Techs., Inc.*, 2022 WL 20157415, at *13 (M.D. Fla. Aug. 4, 2022).

4895-0525-1283.v3

*Educ. Corp. Sec. Litig.*, 809 F.3d 471, 478 (9th Cir. 2015) ("'[i]n a wide variety of areas, the federal courts . . . have imposed liability upon principals for the misdeeds of agents acting with apparent authority'").   ***Third***, Shaw's actions in fraudulently concealing the facts – while he was onsite, before authorizing the Detonation for the sake of expediency – and then lying to Senator Ted Cruz about giving all the facts to public safety officials, ¶¶330-364, make him primarily liable under the "scheme liability" statutory provisions.  *See infra* §VIII.

> **B.  Defendants Were Obligated to Speak Truthfully and Completely Regarding Norfolk's Unsafe Operations**

Defendants' argument that they had no duty to disclose "an undefined increase in a previously disclosed risk," MTD at 17, mischaracterizes their purported "risk" disclaimer and the Complaint.  Plaintiffs allege that Defendants' statements touting PSR and their commitment to safety were materially false or misleading because Defendants concealed that they implemented Norfolk's PSR business model at the expense of safety.  The boilerplate disclosures Defendants cite, MTD at 5-6, 17, do not immunize their statements because they are disconnected from the specific risks that Norfolk's PSR-related safety cuts created, which Defendants concealed during the Class Period.  *See Norfolk Bond*, 2024 WL 3579096, at \*18 (risk disclosures insufficient because Norfolk "did not disclose to investors that, in an effort to improve its Operating Ratio, it had cut corners on safety and employee training . . . at the expense of safety and the Company's broader financial condition in the event of a

- 20 -

catastrophic accident like the one that occurred here"); *In re Vale S.A. Sec. Litig.*, 2020 WL 2610979, at \*14 (E.D.N.Y. May 20, 2020) (despite "general warnings about operational risks," company's statements about dam safety "obviously paint[ed] an incomplete and misleading picture" given "known [safety] issues").[12]

## C.    Defendants' Safety-Related Statements Are Not Puffery

During the Class Period, Defendants told investors: "Safety is core to our business and essential to achieving operational excellence." ¶415.  Now they contend that **all** their safety statements were "puffery."  MTD at 11-15.  A statement is only considered puffery if it is "'so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of [its] importance.'" *Equifax*, 357 F. Supp. 3d at 1224; *accord ECA Loc. 134 IBEW Joint Pension Tr. of Chi. v. JPMorgan Chase, Co.*, 553 F.3d 187, 197 (2d Cir. 2009) (applying "'so obviously unimportant'" puffery standard).

Defendants have already litigated and lost their meritless "puffery" arguments in *Norfolk Bond*, where the court applied the same "'so obviously unimportant'" standard to similar or substantially identical statements as those at issue in this case and recommended denying defendants' dismissal bid because "a reasonable investor would want to know that the implementation of [PSR] was making the Company's

---

[12]  Defendants' case, *Constr. Laborers Pension Tr. for S. Cal. v. CBS Corp.*, 433 F. Supp. 3d 515, 538 (S.D.N.Y. 2020), is inapposite as it involved an alleged failure to disclose a **potential** departure of a key executive.  MTD at 17.

- 21 -

operations less, not more, safe." 2024 WL 3579096, at *12, *16.[13]

This Court should reach the same conclusion. The Complaint in this case sets forth dozens of safety-related statements that Defendants made in the context of Norfolk's adoption of PSR – which was unquestionably important, *i.e.*, "material," to investors – and which were specific and verifiable such that reasonable investors relied on them.[14] *See also* ¶¶79-82, 84-85, 95-101, 431 (discussing the adoption, and likely consequences, of PSR policies). Where, as here, statements are "made **repeatedly** to assure investors," leading "a reasonable investor to rely upon them as reflecting the state of" the Company's operations, they are actionable. *Equifax*, 357 F. Supp. 3d at 1224 ("representations that [the company] was 'committed' to data security" were not puffery);[15] *see also In re Immucor, Inc. Sec. Litig.*, 2011 WL

---

[13] *Compare, e.g., id.* at *5 (listing safety statements), *with* ¶¶411, 415, 422, 427, 433-434.

[14] Defendants' argument that other railroads make similar safety statements contradicts their assertions that investors do not care whether railroads are operated safely. MTD at 13 n.8. It also ignores that Norfolk was the most dangerous of any Class I railroad. ¶383. *See also SEC v. Intelliquis Int'l Inc.*, 2003 WL 23356426, at *5 n.7 (D. Utah Dec. 11, 2003) ("the accounting practices of other companies are irrelevant").

