The following is the PDF of an official transcript.  Official transcripts may only be filed in CM/ECF by the Official Court Reporter and will be restricted in CM/ECF for a period of 90 days.  You may cite to a portion of the attached transcript by the docket entry number, referencing page and line number, only after the Court Reporter has filed the official transcript; however, you are prohibited from attaching a full or partial transcript to any document filed with the Court.

**Stenographic Reporter note:**

**No AI technology was used in the preparation of the Official Certified U.S. District Court Transcript**

```
                     UNITED STATES DISTRICT COURT
                 FOR THE NORTHERN DISTRICT OF GEORGIA
                           ATLANTA DIVISION


BUCKS COUNTY EMPLOYEES    )           Docket Number
RETIREMENT SYSTEM, et al.)            1:23-CV-04175-SDG
                          )
                          )
             Plaintiffs,  )
                          )
                          )
        v.                )
                          )           Atlanta, Georgia
                          )           November 22, 2024
NORFOLK SOUTHERN          )
CORPORATION, et al.       )
                          )
                          )
             Defendants.  )


                 TRANSCRIPT OF MOTION TO DISMISS
            BEFORE THE HONORABLE STEVEN D. GRIMBERG
                  UNITED STATES DISTRICT JUDGE
```

APPEARANCES OF COUNSEL:

```
FOR THE PLAINTIFFS:             MR. JASON C. DAVIS
                                MS. ASHLEY M. PRICE
                                MR. JACK A. GEPHART
                                MR. MICHAEL A. CAPLAN
                                MR. CAMERON B. ROBERTS
                                MR. JOHN C. HERMAN
                                MR. NATHAN A. HASIUK


FOR THE DEFENDANTS:             MR. MICHAEL G. BONGIORNO
                                MS. TAMAR KAPLAN-MARANS
                                MS. DENISE TSAI
                                MS. HILARY H. ADAMS


OFFICIAL COURT REPORTER:        ALICIA B. BAGLEY, RMR, CRR


        Proceedings recorded by mechanical stenography,
              transcript produced by computer
```

2

P R O C E E D I N G S

(in Atlanta, Fulton County, Georgia; November 22, 2024; all parties present)

THE COURT:  All right.  Let me call the case.  This is Bucks County vs. Norfolk Southern, Case Number 23-CV-4175.  Let's have appearances of counsel beginning with the plaintiff.

MR. DAVIS:  Good afternoon, Your Honor.  Jason Davis of Robbins, Geller, Rudman & Dowd.  Co-lead counsel for the court-appointed lead plaintiffs.

MS. PRICE:  Good afternoon, Your Honor.  Ashley Price also with Robbins, Geller, Rudman & Dowd for the co-lead plaintiffs.

THE COURT:  Good afternoon.

MR. GEPHART:  Good morning, Your Honor.  Jack Gephart also of Robbins, Geller, Rudman & Dowd for the co-lead plaintiff.

THE COURT:  All right.

MR. CAPLAN:  Good afternoon, Your Honor.  Mike Caplan of Caplan Cobb.  It's good to see you.

THE COURT:  Good to see you.

MR. ROBERTS:  Good afternoon, Your Honor.  Cameron Roberts also from Caplan Cobb.

THE COURT:  Nice to see you.

MR. HERMAN:  Good afternoon, Your Honor.

John Herman from Herman Jones.

THE COURT:  Good afternoon.

MR. HASIUK:  Good afternoon, Your Honor. Nathan Hasiuk from Kessler, Topaz, Meltzer & Check co-lead plaintiffs.

THE COURT:  Okay.  Excellent.  Well, it looks like plaintiffs' counsel has won the lawyer quantity award.

Counsel for defendants.

MR. BONGIORNO:  Good afternoon, Your Honor. Mike Bongiorno from WilmerHale for the defendants.

THE COURT:  Good afternoon.

MS. KAPLAN-MARANS:  Hi.  Good afternoon. Tamar Kaplan-Marans also from WilmerHale and also for the defendants.

MS. TSAI:  Good afternoon, Your Honor. Denise Tsai also from WilmerHale on behalf of the defendants.

THE COURT:  Good afternoon.

MS. ADAMS:  Good afternoon, Judge.  Hilary Adams of Hall, Bloch, Garland & Meyer on behalf of the defendants.

THE COURT:  All right.  Great.  Good to see you all and thank you for accommodating the odd noon time setting.  I hope you had an early lunch.  I know we

had some challenges finding a date that worked for everyone and it's been a busy week so thanks for accommodating that.

We're here on Norfolk's motion to dismiss. I have reviewed the briefing and it was excellent work on both sides. I don't know if the folks who did the drafting are in the courtroom. If so, great, great work.

I look forward to argument. I believe we've allocated 45 minutes per side which hopefully should be more than sufficient. As the movant, you can reserve some of that time for rebuttal if you'd like. With that, whenever you're ready.

MR. BONGIORNO: Thank you. The folks to my right did the briefing, Your Honor, so I'll acknowledge that right upfront.

THE COURT: Great.

MR. BONGIORNO: Mike Bongiorno for the defendants. If it's okay with the Court, I'd like to do the argument from here.

THE COURT: Sure. The only rule is you stay close to a microphone. As long as you have that upfront, that's perfectly fine.

MR. BONGIORNO: Great. Thank you. And thank you to your folks for accommodating the schedule

and for the plaintiffs as well because some of the scheduling difficulty was my own.  So I appreciate their accommodation and I want to acknowledge that.

THE COURT:  Sure.

MR. BONGIORNO:  I'd like to reserve probably about 10 minutes for rebuttal, if necessary.

THE COURT:  All right.  Ms. Brye, if you would let us know if we get there.  The clock is above the jury box if you want it.

MR. BONGIORNO:  Got it.  Thank you.

Your Honor, this case is an attempt to take a train derailment and turn it into a securities fraud claim.  There's no question that the derailment itself was a significant event and impacted the lives of residents and led to government investigations and congressional inquiries, etcetera.

But this case is not about the impact of that accident on the local folks or the government investigations themselves.  This is a case -- a purported case of securities fraud in an attempt to turn that incident into a securities fraud claim and, as I'll explain, the plaintiffs have not put forward any valid claim in that regard.

It asserts two distinct types of statements. There are the safety statements and there are the vent

and burn statements and I'd like to start -- the vent and burn statements, of course, were in the immediate aftermath of the incident itself.

I'd like to start with the safety statements, those are really what this case purports to be about, and those statements themselves are not actionable, those safety statements, because they are not objectively verifiable, and that is the standard.  They are too vague and too general to sustain a securities fraud claim.

Furthermore, there's nothing in the complaint that can establish scienter with regard to those claims and, of course, that is an essential element of the claim.  The plaintiffs have put forward a series of anecdotal witnesses and other sort of kitchen-sink-type arguments with regard to scienter, but they don't allege any particularized facts that would allow this Court to find that any statement was made with fraudulent intent which is, of course, a requirement.

I want to point to a number of important aspects of our arguments here, Your Honor, because I know the Court is familiar with the briefing, of course.  The challenged statements, when you boil down to what they actually are and you look at them, they're very, very general statements for the most part.

Statements like safety is a way of life at Norfolk Southern and that the company is committed to a, quote-unquote, injury free workplace.  Courts regularly dismiss claims based on statements like this.  They have nothing in them that can be objectively verifiable and no reasonable investor would rely on them in purchasing stock.

THE COURT:  But when looking at reliance for those safety related statements, are you suggesting that we look at each one in isolation or is it fair to look at the totality of the statements and their context to determine materiality?

MR. BONGIORNO:  Well, you certainly should look at the context, Your Honor, there's no doubt about that.

There's a suggestion in the plaintiffs' briefing that the fact that we made statements on multiple occasions somehow makes them material when they otherwise maybe wouldn't be and that's just not the case.  The case law doesn't support that.  We've cited a number of cases.  We cited the Abiomed case.  We cited the Loming Kit vs. Apollo case and a number of other cases.

Furthermore, if you look at the Eleventh Circuit cases that we cite there are -- even though they don't--

because plaintiffs didn't make that exact argument in those cases, but those statements are repeated over and over and over again in those cases that the courts have found to be immaterial.  So I don't think it really matters how many times we said something or whether we said different variations of the same general thing, that doesn't make it material.

