## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

BUCKS COUNTY EMPLOYEES
RETIREMENT SYSTEM, *individually and on
behalf of all others similarly situated*,

    Plaintiff,

                v.

NORFOLK SOUTHERN CORPORATION,
JAMES A. SQUIRES, ALAN H. SHAW, and
CYNTHIA M. SANBORN,

    Defendants.

Civil Action No.
1:23-cv-04175-SDG

### OPINION AND ORDER

This matter is before the Court on Defendants Norfolk Southern Corporation, James A. Squires, Alan H. Shaw, and Cynthia M. Sanborn's motion to dismiss the consolidated complaint [ECF 99]. For the following reasons, Defendants' motion is **DENIED**.

## I.    BACKGROUND

This is a putative class action for securities fraud brought by shareholders of Norfolk Southern—a freight railroad company—after Norfolk's stock value fell steeply following a high-profile train derailment in East Palestine, Ohio.[1] The complaint alleges that Norfolk and three of its executives misled investors by

---

[1]    ECF 82, ¶ 24. The amended complaint at ECF 82 is the operative complaint.

paying public homage to safety even as they systematically dismantled the company's safety infrastructure in an all-out pursuit of profits.

### A.    The Allegations[2]

In 2019, Norfolk embraced a new "cut-to-the-bone"[3] operational strategy called "PSR," short for "precision-scheduled railroading."[4] In theory, PSR increases efficiency by (1) reducing staff, (2) reducing assets, and (3) running fewer trains.[5] In practice, PSR requires running "long trains that transport larger and heavier loads with fewer workers in less time."[6] In Norfolk's case, PSR meant increasing the length of a typical train from around 100 cars to over 200,[7] and cutting personnel by nearly 40%.[8] Norfolk assured investors that it was implementing PSR "without sacrificing safety"[9]: In its annual reports,[10] during

---

[2]    The following factual allegations, drawn from the complaint, are assumed to be true for purposes of the motion to dismiss. *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322 (2007).

[3]    *Id.* ¶ 77.

[4]    *Id.* ¶ 531.

[5]    *Id.* ¶ 72.

[6]    *Id.* ¶ 73.

[7]    *Id.* ¶ 135.

[8]    *Id.* ¶ 109.

[9]    *Id.* ¶ 417.

[10]    *Id.* ¶¶ 422, 424, 427, 433, 434.

earnings calls,[11] at industry conferences,[12] and under oath before Congress,[13] Norfolk reiterated its continuing commitment to safety.

But living out that commitment, the complaint alleges, was too rich for Norfolk's blood. In its pursuit of efficiency, the company built out trains to "astronomical lengths," sometimes as long as five miles;[14] loaded them with tens of thousands of tons of freight;[15] and ran them as fast as it could.[16] Train loads were often arranged in violation of federal regulations, with hazardous materials too close to the engine;[17] and without regard for weight distribution, risking more frequent and dangerous derailments during braking (more on that below).[18] Norfolk preferred to staff its trains with "skeleton crews"[19] of just two people—a conductor and an engineer—whose aging, 1.5-mile-radius radios would regularly lose contact with each other.[20] Facing manpower shortages due to aggressive

---

[11] *Id.* ¶¶ 407, 409, 418, 419, 425, 431, 437, 438.

[12] *Id.* ¶¶ 439, 440, 443.

[13] *Id.* ¶¶ 416, 417, 429, 441.

[14] *Id.* ¶ 123.

[15] *Id.* ¶ 139.

[16] *See id.* ¶ 463.

[17] *Id.* ¶¶ 127–128.

[18] *Id.* ¶¶ 124–126.

[19] *Id.* ¶ 116.

[20] *Id.* ¶¶ 129–131.

personnel cuts,[21] Norfolk slashed its training program for engineers, trying to cram what had previously been done in six-plus months into 90 days.[22] Norfolk's conductors were similarly undertrained and inexperienced: rushed in six weeks through what had been a six-month training program,[23] taught by recent trainees with negligible experience,[24] and expected to learn on the job[25] on trains much longer and heavier than they had ever run before.[26] To maximize its man-hours, Norfolk cut its safety program down from three days every year to one day every three years,[27] and replaced its quarterly safety meetings with webinars.[28]

At the same time Norfolk was entrusting increasingly unqualified crews with operating increasingly gigantic trains, it was making those trains increasingly difficult to properly inspect and repair. Layoffs reduced maintenance personnel in some railyards by 90%[29] and, critically, decimated the ranks of its qualified

---

[21]  *Id.* ¶ 141.

[22]  *Id.* ¶¶ 150–151.

[23]  *Id.* ¶¶ 147–148.

[24]  *Id.* ¶ 146.

[25]  *See id.* ¶ 143.

[26]  *Id.* ¶ 154.

[27]  *Id.* ¶ 159.

[28]  *Id.* ¶ 158.

[29]  *Id.* ¶¶ 113–114.

mechanical inspectors, or "carmen."[30] Those carmen who were not laid off were forced into consecutive 16-hour shifts that rendered them unable to "see straight, let alone look at a car."[31] To reduce time spent inspecting trains at terminals, Norfolk pressured carmen to inspect each car in one minute or less (they had before been allotted three),[32] an infeasible time frame that inevitably led to mechanical defects being missed.[33] Norfolk discouraged carmen from reporting defects, rewarding those who did not report with better working hours,[34] and targeting those who did with discipline or termination.[35] Sometimes, cars were sent out despite having reported defects,[36] or without being inspected at all.[37] Norfolk also abused a regulatory exception that permitted abbreviated inspections at terminals where no carmen were on duty.[38] At such terminals, the full carman inspection—consisting of 90 items, administered by a tradesman with at least three years of experience—was replaced by a 12-item inspection for "imminently

---

[30]  *Id.* ¶¶ 180–181.

[31]  *Id.* ¶ 110.

[32]  *Id.* ¶ 163.

[33]  *Id.* ¶ 168.

[34]  *Id.* ¶ 244.

[35]  *Id.* ¶¶ 248, 250.

[36]  *Id.* ¶ 254.

[37]  *Id.* ¶ 167.

