UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| BUCKS COUNTY EMPLOYEES RETIREMENT SYSTEM, et al. | ) ) ) ) ) | Docket Number 1:23-CV-04175-SDG |
|---|---|---|
| Plaintiffs, | ) ) ) | |
| v. | ) ) ) ) | Atlanta, Georgia November 13, 2025 |
| NORFOLK SOUTHERN CORPORATION, et al. | ) ) ) ) | |
| Defendants. | ) | |

TRANSCRIPT OF TELECONFERENCE
BEFORE THE HONORABLE STEVEN D. GRIMBERG
UNITED STATES DISTRICT JUDGE

APPEARANCES OF COUNSEL:

FOR THE PLAINTIFFS:            MR. JASON C. DAVIS
                              MS. ASHLEY M. PRICE
                              MR. JACK A. GEPHART
                              MR. CAMERON B. ROBERTS
                              MR. JOHNSTON WHITMAN
                              MS. JENNIFER CARINGAL
                              MS. EVELYN SANCHEZ GONZALEZ

FOR THE DEFENDANTS:            MS. TAMAR KAPLAN-MARANS
                              MS. DENISE TSAI
                              MS. HILARY H. ADAMS
                              MR. JEFF SCHOMIG
                              MS. SARAH MACIEL

OFFICIAL COURT REPORTER:       ALICIA B. BAGLEY, RMR, CRR


 Proceedings recorded by mechanical stenography, transcript produced
by computer

P R O C E E D I N G S

(in Atlanta, Fulton County, Georgia; November 13, 2025;

all parties by Zoom)

THE COURT:  All right.  Let me call the case.  This is Bucks County vs. Norfolk.  Case Number 23-CV-4175.  Let's have appearances of counsel beginning with the plaintiff.

MR. DAVIS:  Good afternoon, Your Honor.  Jason Davis of Robbins Geller Rudman & Dowd, LLP, for the plaintiffs.  I'll introduce the other folks from Robbins Geller.  We have Ashley Price, Jen Caringal, Jack Gephardt, and Evelyn Sanchez Gonzalez, Your Honor.

THE COURT:  All right.  Good afternoon.

MR. WHITMAN:  Sorry, Your Honor.  Good afternoon.  Johnston Whitman from Kessler Topaz Meltzer & Check also on behalf of the plaintiffs.  Joined by my colleagues on the Zoom is Alec Garber and Farai Shawa.

THE COURT:  Good afternoon.

MR. WHITMAN:  Good afternoon.

MR. ROBERTS:  Good afternoon, Your Honor.  This is Cameron Roberts from Caplan Cobb also for the plaintiffs.

THE COURT:  All right.  Good to see you.

MS. KAPLAN MARANS:  Hi.  Good afternoon, Your Honor.  This is Tamar Kaplan-Marans from WilmerHale on behalf of the defendants.  I'm joined by a number of my colleagues from WilmerHale.  Denise Tsai, Matthew Lewis, Sarah Maciel, and Jeff Schomig.

THE COURT:  Okay.  Well, great to see you all virtually.  I

hope you're doing well.

We're here to discuss a discovery dispute raised by plaintiffs in a letter dated October 23rd and there was a response by Norfolk dated October 27th, I've reviewed that correspondence.

Let me just say at the outset that privilege issues are one area that sometimes are not conducive to resolving through this informal discovery dispute procedure.  You all did the right thing by raising it this way because that's what my standing order calls for.  But unless the answer is perfectly clear and obvious, I will then generally defer to sort of traditional briefing on it so I can make sure that, you know, the issue's been fully presented and handled in a way that comports with, you know, obviously a complicated area of the law.  I say that just to sort of set expectations that I may not be able to resolve this during this conference, but I'm still happy to hear out the parties' positions and see if we can at least narrow the issue.

So with that, who would like to lead us off?

MR. DAVIS:  With the Court's permission, since it's plaintiffs' letter, we'll take the lead if that's acceptable to the Court.

THE COURT:  Sure.