[15] Defendants' claim that *Equifax* "did not consider relevant Eleventh Circuit precedent," MTD at 13 n.9, overlooks that the cases they cite also hold that the puffery analysis depends on context. *See, e.g., Carvelli v. Ocwen Fin. Corp.*, 934 F.3d 1307, 1320 (11th Cir. 2019) (courts have the "duty to consider the possibility . . . that in context and in light of the 'total mix' of available information, a reasonable investor might nonetheless attach importance to the statement"); *Phila. Fin. Mgmt. of S.F., LLC v. DJSP Enters., Inc.*, 572 F. App'x 713, 716 (11th Cir. 2014) (analyzing

- 22 -

2619092, at *3 (N.D. Ga. June 30, 2011) (statements about "company's commitment to quality were more than puffery" because they "were designed to reassure investors"); *ValuJet*, 984 F. Supp. at 1478 (statements about "safety record" were not "unimportant" to investors); *Vale*, 2020 WL 2610979, at *12 ("statements about safety and sustainability" were not puffery "because [company] repeatedly emphasized its commitment to such priorities").

Defendants' recycled argument from *Norfolk Bond* that "'[n]o investor would take [safety] statements seriously in assessing a potential investment,'" MTD at 12, overlooks that analysts on investor calls questioned Defendants about the safety of Norfolk's operations under PSR, *see, e.g.*, ¶431, as did members of Congress, ¶¶86-92, 417 – clear indications that investors attached importance to the Company's safety statements. *See In re St. Jude Med., Inc. Sec. Litig.*, 836 F. Supp. 2d 878, 888 (D. Minn. 2011) (statements not puffery when made in response to "questions or comments posed by investors, journalists or analysts"). Nor can Defendants argue that their statements about safety were immaterial when they continually "aligned their statements of commitment to safety to their productivity and success as a company." *Massey*, 883 F. Supp. 2d at 618; *see also* ¶409 ("***most importantly, we did***

---

statements "in context"); *Next Century Commc'ns Corp. v. Ellis*, 318 F.3d 1023, 1029 (11th Cir. 2003) (same). *See also* MTD at 12 (citing *Barnes v. Edison Int'l*, 2021 WL 2325060, at *10 (C.D. Cal. Apr. 27, 2021) ("context . . . is key"), *aff'd*, 2022 WL 822191 (9th Cir. Mar. 18, 2022)).

*so safely*"); ¶415 ("*[s]afety is core to our business*"); ¶416 ("*pursuing safe operations is not optional; it's a business imperative*").  Finally, while Defendants contend that none of the safety-related statements is "capable of verification," MTD at 11, this is belied by the first-hand accounts of the former employees and NTSB witnesses describing Norfolk's Company-wide disregard of safety in pursuit of profits, *supra* §IV.A.1, and by Shaw's admissions that "*safety was fourth on [the] list*" of PSR principles and that Norfolk's focus was "solely on profits," ¶¶103, 107.

### D.  Defendants' Safety-Related Statements Are Not Inactionable Opinions

Defendants argue that just four of the challenged safety statements are inactionable "opinions."  MTD at 15-16.  This limited defense fails for three reasons. *First*, for Defendants' statements about the impact of increasing train length, ¶431, the duration of training for a conductor, ¶¶440, 443, and the "visible upticks in qualified employees," ¶442, each is a statement of fact as it "express[ed] certainty" about those topics.  *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 183 (2015).  *Second*, the *Norfolk Bond* court thoroughly reviewed the case law on opinion statements and did not find a single statement about safety to be an inactionable opinion.  *See* 2024 WL 3579096, at \*11-\*12 (discussing standards); *id.* at \*15-\*18 (not finding any statements to be opinions).  *Third*, as the scienter section below demonstrates, none of the speakers believed their statements were true when made; thus, the four so-called "opinion" statements are actionable no matter the label.

- 24 -

4895-0525-1283.v3

*Omnicare*, 575 U.S. at 186, 189 n.7 (opinions actionable where "speaker did not honestly hold" the stated beliefs).

## V.    TAKEN COLLECTIVELY, THE FACTS ALLEGE SCIENTER

To plead scienter, a plaintiff must allege facts raising a strong inference that the defendants either knew their public statements were false or misleading or acted with severe recklessness when making those statements. *Abrams v. MiMedx Grp., Inc.*, 37 F. Supp. 3d 1271, 1277 (N.D. Ga. 2014).  Courts must consider "whether ***all*** of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs*, 551 U.S. at 322-23 (emphasis in original).  The "[C]ourt's job is . . . to assess all the allegations holistically" while "constantly assuming" Plaintiffs' "allegations to be true." *Id.* at 326-27.