There has to be something objectively verifiable in it that can be tested.  So saying safety is a way of life, we're committed to safety, is not something that can be measured against some facts to say, oh, as it turns out you're not because of X, Y, and Z.

So in the Ocwen case, Carvelli vs. Ocwen case, which is obviously an Eleventh Circuit case and a fairly recent one and a very important one the court looks at that.  It looks at the statements made there and talks about, you know, whether those statements to be objectively verifiable and says that they can't.  Now, those statements are very, you know, similar in nature to the types of statements made here and we cite a number of other cases in that regard, of course.

THE COURT:  Again, when looking at materiality, though, and whether this is fair to make an inference that an investor could be making a decision about whether to purchase stock or not, could you see a

scenario where even the same statement, but made consistently and over a prolonged period of time, could impact that decision?

MR. BONGIORNO:  I don't think so, Your Honor.  I don't think the number of times a statement is made is going to make it material or not.

So, for example, in the Second Circuit, the JPMorgan case which we cite to, JPMorgan Chase -- in that case the court analyzed statements about an investment bank's integrity and the court said these statements are made all the time by investment banks. In fact, all the investment banks make these same or very similar statements.

In this industry, Class I railroads, there are only six or seven of them, and we cited virtually identical statements by six Class I railroads, all the same.  No one is deciding whether or not to invest in Norfolk Southern or any of these other railroads because they over and over again --

And by the way, the repetition is, for the most part, simply a quarterly filing that is done every three months and it says the same thing.  I don't think any investor's picking up the quarterly filing and saying, oh, good, they said again, you know, we're committed to safety.  I think I'll buy some of the stock.  I'm not

saying that sort of anecdotally and colloquially, Your Honor. I'm saying that based on the case law.

The Ford case out of the Sixth Circuit -- and, again, these are all circuit court cases. Ford was making cars -- trucks, rather. There were two different Ford trucks and they were replacing one with the other, the Bronco with whatever the more recent version of the Bronco is, and they were putting -- which I cannot remember because we drive GM in my house. But they were putting tires on those trucks, Firestone tires, and they were exploding and they were overheating and they were C rated, not B rated or A rated, and folks in Arizona were getting injured and in some cases killed by these tires because they were too hot.

The court looked at what Ford was saying and they were saying, you know, we put safety in every vehicle and we're -- you know, we're the worldwide leader in safety and things like that. The Sixth Circuit said that those types of statements are numbingly familiar. Of course, "numbingly familiar" means said over and over again to the point where no one's really listening anymore. And, again, they're just too general to be verifiable. If Ford, of course, had said our tires are A rated and they can handle, you know, 200 degrees, and whatever, and if that were true, then of course there

would be a claim, but that's not what we have here.

When you actually look at the statements that they are challenging -- of course, there are some factual statements that we make that are objectively verifiable, but they're not alleged to be false.  No one is coming here and telling you, you know, they reduced the time by which an inspector could look at a train from 4 minutes to 1 minute and they told you they increased it to 7 minutes.  If we had said that, is that material?  I don't know.  That's at least objectively verifiable.  But that's not what we have here.

What we have here are all these general statements about safety and a handful of specific statements that they don't challenge as false.  They just say you left the impression that X, Y or Z and, therefore, you committed securities fraud.

It's a pretty extraordinary leap to say, you know, this train derailed in Ohio in February of 2023 and, therefore, two years earlier when you said this very general statement about safety you were committing securities fraud because, you know, the other shoe was going to drop some day.  That's just not the case.

The things that they complain about in the complaint about train length, about train weight, things like that, they're not claiming that we lied about any

of that.  In fact, much of what they use in their complaint are class period statements about that and then they say, see, they were -- you know, it wasn't as safe as we hoped it would be because they reduced this or they added that, or whatever, they implemented the PSR.  Everybody knew all of those things.  So I don't think that repetition or context gets them out of the materiality box that I think that they're in.

THE COURT:  How do you distinguish -- I know that we have that Southern District of New York case, right, the Norfolk Bond case and the order that was entered over the summer.  They did find materiality as to similar statements if not the same statements; right?

MR. BONGIORNO:  Correct, Your Honor.

THE COURT:  So they just got it wrong?

MR. BONGIORNO:  Yes.  Yes.  I argued that.

THE COURT:  I have no qualms with telling the Southern District of New York they got something wrong.

MR. BONGIORNO:  Nor do I on that matter, Your Honor.

I argued that case in the Southern District.  It was before Magistrate Judge Judge Cave.  Judge Kaplan has not, despite the fact that it's been fully briefed in front of him for a few months, he has not adopted the

report and recommendation as of yet.  At this point we don't have an order.  We just have a report and recommendation.  There are certainly aspects of it that we agree with and aspects of it to which we objected.  I think that she did get it wrong and that when you look at the circuit court decisions which, of course, in the Eleventh Circuit are precedential here and in other circuits are persuasive, certainly more persuasive than the district court, particularly in another jurisdiction, that the law is actually quite clear.

So I mentioned Ocwen.  I haven't mentioned DJSP yet, but that is an Eleventh Circuit case and a case that talks about a company -- it wasn't a company, I suppose.  It was actually a lawyer who did mortgage foreclosures and he had a whole business and somehow it was a public company.  I'm not sure exactly how that works.  But they had a lot of problems with how they were doing things.  They assured investors that they had extensive training, which is something that's complained about in this case, and the Eleventh Circuit said, no, that is immaterial, that is puffery.  Again, that's the DJSP case.

So when you look at the cases we cite, JPMorgan, DJSP, Carvelli vs. Ocwen, Ford, a number of those cases are Eleventh Circuit cases, a Sixth Circuit case, a

Second Circuit case, all at the circuit court level, all saying that statements very similar, practically identical in some respects to the statements here, are too general.

In Carvelli vs. Ocwen - again, an Eleventh Circuit very recent case - says even if it was made in bad faith, that doesn't matter, that's not the point. The point you have to start with the very basic proposition that there is a material misstatement, not puffery, not airy statements, numbingly familiar statements, that type of language that is used.

So I do think that Judge Cave did get aspects of her decision wrong. We're hopeful that Judge Kaplan will see it the same way. Regardless, it's certainly not binding on this court. Of course, that's a Section 11 case so there's no scienter element that needs to be pled there and we certainly have what we believe are very strong scienter defenses in this case.

THE COURT: Let me just give you an example. One of the statements - and I'm sure I'm going to butcher it now because I can't find it - but it had to do with Norfolk's adoption of the PSR, right? Is that the right acronym?

MR. BONGIORNO: Yes. Yeah.

THE COURT: It was a statement such as, you

know, we're not going to adopt this PSR without sacrificing safety, something to that effect.

MR. BONGIORNO:  Yes.  Yes.  I have it.

THE COURT:  Leaving aside -- I'm sure you disagree that that's a false statement.  But taking the allegations as true, that that was a false statement, how do you argue that that's not material?

MR. BONGIORNO:  So just to back up a bit, Your Honor.  If it's not material -- we argue it's not material because you cannot show that it's false.  You cannot establish the truth or falsity of the statement.

THE COURT:  Would you acknowledge, then, that if it is false it's material?

MR. BONGIORNO:  Absolutely not, Your Honor, because I do not believe it can be established to be true or false.

THE COURT:  I mean, it seems like you're conflating falsity with materiality.  Those are two different tracks; right?

MR. BONGIORNO:  Very different, Your Honor. And I don't think so and I don't think -- because I'm trying to view it through the same lens that the circuit courts view it, which is can it be established that the statement is true or false, if it can't, then it's not material.  That's how the circuit courts analyze it.

They analyze statements very similar to, if not identical, to these and say the same thing.  So all of those statements that I just went on and on about with all those different circuit courts, those are all statements that the courts say you cannot establish the truth or falsity of those statements.

So saying we're committed to safety or saying what was said here, which is we're going to do it in the most efficient manner possible without sacrificing safety, I don't think that that can be established to be false, regardless of what the facts are.

THE COURT:  Again, given the allegations in the complaint that Norfolk did take many steps through the implementation of PSR to maximize efficiency at the cost of safety, why can that not be used as a way to verify the statement was, in fact, false?

MR. BONGIORNO:  Because I just think the statement is too general to be established to be true or false.

To look at, you know, statements that the Eleventh Circuit has said, we're devoting substantial resources to the problem with improved results and taking a leading role making progress towards compliance, the Eleventh Circuit said, no, none of that is material, none of that is objectively verifiable.  I

think those statements are quite similar to the statement that Your Honor is mentioning.