[38]  *Id.* ¶ 180.

hazardous conditions" administered by conductors trained, if they were lucky, for 45 minutes on a computer.[39] At Norfolk, this regulatory exception largely became the rule, as cars ran for tens of thousands of miles without being properly inspected.[40] Despite regulations mandating that cars undergo brake inspections every 1,000 to 1,500 miles, and despite Norfolk's own policy calling for car inspections every 3,500 miles, Norfolk cars went uninspected for over 40,000, or 70,000, or in one case 90,000 miles.[41]

Car defects missed by inspections—particularly wheel and brake defects—could theoretically still be caught by Norfolk's "wayside detection" sensors.[42] But Norfolk, seeking to cut maintenance costs, started spreading its wayside detectors further apart,[43] and made it more difficult for crews to respond to wayside detector alerts.[44] Previously, alerts were immediately broadcast to the crew over radio.[45] Norfolk blocked most of those broadcasts.[46] Instead, all but the most critical alerts were sent to a central "wayside desk," manned by a single employee working a

---

[39]    *Id.* ¶¶ 179–180, 183.

[40]    *Id.* ¶ 180.

[41]    *Id.* ¶ 194.

[42]    *Id.* ¶¶ 17, 175, 207.

[43]    *Id.* ¶ 210.

[44]    *See id.* ¶¶ 213–214.

[45]    *Id.*

[46]    *Id.*

12-hour shift[47] who determined whether the crew needed to be notified of the alert.[48] Notifications from the wayside desk fell noticeably after Norfolk implemented PSR.[49] And even when crews did receive notifications, they were often told by their dispatcher to ignore them:[50] to keep a train moving despite an overheated wheel, for example, or a malfunctioning brake.[51]

The alleged emptiness of Norfolk's commitment to safety was laid bare[52] on the evening of Friday, February 3, 2023, when a 1.75-mile, 149-car, 18,000-ton Norfolk train carrying hazardous materials crashed in East Palestine, Ohio.[53] The train that day was staffed by two separate crews: one that took it from its origin in Illinois to Toledo, Ohio; and another crew that took over at Toledo and was operating the train during the crash.[54] They were inexperienced crews. The engineer on the first expressed concern about the size and weight of the train—it was longer and heavier than any he had ever run—but was told to "just take it and, you know, hope for the best"; the conductor on the second crew had only

---

[47]  *Id.* ¶ 231.

[48]  *Id.* ¶ 215.

[49]  *Id.* ¶ 216.

[50]  *Id.* ¶¶ 222–225.

[51]  *Id.* ¶ 228.

[52]  *See id.* ¶ 20.

[53]  *Id.* ¶ 2.

[54]  *Id.* ¶ 160.

eight months of experience.[55] The train underwent an abbreviated inspection before leaving Illinois, but that inspection failed to catch a mechanical defect in a wheel bearing,[56] which began to overheat.[57] The overheating bearing set off a wayside alert[58]—which should have stopped the train[59]—but the alert was missed because the lone employee manning the wayside desk was busy attending to three others.[60] As the wheel bearing overheated to critical levels, the crew were finally notified and the emergency brakes were engaged,[61] but it was too late. The exact cause of the crash is unclear from the complaint,[62] but by the time the train came

---

[55] *Id.*

[56] *See id.* ¶ 192.

[57] *Id.* ¶ 3.

[58] *Id.* ¶ 4.

[59] *See id.* ¶ 220.

[60] *Id.* ¶ 236.

[61] *Id.* ¶ 374.

[62] For purposes of this motion, the Court limits its consideration to the facts in the complaint. *Johnson v. City of Atlanta*, 107 F.4th 1292, 1298 (11th Cir. 2024) ("[A] court generally may not consider matters outside of the pleadings" on a motion to dismiss). After the operative complaint was filed, the National Transportation Safety Board released an investigation report finding that the East Palestine derailment was caused by an overheated bearing. NAT'L TRANSP. SAFETY BD., Norfolk Southern Railway Derailment and Hazardous Materials Release, RAILROAD INVESTIGATION REPORT RIR-24-05 (June 25, 2024), https://www.ntsb.gov/investigations/Pages/RRD23MR005.aspx (choose "RIR-24-05" under "Reports") [https://perma.cc/84MX-FEQF]. The Court takes judicial notice only of the fact that such a report was published. *See Kerruish v. Essex Holdings, Inc.*, 777 F. App'x 285, 293 (11th Cir. 2019) (limiting judicial notice "to determining what happened in the course of a proceeding").

to a stop, thirty-eight cars had derailed.[63] Some of the derailed cars contained combustible fluids that quickly leaked out and erupted into flames.[64] The resulting "inferno"[65] burned for days.[66]

Norfolk's alleged priority in the aftermath of the derailment was exactly the same as before it: keeping trains moving.[67] This included resuming freight service through East Palestine as soon as possible.[68] Service could not resume, however, because the tracks were blocked by, alongside other wreckage from the crash, five derailed tank cars filled with the carcinogenic chemical vinyl chloride.[69] Properly disposing of the vinyl chloride entailed carrying it away on special trucks that Norfolk did not have and could not get without indefinite delay.[70] Instead of waiting on the trucks, Norfolk conducted a "vent-and-burn," that is to say, Norfolk blasted holes in the bottom of the tank cars, drained the vinyl chloride onto the ground, lit the vinyl chloride on fire,[71] and sent it up into the atmosphere

---

63    *Id.* ¶ 4.

64    *Id.* ¶ 278.

65    *Id.*

66    *See id.* ¶ 316 & n.13.

67    *Id.* ¶ 276.

68    *Id.* ¶ 285.

69    *Id.* ¶¶ 20, 281.

70    *Id.* ¶ 361.