MR. DAVIS:  Yes.  So there are two issues before the Court, both focus on a witness by the name of Nabanita Nag who is the executive vice president of corporate affairs and chief legal officer of the corporate defendant Norfolk Southern during the relevant time

period.  The two specific issues, as the Court is aware having read the papers, are waiver, as the Court just discussed, and a simpler issue, from my point of view, is simply whether Ms. Nag should be designated a custodian under Rule 26.

I understand the Court may want additional briefing and more detail on the waiver issue.  But from a very sort of high level, I just want to talk briefly about where I think there's a difference between how the parties are actually looking at the doctrine of waiver under Cox.

As the plaintiffs read defendants' papers, it appears as though they're under the impression that an at issue waiver can only occur in the context of asserting a good faith defense when that defense hinges on advice of counsel.  The plaintiffs would respectfully submit that that is a misimpression of the scope of the only controlling authority that the parties have cited in their papers which, of course, is Cox vs. Administrator U.S. Steel.

I'll just refer the Court to a passage in Cox - and this is at pincite 1419 - where it says a party, quote, "Waives the privilege if it injects into the case an issue that in fairness requires an examination of otherwise protected communications," end quote.  Later on the same page, Your Honor, the court clarifies that, you know, the holder must inject a new factual or legal issue into the case and there the Eleventh Circuit is quoting language from the Seventh Circuit, Your Honor.

So just structurally the way that we're thinking about this

subject matter is -- Cox is very clear that a party can put at issue otherwise protected communications by some affirmative act and the affirmative act in this case, plaintiffs assert, is that -- for example, Defendant Shaw has asserted he acted in good faith, exercised reasonable care, and did not know and in the exercise of reasonable care could not have known of the purported false or misleading nature of the alleged misstatements and omissions.

The most specific example that is before the Court is Mr. Shaw's discussions with the governor of Ohio, DeWine, leading up to DeWine and other government officials' decision to authorize the vent and burn of five cars in East Palestine on February 6th, 2023.

As the Court knows from the papers and will recall from the motion to dismiss process two critical facts were, you know, whether Norfolk Southern was aware of the fact that temperatures of those cars were falling and the temperatures, in turn, are an important factual consideration because the manufacturer of the chemical in those cars, OxyVinyl, had explained that if the temperatures of those cars are falling those cars are not going to explode, they're not going to result in a catastrophic explosion.

So defense in their letter had said that they are merely asserting a generic good faith defense that they didn't -- you know, they didn't know -- that Shaw in this case didn't know and acted in good faith in conveying that the governor needs to okay blowing up these five cars or there would be a catastrophic explosion and doesn't bring in the advice of counsel defense.

We submit that that argument is mistaken and we go back to Cox, specifically the page that I referenced at the outset of this argument, and Cox refers favorably to a Fifth Circuit case starting off with Conkling.  Basically what happened in that case, Your Honor, is a party said, look, I didn't know a statement was false for 18 years until after the fact, 18 years after the statement was made.  There was some circumstantial evidence in that case, Your Honor, that the party may have learned that a statement was false through the party's attorney before that 18-year period.

So in this case we refer the Court to Exhibit 16 to plaintiffs' letter and Exhibit 16 is testimony of Defendant Shaw from the Ohio action case.  The Court will recall that plaintiffs moved to compel this testimony and other testimony.

On Page 258, examining counsel asks Defendant Shaw, you know, where he was getting his information from leading up to the vent and burn on February 6th, 2023 and he's asked who were you primarily getting that information from?

Answer:  Well, I was getting the information from a number of sources.

Question:  Okay.  What sources were those?

Answer:  That would include Paul Duncan, Nabanita Nag, and folks in our community affairs team, end quote.

The record will reflect I misspoke a little bit in reading one of the questions, but it doesn't affect the substance of the testimony, Your Honor.

So what we know from this testimony is that Mr. Shaw did, in fact, communicate with Nabanita Nag before the decision was made to blow up these railcars on February 6th, 2023, and what we know from other documents in the record, Your Honor, is it's very, very likely that Ms. Nag was aware of the fact that the railcar temperatures were declining.