### A.    Defendants Knew or Recklessly Ignored Facts Contradicting Their Public Statements

The facts sufficiently allege scienter because they show the widespread degradation in safety standards under PSR in conjunction with Defendants' roles in implementing PSR and their direct observation of the negative impact on safety. *See Maverick Fund, Ltd. v. Mohawk Indus., Inc.*, 2023 WL 2887603, at *10 (N.D. Ga. Mar. 31, 2023) (scienter alleged where "the nature, duration and extent of the fraud" were coupled with the individual defendants' roles in the company and their participation in corporate disclosures); *see also In re Ebix, Inc. Sec. Litig.*, 898 F.

- 25 -

Supp. 2d 1325, 1346-47 (N.D. Ga. 2012) (same); *City of Sunrise Gen. Emps.' Ret. Plan v. Fleetcor Techs., Inc.*, 2018 WL 4293143, at \*11 (N.D. Ga. May 15, 2018) ("company-wide" conduct bolsters scienter inference).[16]

**Shaw's Authorization of the Detonation**.  Defendants do not, and cannot, dispute that Shaw was "in the room," ¶342, and personally authorized the Detonation based on falsified temperature information.  His personal participation and deceptive actions in this PSR-driven decision – quickly moving to "restore rail operations" while unnecessarily endangering public safety – support both that Shaw orchestrated PSR's degradation in safety standards and that he knew of the consequences.  ¶¶341-346. Those facts allege scienter. *See, e.g.*, *Mohawk*, 2023 WL 2887603, at \*11 (defendant "personally told" about the conduct).

**Company-Wide Culture of Disregarding Safety**.  More facts show scienter as to Shaw, Sanborn, and Squires and their participation in the scheme to implement PSR at the expense of safety.  The Complaint alleges that Defendants' PSR business strategy caused the widespread collapse in safety conditions, as reflected in the statements of *22* former employees and NTSB witnesses who worked at multiple

---

[16] Defendants' primary scienter authority supports Plaintiffs' theory because it explained that where, as here, the problematic activity is widespread, knowledge or reckless disregard of the conduct will be imputed to management if they "orchestrated" it or the plaintiffs allege "*some* facts showing *how* knowledge of the fraud would or should have percolated up to senior management." *Mizzaro*, 544 F.3d at 1250-51 (first emphasis in original).

4895-0525-1283.v3

levels of the Company's hierarchy, in multiple different functions and roles, and who spanned the geographic breadth of Defendants' operation with placements in numerous states and at the Company's Georgia headquarters.  ¶¶40-61.[17]

"Strikingly, [these accounts] tell what is essentially the same story – a rampant disregard for [safety] standards – from markedly different angles" that began with Defendants' implementation of PSR, which Squires spearheaded and Shaw and Sanborn further championed.  *In re Countrywide Fin. Corp. Deriv. Litig.*, 554 F. Supp. 2d 1044, 1059 (C.D. Cal. 2008).  *See, e.g.*, ¶¶79, 99, 113-114, 116-120, 135, 146, 150, 152, 170-171, 188, 196-197, 203-206, 217, 223, 228-229, 231-237, 245, 253, 256, 258 (in which former employees and NTSB witness, Gary Rambo, describe top-down pressure across Norfolk's operation to prioritize speed over safety and a widespread paring of investment in training, safety measures, and safety procedures). The notion that this "Company-wide culture" went unnoticed by the Individual Defendants, in a closely regulated industry where safety is paramount and the repercussions of a single mistake are astronomical, "simply does not square with" the responsibilities of the Individual Defendants and their public statements regarding

---

[17]  "The FEs' descriptions of safety and operational issues . . . 'provide no basis for believing that factors unique to the relevant [locations], rather than company-wide practices,' resulted in the increased safety risks that the FEs experienced."  *Norfolk Bond*, 2024 WL 3579096, at \*14 (quoting *N.J. Carpenters Health Fund v. Royal Bank of Scot. Grp., PLC*, 709 F.3d 109, 124 (2d Cir. 2013)) (alteration in original).

- 27 -

their vigilance and commitment to safety. *Countrywide*, 554 F. Supp. 2d at 1065 ("the inference of scienter here is at least as plausible as [defendants'] competing view"); *see also Fleetcor*, 2018 WL 4293143, at *11 (company-wide evidence provided by ten former employees supported a strong inference of scienter). The widespread, near universality of this culture that placed profits over safety, in concert with the Complaint's other allegations, makes it far more likely than not that Defendants knew about it. *Mizarro*, 544 F.3d at 1249 (scienter pled where there is "at least a fifty-fifty chance that the individual defendants knew about the alleged fraud (or were severely reckless in not knowing about it) based on its nature, duration, or amount").