A lot of times these statements are made in the context of these Eleventh Circuit cases, the Ocwen and the DJSP case, in the face of criticism about the practices that are being dealt with.

In the Ocwen case, they're having all kinds of problems. They have regulatory scrutiny. They said don't worry about it, we've fixed it, we're good now. We have the sufficient process. We're doing this, we're doing that, and they were wrong. It got worse. The expenses related to the regulatory scrutiny got higher and the Eleventh Circuit said, no, not on these statements, these statements aren't good enough.

And, you know, the JPMorgan case from the Second Circuit said the bank's highly disciplined risk management set the standard for integrity and then they were having all these problems with Worldcom and Enron and the Second Circuit said we know that this is important/critical to an investment bank's business that they operate with integrity and we know that they said that they set the standard for integrity and we know that they had all of these problems with integrity as very specifically alleged in the complaint with regard to, you know, facilitating or allowing all these

questionable practices with Enron and I think it was Worldcom, but it doesn't matter because you can say you set the standard for integrity and no one is going to reasonably rely on that because it's not objectively verifiable and I don't think that any of these statements, including the one Your Honor pointed out, are any better in that regard, set any bar that we have to be able to jump over to say that statement is true because they're just too general.

Again, they don't challenge the specific statements we made, the facts that we said about the data that we gave. Most of that was publicly available anyway. So it's objectively verifiable facts is the standard, not the sort of general airy type of statement, Your Honor.

THE COURT: Do you agree or concede that the misstatements, at least the ones that were set forth in I believe it was the attachment to the brief 99-1, satisfied 9(b)? In other words --

MR. BONGIORNO: Sure. Yes, Your Honor.

THE COURT: You're not making --

MR. BONGIORNO: The who, what, where --

THE COURT: Yeah. You're not making a 9(b) argument?

MR. BONGIORNO: Not with regard to the who,

what, where, and when of identifying the actual statements, no.

THE COURT:  Okay.

MR. BONGIORNO:  It's just the component of it which I think is more -- the law is more adequately fleshed out in the PSR in terms of scienter certainly.

THE COURT:  Okay.  I just want to make sure I understood the argument.

MR. BONGIORNO:  Absolutely.

So why don't I turn to scienter, Your Honor, because I think we've covered materiality pretty extensively.  I'm happy to answer any questions, of course.

So for scienter the plaintiffs focus on a few things.  One, the former employees, and we have page after page of former employee allegations.  But those do not establish the scienter of the individual defendants here.  There's almost no connection or even alleged connection between any of them and the individual defendants.

I think there are 20 odd former employees included in the complaint and all but two of them don't say anything about any contact with any individual defendant and most of what they have to say is -- I'm not saying it's true or not true because I have no idea.

I'm not trying to say it's not important to those individuals in what they were doing in their day-to-day jobs either, I'm not trying to diminish their importance to the company or anything like that.

But this is a company that had as many as 25,000 employees.  It's obviously an Atlanta-based company, but has employees all over this half of the country.  Many employees, of course, came and went during the class period.  So we're talking about tens of thousands of employees, some of whom were laid off or furloughed during various points in time and some of whom, you know, were asked to work very hard and perhaps were unhappy about that.  But that does not create scienter at the corporate level at the corporate offices here in Atlanta, Your Honor.

THE COURT:  How do I consider that when you're telling me, though, on a motion to dismiss?

MR. BONGIORNO:  Well, you don't have to -- you don't have to assume that it's not true or anything like that.  We understand the plaintiffs have the benefit of whatever the pleading burden is here and, of course, you know, the Court will assume things are true. I'm not asking you to not believe them.  What I'm suggesting, Your Honor, is that they don't have the connection to the individual defendants and they don't

allege a company wide practice.

So, again, I'll go to the Eleventh Circuit with Home Depot.  In Home Depot, the confidential witnesses or former employees or however they're described in that complaint were of a much higher level and had much more to say about what was going on with the company's practices.  But the court said, okay, but it doesn't -- nothing they say means that the individual defendants and the corporate-level executives were dictating these practices.

So, you know, if somebody's boss in a rail yard told them to move faster or ignore something, there's no indication that the CEO knew about that, certainly no suggestion the CEO told that person to do that or ever even met that person or their boss.

So for scienter there has to be some knowledge and intent - and, of course, intent to deceive - on the part of the individual defendants or somebody at the company who has authority to do such a thing.  So these lower-level corporate employees, rail-yard employees, carmen, whoever they may have been, they can't establish that.  They have two folks who said that they were aware of meetings.

THE COURT:  I guess that was my question, though.  You're telling me that they're low level, they

don't speak for the company.  Where does that come in on the four corners of the complaint?

MR. BONGIORNO:  Well, it's not alleged that they did so you don't have to take my word.  I'm not asking you to say, oh, I know who they are and whatever, no.  I'm certainly not asking the Court to go beyond the four corners of the complaint to make that determination, absolutely not.

All I'm asking the Court to do is what the case law does and what Home Depot and the Eleventh Circuit did in a number of other cases that we cite which is look at the allegations of the complaint, see what was actually alleged, and see whether it's enough to establish that these allegations rise to the level of scienter here in Atlanta at the corporate offices, and I submit to you that they absolutely do not.  They don't even come close.

The only two former employees who are alleged -- again, I'm sticking to what's in the complaint.  I'm not asking the Court to add to it or subtract from it or anything like that.  There are two individuals who say, well, you know, there were meetings, there were weekly meetings, there were reports.  You know, the CEO, or chief operating officer, asked for reports, they saw reports.  But they do not say what is in those reports

that makes what the company said false.  So there's nothing that they're able to point to specifically that would allow them to establish scienter of the individuals.  So that's the shortcomings of the former employees.

I also want to point out again -- I believe it's the Home Depot case, Your Honor, and it is very important for scienter.  There's not a single allegation of insider stock sales in this case.  This is extremely unusual.  We do these cases all the time.  The folks to my left do these cases all the time.  We almost always see stock sales, sometimes pursuant to 10b5-1 plans and sometimes otherwise, and that helps establish motive on the part of the defendants, particularly if they're not pursuant to 10b5-1 plans.  What the Home Depot case says is we get the benefit of the doubt in this circumstance.  No insider sales decreases the inference of scienter.  So there's nothing here in that regard and I think that that's very important.

Home Depot also says that they can't plead scienter by status and they really do try to do that.  They say this is an important aspect of the company.  These executives were hands on.  This is something they should have known about and, therefore, they must have known about it.  They go so far as to say, you know, the

CEO said that he, you know, was out there in the field and he was talking to people, all of that, and we cite cases that make it very clear that that's not good enough.

You're accusing these folks of fraud. Okay. You're not accusing these folks of negligence or breach of fiduciary duty or some other problem that they may have caused or they may have been a part of that was not intentional. They are accusing these folks of fraud. In order to do so the pleading standard is significant.

I know the Court's familiar with the PSLRA, of course, but that's why it's here and that's why these are requirements of the law and of the pleading standards and that's why, unlike your typical motion to dismiss where, you know, most things will satisfy it and the pleading burden is not particularly high, the pleading burden is quite high here. It's quite high and that's why we have all of these circuit court cases that I'm able to cite to where materiality is decided on a motion to dismiss, scienter is decided on a motion to dismiss, because you have to get over that pleading burden to get to the next stage. They can't do that here.

Another argument they make on scienter is, well, if you spoke about it you must have known about the

topic, period.  Case law does not support that concept. You have to plead more than that in order to establish not just falsity but known falsity.

Another thing they do is they try to rely on the compensation plans and say that the compensation plans gave them a motive to commit fraud because, you know, the better the company did the more money they would make.  If that were enough, Your Honor, there would be scienter pled in every single case against a public company.

The corporate officers of course do better when the company does better.  The shareholders most certainly want that to be the case.  That is not enough to provide a motive.  No one's compensation was tied to the stock price.  No one's compensation was enhanced by timely insider stock sales at high prices right before some announcement of something terrible happened and the stock price dipped.  By the way, that would be tough to argue here because it's not as though even the plaintiffs are claiming that we knew that there was going to be a derailment in February of 2023.

This isn't a typical securities fraud case where, you know, everyone's saying at some point sales were going to fall off and everyone was going to figure out that the whole company was a sham or whatever the case

may be.  This was an unfortunate accident, which I started with, which is being turned into a securities fraud case, but no one knew this was going to happen.