71    *Id.* ¶¶ 353, 370.

in a billowing cloud of dark chemical smoke.[72] Norfolk resumed service through East Palestine the next day.[73]

Norfolk allegedly got permission to conduct the vent-and-burn by duping public authorities into believing the tank cars were about to blow up.[74] On Saturday, the day after the crash, Norfolk began inquiring into the possibility that the vinyl chloride inside the tank cars was undergoing polymerization, a runaway chain reaction generating enough heat and pressure to tear the tank cars apart.[75] These inquiries were soon rebuffed: Norfolk was advised by chemical experts at Oxy Vinyls, the manufacturer of the vinyl chloride in the East Palestine tank cars,[76] that the potential for polymerization was "extremely low."[77] Norfolk was further advised that it could know for sure if polymerization was occurring by monitoring the tank cars for its signature sign: a steep, sustained rise in temperature over time.[78] Accordingly, once the fire from the crash had begun to abate—on Sunday, February 5, at 4:00 p.m.—Norfolk took the tank cars' temperatures.[79] It found that

---

[72]  *Id.* ¶ 357.

[73]  *Id.* ¶ 361.

[74]  *Id.* ¶ 21.

[75]  *Id.* ¶ 293.

[76]  *Id.* ¶ 286.

[77]  *Id.* ¶ 293.

[78]  *Id.* ¶¶ 294–296.

[79]  *Id.* ¶ 315.

four out of the five cars were within normal limits (65–67°F),[80] but that the fifth was elevated at 135°F.[81] An hour later, temperatures in the first four cars remained the same, while the fifth's had risen to 138°F.[82] Oxy Vinyls quickly reassured Norfolk that 138°F was "a long, long way[ ]" from danger,[83] and that a 3°F increase over the course of an hour was not consistent with polymerization.[84]

What Norfolk told public officials that evening was allegedly different. Speaking first with the local fire chief Keith Drabick, Norfolk reported that given the observed 3°F increase in one of its tank cars, it believed the vinyl chloride in that car to be undergoing polymerization; and that because all five vinyl chloride cars had been exposed to the same conditions, it believed polymerization was similarly underway *in all five cars*.[85] Norfolk repeated this message to the National Transportation Safety Board[86] and to Ohio governor Mike DeWine,[87] who issued an urgent evacuation notice to those living within a mile of the derailment, after 7:30 p.m. on Sunday evening, warning of a "drastic temperature change" that

---

[80]  *Id.* ¶ 319.

[81]  *Id.* ¶ 318.

[82]  *Id.*

[83]  *Id.* ¶ 323.

[84]  *Id.* ¶¶ 324–326.

[85]  *Id.* ¶ 327.

[86]  *Id.* ¶ 328.

[87]  *Id.* ¶ 330.

could lead to "catastrophic tanker failure," with the potential to launch "deadly shrapnel" up to a mile through the air.[88]

By 10:00 a.m. on Monday, Norfolk had "conclusive" evidence *against* polymerization:[89] It knew that the temperature in the first four tank cars had remained the same overnight, while the fifth's had fallen from 138°F to 126°F, for a 12°F *decrease* over 16 hours.[90] Nevertheless, when Chief Drabick and Governor DeWine walked into Norfolk's on-site command center to meet with Defendant Shaw and other team members a few hours later, they were presented with an ultimatum: either immediately authorize Norfolk to conduct a vent-and-burn, or allow the tank cars to explode.[91] Norfolk claimed that its temperature data showed polymerization to be underway, and that decisive action was necessary given the weather and time of day.[92] The vent-and-burn of all five tank cars was conducted later that afternoon.[93] Subsequent tests by Oxy Vinyls confirmed that no polymerization ever occurred.[94]

---

[88] *Id.* ¶¶ 332, 513.

[89] *Id.* ¶ 337.

[90] *Id.* ¶ 338.

[91] *See id.* ¶ 342–343.

[92] *Id.* ¶ 343.

[93] *Id.* ¶ 356.

[94] *Id.* ¶ 362.

B.    **The Claims**

This case was originally filed by named Plaintiff Bucks County Employees Retirement System.[95] In accordance with the Private Securities Litigation Reform Act (PSLRA)—the statute governing private securities cases like this one—the Court appointed two pension funds to be Co-Lead Plaintiffs: AkademikerPension and Ironworkers Local 40, 361 & 417 Union Annuity, Pension, and Topping Out Funds.[96] Akademiker and Ironworkers together filed the operative consolidated complaint, asserting two causes of action for securities fraud.[97]

Plaintiffs' first claim, under Section 10(b), 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. 240.10b-5, is asserted against Norfolk and three of its executives:[98] Alan Shaw, the current CEO;[99] James Squires, the former CEO;[100] and Cynthia Sanborn, the former COO.[101] The gist of Plaintiffs' 10b-5 claim is that Defendants artificially inflated Norfolk's stock price through false statements; that Plaintiffs purchased Norfolk's stock at the inflated price in reliance on the false statements; and that

---

[95]    ECF 1. The case was originally filed in the Southern District of Ohio, from where it was transferred. ECF 47.

[96]    ECF 77.

[97]    ECF 82. The Court will refer to Akademiker and Ironworkers as "Plaintiffs."

[98]    ECF 82, at 284.

[99]    *Id.* ¶ 32.

[100]   *Id.* ¶ 33.

[101]   *Id.* ¶ 34.

Plaintiffs suffered damages when Norfolk's inflated stock price dropped in the aftermath of the derailment. Plaintiffs' second claim, under section 20(a), 15 U.S.C. § 78t, is asserted against the executives only,[102] and is wholly derivative of Norfolk's liability under Rule 10b-5.[103] Defendants move to dismiss under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim.

## II.    DISCUSSION

To state a claim for securities fraud under Rule 10b-5, a plaintiff must allege six elements: "(1) a material misrepresentation or omission; (2) made with scienter; (3) a connection with the purchase or sale of a security; (4) reliance on the misstatement or omission; (5) economic loss; and (6) a causal connection between the material misrepresentation or omission and the loss, commonly called 'loss causation.'" *Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230, 1236–37 (11th Cir. 2008). Defendants contest whether Plaintiffs have sufficiently alleged the first two elements,[104] which the Court addresses in turn.

### A.    Material Misrepresentation or Omission.

Defendants first argue that the complaint fails to sufficiently allege an actionable misstatement. By Defendants' count, the complaint contains 35 alleged

---

[102] *Id.* at 287.

[103] *Id.* ¶ 580.