After she became aware of that fact, which we believe happened on the basis of circumstantial evidence, we're seeking more evidence to back it up through this procedure -- after she received that information, she flew with Mr. Shaw on the company's private jet to East Palestine and we submit that it is highly likely that Ms. Nag would have informed Mr. Shaw about these temperatures declining and the information the company learned from OxyVinyl on that flight.

Nonetheless - and here's where the manifest unfairness comes into play under Cox - Mr. Shaw later testified that he was not aware of temperature -- of these kinds of measurements, temperature measurements, of the cars before the vent and burn decision was made, nor was he aware of any OxyVinyl's information before the vent and burn decision was made.

It's a subtle difference between merely denying a fact and affirmatively advancing one, plaintiffs understand that.  But what happened here is the defendants have gone on offense, Mr. Shaw has gone on offense and he is saying -- he's going to testify to the jury he didn't know and with the exercise of reasonable care couldn't have known that this vent and burn was unnecessary.

Meanwhile, defense counsel are preventing the plaintiffs from obtaining evidence from Ms. Nag's file to test the veracity of that affirmative assertion and, Your Honor, that's where the manifest unfairness that Cox is talking about comes into play.

On the one hand, Shaw is going to testify to the jury he believed in good faith this was all necessary, he relied on certain experts. Meanwhile, the evidence is clear that he spoke with counsel before making the decision to vent and burn and we submit there's plenty of circumstantial evidence that Ms. Nag had access to those temperatures.

In a nutshell, I wanted to sort of capture the essence of plaintiffs' argument on the waiver point, I believe I've done so, and I'll pause there because I don't know if the Court wanted to split the argument in the waiver.

THE COURT:  Let me ask you this.

MR. DAVIS:  Yes.

THE COURT:  Let me make sure I understand.  Are you sort of acknowledging that any conversation or any communication that Ms. Nag would have had with Mr. Shaw, whether on that flight or otherwise, would have been in the context of a legal communication?

MR. DAVIS:  No, Your Honor.  We would not submit that.

By the same token, it's our understanding based on the fact that Ms. Nag is not a custodian in this case that we do not have a complete privilege log, nor do we have a complete record -- a complete production of all the materials that would otherwise be produced from

Ms. Nag's file.

So to get to the point, Your Honor, I suppose it's theoretically possible that if the defendants agree to designate Ms. Nag a custodian and they produced a letter stating -- you know, a letter from Ms. Nag to Mr. Shaw describing the temperature and the OxyVinyl information then this discussion about waiver would be moot.

THE COURT:  Okay.  All right.  Why don't we -- go on then.

MR. DAVIS:  Okay.  Again, I don't want to belabor the waiver point, but I do also want to talk about the production of files from-- you know, just generally the production of documents from Ms. Nag's files.  This is a very straightforward Rule 26 analysis and the defendants cite a number of cases where, you know, a court has decided not to require the production of documents.

I think their lead case is out of the Northern District of Illinois, Dale vs. Deutsche, and basically what happened in that case is the -- you know, the parties had discussions around custodians.  It appears as though there was very limited evidence as to why three lawyers whom the plaintiffs wanted to designate as custodians were relevant at all.

In fact, what happened in that case -- the dispute was focused on basically how a company had behaved after a merger went through. The dispute had to do with how the company raised prices after this merger.  The court described in that case that the three lawyers appeared to have more to do with negotiating the merger and the leadup to the merger and didn't have much involvement in what was happening

afterwards.  From that point of view and taking into consideration what was at stake in that case, namely, a cellphone service price hike from $16 to $72, the potential relevance of the documents, you know, weren't outweighed by the potential burden given the defendants' argument that there would be a lot of privileged material.

In this case, as our letter shows -- you know, Ms. Nag is directly relevant to the claims and defenses at issue in this case. One of the examples that we cite to the Court is that Ms. Nag is working with Defendant Shaw in preparing the testimony that Defendant Sanborn is going to give to the Senate in the summer of 2022 and these facts are very important in this case for several reasons.  To start off with, Ms. Nag as the chief legal officer and Section 16 officer of Norfolk Southern effectively is Norfolk Southern for the purposes of the statements that Norfolk Southern makes in this case.