**Defendants Touted Their Knowledge of Safety Conditions**. In addition to alleging "widespread" degradation of safety standards, the Complaint alleges particularized facts showing Defendants ***did*** have "'access to information'" about the rampant degradation of safety standards "'contradicting their public statements.'" *Equifax*, 357 F. Supp. 3d at 1233 (such facts plead scienter); *see also In re Netbank, Inc. Sec. Litig.*, 2009 WL 2432359, at *12 (N.D. Ga. Jan. 29, 2009) (same); *Mizzaro*, 544 F.3d at 1251 (scienter can be satisfied by "***some*** facts showing ***how*** knowledge of the fraud would or should have percolated up to senior management") (first emphasis in original).

The facts showing Squires, Shaw, and Sanborn "held [themselves] out to investors as knowledgeable about [the impacts of PSR on safety] . . . [and] spoke in

- 28 -

detail" on that topic strengthens the scienter inference. *Allegheny Cnty. Emps.' Ret. Sys. v. Energy Transfer LP*, 532 F. Supp. 3d 189, 228 (E.D. Pa. 2021) (scienter adequately alleged); *see also* ¶¶455-460; *Monroe Cnty. Emps.' Ret. Sys. v. Southern Co.*, 2018 WL 1558577, at \*29 (N.D. Ga. Mar. 29, 2018) (scienter pled where defendants were "present at [company] meetings" and "regularly visited" job sites); *HD Supply*, 341 F. Supp. 3d at 1361 (scienter pled where "[d]efendants were involved in daily and weekly updates of [the company's] supply chain . . . [and] gauged daily progress").

For example, Shaw admitted: "[A] lot of [Norfolk employees] will ***express their concerns directly to me . . . I'm out in the field a lot . . . I'm in the crew rooms . . . they get direct input to me, they got my phone number***." ¶456. Before Congress, Sanborn described her visits to railyards "listening to . . . employees and what they have to say ***around safety*** and concerns that they have." ¶¶95-97, 460. "[O]nce or twice a week," Shaw and, at times, Sanborn would attend Norfolk's ***daily calls where safety*** was discussed. ¶¶466-467; *see also Mohawk*, 2023 WL 2887603, at \*11 (presence at relevant "'weekly . . . staff meetings'" supports scienter). Sanborn admitted to being "***laser-focused***" on safety operations. ¶418. Squires launched the PSR program and admitted to "staying very close" to its impact by participating in "over 300 meetings" in 2020 and "one-on-one meetings" with the Company's "top 140 leaders." ¶¶79, 459. Defendants even acknowledge they reviewed "the

- 29 -

Company's safety metrics," MTD at 36, while a former director in Norfolk's marketing department provided details about internal metrics – such as an individual car's movements and whether it was rerouted for a bad order tag – that were accessible to Defendants and provided specifically to Shaw and Sanborn. ¶¶468-469. These facts establish far more than run-of-the-mill "hands-on" leadership, and readily support a strong inference of scienter. MTD at 26.

**Defendants' Compensation Was Based on PSR Goals**. Defendants were focused "solely on profits," ¶276, at least in part because they earned bonuses based on PSR-based goals like reducing OR, ¶¶485-488. Only after the Derailment did Norfolk add "safety" to its performance factors. ¶¶489, 497; *see also Carpenters Health & Welfare Fund of Phila. v. Coca-Cola Co.*, 2002 WL 34089163, at \*15 (N.D. Ga. Aug. 20, 2002) (compensation "significantly tied" to fraud-related facts supported scienter); *contra* MTD at 34 (citing generic compensation cases).

**Safety Was Central to Defendants' Business**. Defendants' admission that "[s]afety is *core* to our business," ¶415, further bolsters the scienter inference. *In re Flowers Foods, Inc. Sec. Litig.*, 2018 WL 1558558, at \*14 (M.D. Ga. Mar. 23, 2018) ("An inference of scienter is bolstered by [p]laintiff's numerous allegations indicating that the [business] model was a 'core operation.'").

**The FRA Warned Defendants About the Impact of PSR on Safety**. Squires and Shaw both received written notice from the FRA warning them and Norfolk about

4895-0525-1283.v3

safety problems, including the "potential relationship between recent changes to the duration of [Norfolk's] conductor training, and the frequency and severity of conductor incidents and injuries," and about the "negative effect" of rail workers' fatigue on "safe railroad operations." ¶¶473, 475-476, 481. Such facts put them on notice and supports scienter. *See ValuJet*, 984 F. Supp. at 1477, 1480 (scienter where regulator "identified numerous safety-related incidents" and "expressed concern" directly to company). The FRA's July 8, 2022 Special Audit similarly identified Norfolk's violations of safety regulations and put Defendants on notice that the safety of their operations had been called into question. ¶¶483-484; *see Equifax*, 357 F. Supp. 3d at 1234 (scienter where "Equifax received clear warnings about [security] vulnerability from both the government and its own employees"). Contrary to Defendants' claim, MTD at 29, the Complaint alleges that Norfolk both received *and* commented on the FRA's report as part of the FRA Special Audit, ¶484.