I'm sure they'll get up and say, well, it was inevitable it was going to happen some day because they were cutting safety so much, but that's not true and that's not fair and that's certainly not -- there's no motive here.  There's nothing behind the scienter allegations.

THE COURT:  Do you agree, though, that the allegations relating to the derailment, the vent and burn allegations, could be evidence or is evidence of scienter?

MR. BONGIORNO:  The short answer to the question is, no, Your Honor, but I'm trying to put it in the right rubric to make sure I understand the question.

I'll say a couple of things about the vent and burn.  I don't think that the vent and burn could establish that the statements about commitment to safety were false.  I think their theory on the vent and burn is simply the company wanted to do this and made misstatements to the governor in Ohio so they can get the trains running again.

I don't think that the vent and burn is evidence of -- I don't think they're using it as evidence of a

lack of a commitment to safety two years ago or whenever it is that they say we started no longer having a commitment to safety.  It's another point which is unclear to me how this class period starts or why it starts when it does.  Never mind why it keeps going beyond the derailment.

I mean, there's all sorts of problems with the vent and burn, but I don't view it - and I'm sure plaintiffs' counsel will correct me if I'm wrong - I don't view their theory on the vent and burn that it shows a lack of commitment to safety.  I think their theory is it's part of a common scheme because they were just doing more to try to increase profits and try to hide the motivation behind the vent and burn which was really to get the trains back on the tracks and in doing so they made misstatements.

But I'll say a few things about the vent and burn, Your Honor, and hopefully answer your question in the process.  They try to extend the class period by including these post-derailment statements.  There was a derailment, stock price dropped, one would think that would be the end of the class period.  Instead, the class period goes on longer and the attempt to increase the supposed damages goes on longer by trying to, you know, add to this with the post-derailment incidents.

You've seen our standing argument, I know you've read the briefs carefully so I won't rehash the standing argument for you now.  They do not have standing.  These are two quite different things.  These generalized statements about safety and statements to the governor in the press conference, whatever it was, town hall, in the context of the emergency situation in the middle of the train derailment are two quite separate things.  We cite a number of cases for common scheme and why this is not a common scheme that would allow these -- statements that were made after their last purchase and being part of an entirely separate incident does not give them standing.  So you certainly can and should dismiss those claims with regard to these claims.  Maybe there's some other plaintiff out there that wants to bring these claims.

THE COURT:  Yeah.  My question was not about whether those statements themselves are actionable but, rather, whether the statements could be evidence of scienter as to the general statements about safety.

MR. BONGIORNO:  Okay.  So I don't think so, Your Honor, and I can't imagine how when those statements about -- general statements about safety were being made that two years in the future, 16 months in the future, whenever it was, a statement to the governor

about what was going on in a railcar shows that they didn't have a commitment to safety two years ago when they made that statement.  I think that's fraud by hindsight.  I don't think that they're even really related in that regard and I don't think they show -- if those statements are measurably -- could measurably be true or false, I don't think a statement about the vent and burn could establish the falsity of that statement or the scienter, the state of mind of the individual or the entity making that statement two years prior.  I think that those are too disconnected to help in the scienter analysis.

THE COURT:  Okay.

MR. BONGIORNO:  I'm sorry I didn't answer that question when you first asked it, Your Honor.  I may have misunderstood it.

In any event, on the vent and burn -- and I will wrap up very shortly, I'm mindful of the time.

On the vent and burn, again, no standing, no false statement because they're trying to establish conduit liability and they absolutely can't and we cite cases that say for conduit liability the pleading standard is very high and that there has -- the intent that the statements be disseminated to the market by the conduit and there's nothing to suggest that whatever was

said to Governor DeWine --

By the way, what they alleged was said to Governor DeWine isn't the same thing as what Governor DeWine actually said which they say was false.  So there's a very important disconnect there between the temperature was volatile and it was increasing and what Governor DeWine said which is a dramatic increase in temperature.  I'm not asking you to decide what was or wasn't said to Governor DeWine.  I'm only asking you to take at face value what's in the complaint which is not that anybody from Norfolk Southern said to Governor DeWine that there was a dramatic increase in temperature because that's not in the complaint.

The requirement for conduit liability is that we intended that the conduit repeat the statements to the market, that's what the case law says.  There's no basis to even say that we intended to do anything with it other than act on it with regard to this emergency situation.

So I don't think there's a common scheme that gets them there so they don't have standing.  I don't think there's conduit liability there.  Typically conduit liability is a statement to an analyst knowing that the analyst is going to publish a report and investors are going to rely on it and the stock price is

going to go up.  I don't think anyone was thinking about the stock price when they're trying to figure out what to do with these cars.  I also don't think there's loss causation, that's in our brief as well.

With that, I'm at 9 minutes left.  I will sit down.  Thank you, Your Honor.

THE COURT:  Thank you very much.

MR. DAVIS:  Good afternoon, Your Honor. Jason Davis of Robbins, Geller, Rudman & Dowd for the lead plaintiffs.  If it please the Court, I'd like to guide my argument with a PowerPoint presentation today.

THE COURT:  Sure.

MR. DAVIS:  May I approach with hard copies?

THE COURT:  Yes.  You can give that to Ms. Brye and she'll hand it over.  Are we not able to get it on the screen because of the Zoom?  Multiple copies?

MR. DAVIS:  It's extra paper copies, Your Honor.  I'm going to be speaking from the electronic copy and I'll use that to guide my argument today.

THE COURT:  Go ahead.

MR. DAVIS:  Thank you, Your Honor, for holding oral argument today.

Like my friend represented, the defendants, I'm going to attempt to simplify some of the complexities before the Court by focusing on two key themes.  The

first is materiality and the second is scienter which my friend representing the defendants primarily focused on this morning.

So as to materiality, Your Honor, we would ask the Court to reject the defendants' arguments that statements concerning the manner in which a company is implementing its core operating plan and doing so without sacrificing safety is immaterial or puffery as a matter of law for one simple reason and that is reasonable investors, whether they're investors in a railroad company or an airline or a coal mining company or an oil drilling company, are imminently reasonable in relying upon management's repeated assurances that they are prosecuting and executing an operating business plan that does pursue profits but not at the expense of safety.

The reason why investors are imminently reasonable and that these are reasonable commercial expectations is because, as the cases show in our papers, the consequences of management pursuing short-term near-term profits while relegating safety to second, third, fourth place in the corporate business plan are catastrophic.

We cite these cases in our papers.  It's Transocean and Massey and Norfolk and Judge Thrash's

opinion in ValuJet.  All of these decisions stand for the proposition that reasonable investors in industrials consider safety important.  And, of course, the Norfolk Bondholder case that Your Honor mentioned and of course has read reached that very same conclusion on substantially similar facts, as the Court noted.

As Magistrate Judge Cave explained, it's Norfolk Southern's repeated emphasis on safety.  The importance of safety to its continued viability as a company that makes these statements material or at a minimum, most importantly, doesn't allow the Court to dismiss them under well-established materiality standards at the pleading stage.

So what's important and one of the reasons we would invite the Court to rely on the Norfolk Bondholder case, even though it's from a different district, is that as this comparison demonstrates to the Carvelli case from the Eleventh Circuit, what's happening in the Second Circuit and Eleventh Circuit is identical in terms of the legal standard that is applied to assess whether statements are puffery.  It's unsurprising that both courts are applying the same statements, Your Honor, because the standard for materiality traces back to the U.S. Supreme Court's decision in Basis, Inc. vs. Levinson and even further back some would argue.

But what's important for present purposes is that the articulation of the standard is clear and that is courts will not dismiss statements on puffery grounds unless the statements are so obviously unimportant to a reasonable investor that reasonable minds could not differ.

THE COURT:  How do you define "unimportant"? Certainly everyone would say safety, of course, is important to a railroad.  But I think the argument is that, of course, that statements are always made and it's almost, you know, sort of becomes white noise, right, because those -- you know, emphasizing safety is something that the industry will always make and so at some level it becomes sort of a nonfactor when it comes to making investment decisions because nobody's not saying that safety is important.

MR. DAVIS:  Thank you for the question, Your Honor.

Two things.  One was the market practice and the second was how does it work in this particular case and I'll take it in reverse order.