[104] ECF 99, at 14.

misstatements.[105] Of these, 30 were made before the derailment and relate in some way to the safety of Norfolk's PSR operations. The other five, made after the derailment, all relate to the vent-and-burn. Defendants contest the actionability of the two groups of alleged misstatements—the "safety statements" and the "vent-and-burn statements"—on different grounds.

### 1. The Court Assumes That the Vent-and-Burn Statements Are Not Actionable.

Beginning with the latter: Defendants argue, as something of a threshold matter, that Plaintiffs lack standing to sue for the vent-and-burn statements because they were made *after* Plaintiffs purchased Norfolk stock.[106] Defendants are at least partly correct. Akademiker[107] and Ironworkers[108] do not dispute that they last bought Norfolk stock in 2022, and that the vent-and-burn statements were made in 2023. Clearly, Akademiker and Ironworkers could not have been misled into purchasing stock by a statement that had not yet been made. Thus, they lack

---

[105] The alleged misstatements are subject to the special pleading requirement of Federal Rule of Civil Procedure 9(b) that fraud be alleged "with particularity." *Mizzaro*, 544 F.3d at 1237. Defendants do not dispute that the 35 misstatements discussed in this Order have been alleged with enough particularity to satisfy Rule 9(b). ECF 114, at 19–20. These misstatements—along with citations to where they appear in the complaint—are listed in a chart appended by Defendants to their motion to dismiss. ECF 99-1.

[106] ECF 99, at 27.

[107] ECF 24-3, at 4.

[108] ECF 25-4, at 3.

standing to assert a Rule 10b-5 claim premised on the vent-and-burn statements—at least in their own right.

The analysis is different for Plaintiffs' ability to sue in their capacity as putative class representatives. District courts often allow a 10b-5 plaintiff to sue on behalf of a class for statements made after the plaintiff himself bought stock, *if* those statements were made "in furtherance of a common scheme to defraud." *Upton v. McKerrow*, 887 F. Supp. 1573, 1577 (N.D. Ga. 1995); *see also In re Internap Network Servs. Corp. Sec. Litig.*, 2012 WL 12878579, at *2 (N.D. Ga. Aug. 22, 2012) (collecting cases). Those courts have reasoned that where a defendant's conduct consists, not of "specific, isolated statements," but of a "series of alleged interrelated misrepresentations" over some period of time, the plaintiff need not have bought stock on the last day of that period to bring a Rule 10b-5 claim for the entire course of the defendant's conduct. *Hoexter v. Simmons*, 140 F.R.D. 416, 422 (D. Ariz. 1991).

Under that framework, the threshold question here is whether the safety statements and vent-and-burn statements formed part of the same allegedly fraudulent scheme to defraud investors. The Court tends to think they did. As the Eleventh Circuit has explained, "[f]raudulent statements that prevent a stock price from falling can cause harm by prolonging the period during which the stock is traded at inflated prices." *FindWhat Inv. Grp. v. FindWhat.com*, 658 F.3d 1282, 1314

(11th Cir. 2011). That seems to be Plaintiffs' theory of liability here: that Defendants' safety statements inflated Norfolk's stock price, and that Defendants' vent-and-burn statements kept prices inflated by hiding the truth about Norfolk's unsafe operations from the public for a while longer.[109] At this stage in the litigation, that is likely enough. Nevertheless, the actionability of the vent-and-burn statements is not dispositive of the sufficiency of Plaintiffs' complaint, and thus the Court will not rule on it here.[110] Rather, the Court will assume without deciding that the vent-and-burn statements are *not* actionable for purposes of the instant motion.

### 2.    The Safety Statements Are Actionable.

The safety statements—of which there are 30—are somewhat of a mixed bag. Some extol safety in the abstract: "Safety is a way of life at Norfolk

---

[109] The vent-and-burn statements consist of Governor DeWine's initial evacuation notice, ECF 82, ¶ 446; three excerpts from a press conference during which Norfolk executive Scott Deutsch spoke about the impending vent-and-burn, *id.* ¶¶ 449–51; and Norfolk's press release confirming that the vent-and-burn had been successfully conducted, *id* ¶ 453.

[110] Defendants also argue that the vent-and-burn statements are not actionable because they are not attributable to Defendants and because they are not false or misleading. ECF 99, at 31–35. Because the Court assumes that the vent-and-burn statements are not actionable for purposes of resolving the instant motion to dismiss, these arguments need not be addressed at this time.

Southern,"[111] for example, or "[S]afety is top down-bottom up."[112] Others speak to Norfolk's emphasis on safety within particular programs: "Our capital spending and replacement programs are and have been designed to assure the ability to provide safe, efficient, and reliable rail transportation services,"[113] for example, or "Safety extends to hazardous materials too."[114] Some are very vague: "The Board is committed to safety as a core value of Norfolk Southern."[115] Others are more specific: "It's going to take us 3 to 4 months to train crews because we're not going to cut corners on safety."[116]

To be actionable under Rule 10b-5, these statements must be "misleading as to a material fact." *Basic Inc. v. Levinson*, 485 U.S. 224, 238 (1988) (emphasis omitted) Defendants argue that the safety statements do not meet this standard for three reasons: (1) some of the statements are mere expressions of opinion, as opposed to representations of fact; (2) the non-opinion statements are not material because they are too vague to be verifiable; and (3) the complaint fails to otherwise allege a misleading omission. These arguments are addressed in turn.

---

[111]  ECF 99-1 ¶ 411.

[112]  *Id.* ¶ 415.

[113]  *Id.* ¶¶ 433–434.

[114]  *Id.* ¶ 429.

[115]  *Id.* ¶¶ 410, 414.

[116]  *Id.* ¶ 440.