As a consequence, when she's working on those documents, all of the knowledge that she has about whether the company is actually operating in a safe manner or not, which is one of the core issues here in this case, could be outcome determinative as to liability in this case.  For that reason, we would submit that Ms. Nag's relevance and importance to what's happening in this case is a far cry from the apparent irrelevant nature of the attorneys' work in the Dale vs. Deutsche case.

In addition -- you know, what's at stake in this case, Your Honor, as the complaint explains -- after the vent and burn happened ultimately the company was forced to pay $966 million.  In addition,

what we know from the record so far is that Ms. Nag and Mr. Shaw received reports from the federal government that apparent lax safety standards have resulted in the death of a conductor. There's evidence that better training may have prevented that death. These are just a handful of examples.

Importantly, different from Dale vs. Deutsche, Ms. Nag, according to her resumé, actually also worked on SEC filings which, of course, are alleged to be false and misleading in this case in a number of ways. Back to my earlier point. Norfolk Southern's a corporate entity that acts through the behavior of its agents, including Ms. Nag. There are myriad examples that we could cite, of course, if we needed to brief this issue.

But as to designating Ms. Nag as a custodian, we submit that the Court can and should make that decision presently. The needs of -- what's at stake in this case is quite great, the relevance of Ms. Nag's information is very high for the reasons just cited.

The Court didn't ask this question but I'll just, you know, offer a suggestion based on what the Court said at the outset of the call is -- you know, if the Court were inclined and did order the defendants to, you know, produce documents from Ms. Nag's file, then certainly it's possible that the waiver point that plaintiffs made at the top of the argument could be muted -- mooted, excuse me, Judge. It's possible that the defendants after producing her materials will simply produce the documents that show she had access to the temperature and OxyVinyl data.

From that point of view, Your Honor, we could welcome a solution where the Court orders Defendant Norfolk Southern to designate Ms. Nag a custodian and just allow the plaintiffs to hold in abeyance the waiver argument which could be more complicated and could benefit from the discovery that the defendants would produce with regard to Ms. Nag, Your Honor.

THE COURT:  I'm not following.  If Ms. Nag was designated as a records custodian then -- what you're saying is that then the previous search queries would be run on her documents; correct?

MR. DAVIS:  Yes, Your Honor.

THE COURT:  And then are you saying -- I'm presuming that they would withhold all of the documents on privilege grounds.

MR. DAVIS:  It's possible that they could do that.  I would defer to counsel on that.

There have been some communications, as defense counsel's letter notes, with Ms. Nag's name on them that have not been withheld on the basis of privilege.  The only point I'm making, Your Honor, is that a more fulsome search of Ms. Nag's files and production of her files would allow a more fulsome development of the factual record and a more fulsome factual development of the record certainly would be helpful to, you know, a full motion on the waiver issue.

THE COURT:  The decisions of who would be part of the record-- who would be designated as records custodians, was that a decision that was made unilaterally by Norfolk or was that a discussion that you all had?

MR. DAVIS: That was a discussion. It was a dispute. The parties maintain that dispute in good faith. As the documents started to roll in and plaintiffs appreciated more and more the importance of Ms. Nag, we decided that it was important in serving our clients to, you know, go back to the defendants and ask them to designate Ms. Nag as custodian, they disagreed with that, and we ended up before Your Honor.

THE COURT: Okay. Great. Let me hear from counsel for Norfolk.

MS. KAPLAN-MARANS: Hi, Your Honor. Good afternoon. Thank you for the opportunity to discuss this today. So I'm happy to start with the waiver issue and then to address Mr. Davis's second point in the alternative argument.

Courts in this district and elsewhere have consistently held that asserting a good faith defense does not on its own waive attorney/client privilege unless a party affirmatively places legal advice at issue which Mr. Shaw has not done.