**Defendants Testified Before Congress**. It would have been "'an extreme departure from the standards of ordinary care,'" *Equifax*, 357 F. Supp. 3d at 1233, for Sanborn and her boss (Shaw) to have made no inquiry into the rampant safety degradation at Norfolk prior to Sanborn being called to testify before Congress on that very subject, ¶¶95-97. *See In re Jan. 2021 Short Squeeze Trading Litig.*, 620 F. Supp. 3d 1231, 1254 n.14 (S.D. Fla. 2022) (statements made under oath "lend[] support" to scienter). The fact that Sanborn left Norfolk, ¶¶492-495, after testifying before

- 31 -

Congress further supports scienter.  *See Equifax*, 357 F. Supp. 3d at 1245 (departures related to alleged fraud supports scienter).[18]

No stranger to congressional inquiries into safety, Shaw – who participated in the Detonation decision – represented to Senator Cruz that Norfolk "will be transparent" when dealing with the government's safety investigations.  ¶363.  Yet Norfolk's behavior "deeply troubled" NTSB officials because it: (1) "delayed or failed to provide critical investigative information"; (2) misrepresented and tried to conceal (by not producing) "text messages" that proved Shaw and his team knew the railcars' temperatures before detonating them; (3) "not once, not twice, not three times, but four times" attempted to "manufacture their own evidence"; and (4) "abuse[d]" the investigative process going so far as to "threat[en]" federal investigators.  PEx. B at 1-3.[19]  Shaw's testimony to Senator Cruz shows his involvement in the investigation,

---

[18]  In Defendants' cases, MTD at 32, there were no allegations that the executive departures were related to the fraud.  *See, e.g.*, *In re Jiangbo Pharms., Inc., Sec. Litig.*, 884 F. Supp. 2d 1243, 1263 (S.D. Fla. 2012) ("[p]laintiffs fail to allege any facts to suggest that [the executive] left because of [the fraud]"), *aff'd sub nom. Brophy v. Jiangbo Pharms., Inc.*, 781 F.3d 1296 (11th Cir. 2015).

[19]  The Complaint references the NTSB's investigation more than 100 times, and the Court should consider the findings set forth in public NTSB documentation in the collective scienter analysis.  *See, e.g.*, *Ward-Richardson v. FCA US LLC*, 690 F. Supp. 3d 1372, 1375 n.2 (N.D. Ga. 2023) (taking judicial notice of report and letters accessible from National Highway Traffic Safety Administration website); *McCone v. Thorpe*, 828 F. App'x 697, 698 (11th Cir. 2020) ("[a] district court may take judicial notice of public records" when considering a motion to dismiss).  *See also* Plaintiffs' RJN.

¶363, as does Shaw's onsite participation in the Detonation, ¶¶342, 501.  Norfolk's

"'reprehensible'" conduct in obstructing the ensuing investigations is attributable to

Shaw and supports the scienter inference.  PEx. B at 2.  *See, e.g.*, *In re Eletrobras Sec.*

*Litig.*, 245 F. Supp. 3d 450, 469 (S.D.N.Y. 2017) ("obstruction of justice" supports

scienter).

### B.     The Inference of Scienter Is More Cogent and Compelling Than Any Competing Inference

Considered holistically, the Complaint readily pleads a strong inference of

scienter that is at least as compelling as any plausible opposing inference.  *Tellabs*,

551 U.S. at 324.  The only non-fraudulent inferences Defendants suggest are that they

considered Norfolk's operations "to be within a range that could reasonably be

described as 'safe'" and that "any information disclosed to the public about the

[Detonation] was aimed at ensuring public safety."   MTD at 36, 38.[20]   These

counterfactual, conclusory assertions fail because they assume none of the

Complaint's allegations is true and draw all inferences in Defendants' favor.  That is

improper.  *Tellabs*, 551 U.S. at 326-27.  Defendants could have disputed the facts by

answering the Complaint; instead, they moved to dismiss.  Therefore, the correct

---

[20]  The inference that Norfolk and its agents were simply trying to ensure public safety is again belied by the NTSB's final Railroad Investigation Report, which found: "Norfolk . . . and its contractors compromised the integrity of the vent and burn decision by creating unwarranted urgency and not communicating expert opinions and information completely and accurately."  PEx. A at 170.

- 33 -

question is: "When the allegations are accepted as true and taken collectively, would a reasonable person deem the inference of scienter at least as strong as any opposing inference?" *Id.* at 326. The answer to that question clearly is "yes."