So it's important in this particular case -- because as we know Norfolk Southern's a railroad company --

(Off-the-record discussion)

MR. DAVIS:  Norfolk Southern is a railroad company.  It's been around for over 100 years and in 2019 they adopted a new business operating plan, this PSR operating plan.

THE COURT:  Right.

MR. DAVIS:  They linked the execution, the implementation of this business operating plan, which had a reputation in the market as a cut-to-the-bone strategy, to their manner, their special manner of implementing which is that they were going to do it without sacrificing safety.  So we would submit, Your Honor, that investors who are looking at a company that's been operating one way for over 100 years, they're going to change the way they do business, in that context, safety takes on heightened importance.

As to the question of the market practice around safety, we don't have all of the other railroads in the court today, Your Honor, and the defendants, respectfully, have gone way outside the four corners of the pleading in trying to introduce comments by these other railroads.  But to the extent that the Court considers them, that's fine.

We would submit, Your Honor, that it's establishing the reasonableness of investors in investing in these different companies.  They have to

make a decision.  They're going to allocate capital, perhaps, to an industrial concern and if there's one company that is not saying they're going to operate safely, that's going to be a ding against that company, and perhaps that's the reason or one of the manners in which they're all competing for capital, which they are, from my client and other clients.

So we would submit, Your Honor, that in that context which is important, you know, safety is going to be very -- is going to have heightened significance to investors and we would submit --

THE COURT:  So are you saying that for the purposes of this case the statements -- the context, the crucial context, is the implementation of the PSR, that it's not general statements about safety?

MR. DAVIS:  That is precisely correct, Your Honor.  It's really the relationship that's important. There's a relationship here.

The company is embarking upon a new operating strategy, they're hiring new senior management to execute it, and there is awareness in the market it's a cut-to-the-bone strategy.  But management is going out to the market and even to Congress and saying don't worry -- in substance, don't worry.  We're implementing this plan without sacrificing safety.  So Your Honor is

correct.

What's different -- one thing that's different in this case is these aren't single words that were plucked out of documents.  They're making these assurances in context and that's what we think makes the statements particularly important.

On the subject of materiality that Your Honor highlighted earlier, there is a temptation, it seems, on the part of the railroad to conflate materiality and falsity and they, in substance, we would argue, have conceded falsity by focusing exclusively on materiality.

But one thing that we learned from the case law all the way up to the Supreme Court, and this subject came up two weeks ago at oral argument before the Supreme Court, is that the Supreme Court is loathe to put materiality in a box, is loathe to create categorical rules around materiality which is why the standard -- the so obviously unimportant standard is so permissive and expansive and that traces all the way back to the Supreme Court and the statute itself, as we explain, because when we look to the statute, Section 10b and its implementing regulation 10b-5, it doesn't say the statements -- it says that the statements need to be false or misleading in the circumstances.

So even the rule and the statute itself asked the courts to consider the surrounding circumstances in much the same way that closer to home now, Your Honor, the Northern District of Georgia considered in the ValuJet case and its twin case Equifax which, again, Judge Thrash also considered.  In both of those cases, in much the same way that Magistrate Judge Cave considered the repeated nature of the statements, the relationship of the statements to the business operations.  In the case of ValuJet, they're saying that they're safe and that they're pursuing profits without, you know, sacrificing operational integrity we would submit supports this broader analysis that does consider context.

As to the ValuJet case, you know, Your Honor mentioned one of the statements that the defendants made -- paraphrasing, you know, PSRs is about operating efficiently without sacrificing safety.  We see some of the statements that the court considered in the ValuJet case and they were similar in some ways.  They said their paramount goal was profitability while maintaining operational integrity.  At the same time they're out there telling the market that they're operating safely or certifiably among the very best in the airline industry.  So context does matter.  Context of the business plan.  Context of what the company is doing.

What is the relationship to the concept they're conveying to the core of the business?

Returning to the Equifax decision.  In that case the court was considering the importance of cyber security.  Now, if the case focused on a railroad company, investors might not care as much about cyber security when focused on a railroad company.  But when we're applying it to a data company that holds the private information of nearly every U.S. citizen, it takes on a different level of importance and this is consistent with reasonable commercial expectations.  If you're sitting down to invest in a company, a data-driven company, you're going to care about cyber security.  If you're sitting down to invest in an industrial concern, maybe you care, probably not as much, and that's why the statute and the case law and the standards are so helpful in this regard, Your Honor.

You know, a couple of other things that I just wanted to say.  As to the Carvelli case and the Ocwen case and the DJSP case that counsel referenced, you know, these cases are mortgage companies essentially pushing paper, they're talking about training, and it's hard to dispute what the Eleventh Circuit is saying in those cases.  Who really cares what the training is in a paper-pushing company?

But when we look at Transocean and the Deepwater Horizon explosion that occurred in part because the absence of safety training, investors are really going to care about those types of things because training -- the absence of training doesn't result in a paper cut. It results in multi-billion dollar damages which is what you have here in this case.

My friend also talked about scienter and I'll transition to that now. I'd just like to talk about two cases, one my friend mentioned and the other that sets the standard for all of us. The case that sets the standard, of course, is the Tellabs opinion that Justice Ginsburg penned.

What we learned from Justice Ginsburg is that in analyzing these complaints in determining whether there is an inference of scienter, it is important to take a couple of things -- to take note of a couple of things. The first is that, as the Court alluded to, we always accept the facts as true as pled and draw all reasonable inferences in the plaintiffs' favor.

In addition, Justice Ginsburg teaches me that we don't need to look or present evidence pre-discovery of the smoking-gun variety. Rather, circumstantial evidence is sufficient. The court critically also teaches that it's important not to consider every single

fact as though applying the Federal Rules of Evidence on a bit-by-bit basis.  But to look at all of the facts in their totality in much the same way that we look at a painting and take a step back and ask ourselves holistically would a reasonable person think there's a 50/50 chance that the defendants knew about the subject matter.

The second case I wanted to mention is the Home Depot case that my friend was talking about and we think that case is actually helpful to us and it helps operationalize Tellabs in the Eleventh Circuit.

The Home Depot case explained that plaintiffs in securities fraud cases can establish this 50/50 inference in a number of ways especially where, as here, we have company wide conduct.  I'm going to talk about the company wide conduct briefly and then the two methods for establishing scienter.

So the company wide conduct in the Home Depot case -- basically there were six CWs, to be precise. Five of them were, quote, clerks or people who worked at a store level and the Eleventh Circuit --

THE COURT:  You said what?  CWs?

MR. DAVIS:  They were called confidential witnesses who once worked for the company but no longer did parallel to the FEs in this case and the Eleventh

Circuit credited all those allegations and said, yes, these are sufficient to establish for pleading purposes that there was company wide conduct.  It was not sufficient to allow the scienter inference for different reasons that I'm going to get to in a moment.  But the court did recognize two circumstances where company wide conduct could be inferred to support the scienter inference.

The first is what I'll talk about first in this case and to quote Mizzaro, the Home Depot case, they explain that some frauds, quote, undeniably require the participation of senior management.  The way that the court is looking at the facts in that fact pattern is from the point of view is are there facts suggesting that management was orchestrating the disputed conduct?  Here, we have those kinds of facts in multiple forums.

First, after the East Palestine derailment we have the CEO of the company admitting, in response to testimony, that PSR had a near-term focus solely on profits.  In addition, we have the chairman of the board, former CEO Squires, explain that the PSR playbook was to drive down costs.  Of course, Defendant Squires, Shaw, and Sanborn are paid handsomely to do so.

My friend made an argument about motive and stock sales.  As the complaint explains, a sizable percentage

of the compensation of these individual defendants was not tied to how does the company do overall generally. Rather, it was tied to operating income and operating revenue and those two metrics, Your Honor, are the way that they measure how much they're driving down those costs in implementing PSR.  PSR and the financial incentives are directly linked.

Now, an argument has been made in the papers suggesting -- and I don't want to put words in my friend's mouth -- but suggesting that perhaps Mr. Shaw didn't admit before Congress that they did focus on near-term profits at the expense of safety.  So what we've done, just to dispel any question about that issue, is prepared this short clip of the question.  I think it's about 30 seconds and I'll play it now.

(recording played)

MR. DAVIS:  So we submit, Your Honor, that that is as our facts consistent with the Mizzaro opinion and consistent with the Tellabs analysis that's tending to show that defendants are orchestrating the PSR plan with a view to - with a view to increasing short-term profits.