### i.    Factuality

First, Defendants argue that certain of the safety statements are not actionable because they are opinions.[117] Rule 10b-5 requires a false representation of *fact*, which courts have interpreted to generally exclude statements couched as opinions. *Carvelli v. Ocwen Fin. Corp.*, 934 F.3d 1307, 1322 (11th Cir. 2019). That general rule is subject to two important caveats. First, "every statement of opinion explicitly affirms [the] fact[ ] that the speaker actually holds the stated belief." *Id.* For example, the statement "I believe that the earth is flat" is false if the speaker actually believes that the earth is round. *Id.* Second, a statement of opinion that contains "embedded statements of fact" is false if the embedded facts are false. *Id.*

Here, the following statements that Defendants made about the advantages and disadvantages of increased train length are couched as opinions:

1.    "I think train length really helps us right now";[118]

2.    "I don't see it working against us both near term, nor do I see it working against us long term";[119]

3.    "I don't see a reason that we should expect or want or think necessary, any restrictions on train length;" and[120]

---

[117]  ECF 99, at 15–17.

[118]  ECF 82, ¶ 431.

[119]  *Id.*

[120]  *Id.*

4.    "I truly believe that the technology that's brought to us . . . makes it a very safe and effective operation."[121]

The Court is hesitant to declare these statements non-actionable as a matter of law at this stage. As discussed in more detail below, there are substantial allegations in the complaint indicating that Defendants' safety statements were made in bad faith. Those allegations support the inference that Defendants knew, for example, that running longer trains posed a long-term safety risk, or that *some* restriction on train length might be expected or necessary. Furthermore, the fourth statement arguably contains the factual claim that Norfolk's technology makes its operations safe. Nevertheless, for ease of analysis, the Court assumes without deciding that the above statements are *not* actionable for purposes of the instant motion.

### ii.    Materiality

Second, Defendants argue that the safety statements are not actionable because general statements about "safety" are too vague to be verifiable.[122] This argument rests on a false premise. Admittedly, it is difficult to quantify a corporation's "commitment to safety."[123] But it does not follow that abstract statements about safety are always unfalsifiable. "Safety [is] a core value"[124] may

---

[121]   *Id.*

[122]   ECF 114, at 17.

[123]   ECF 82, ¶ 410.

[124]   *Id.*

be vague, but it is not meaningless. It indicates something about the importance that Norfolk placed on safety relative to other operational imperatives like profitability or efficiency. It would be false to call safety a core value if, in fact, it were a peripheral value, or not a value at all. And that is what Plaintiffs have alleged: that Norfolk had pursued profits "at the expense" of safety;[125] that maximizing efficiency came at the cost of "sacrificing safety;"[126] that Norfolk's training programs were "compromis[ing] safety" at every turn.[127] If Plaintiffs' allegations are true, and they are only allegations at this stage, then Defendants' statements were false.

Of course, to Defendants' point, their representations must not only have been false but also material. "[M]ateriality depends on whether a substantial likelihood exists that a reasonable investor would have viewed a [false representation] as significantly altering the total mix of information made available." *Carvelli*, 934 F.3d at 1317. Some statements, no matter how false, are immaterial because they are "puffery," that is, so vague and obviously hyperbolic that "no sensible man" could take them seriously. *Id.* at 1319. However, it is important to keep in mind that assessments of materiality are "delicate." *TSC*

---

[125] *Id.* ¶ 417.

[126] *Id.*

[127] *Id.* ¶ 438.

*Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 450 (1976). They call for judgments about the reasonableness and significance of inferences drawn by investors in view of the totality of the circumstances. *Id.* Such judgments are, by their nature, "peculiarly ones for the trier of fact." *Id.* Thus, courts should not rule statements immaterial as a matter of law—*even if they are puffery*—unless "reasonable minds could not differ on the question of their importance." *Carvelli*, 934 F.3d at 1320. It is a low standard, especially in the context of a motion to dismiss, and Plaintiffs here have met it.

Three aspects of this case especially counsel against deciding materiality as a matter of law. The first is the industry in which Norfolk operates. The heightened importance of safety in inherently dangerous industries can support an inference of materiality. *Bricklayers & Masons Loc. Union No. 5 Ohio Pension Fund v. Transocean Ltd.*, 866 F. Supp. 2d 223, 244 (S.D.N.Y. 2012). Thus, district courts—including in the Northern District of Georgia—have declined to rule as a matter of law that vague public statements touting a company's safety were immaterial, when those companies operated in industries like deepwater drilling, mining, and aviation. *Id.* at 243 (declining to rule a deepwater drilling company's statement that "it conducted extensive training and safety programs" immaterial as a matter of law); *In re Massey Energy Co. Sec. Litig.*, 883 F. Supp. 2d 597, 604 (S.D.W. Va. 2012) (declining to rule a mining company's statements that "it had a strong company

commitment to the safety of its miners and that it had begun safety improvement initiatives" immaterial as a matter of law); *In re ValuJet, Inc., Sec. Litig.*, 984 F. Supp. 1472, 1477, 1479 (N.D. Ga. 1997) (declining to rule an aviation company's statement that "[its] safety record had been certifiably among the very best in the airline industry" immaterial as a matter of law). Norfolk likewise operates in an industry fraught with danger.[128] In that context, it is difficult to rule Norfolk's professed commitment to safety immaterial to investors as a matter of law.

Also weighing in favor of materiality is the sheer number of public statements about safety made by Norfolk and its Class I railroad competitors.[129] A company's repeated emphasis of an operational priority, even at a high level, can give rise to an inference of materiality. *In re Vale S.A. Sec. Litig.*, No. 19 CV 526, 2020 WL 2610979, at *12 (E.D.N.Y. May 20, 2020). Defendants disagree, arguing that repetition tends to signify *im*materiality.[130] That may in a sense be true: Where

---

[128]   *See* ECF 82, ¶¶ 473, 547.

[129]   ECF 99, at 25 n.8. Norfolk, in its motion to dismiss, asserts that Norfolk's Class I railroad competitors make the same kinds of statements about safety as Norfolk is alleged to have made here. *Id.* at 15. Plaintiffs do not argue that this assertion should be disregarded as extrinsic to their complaint. *SFM Holdings, Ltd. v. Banc of Am. Sec., LLC*, 600 F.3d 1334, 1337 (11th Cir. 2010). The Court thus assumes that the public filings underlying this assertion are subject to judicial notice, and properly considered in ruling on the instant motion. *Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1276 (11th Cir. 1999).