So just to clarify what exactly has happened here, defendants asserted in our answer to the amended complaint a good faith affirmative defense. Plaintiff then served interrogatories. We had a number of meet and confers. Eventually Mr. Shaw submitted an interrogatory response in which he specifically stated that in asserting the good faith defense he was relying on technical experts in connection with the vent and burn of the railcars following the East Palestine derailment. We made very clear that there was no

advice of counsel defense being asserted in anyway and it was exclusively based on technical experts.

Mr. Davis mentions the Cox case which he relies on very heavily. But that case is extremely distinguishable because there the defendant expressly claimed that their conduct was lawful and relied on legal advice to support that claim.  That case concerned revised leave-of-absence policy and the parties there said that they believed the policy to be lawful so they affirmatively put forward a legal-related issue.

The case that Your Honor recently decided in July, the Cáceres vs. Sidley Austin case, is actually very instructive even though Your Honor found waiver there.  There, as you know probably better than I do, the plaintiffs affirmatively put forward a legal issue.  It was concerning whether their claims were time barred and they were relying -- without asserting a reliance by counsel defense, they put that issue front and center as part of their defense and Your Honor found waiver there.  That is not the case here.  Mr. Shaw has been explicit and we have been explicit that the good faith reliance here is exclusively on technical experts and not legal counsel.

THE COURT:  It seems to me that this is like an example of like ships passing in the night on the argument, but maybe you all can correct me if I'm wrong, because what -- I don't hear Mr. Davis arguing that the good faith defense that's been asserted is a good faith reliance on counsel defense.  What I hear him saying is that there may have been information conveyed by Ms. Nag that was not

within the attorney/client privilege but nevertheless was communicated to Mr. Shaw that would not be covered by the attorney/client privilege and that would rebut a general good faith defense.

Am I understanding that correctly, Mr. Davis?

MR. DAVIS:  Yes, Your Honor.

So the record is clear.  I want to be extremely clear I'm going to describe a hypothetical document that we do not have.  I'm just describing a hypothetical document.

If Ms. Nag texted Mr. Shaw the car temperatures are going down, full stop, that's not privileged.  It's a communication or fact and it's not a privileged document.  If that exists, the defendants should look for it and produce it to us.

THE COURT:  And you would agree with that; correct?

MS. KAPLAN-MARANS:  Are you speaking to me, Your Honor?

THE COURT:  Yes.

MS. KAPLAN-MARANS:  Yes.  To be very clear here, Mr. Shaw is a custodian.  There are 36 custodians here.  So to the extent Ms. Nag was communicating with any of those custodians in a non-privileged manner, those communications will be produced.  All three individual defendants are custodians and a number of Norfolk Southern executives are custodians as well.  So, again, those will be very much part of the mix and they will be produced if they're not privileged.  If they're privileged, they will be on a privilege log.  So the exact document or text that Mr. Davis is describing hypothetically -- whether or not it's privileged, I'm not taking a position right now on

that, but it would either be produced or on a privilege log.

MR. DAVIS:  May I make a 30-second point in response, Your Honor?

THE COURT:  Let her finish her argument and then I'll let you rebut.

Go ahead, Ms. Kaplan.

MS. KAPLAN-MARANS:  I was just going to also -- one thing that I'm not understanding that Mr. Davis is arguing if that's not privileged why is the whole basis for this argument a waiver argument. I'm sort of not understanding what the exact point here that we're arguing about.  My understanding is that they were disputing waiver and saying because of waiver they're entitled -- it does not sound like that's what he's saying.

I also want to emphasize that I think the plaintiffs are conflating relevance with privilege.  We acknowledge that there may be relevant documents in Ms. Nag's files that potentially have information related to this litigation.  But if they're privileged, they are protected.  She was the chief legal officer of the company and courts have consistently found that those are privileged communications when it's involving a chief legal officer.

THE COURT:  What is the downside then -- Ms. Kaplan, what is the downside to designating Ms. Nag as a records custodian and checking her files to make sure that there's not something captured in there, a communication that is not captured in other custodians?

MS. KAPLAN-MARANS:  It would be a burden argument and a

proportionately argument.