## VI. FORMER EMPLOYEES AND NTSB WITNESSES SUPPORT PLAINTIFFS' SCIENTER ALLEGATIONS

Defendants argue that the Court should disregard the consistent accounts of the former employees and NTSB witnesses when weighing the scienter allegations. MTD at 24-25. "In order for statements from a confidential witness to raise a strong inference of scienter, the statements 'must be described with sufficient particularity to establish [the witness'] reliability and personal knowledge' and the statements 'must themselves be indicative of scienter.'" *Luczak v. Nat'l Beverage Corp.*, 812 F. App'x 915, 925 (11th Cir. 2020). Both of these requirements are met.

There can be no doubt about the former employees' and NTSB witnesses' "'reliability and personal knowledge.'" *Id.* Defendants' argument that two of the NTSB witnesses, David Arouca and Jared Cassity, did not work for Norfolk, MTD at 25, overlooks that they were union officials who represented Norfolk workers and who established their detailed knowledge of working conditions at the Company while participating in a government investigation. *See* ¶¶63-64, 123-126, 129, 154, 162, 165-166, 180, 194, 242-244, 253, 263, 267, 273. Defendants' own description of the former employees, MTD at 24-25 n.17, establishes that they "span different levels of the Company hierarchy," confirming their reliability. *Freudenberg v. E*Trade*

- 34 -

4895-0525-1283.v3

*Fin. Corp.*, 712 F. Supp. 2d 171, 197 (S.D.N.Y. 2010); *Norfolk Bond*, 2024 WL 3579096, at \*14 (same).

Defendants primarily contest the second requirement under *Luczak* – that the information provided by the former employees and NTSB witnesses is not indicative of scienter – because some of them did not have direct contact with Defendants. MTD at 24-25. Yet, direct contact is not required where, as here, "allegations from confidential witnesses contradict statements 'directly and repeatedly' made by" defendants. *Luczak*, 812 F. App'x at 925[21]; *see also Fleetcor*, 2018 WL 4293143, at \*11 (rejecting argument that former employees lacked a "direct[] link[]" to defendants because the fraud "was company-wide"); *Tung v. Dycom Indus., Inc.*, 454 F. Supp. 3d 1244, 1258 (S.D. Fla. 2020) (crediting multiple sources that corroborate one another); *Equifax*, 357 F. Supp. 3d at 1236 (same); *Massey*, 883 F. Supp. 2d at 621 (scienter where large gap between defendants' statements and reality). Even so, a former senior director of commercial planning and a former director in the marketing department at Norfolk recalled specific details about regular calls and meetings with

---

[21] Defendants' cases, MTD at 24-26, are therefore inapposite. *See, e.g.*, *Plymouth Cnty. Ret. Sys. v. Carter's, Inc.*, 2011 WL 13124501, at \*25 (N.D. Ga. Mar. 17, 2011) (no access to contrary information); *Mogensen v. Body Cent. Corp.*, 15 F. Supp. 3d 1191, 1219 (M.D. Fla. Mar. 19, 2014) (vague allegations regarding conference calls insufficient); *In re Am. Express Co. Sec. Litig.*, 2008 WL 4501928, at \*8 (S.D.N.Y. Sept. 26, 2008) (former employees had no relevant knowledge), *aff'd sub nom. Slayton v. Am. Express Co.*, 604 F.3d 758 (2d Cir. 2010).

4895-0525-1283.v3

Sanborn and Shaw in which safety and training were discussed.  ¶¶467, 471.

## VII.   PLAINTIFFS HAVE STANDING TO REPRESENT THE CLASS

Defendants' argument that Plaintiffs have standing to challenge some statements but not others, MTD at 17-19, fails because it sidesteps how standing applies to schemes to defraud that parties pursue on behalf of an investor class.

"Numerous courts have stated that class representatives *do* have standing to assert claims under §10(b) which arise from statements made after the class representative purchased shares as long as the statements allegedly were made in furtherance of a common scheme to defraud." *Upton v. McKerrow*, 887 F. Supp. 1573, 1577 (N.D. Ga. 1995).  Here, though Plaintiffs' purchases occurred prior to a subset of Defendants' fraudulent statements, they have standing to bring Rule 10b-5 claims relating to the Detonation because all of the "statements can be said to have been made in furtherance of a common scheme to defraud." *In re Internap Network Servs. Corp. Sec. Litig.*, 2012 WL 12878579, at *2 (N.D. Ga. Aug. 23, 2012).