Now, the question is -- the other piece of the equation is, well, where does safety fit into this plan? On that point the complaint alleges -- the complaint

alleges -- excuse me.  The complaint alleges and provides information that Shaw gave to the NTSB when they were investigating the East Palestine crash.  What he told the NTSB was that PSR had downgraded safety to fourth place and this message was placed in written materials distributed throughout the company which shows it's part of a company policy.

What's more, Mr. Shaw visited the employees in the field and learned from them that this message really, really frustrated craft employees.  But there's much more than that because the other way that plaintiffs can establish the scienter inference through Mizzaro and Home Depot line of thinking is that plaintiffs can show, quote, "That the defendants," quote "must at least" -- "The plaintiffs must," quote, "at least elect some facts showing how knowledge of a fraud would have or should have percolated up to senior management," end quote.  So we refer to that as sort of the percolated-up branch and, of course, these two lines of thinking, the orchestrated and the percolated pieces, under the structure of Tellabs should be considered together as part of a holistic analysis.

On this percolated-up branch, we have not just six former employees, as was the case in Home Depot, but, rather, 22 and a number of craft leaders who are

leading the unions who represent the craft employees at Norfolk Southern which is significant because, as the record reflects, 80 percent of the company's employees are in those craft unions so they're representatives of them so their testimony should -- their facts should be given considerable weight.

In addition, there's information from the corporate headquarters -- I just want to take a step back and summarize some of this. It goes on, as my friend mentioned, page after page after page in the complaint because the PSLRA wants to provide that detail. But fundamentally what it demonstrates is the relationship that we were talking about in the context of materiality, that there was -- there's a before and after experience of all these employees at the company.

Before PSR, safety was managed one way. After PSR, it was managed in a different way. And what are the particulars? Well, to start off, in executing PSR management fired 40 percent of the people working at the company. Unfortunately for investors, this was not lawyers like me or paper pushers. Rather, it was the muscle of the company that is executing all of the safety apparati that make the railroad safe.

Who are these people? That includes carmen, they're responsible for inspecting the individual cars

before they leave the rail yard.  This includes plumbers and pipefitters who are responsible for making sure the gas and the steam moves cleanly through the locomotive engines.  This includes the maintenance workers who are conducting other operations on those locomotives.  It includes track inspectors who are looking at the tracks to make sure that they are laid cleanly and safely.  And we're not talking about small numbers here, Your Honor.  We're talking about these groups of people being decimated, 80, 90 percent.  We have information in the complaint demonstrating that.

What is happening as a consequence of all these things -- to give another -- all these things, not just the cut in employees, but as my friend mentioned, at the same time that they're cutting the muscle that executes the safety, they're doubling train size, they're increasing the speed of these trains.  Because they're cutting the number of people who conduct inspections and they're increasing the speed of these trains, there's simply less time, straight math, to conduct safe inspections and that's one of the things that fall by the wayside.

Speaking of wayside, prior to PSR what we learned from some of the employees is the company had actually employed really great technology that would capture some

problems after the trains left the rail yard.  So this technology is called wheel-bearing detectors and very simply, Your Honor, all that is is technology that's installed at 10, 15, 20 miles along the track and it shoots infrared detectors up at the wheels and the wheel bearings and then what it can do, prior to PSR, is sound a message that there's a spike in a wheel which is a problem.  If there's a big temperature spike, the bearings could be malfunctioning and you're going to have a derailment.  What it could do is communicate that information immediately to the engineer who's driving the train, the conductor who is making sure, you know, the operations are going smoothly and that's what happened before PSR.

So if the folks who are driving the train are aware that they're transporting gas and petroleum through Atlanta and there's toxic chemicals back there as well and they get that temperature spike alert they can slow that train down and go take a look.  That's what they did.

After PSR, the folks realized they were getting fewer alerts and what happened is corporate at headquarters silenced all of the alarms across the entire network.  You would think they sent the alarm to corporate headquarters to a gigantic team of people who

are responsible for monitoring this, but that would be a mistake, because all those alarms actually went to one person named Rambo who in a 12-hour shift had to review 300 alarms a day.  One of the reasons that the temperature-spike alarm never went to the crew before the train crashed in East Palestine is because Mr. Rambo was attending to three other alerts at the same time and he just missed it.

THE COURT:  Is all of this -- I know the part that you just mentioned is in the complaint.  Is the other part about that technology that was used before the PSR?

MR. DAVIS:  Yes, Your Honor.

So there's detailed allegations in the complaint around the hot wheel-bearing detectors and there's factual information from folks who say prior to PSR we used to get these alerts two or three times -- I don't know if it's a year or during a certain confined time period.  Then after PSR they started not to get any and what they learned after that is that the alerts had been silenced.  Does that answer the question?

THE COURT:  Yes.  I just want to make sure we weren't going outside the complaint.

MR. DAVIS:  Yes, Your Honor.  There is extensive discussion of the hot wheel-bearing detectors

in the complaint, Your Honor.

So the question becomes -- you know, in these circumstances -- before proceeding, I just want to compare and contrast what's going on in Home Depot with what's going on here in Norfolk Southern.

In Home Depot, the Eleventh Circuit really applied very thoughtful, commonsense analysis and they said, look, these -- okay.  Fine.  There's company wide conduct here, but what is the conduct?  They're basically overcharging some vendors and it makes maybe the numbers look better at the store level.  They were saying, look, the low-level employees could have been doing this by themselves and we can't see a reason why they wouldn't.  That is the opposite of what's going on here.

The company employees of a railroad, number one, are not firing themselves and, number two, they most certainly are not themselves reducing safety standards that make it more likely that they're going to get hurt or they're not going to be seeing their families at the end of the day and I think that's an important fact to keep in mind.

But how would this information have percolated up beyond just merely being a company wide scheme?  Well, we learned from more testimony that -- from Shaw that,

you know -- actually, I believe this information from Shaw is actually not testimony but from an NTSB interview.  He explains that the craft employees will express their concerns directly to him.  Sanborn does provide testimony that these employees in the rail yards express their safety concerns directly to her.

So they're talking -- they're not saying the employees are telling us there's not a problem with safety.  They're saying they're expressing their concerns directly to us.  We think we're done under Mizzaro on that alone, but there's far more facts than just that, Your Honor because, in addition, there are corporate employees cited in the complaint who refer to revenue history reports and realtime daily movement traffic history reports that go to Shaw and Sanborn.

You know, very simply stated, as you would expect, you know, these railroad executives are getting reports every day, volume of cars, amount of money, time in terminal, length in train, the train's movements, all leading to the conclusion that these executives are seeing reports and it's obvious, given the length of the train, the amount of time that they're at these different stations, that there's very short inspections.

What we learned is the inspections per car per side of car by these carmen is 30 seconds.  This all

came out after the East Palestine crash and it was pretty much universally understood that that's not possible to do an appropriate inspection in that time.

We also have these Key Risk Indicators quarterly board reports that are mentioned in the complaint and we note that Squires and Shaw sat on the board and one of the individuals responsible for putting these together explained that there was a refrain to operate longer and leaner and operate longer investor trains. Management did not seem to be concerned with how long is too long or how fast is too fast to run a train.

Again, these are the dangerous conditions and shows a manner in which they're percolating up to management and I think this goes even further than what the Mizzaro court requires which they were talking about mechanisms, methods --

(off-the-record discussion)

MR. DAVIS: Mechanisms and methods of information percolating up. But we don't need to rely just on these reports because we know from the June 14, 2022, testimony in front of the House at a hearing titled "Examining Rail Safety," end quotes, which backed the materiality discussion, if I'm an investor and before the hearing I think safety's puffery, when the United States Congress starts looking into safety of my

railroad I'm going to care even more.  So this is consistent with context analysis that we were talking about earlier.

What we learned from this hearing is one of the union reps talks about there not being enough time to examine the rail cars and then he refers to a Norfolk Southern document that's discussing these short times in which these carmen are supposed to conduct their inspections on the rail cars and he says, quote, "Not enough time," end quote.  What do we know?  We know Sanborn's testifying at the exact same hearing and that's another manner in which these dangerous inspection practices are percolating up to management.

But there's more than that.  Similar to the ValuJet opinion, we have letters from the FRA that are cited in the complaint where the FRA is writing to Squires and is writing to the CEO, Shaw, and they're reporting significant deficiencies in safety and employee fatigue and concerns about the adequacy of inspections.  We don't need to belabor the details.  The point here is similar to ValuJet.  It's another mechanism by which these dangerous safety practices can percolate up.