[130]   *See* ECF 114, at 11.

every Class I railroad is touting its commitment safety, it is perhaps reasonable to choose between them based on other criteria. But the opposite may also be true: If, for example, only five out of the six Class I railroads[131] were touting their commitment to safety, a reasonable investor could find the silence of the sixth to be significant; and where a company deems it appropriate to publicly reaffirm its commitment to safety dozens of times over the course of three years, a reasonable investor could conclude that the safety of that company's operations are significant. Ruling that Defendants' repeated statements about safety *cannot* raise a reasonable inference of materiality is tantamount to resolving competing factual inferences against Plaintiffs on a motion to dismiss. That is something the Court cannot do.

Finally, the fact that Defendants' safety statements occurred as Norfolk was implementing a new operating plan weighs in favor of materiality. Norfolk's pivot to PSR is, in the Court's view, critical context for assessing the materiality of Defendants' repeated insistence that Norfolk was committed to safety. Norfolk brass allegedly had, at one time, rejected PSR as a "short-term, cut-to-the-bone strategy,"[132] and the effect of PSR on freight rail safety had been subject to enough

---

[131]  ECF 82, ¶ 73.

[132]  *Id.* ¶ 77.

public concern to trigger a congressional hearing.[133] In that context, a reasonable investor could understand Defendants' safety statements to be an integral part of Norfolk's investment thesis: that Norfolk could enrich shareholders through PSR by maximizing efficiency and profitability *while maintaining the same level of safety as before*.[134] That is an entirely different value proposition than the alternative, in which efficiency and profitability are maximized *at the expense of safety*. In the latter, investors are warned that any financial benefit gained by streamlining operations could be offset—if not outweighed—by the potential fallout from running more dangerous trains. It would be eminently reasonable for an investor to view the latter as a substantially risker bet than the former. And statements that have the potential to substantially impact reasonable investors' risk-benefit analyses are not immaterial as a matter of law.

### iii.    Omissions

Third, Defendants argue that the safety statements are not actionable under an alternative theory of material omission. The Court again disagrees. "Rule 10b–5 prohibits not only literally false statements, but also any omissions of material fact 'necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.'" *FindWhat*, 658 F.3d

---

[133]  *Id.* ¶ 86.

[134]  *See id.* ¶ 417.

at 1305 (quoting 17 C.F.R. § 240.10b-5(b)). Thus, once Defendants made public statements about Norfolk's valuation of and commitment to safety, they came under a duty to ensure that those statements were "not so incomplete as to mislead." *Id.* Plaintiffs have sufficiently alleged that Defendants breached that duty by failing to inform investors of the myriad ways in which safety at Norfolk was not being valued and prioritized. The same reasoning extends to Defendants' more program-specific statements. For example, a reasonable investor could view the statement "Safety extends to hazardous materials"[135] as misleading, if Norfolk was routinely violating federal regulations by placing hazardous materials too close to the engine.[136] He could view the statement "Our capital spending and replacement programs are and have been designed to assure the ability to provide safe . . . rail transportation services"[137] as misleading, if Norfolk was slashing its maintenance budget, firing its mechanics, and refusing to buy replacement parts for its trains.[138] And he could view the statement "[I]t's going to take us 3 to 4 months to train crews because we're not going to cut corners on safety"[139] as

---

[135] *Id.* ¶ 429.

[136] *Id.* ¶ 430.

[137] *Id.* ¶¶ 433–434.

[138] *Id.* ¶ 435.

[139] *Id.* ¶ 440.

misleading, if new crews were being trained by instructors with virtually no railroading experience in violation of Norfolk's own policies.[140]

The Court takes no position on whether its materiality ruling is consistent with the one recently handed down by the Southern District of New York in the related case *In re Norfolk Southern Corporation Bond/Note Securities Litigation*, No. 23-cv-4068, 2025 WL 641089 (S.D.N.Y. Feb. 27, 2025). *Norfolk Bond* was, like this case, a securities fraud suit against Norfolk Southern, over public statements it had made while implementing PSR, precipitated by the fall in Norfolk stock following the East Palestine derailment. *Id.* at *1. One of the main issues in *Norfolk Bond* was the materiality of Norfolk's public statements about safety, including several of the same statements at issue here. *Id.* at *3. The *Norfolk Bond* court ruled, in granting the defendants' motion to dismiss, that the alleged misstatements were "archetypical puffery" and thus non-actionable as a matter of law. *Id.*

In this Court's view, however, *Norfolk Bond* is distinguishable for at least two reasons. First, the safety statements at issue in *Norfolk Bond* were much more limited than those alleged here. The *Norfolk Bond* statements numbered only seven—as opposed to the 35 alleged here—and did not include those the Court

---

[140] *Id.* ¶ 444. Plaintiffs have, of course, alleged that this statement was not only misleading but literally false: that conductors and engineers were being rushed through training in as little as six weeks. *Id.*

believes are most clearly material: those on the relative importance of safety compared to other operational priorities, for example, or on Norfolk's handling of hazardous materials, or on how long it took Norfolk to train conductors and engineers. Second, Akademiker and Ironworkers appear to have made arguments that the plaintiffs in *Norfolk Bond* court did not. As a result, *Norfolk Bond* considered none of the factors that the Court deems especially relevant to materiality here: the inherent danger of the railroading industry, Norfolk's repeated emphasis on safety, and its concurrent embrace of PSR. *See id.* *4 (noting plaintiffs' failure to allege that "puffery could be made actionable via repeated emphasis"). In other words, though they involve the same defendant and arise out of similar facts, this and *Norfolk Bond* are not the same case, and do not require identical results. Defendants' motion to dismiss on materiality grounds is accordingly denied.[141]

## B. The Allegations Collectively Raise a Strong Inference of Scienter.

In addition to the first 10b-5 element of materiality, Defendants contest whether the complaint has sufficiently alleged the second element of scienter: A 10b-5 plaintiff must show that the defendant's material misstatements were made "with the requisite culpable state of mind," *FindWhat*, 658 F.3d at 1299, which are, in the Eleventh Circuit, "intent to deceive" and "severe recklessness," *Mizzaro*, 544

---

[141] The Court's ruling here is that Plaintiffs' complaint is not subject to dismissal on materiality grounds. That ruling does not preclude a later determination that particular statements are non-actionable as a matter of law.