Again, they have served 105 requests for production and actually some additional ones yesterday.  We have 36 custodians.  We've agreed to review over 550,000 documents.  In preparation for today, we ran privileged screens over -- key privilege terms over Ms. Nag's files during the relevant time to assess what the hit rate would be for potential privileged documents.  Over all her files during the relevant time the 63 percent hit rate on privileged terms.  When you limit that to documents that hit on actual search terms that we're using in this case, that goes up to 75 percent.  So that would mean extensive privilege review, extensive privilege logging, when many of those documents will also be part of the mix anyway from the 36 other custodians.

THE COURT:  All right.  Mr. Davis, go ahead.

MR. DAVIS:  Thank you, Your Honor.  Yes.

So the first point around searching other custodians' files, I think the Court is correct that -- you know, we always see when a new custodian is added that there's new documents.  It's a big mistake to assume that the only way that Ms. Nag is communicating with Shaw or Sanborn or anybody else is via text or email.

I was very careful to spell out a hypothetical email at the earlier part of my argument.  But what we know from the testimony and from records is that Ms. Nag is frequently in, you know, earshot communication with Mr. Shaw.  There's this extraordinary example of flying on a jet, but that's not the only way that these folks meet,

and judges permit juries all the time to infer that one person informed another, you know, certain subjects at a meeting that, you know, the person learned just before the meeting.

So back to the hypothetical example. If Ms. Nag receives updates from, you know, some third party that these temperatures are falling, that OxyVinyl provided certain advice, you know, shortly before she gets on the jet with Mr. Shaw, we may never know what was actually said on that jet because I doubt there's a transcription of what was said. But a reasonable juror could consider the evidence, listen to the testimony from the witnesses, and make a determination as to whether they think that Ms. Nag communicated that kind of important information to Mr. Shaw.

Again, you know, Ms. Nag is Mr. Shaw's direct report. They're meeting all the time in multiple different contexts and we've given examples of that. So we think it's a grave error to assume that the only way Ms. Nag is conveying information to her boss is via email.

THE COURT: Are you only concerned with communications with Mr. Shaw?

MR. DAVIS: No, Your Honor.

This is an important point. What I've attempted to do in my argument today is use this particular fact set to advance some of the legal points. But as the letter demonstrates, Ms. Nag also was involved in preparing the chief operating officer, Ms. Sanborn, to prepare for the Senate hearing in the summer of 2022 when she allegedly made a number of false or misleading statements about the

company's approach to safety and, as plaintiffs' letter demonstrates, you know, Ms. Nag participated in preparing a witness for that testimony and Ms. Nag in her role as head of -- as overseeing government affairs received those warnings from the government about problems in conductor training that led, apparently, to the death of a Norfolk Southern conductor and under Eleventh Circuit securities case law that we cited in our opposition to motion to dismiss when a nonspeaking party furnishes information that's then, you know, conveyed to the market as it was in the case of these Senate hearings the company is responsible for that misinformation.

So to put a very fine point on it, Your Honor, if Ms. Nag is working and she is -- it appears she is -- working on the Senate testimony and the information that's going to go to the Senate and she knows that information is false or misleading, then the company is liable as a consequence.  That would be an argument that the plaintiff would like to make.  We respect the fact that we're in the discovery phase, Your Honor, but I just wanted to preview some of the merits so the Court can appreciate from a relevance point of view why Ms. Nag's files are so important.

THE COURT:  Okay.  Back to one of Ms. Kaplan's points, though, then what is the basis for your waiver argument?

MR. DAVIS:  The basis for the waiver argument, Your Honor, goes back to the sword and shield principle that Cox illuminated and simply stated -- I'm familiar with the Court's Cáceres' opinion.  I apologize if I'm not pronouncing the name correctly.

But basically, as I understand it, Your Honor, what happened in that case is, you know, a party said that, hey, we didn't know the statute of limitations -- I think what happened in the case is the defendant said your claims are untimely and the plaintiff said, no, no, no, we didn't know about this problem with this tax advice until much later and then as it turns out the party in that case may have learned about the problem with the tax opinion much earlier from an attorney.