In Norfolk's own words, the supposed purpose of the intentional Detonation was to prevent the railcars from self-detonating in "***the safest way***," ¶451, but the truth was all about profit: namely, clearing the tracks quickly, ¶276. *See also id.* ("the same policies that placed expediency and profits above safety were in effect as Norfolk deceived emergency personnel, the Ohio governor, and the public").  Shaw, Wood, and Deutsch's Detonation-related conduct, all imputed to Norfolk, "perpetuated the

- 36 -

4895-0525-1283.v3

false and misleading perception" that Norfolk implemented PSR without compromising safety. *Internap*, 2012 WL 12878579, at *2.[22]

## VIII.  PLAINTIFFS ADEQUATELY ALLEGE SCHEME LIABILITY

The Complaint alleges both "making" a statement liability under SEC Rule 10b-5(b) and "scheme" liability as to all Defendants under Rules 10b-5(a) and (c).  ¶¶571-573.  Deceptive acts give rise to "scheme" liability even if the defendant did not otherwise "make" a statement to the public.  *Lorenzo*, 587 U.S. at 78-81. "These provisions capture a wide range of conduct."  *Id.* at 79.

Defendants ignore the scheme liability claims likely because they are well pled. The Complaint alleges, for example, that "Shaw violated Rules 10b-5(a) and (c)" because he "planned and pressured other executives to execute a company-wide policy and practice of elevating efficiency above safety while covering up the conduct through materially false or misleading statements."  ¶¶571-573.  Shaw then

---

[22]  Having ignored the "common scheme to defraud" alleged in the Complaint, *Upton*, 887 F. Supp. at 1577, Defendants' authority is inapplicable.  For example, standing was not found in *ReWalk* because plaintiffs themselves pled *two theories of liability under two separate statutes* – the Securities Act of 1933 and the Exchange Act – and because "counsel for *plaintiff explicitly argued that there were two separate classes*." *Wang Yan v. ReWalk Robotics Ltd.*, 391 F. Supp. 3d 150, 156-57 (D. Mass. 2019), *aff'd on other grounds*, 973 F.3d 22 (1st Cir. 2020).  Similarly, in *Marcam*, the allegations concerned two unrelated misrepresentations: (1) a failure to consolidate subsidiaries' losses; and (2) the false description of an acquisition.  *Abato v. Marcam Corp.*, 162 F.R.D. 8, 8-10 (D. Mass. 1995).  This case involves one course of dangerous conduct – whether blowing up toxic railcars or intimidating employees who raised safety concerns – focusing "solely on profits."  ¶276.

4895-0525-1283.v3

orchestrated the Detonation scheme, in which several Norfolk agents gave "materially false or misleading information to government officials." ¶572. *See also Mohawk*, 2023 WL 2887603, at *9 (scheme liability claim sufficiently alleged as to defendant who "oversaw" false statements but did not make them); *SEC v. Curshen*, 888 F. Supp. 2d 1299, 1307-08 (S.D. Fla. 2012) (scheme liability covers "broader" conduct than just statements, including the "orchestrat[tion] [of a] false media campaign"). Norfolk is therefore also liable for the conduct of its agents Wood and Deutsch, who likewise participated in the scheme to conceal information from Governor DeWine and emergency responders to manipulate them into approving the Detonation. *See* ¶¶284, 327-333, 339, 341, 346, 347, 349-355.

Shaw similarly testified to Senator Cruz that he and Norfolk had given public safety officials the "best information" he had at the time. ¶¶363-364. Shaw knew this was untrue. *See supra* §IV.A.2. As discussed above, Norfolk's subsequent "reprehensible" conduct (in the NTSB's words) in dealing with federal investigators also is attributable to Shaw given his representations, as CEO, that Norfolk would be "transparent" in the investigation.

## IX.   THE LIMITED LOSS CAUSATION DEFENSE FAILS

In restricting their loss causation argument to a handful of statements made toward the end of the Class Period, Defendants implicitly concede that the Complaint sufficiently alleges loss causation as to the vast majority of the alleged misstatements.

- 38 -

Even so, Defendants' narrow loss causation argument fails.

The pleading standards are modest. Procedurally, "[l]oss causation pleading need only satisfy Rule 8 standards, not the heightened standards of Rule 9 or the PSLRA." *Ebix*, 898 F. Supp. 2d at 1347. Substantively, loss causation merely requires some "causal connection between the misrepresentation and the investment's subsequent decline in value." *Robbins v. Kroger Props., Inc.*, 116 F.3d 1441, 1448 (11th. Cir. 1997). Causation in the securities context requires only that the information that causes a decline in stock value "relate" to the subject matter of the prior misstatements. *Equifax*, 357 F. Supp. 3d at 1249 (truthful "disclosure[s] need not precisely mirror an earlier misrepresentation, but instead must relate to the misrepresentation and not other negative information about the company"); *Luczak*, 812 F. App'x at 920 (plaintiffs need only show "'defendant's act was a substantial or significant contributing cause'"). The Complaint does so. ¶¶511-552.