Now off to a document that they want the Court to consider in their RJN that we think actually helps us.

When the Federal Rail Administration examined and conducted an audit on the railroad they examined thousands of railcars and they found 16 percent of cars had inspection deficiencies and when they examined hundreds of locomotives they found 69 percent of the locomotives had inspection deficiencies.  Of course this is the outcome where there's not enough people to conduct inspections.

It's important, I think, also to keep in mind that we're talking about a system where pulling out different pieces of safety has an impact on the safety as a whole.  Off to statistics because there's more information that percolates up.  In the record we have a statement in the 2022 annual report from Shaw where it says, quote, "We measure employee safety performance through internal metrics such as accidents."

What did we learn from statistics?  From the 2018 to the 2022 period accidents at Norfolk Southern went up 65 percent.  What is more, they went up more than any other railroad at the Class I level.  Again, another piece of the puzzle.  Other former employees at the company recount senior daily conference calls on safety. Shaw and Sanborn attended these calls from time to time.

Continuing the question of scienter and the relevant inference and focus on the question the Court

posed, Your Honor, to my friend around what is the relevance of this vent and burn situation.  We submit, Your Honor, it is one of the most powerful pieces of scienter inferences.  Granted, it came late in the class period, but it's so detailed and it shows how the company is implementing PSR.

How does it show that?  It shows it because it demonstrates that even with the focus -- the focus that was on the company at the time, the CEO of the company flies in and the company decides that they're going to detonate five railcars when it was unnecessary to do so, as they learned in realtime from the folks who manufactured both the railcars and the contents of the railcars company, a company called Oxy Vinyls, who is the largest manufacturer of vinyl chloride in the United States, and they have their top people helping out Norfolk Southern over the weekend.  They told them, look, you cannot have this runaway polymerization reaction occurring in these cars unless you have this massive run up in temperature.

So what happened is the Norfolk Southern employees took the temperature of the cars, five cars, and as to the first four cars, which were much further away from the fifth, they just stopped taking their temperatures for seven hours because they were so low.

They were 65 degrees.  There was no worry about those ever blowing up.

As to the fifth car that's up against a hopper car that's still warm and is transmitting heat, the temperature in that car reached 138 degrees or 139 degrees at its max and overnight -- over Sunday night into Monday morning it fell 12 degrees.  What the Oxy Vinyls' folks explained to Norfolk Southern is the science is clear you cannot have polymerization where the temperature goes up and down, first and foremost, and you certainly don't have polymerization when the temperature is declining overnight.

This is all in the NTSB report and in the complaint we cite extensive testimony and interview commentary by Paul Thomas who was the top person at Oxy Vinyls.  He just said when he finally got all the temperature data from the company it was conclusive evidence that there was no polymerization.

THE COURT:  How does that qualify as scienter knowledge as to the representations that were made two years prior?

MR. DAVIS:  This would not be - this would not be complete and I wouldn't argue this would be sufficient standing alone as to all of those.  Under Tellabs, we would invite the Court to consider it as one

piece of the puzzle and the argument and our theory, Your Honor, is simply stated that it is an example.  I think that's the best and fairest way to describe how this fits into the overall PSR and safety theory that we have and we believe that a reasonable jury could look at it as such.

We have a statement from then Senator Brown on the vent and burn where he says, quote, "This explosion which devastated so many was unnecessary.  This is more proof that Norfolk Southern puts profits over safety and cannot be trusted," end quote.

This is the idea.  The idea is that, you know, if this case were ever to go to trial a reasonable juror may not rest the entire finding of liability on this one example, but it's just an example that makes it more likely than not that the defendants did, in fact, operate PSR sacrificing safety which is the fundamental theory of this case and one that we think Magistrate Judge Cave considered rightfully and we would invite the Court to follow that.

There are a number of other technical arguments that I'm happy to address, but we think with these two pieces in place all of these other questions will be much easier to answer, Your Honor.

THE COURT:  All right.  But you're also

contending that the vent and burn statements are actionable in and of themselves?

MR. DAVIS:  This is true.  I'll start with the simplest one.  I'm starting with big picture and this is sort of less big picture.

So the simplest statements that we have are Monday, February 6th, from an employee, Scott Deutsch -- and I do think it's important to clean up some potential confusion around what is the doctrine as to that statement.

First and foremost, we want to say that the theory here is Deutsch leaves a meeting with Sanborn and other first responders.  They give these first responders 13 minutes to authorize the blowing up of these five tank cars and then Deutsch leaves that meeting and goes to make the statements in question.

You know, we could have named him as a defendant. He did make a statement.  But, you know, our view is that the big boss, Shaw, really is responsible here and we don't have to name Deutsch.  The legal basis for that is simply respondeat superior and I believe, actually, the -- I think the Home Depot case does discuss this subject a little bit, that there could have been other folks who are not named defendants who could still give rise to liability to Norfolk Southern.

We do cite the China Cast opinion.  Granted, it's out of the Ninth Circuit, but the reason it's helpful is because it cites a bunch of cases from the different circuits discussing that.

The theory of liability for Mr. Deutsch specifically is just very straightforward made a statement in respondeat superior, that's the wrinkle on top of that one statement.  So there's a question or a dispute as to what he actually said.  So it seems like that's a good place to resolve -- to start the inquiry, what did he actually say.

From our reading, and counsel put the entire transcript of the statement in the record --

THE COURT:  Right.  I know there's a dispute about the context in which he said it and was he sort of assuming facts from the governor's question or not, I understand that.  I guess my question is more from a legal analysis how can that statement -- even taking your interpretation of it, how can that be actionable given that your clients had purchased -- had not purchased stock in, what, the two years prior to the statement?

MR. DAVIS:  Forgive me, Your Honor.  I wasn't listening carefully enough.

So the question is standing.  We're talking about

due process and the capacity of an individual representative to represent the entire class, that's like the big idea, and the defendants don't dispute -- we don't dispute that our clients purchased -- stopped buying stock before that period.  I think they mentioned a couple of months, that sounds about right.

What they don't mention is that -- they don't dispute that our clients have standing to represent all of the investors who purchased up to Friday, February 3, 2023, which is when the last safety statement was made. The reason that's the case is because the case law is clear that individual lead plaintiffs have standing to prosecute a case on behalf of everybody provided it's a common scheme or a common plan.  We allege, as we've just laid out, that the vent and burn and the statements were part of a common plan or a common scheme.

So if the Court agrees with the plaintiffs that there's a close enough fit between those statements and the others, then we do have standing.  If the Court reached the conclusion that this has nothing to do with PSR, then it might fall, what my friend is inviting to do, but I think that lays out the analysis.

THE COURT:  So it rises and falls on whether it's part of the same course of conduct on the previous just general safety statements?

MR. DAVIS:  I think at a high level that's fair.  We cite a couple of cases and it's sort of a technical analysis and we would respectfully request the Court consider some of the case law on that subject.

And, yes, the Court has to exercise some judgment, of course, as to the relationship between the two.  On the cases that my colleague cites where the courts come out the other way, sometimes you have a piece of the case that counsel are advancing like a separate subclass, it's a different statute, these kinds of things, but we don't have that here.

We're not making this argument after the fact. We obviously didn't know they were going to make this argument in drafting the complaint and the complaint speaks for itself in terms of connecting the common scheme to PSR.  I think that answers the Court's question.

THE COURT:  Yes.  Thank you.

MR. DAVIS:  I'm done with my presentation. If the Court has any additional questions I, of course, invite them.

THE COURT:  I guess one question is how do you respond to the point that was made about -- that there are no insider stock sales in this case and is that -- how does that impact the analysis, if at all?

MR. DAVIS:  It doesn't impact the analysis at all for a couple of reasons.  They were saying that there's no stock sales and this relates to motive. Motive and opportunity, actually, is a little bit of an outdated way of demonstrating scienter and so it's become less common.

The other thing that's happened that's really important, Your Honor, and my friend mentioned it briefly, is the SEC passed basically a statutory safe harbor for executive trading under 10b5-1 plans and it's under that safe harbor when they're making those trades and my understanding, it's not in the complaint, and I'm not 100 percent sure -- my understanding is like all executives in these big companies, they execute these 10b5-1 plans, and it's very difficult to demonstrate insider trading once they've done that

Now, from an academic point of view, I think those cases are very, very mistaken because the executives under the 10b5-1 plans can set up a plan when the stock is going to be sold, let's just say by robots or robotically sold, so they don't control the sale. The problem is they control the timing of when the information gets out.