F.3d at 1238. Moreover, the PSLRA subjects allegations of scienter to a heightened pleading standard: The allegations must raise an inference of fraudulent intent that is not only *plausible*—as ordinarily required under Rule 12(b)(6), *Ashcroft v. Iqbal*, 556 U.S. 662, 682 (2009)—but *strong*, that is, "cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 314 (2007). In other words, the inference that the defendant acted with scienter must be "at least as likely" to a reasonable person as the inference that he did not. *Id.* at 328 (emphasis omitted). It is, all together, quite the "stringent standard." *Mizzaro*, 544 F.3d at 1238.

Plaintiffs have nevertheless satisfied this standard because the inference of scienter raised by the allegations here is not only strong, but overwhelming. All too often, PSRLA plaintiffs seeking to raise the requisite inference of scienter must do so "by circumstantial evidence alone." *Id.* at 1249. Not so here, where Plaintiffs have a "smoking-gun" allegation: that Defendant Shaw, speaking under oath in the months after the derailment to the U.S. Senate Committee on Environment and Public Works, stated that Norfolk's pre-derailment operational posture was a "near-term focus . . . *solely on profits*."[142] As alleged, Shaw's statement sounds much like an admission that Norfolk's pre-derailment statements touting its focus on

---

[142]  ECF 82, ¶ 103 (emphasis added).

safety were knowingly false. It is, effectively, a concession of scienter. Notably, though Shaw's statement is central to Plaintiffs' allegations,[143] Defendants barely address it in 65 pages of briefing.[144] Their silence is deafening. Shaw's statement, by itself, may well be enough to create the requisite inference of scienter.

But Plaintiffs have alleged much more than that single statement. The complaint is replete with allegations about the pervasiveness of Norfolk's safety violations that bolster the inference of scienter. The Eleventh Circuit in *Mizzaro* discussed how—and how not—to infer scienter from circumstantial allegations regarding the "nature, duration, and amount" of alleged company-wide misconduct. 544 F.3d at 1249. As *Mizzaro* explained, there is a critical difference between inferring the *existence* of company-wide misconduct and inferring company executives' *knowledge* of it. *Id.* at 1247. The PSLRA requires the latter inference, which according to *Mizzaro* can be raised in at least two ways. First, the plaintiff can show that the nature of the misconduct was such that it "simply [could not] be carried out by low-level employees acting on their own." *Id.* at 1249. Second, the plaintiff can show a mechanism by which knowledge of the

---

[143]  Both Plaintiffs' complaint and their response brief reference Shaw's statement early and often. ECF 82, ¶¶ 1, 103, 276, 420, 435; ECF 101, at 11, 14, 33, 39, 46.

[144]  ECF 107, at 23.

misconduct "would or should have percolated up to senior management" from their lower-level employees. *Id.* at 1251. Plaintiffs here have alleged both.

First, the sheer scale of Plaintiffs' allegations gives rise to an inference of senior management participation. *Mizzaro*, 544 F.3d at 1249. Norfolk's alleged deprioritization of safety was comprehensive. It pervaded every aspect of the company's operations: from how trains were built, to how fast they were run; from how tracks were maintained, to how cars were inspected; and from how employees were trained, to why they were terminated. It allegedly impacted every area of the company's footprint: from its corporate headquarters in Atlanta, Georgia;[145] up the East Coast through North Carolina,[146] Virginia,[147] Pennsylvania,[148] and New York;[149] into the Midwestern states of Indiana,[150] Illinois,[151] and of course Ohio.[152] And it was allegedly felt by every level of

---

[145] ECF 82, ¶ 47.

[146] *Id.* ¶ 58.

[147] *Id.* ¶ 41.

[148] *Id.* ¶¶ 46, 51.

[149] *Id.* ¶ 54.

[150] *Id.* ¶ 50.

[151] *Id.* ¶ 54.

[152] *Id.* ¶¶ 40, 43–46, 48–49.

employee: from conductors[153] to engineers;[154] from sheet metal workers[155] to accounting analysts;[156] from first-line supervisors[157] to senior managers.[158] Norfolk's alleged deprioritization of safety was remarkable for not only its breadth but its magnitude: 90% layoffs,[159] a forced 67% cut to car inspection times,[160] a 50–75% decrease in crew training,[161] and cars routinely running uninspected for tens of thousands of miles.[162] The escalation of Norfolk's unsafe practices was allegedly synchronized, scaling with the company's implementation of PSR. And the ways in which Norfolk is alleged to have deprioritized safety, by their overarching nature, implicate senior-management-level prerogatives: relegating safety from first to fourth on a list of company principles,[163] for example, or loosening company-wide safety training requirements,[164] or centralizing the wayside alert

---

[153] *Id.* ¶¶ 44–45.

[154] *Id.* ¶¶ 40, 42– 43.

[155] *Id.* ¶ 41.

[156] *Id.* ¶ 59.

[157] *Id.* ¶ 56.

[158] *Id.* ¶ 18.

[159] *Id.* ¶¶ 113–114.

[160] *Id.* ¶ 163.

[161] *Id.* ¶¶ 147–150.

[162] *Id.* ¶ 194.

[163] *See id.* ¶ 107.

[164] *See id.* ¶¶ 158–159.

system for Norfolk's entire train network.[165] In short, the complaint alleges that Norfolk's deprioritization of safety was so systematic, coordinated, and all-encompassing that it gives rise to a strong inference that "it must have originated with senior [ ] officials." *Mizzaro*, 544 F.3d at 1250.

Second, Plaintiffs have alleged the existence of various mechanisms through which knowledge of Norfolk's safety failures could and should have percolated up to its executives. Norfolk executives allegedly were put on direct notice of potential safety issues arising out of PSR, during the relevant class period, in three different ways. First, the Federal Railroad Administration (FRA) sent Norfolk a series of letters—addressed to Norfolk's CEO by name—warning of such safety issues as the prevalence of workplace accidents,[166] the negative effect of employee fatigue,[167] the inadequacy of Norfolk's mechanical inspections,[168] and the inadequacy of its conductor and engineer training.[169] Second, the FRA conducted a "system-wide special audit" of Norfolk that uncovered violations of federal safety regulations in such areas as "operational testing," "on-the-job training," and

---

[165] *Id.* ¶¶ 213, 218–219.