So what we're saying here is -- similarly, under Cox -- Cox is not limited to strictly legal advice.  What Cox is saying is if -- you know, even if -- so I guess my point, Your Honor, is even if the defendants come back and say this hypothetical email that we were talking about from Ms. Nag to Mr. Shaw describing all of these hypothetical facts -- even if it is privileged, which we don't think it is, even if it is privileged under the at issue waiver doctrine articulated in Cox because Mr. Shaw testified, number one, Ms. Nag provided information to him leading up to the vent and burn and, number two, he affirmatively testified he did not know about the temperature and did not know about OxyVinyl.  We submit under Cox that fairness requires an examination of that hypothetical email even if it were privileged.

THE COURT:  Okay.  Walk me through, Mr. Davis -- let's say I order Ms. Nag to be designated as a records custodian, what happens next?

MR. DAVIS:  Your Honor, we want to be very respectful of

judicial resources and defendants' time and as I stand here I simply cannot say what the defendants will actually produce to the plaintiffs and --

THE COURT:  Are you saying what they would produce would be based on all previous queries?

MR. DAVIS:  I'm sorry, Your Honor.  We think the process that they'll follow is settled.  I'm happy to entertain a dispute.  But I think the parties are settled on search terms and dates and things like that.  So the process is settled.  The simple point I'm making, Your Honor, is we don't know what documents will actually be produced to the plaintiffs as a result of having Ms. Nag being designated as a custodian, nor do we know which documents will end up on the privilege log and which documents won't.

THE COURT:  I guess what I'm getting at is is there a narrower set of search terms that could be tailored for Ms. Nag that would alleviate the burden and not cause an overproduction, any sort of more hits than necessary?

MR. DAVIS:  Yes, Your Honor.

This is no criticism of defense counsel.  Today's the first time I heard of the 75 percent hit rate.  You know, we're more than happy to work with defense counsel to reduce burden through commonsense means.  It may be the case that we can reduce the burden through different search terms like the Court suggested and we're happy to do that.

THE COURT:  Okay.  Here's what I'm going to do.  I will order

that Ms. Nag be designated as a records custodian, but I am sort of reserving ruling on who is going to bear the cost of the search of Ms. Nag's records.  It will depend on what it yields.

In other words, what I would like, Ms. Kaplan, for you and your team to do is to designate and classify all work that is being done in furtherance of this order to designate her as a records custodian and run the searches that plaintiffs request and if at the end of this process it turns out that what is produced ultimately is either not relevant or was already produced by previous custodians, I would be amenable to a request for the plaintiffs to bear the cost of those fees.

MS. KAPLAN-MARANS:  Understood, Your Honor.

THE COURT:  So, Mr. Davis, that hopefully incentivizes you and your folks to narrow the search to what you believe is most likely to generate productive results.

MR. DAVIS:  Yes, Your Honor.  As I mentioned, we're open to considering search terms and other parameters.

You know, we would like - we would like some advance notice on where these costs are going.  We don't want to be, you know, hit with some tens of thousands of dollars or a $100,000 bill after the fact. We certainly would like to know in advance what this endeavor is actually going to cost if the Court's going to entertain cost shifting.

THE COURT:  Well, I'll let you communicate that with Ms. Kaplan, if you want her to flag for you when they've hit certain

thresholds, you all can work that out.

MR. DAVIS:  Yes, Your Honor.

THE COURT:  Again, I'm not saying that I will be shifting that burden.  It will depend on the results.  If it turns out that it does, in fact, produce results that were not otherwise captured, then I wouldn't see a need for shifting the fee burden.

MS. KAPLAN-MARANS:  Your Honor, our view is that this will require a very, very careful and thoughtful and meticulous privilege assessment process that requires multiple levels of review.  So I'm just, you know, previewing that for the Court and for Mr. Davis.  But it is a very -- it will take many hours to do.  So perhaps next steps would be to come up with narrower terms so that that overall population is significantly less.  I think, Your Honor, that might be what you're suggesting.

THE COURT:  Yes, exactly.  I'm trying to balance here with what -- it sounds like Mr. Davis may very well be right.  There may be documents in Ms. Nag's files that are relevant that are not privileged and that have not otherwise been produced.  But there is -- I can see why there was a significant burden to finding those needles and so I'm trying to balance those two things.