Defendants quibble that none of the disclosures "concerned the temperature of the railcars" or "the likelihood of polymerization." MTD at 40. The "mirror image" disclosure that Defendants demand is not required; and the alleged corrective disclosures certainly "relate" to Defendants' misstatements about their safety practices, the costs of aligning those practices with the prior statements, and the costs of dealing with the completely unnecessary railcar Detonation. These foreseeable costs also allege loss causation. *See, e.g.*, *Flowers*, 2018 WL 1558558, at *18 ("[i]t is

- 39 -

4895-0525-1283.v3

sufficient to show that a risk defendants allegedly concealed materialized and arguably caused the plaintiffs' losses") (alteration in original).

The Complaint readily satisfies notice pleading as to loss causation.

## X.   CONTROL PERSON LIABILITY

The Rule 10b-5(a)-(c) claims are sufficiently alleged.  As a result, the "control person" claims under §20(a) proceed because Squires, Sanborn, and Shaw conducted the Company's day-to-day affairs.  *Equifax*, 357 F. Supp. 3d at 1251-52.

## XI.   CONCLUSION AND LEAVE TO AMEND

For the foregoing reasons, Defendants' Motion should be denied in its entirety. Plaintiffs maintain the sufficiency of the Complaint, but if the Court finds otherwise, Plaintiffs respectfully request leave to amend.  *See Fernau v. Enchante Beauty Prods., Inc.*, 847 F. App'x 612, 623 (11th Cir. 2021) ("Under Rule 15(a)(2), leave to amend should be freely granted 'when justice so requires.'").

DATED:  August 23, 2024          Respectfully submitted,

ROBBINS GELLER RUDMAN
  & DOWD LLP
JASON C. DAVIS (CA 253370)
(admitted *pro hac vice*)

s/ Jason C. Davis
JASON C. DAVIS

- 40 -

Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA  94104
Telephone:  415/288-4545
415/288-4534 (fax)
jdavis@rgrdlaw.com

ROBBINS GELLER RUDMAN
  & DOWD LLP
ASHLEY M. PRICE (CA 281797)
(admitted *pro hac vice*)
JACK ABBEY GEPHART (CA 345398)
(admitted *pro hac vice*)
655 West Broadway, Suite 1900
San Diego, CA  92101-8498
Telephone:  619/231-1058
619/231-7423 (fax)
aprice@rgrdlaw.com
jgephart@rgrdlaw.com

*Counsel for Co-Lead Plaintiff the Ironworkers
Funds and Co-Lead Counsel for the Class*

HERMAN JONES LLP
JOHN C. HERMAN
(Georgia Bar No. 348370)
3424 Peachtree Road NE, Suite 1650
Atlanta, GA  30326
Telephone:  404/504-6500
404/504-6501 (fax)
jherman@hermanjones.com

*Counsel for Co-Lead Plaintiff the Ironworkers
Funds and Co-Liaison Counsel*

- 41 -

4895-0525-1283.v3

MURRAY MURPHY MOUL + BASIL LLP
JOSEPH F. MURRAY (OH 0063373)
(admitted *pro hac vice*)
1114 Dublin Road
Columbus, OH  43215
Telephone:  614/488-0400
614/488-0401 (fax)
murray@mmmb.com

*Counsel for Bucks County Employees Retirement System and the Ironworkers Funds*

KESSLER TOPAZ MELTZER
  & CHECK, LLP
JOHNSTON DE F. WHITMAN, JR. (PA207914)
(admitted *pro hac vice*)
NATHAN A. HASIUK (PA314644)
(admitted *pro hac vice*)
AUSTIN W. MANNING (PA327640)
(*pro hac vice* pending)
VANESSA M. MILAN (PA329312)
(admitted *pro hac vice*)
DYLAN J. ISENBERG (PA333996)
(admitted *pro hac vice*)
280 King of Prussia Road
Radnor, PA  19087
Telephone:  610/667-7706
610/667-7056 (fax)
jwhitman@ktmc.com
nhasiuk@ktmc.com
amanning@ktmc.com
vmilan@ktmc.com
disenberg@ktmc.com

*Counsel for Co-Lead Plaintiff Akademikernes Pensionkasse and Co-Lead Counsel for the Class*

- 42 -

4895-0525-1283.v3

CAPLAN COBB LLC
MICHAEL A. CAPLAN
(Georgia Bar No. 601039)
CAMERON B. ROBERTS
(Georgia Bar No. 599839)
75 Fourteenth Street, NE, Suite 2700
Atlanta, GA  30309
Telephone:  404/596-5600
404/596-5604 (fax)
mcaplan@caplancobb.com
croberts@caplancobb.com

*Counsel for Co-Lead Plaintiff Akademikernes*
*Pensionkasse and Co-Liaison Counsel*

## RULE 7.1(D) CERTIFICATION OF COMPLIANCE

The undersigned counsel certifies that this document has been prepared in

accordance with the font and type specifications required under Northern District

of Georgia Local Rules 5.1 and 7.1.

*/s/ Jason C. Davis*
JASON C. DAVIS

- 43 -