So, for example, if there's a 10b5-1 plan and they're going to sell in the next 12 months, but they

know there's a problem with the company -- you know, I would argue it's insider trading if they don't release it and they have an incentive not to release it until the end of that 12-month period when they're done selling.

But this is all academic at this point.  We think that certainly there's plenty of case law that says, you know, the presence or absence of insider trading doesn't negate scienter and we go back to the, you know, Home Depot case that lays out the structure of what is sufficient, and we think we have more than enough facts under Tellabs and Home Depot for that purpose, Your Honor.

THE COURT:  Okay.  Thank you very much.

MR. DAVIS:  Thank you, Your Honor.

MR. BONGIORNO:  Just a couple of quick points, if I may, Your Honor.

THE COURT:  Sure.

MR. BONGIORNO:  My friend here knows the law very well and it's interesting that he says motive is outdated and it doesn't matter.  I wish that they believed that when they drafted the complaint and when they drafted their opposition to the motion to dismiss because, again, they're accusing my clients of fraud and they're saying they have a motive to commit fraud.  You

don't have to look any further than Page 30 when they talk about the compensation structure and how defendants' compensation was based on PSR, focused solely on profits, etcetera.  They're clearly arguing that we had a motive to commit fraud.

They can give the Home Depot case the back of their hand when it's convenient, but the Home Depot case makes very clear that a lack of insider sales goes against a finding of scienter, and that's the law in this circuit and it's certainly good law and that's what we have here so I just wanted to clarify that point.

We didn't talk about the NTSB report because it's improper, it shouldn't be before this Court.  It got mentioned in the slides that I saw for the first time this afternoon.  I'd ask that the Court ignore that report because it's not proper to be before the Court.

With regard to -- you heard two different things about the inspection times.  You heard this 1 minute and 30 seconds per side, etcetera.  You heard we found out about this for the first time in the wake of the East Palestine derailment so this was some sort of revelation we had hidden that we had done this.  This is one of these, you know, terrible things that happened we only learned about after the fact.

But then later in these slides you heard about

testimony before the Senate in the middle of the class period about this 1 minute and it's in the complaint. It says it right there in Paragraph 93 of the complaint. Union Representative Grissom testified about the inspections per side June 14th, 2022.  So that wasn't a big post-class period or post-derailment revelation being hidden from the market.

By the way, we never said anything contrary previously which is why we spent so much time at the beginning of the argument talking about what are objectively verifiable statements and what aren't. There was no statement that was contrary to that.  The only statement during the class period we heard about today about inspection times was in the middle of the class period and it was the same thing we heard at the end of the class period, that's not securities fraud.

The same thing with this notion of, oh my gosh, safety was fourth or fifth on a list of priorities, by the way, priorities -- and, again, you heard that was, you know, something that a confidential witness said or post-class period.  Paragraph 80 of the complaint says it twice, that it was mentioned in 2019 in an investor day call and it was mentioned again later for key disciplines, including safety and five core principles, including safety.  So these are not post-class period

revelations that shocked everybody after the fact and established that there was some objectively verifiable fact that was false that was said by the defendants during the class period.

He also, understandably, gave the back of his hand to Eleventh Circuit precedent on what is and isn't material.  He described the defendant companies in these cases that came out in favor of the defendants as paper pushers and mortgage companies and who cares about what they were doing and whether and not that mattered.  You know, you've got four pictures of explosions on the screen and that's -- you know, that matters.  But the investors in the companies that were supposedly defrauded in these other cases, they don't matter.

This is not a personal injury case.  This is not an environmental case.  This is not a tort case.  This isn't about whatever happened to the folks in Ohio and Pennsylvania as a result of the derailment.  This is about investors.  Investors in a mortgage company care about compliance and investors in a bank care about integrity.  Federal Circuit courts have said, yes, those things are important, but statements made about them that are not specific and are not objectively verifiable are not material, period, paragraph.

So he can get up and say -- and I understand why

he is saying it, he's a very good advocate -- that safety is important to railroads and they're making statements about safety.  It's the same thing.  Safety is important to a car manufacturer and its investors, airy statements about we are a worldwide leader in safety, Ford.

Statements by a mortgage company.  In the face of regulatory scrutiny that we're doing all of these things, we're training, we're now going to be compliant.  Our, you know, expenses associated with the regulatory scrutiny are going to go down and then they don't and the Eleventh Circuit says not material.

THE COURT:  Well, I guess the counterargument is, right -- again, we're not talking about these 10,000-foot-level general statements about safety.  We're talking about the context which is as a company as a railroad we're making a shift.  We're changing our business model.  We're implementing PSR.  So, investors, listen up.  Things are going to be changing.  We're changing our priorities.  We're going to be doing business differently now by adopting this model.  But don't worry, safety is still our priority.  None of this is going to be at the expense of safety.  Investors are making a decision about whether they want to invest in a company that is changing their business

model in this way.  Doesn't that make the materiality question different than just general statements, you know, the sort of, like I said earlier, the white noise of a railroad always saying that they're going to prioritize safety?

MR. BONGIORNO:  Well, that's very similar -- that analysis that you made, Your Honor, is similar to what was going on in the Carvelli vs. Ocwen case.  I keep going back to that not just because it's favorable to us but because it's the most recent Eleventh Circuit analysis of puffery which is what this case is about and what our arguments are about.

In that case, again, they're looking at the same type of situation and they're saying we're devoting substantial resources to the problem with improved results.  So it wasn't just in a vacuum that they were saying that they were devoting substantial resources and it wasn't just, you know, out of nowhere that they decided to talk about this.  They were talking about it in a very specific context and the court said, and I mentioned before, even if the statements were made in bad faith, they have to be objectively verifiable.

So to say, you know, we're not sacrificing safety, there's no way to objectively verify that because it is too general.  We did not say we're not

going to spend $1 less on safety.  We do not say anything specific that they say was false.

In fact, as I just mentioned, the details that were out there during the class period about and everybody knew we were reducing head count, everybody knew we had increased train lengths, and everybody knew the trains were going to be heavier, all of this stuff is out there, so it's not as though there was something that they say that we said specifically that was false.

It's the same thing with Ford and the tires. Tires are exploding, people are dying, and they had to recall.  They had to do all these other things.  They go back and they say, well, what were you saying, and the Sixth Circuit said numbingly familiar statements.

So what was being said here we're not running from the context in any respect, Your Honor, we're very aware of it.  It's just not enough.  Every railroad was implementing PSR.  Every railroad was saying we run a safe railroad and using all these same points.

JPMorgan, the same thing, the context, financial crisis.  Enron, Worldcom, all that.  I won't torture the Court by describing the cases over and over again.  I know I'm out of time.  But we're aware of the context, we understand it, but the statements have to be objectively verifiable regardless.  Thank you, Your

Honor.

THE COURT: Okay. Great. Well, thank you. You had a high bar to make the oral argument match the briefing, but I think both sides managed to do that. Excellent, excellent work.

You've certainly given us some things to think about for sure. I'm going to take the motion under advisement. No promises on when we will get it out. Just rest assured, it's a priority for us. We will do our best to get it out as soon as we can. I am presuming that one side or the other will notify us immediately if the New York case gets ruled upon.

MR. BONGIORNO: You can probably guess which side will notify you depending on the --

THE COURT: Right. Exactly. One side will certainly be anxious to notify me one way or the other. So please do that.

But having said that, we're not waiting for it. We're going to -- when we're ready to enter our order, we will do that. We're not going to stand down, certainly not for the Southern District of New York.

Anything else for us to take up today? No? Thank you all. I know most of the folks in the courtroom have traveled from out-of-town to be here so thank you very much, especially right before the

holiday.  I hope you have a wonderful Thanksgiving.  All right.  We're in recess.  Have a good weekend.

(Proceedings concluded at 1:30 p.m.)

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF GEORGIA

CERTIFICATE OF REPORTER

I do hereby certify that the foregoing pages are a true and correct transcript of the proceedings taken down by me in the case aforesaid.

This the 2nd day of December, 2024.

/S/ Alicia B. Bagley _____
ALICIA B. BAGLEY, RMR, CRR
OFFICIAL COURT REPORTER
(706) 378-4017