[166] *Id.* ¶ 473.

[167] *Id.* ¶ 475.

[168] *Id.* ¶¶ 476–477.

[169] *Id.* ¶ 481.

internal reporting of mechanical defects.[170] The FRA published a report on the results of its audit and provided a copy of it to Norfolk. Third, Norfolk executives were present at a congressional hearing convened for the purpose of discussing freight rail safety, specifically in the context of PSR, in which members of the U.S. House of Representatives, federal regulatory agencies, and rail worker union representatives all testified about the negative impact of PSR on worker safety. Even more starkly, it was *at this very hearing* that Defendant Sanborn is alleged to have falsely testified that Norfolk could implement PSR "without sacrificing safety."[171] Any one of these was likely sufficient on its own to put Norfolk on notice that it was not living up to its stated commitment to safety.

At a more basic level, Plaintiffs have adequately alleged that knowledge of Norfolk's safety failures should have percolated up to the company's executives because those failures were obvious, in the sense both that they were easy to detect and that they were the natural result of the way Norfolk implemented PSR. The complaint pleads that Norfolk's safety failures were easy to detect because they manifested themselves exactly where one would expect: workplace accidents. Accidents at Norfolk allegedly grew more frequent every year between 2018 and 2022 (Norfolk implemented PSR in 2019, and the derailment occurred in 2023)—a

---

[170]   *Id.* ¶ 483.

[171]   *Id.* ¶ 417.

continuously upward trend that was allegedly unique among Class I railroads.[172] In addition, the number of accidents over that period increased by almost 2 accidents per million train miles, or by over 150%—a raw number and rate allegedly much higher than at any other Class I railroad.[173] Such statistics should have been difficult for Norfolk's executives to ignore. In addition, the complaint pleads that Norfolk's safety failures should have been expected, given the way in which Norfolk was implementing PSR. Plaintiffs' allegations strongly suggest that Norfolk's executives must have known, at a minimum, that under PSR their company was running longer and heavier trains; was relying on a younger and more inexperienced pool of conductors and engineers; and was mandating shorter inspection times for train cars despite firing or furloughing car inspectors and maintenance personnel *en masse*. The clear negative safety implications of these policies should have given Norfolk's executives cause for concern.

There are two further indicia of scienter that the Court will discuss in any detail.[174] One is Norfolk's actions during the vent-and-burn. The Supreme Court

---

[172] *Id.* ¶ 383.

[173] *Id.*

[174] Plaintiffs' complaint alleges various other indicia of scienter. For example, it alleges that Norfolk executives received direct feedback from their low-level employees about safety issues, ECF 82, ¶¶ 457, 460; that Norfolk executives monitored train size and speed as drivers of operational risk, *id.* ¶ 461; that Norfolk executives regularly attended management-level conference calls to discuss safety issues, *id.* ¶ 466; and that two of Norfolk's executives—one of

has made clear that the proper inquiry is "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter." *Tellabs*, 551 U.S. at 323; *see also* FED. R. EVID. 404(b)(2) (permitting evidence of collateral conduct to prove motive or intent). Here, Norfolk's actions during the vent-and-burn support an inference of scienter for Norfolk's safety statements because, as discussed above, both can be seen as arising out of the same fraudulent scheme. The vent-and-burn allegations, assumed to be true, show that Norfolk lied to government officials and endangered public safety so that it could more efficiently restore post-derailment freight services. These allegations support the inference that, under PSR, efficiency was Norfolk's overriding operational priority—and that safety and candor were not. The allegation, furthermore, that Norfolk's on-the-ground derailment response team included Defendant Shaw supports the inference that the company's emphasis on efficiency came straight from the top.

The second is Norfolk's executive compensation structure. "[M]otive can be a relevant consideration, and personal financial gain may weigh heavily in favor of a scienter inference." *Tellabs*, 551 U.S. at 325. Plaintiffs have alleged that Norfolk's executive incentive compensation packages during the relevant time

---

them Defendant Sanborn—were terminated during the class period for their perceived contribution to Norfolk's deprioritization of safety, *id.* ¶ 493. Given the strength of Plaintiffs' other allegations, the Court need not determine the extent to which these facts support the inference of scienter.

period depended heavily—in some years exclusively—on two metrics.[175] The first was operating income, which is purely a measure of profits.[176] The second was operating ratio, a measure "of how efficiently a railroad generates revenues."[177] Only in 2023 did Norfolk change executive compensation packages to exclude references to operating ratio and instead include metrics like injury and accident rates.[178] Standing alone, these allegations would not support the requisite inference of scienter. *FindWhat*, 658 F.3d at 1303. But considered together with other allegations, the fact that Norfolk executives had an alleged financial incentive to pursue policies that prioritized profitability and efficiency, even when those policies came at the expense of safety, further supports the inference of scienter.

For all of these reasons, the collective strength of Plaintiffs' scienter allegations is more than enough to overcome even the heightened standard imposed by the PSLRA. If Plaintiffs' allegations are true, and again, that is still a big "if" at this stage, then Norfolk's disregard of safety was a feature, not a bug. The complaint sufficiently alleges that Defendants' prioritization of profit and

---

[175] *Id.* ¶¶ 485–488.

[176] *Id.*

[177] *Id.* ¶¶ 6, 485.

[178] *Id.* at 497.

efficiency over safety was part of Norfolk's PSR "business model";[179] that it was implemented through a series of top-down, railroad-wide policies attributable directly to its top executives; and that it was discoverable by anyone who cared to look.

## III.   CONCLUSION

Defendants' motion to dismiss [ECF 99] is **DENIED**. Defendants are **ORDERED** to file their answer to Plaintiffs' complaint within 30 days. The parties are **ORDERED** to file their Joint Preliminary Report and Discovery Plan within 30 days of Defendants' answer.

**SO ORDERED** this 24th day of March, 2025.

Steven D. Grimberg
United States District Judge

---

[179] *Id.* ¶ 399.