MR. DAVIS:  I mean, I think I should just, you know, note that -- the incentive shifting here, of course, means the defendants may take longer.  The probability that they may put a lot of materials on a privilege log, we have to come back and dispute those documents, that raises costs and, you know, the fight here is at present between

pension funds and, you know, a multinational company with ample resources to shoulder discovery burdens and from a policy matter we would respectfully submit that Congress, in passing the Private Securities Litigation Reform Act in 1995, addressed the discovery burdens that large companies like Norfolk Southern face in these cases through the pleading process and by raising the pleading standards and so -- you know, I'm not sure that my clients can bear millions of dollars in legal expenses.  If that's the Court's decision, of course we're going to respect it.  But of course we need to speak with our clients about that decision.  But, you know, if that's the decision, my concern is that we've effectively decided that Ms. Nag will not be a custodian.

THE COURT:  Again, to be clear, I'm not ruling today that plaintiffs will bear the burden.  What I'm saying is that after this process is complete that Norfolk will have leave to move for the shifting of those fees if it can demonstrate that the results of this process were not what had been represented today.

MR. DAVIS:  Yes.  And I appreciate what the Court is saying.

To be clear, I don't believe I've made a factual representation as to what the results will be.  I believe I've been clear I don't know what they will be.  The record seems to suggest there may be additional documents and my expectation, based on defendants' letter and what we've seen so far is, yes, most likely -- whether they're privileged or not, I mean, there will be a good faith dispute about that, but most likely defendants will put a lot of those documents on

a privilege log.  And even if it's three days' worth of production, knowing the fine counsel representing Norfolk Southern, my expectation is that probably would be hundreds of thousands of dollars worth of defense fees.  The simple point that I'm making is that may be a risk that is simply too high to bear for my clients and as a consequence -- again, we respect the Court's decision.  Just to be clear, the consequence may well be that Ms. Nag is not a custodian.

THE COURT:  Okay.  Well, that's a decision you all need to make.

MR. DAVIS:  Thank you, Your Honor.

THE COURT:  All right.  So where does this leave us then?  Mr. Davis, will you communicate to Ms. Kaplan on how you wish to proceed by a certain date?  Do you want to agree on that?

MR. DAVIS:  Yes, Your Honor.

Without knowing exactly how long it will take to get back to all the clients, I think we could commit in good faith to attempt to get this issue resolved by mid week or the end of the week next week, if that's fair.

THE COURT:  All right.  Does that work for you?

MS. KAPLAN-MARANS:  Yes.  But with the *caveat* just that if we need to run different search terms we're sort of at the mercy of our e-discovery vendors and so it seems to be not a super quick turn-around time generally with running searches.  So I just would like to build in time for the plaintiffs are going to get us limited search terms to give us enough time to run them and assess the

results.

THE COURT:  All right.  Okay.  Well, I will leave that to you to communicate among yourselves.  That has not been an issue in this case so I won't get in the way of that.

Then with regard to any waiver issue, Mr. Davis, it may depend on whether you want to pursue this discovery or not and whether -- and if so, you may wish to wait to see that result before you present that issue again.  But if you do, you do have leave to file a motion on the docket in the traditional sense and we will resolve that once it's been fully briefed.

MR. DAVIS:  Understood.  Thank you, Your Honor.

THE COURT:  All right.  Anything else for us to take up today?

MS. KAPLAN-MARANS:  No.  Thank you, Your Honor.

MR. DAVIS:  No, Your Honor.

THE COURT:  All right.  Thank you.  We're in recess.

(Proceedings concluded)

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF GEORGIA

CERTIFICATE OF REPORTER

          I do hereby certify that the foregoing pages are a true and correct transcript of the proceedings taken down by me in the case aforesaid.

                    This the 17th day of November, 2025.


                              /S/ Alicia B. Bagley _____
                              ALICIA B. BAGLEY, RMR, CRR
                              OFFICIAL COURT REPORTER
                              (706) 378-4017