## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA

| | |
|---|---|
| BUCKS COUNTY EMPLOYEES RETIREMENT SYSTEM, on Behalf of Itself and All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>NORFOLK SOUTHERN CORPORATION, JAMES A. SQUIRES, ALAN H. SHAW, and CYNTHIA M. SANBORN,<br><br>Defendants. | Civil Action No. 1:23-CV-04175-SDG<br><br>ORAL ARGUMENT REQUESTED |

## DEFENDANTS' OPPOSITION TO LEAD PLAINTIFFS' MOTION FOR CLASS CERTIFICATION AND APPOINTMENT OF CLASS REPRESENTATIVES AND CLASS COUNSEL AND SUPPORTING MEMORANDUM OF LAW

## TABLE OF CONTENTS

INTRODUCTION ..................................................................................................1

FACTUAL BACKGROUND ...............................................................................3

  I.  Norfolk Southern's Business...........................................................................3

  II.  The East Palestine Derailment .......................................................................5

  III. The Challenged Statements............................................................................6

ARGUMENT .........................................................................................................8

  I.  The Lack Of Price Impact Precludes A Finding That Common Questions Of Reliance Predominate...............................................................8

    A.  The Alleged Misstatements Cannot Support An Inference Of Price Impact..................................................................................................11

      1. There is no "front end" price impact .......................................................11

      2. The alleged misstatements suffer a *Goldman* mismatch .......................13

    B.  The Purported Corrective Disclosures Do Not Support An Inference Of Price Impact............................................................................................20

      1. Many corrective disclosures were not accompanied by statistically significant price declines .......................................................................21

      2. Many alleged corrective disclosures did not reveal new information to the market..........................................................................................23

      3. Many alleged corrective disclosures were unrelated to, and thus could not correct, the challenged statements ..................................................29

  II.  If A Class Is Certified, It Must Be Shortened To Include Only Challenged Statements That Impacted The Stock Price And Valid Corrective Disclosures ......................................................................................34

  III. The Claims Of The Named Lead Plaintiffs Are Atypical And They Are Inadequate Representatives Of Post-Derailment Purchasers...........................35

    A.  Lead Plaintiffs Are Atypical Because They Lack Standing To Assert Claims Of Class Members Who Purchased After The Vent-And-Burn Statements ...............................................................................................35

    B.  Lead Plaintiffs Cannot Satisfy Rule 23(a) Because Purchasers After The Derailment Are Subject To Different Defenses .......................................38

CONCLUSION...................................................................................................40

# TABLE OF AUTHORITIES

Page(s)

## CASES

*A&M Gerber Chiropractic LLC v. GEICO General Insurance Co.*,
    321 F.R.D. 688 (S.D. Fla. 2017)........................................................35

*Abato v. Marcam Corp.*,
    162 F.R.D. 8 (D. Mass. 1995) ........................................................37

*Arkansas Teacher Retirement System v. Goldman Sachs Group*,
    77 F.4th 74 (2d Cir. 2023) ........................................................*passim*

*Babineau v. Federal Express Corp.*,
    576 F.3d 1183 (11th Cir. 2009) ........................................................10

*Basic Inc. v. Levinson*,
    485 U.S. 224 (1988)........................................................1, 9, 10, 23

*Beck v. Maximus, Inc.*,
    457 F.3d 291 (3d Cir. 2006) ........................................................37

*Brahman Partners II, L.P. v. Ocwen Financial Corp.*,
    2018 WL 11450091 (S.D. Fla. Dec. 4, 2018)........................................................32

*City of Warren General Employees' Retirement Sstem v.*
    *Teleperformance SE*,
    746 F. Supp. 3d 1395 (S.D. Fla. 2024)........................................................26

*Comcast Corp. v. Behrend*,
    569 U.S. 27 (2013)........................................................8, 36

*Dura Pharmaceuticals, Inc. v. Broudo*,
    544 U.S. 336 (2005)........................................................32

*Erica P. John Fund, Inc. v. Halliburton Co.*,
    309 F.R.D. 251 (N.D. Tex. 2015)........................................................21, 22

*FindWhat Investor Group v. FindWhat.com*,
    658 F.3d 1282 (11th Cir. 2011) ........................................................22, 23

*Gambrill v. CS Disco, Inc.*,
   2025 WL 3771433 (W.D. Tex. Dec. 16, 2025)...............................................32

*Goldman Sachs Group, Inc. v. Arkansas Teacher Retirement System*,
   594 U.S. 113 (2021)...............................................................................*passim*

*Halliburton Co. v. Erica P. John Fund, Inc.*,
   573 U.S. 258 (2014)......................................................................................9

*IBEW Local 98 Pension Fund v. Best Buy Co., Inc.*,
   818 F.3d 775 (8th Cir. 2016) ......................................................................11

*In re American International Group, Inc. Securities Litigation*,
   265 F.R.D. 157 (S.D.N.Y. 2010), *vacated and remanded on
   other grounds*, 689 F.3d 229 (2d Cir. 2012)..............................................21

*In re Boeing Co. Aircraft Securities Litigation*,
   2022 WL 3595058 (N.D. Ill. Aug. 23, 2022) ........................................30, 33

*In re Boeing Co. Aircraft Securities Litigation*,
   2026 WL 734721 (N.D. Ill. Mar. 16, 2026) ................................................34

*In re BP p.l.c. Securities Litigation*,
   2013 WL 6388408 (S.D. Tex. Dec. 6, 2013) .........................................39, 40

*In re Concho Resources, Inc.*,
   2025 WL 1040379 (S.D. Tex. Apr. 7, 2025)................................................14

*In re Equifax Inc. Securities Litigation*,
   357 F. Supp. 3d 1189 (N.D. Ga. 2019)........................................................33

*In re FibroGen Securities Litigation*,
   2024 WL 1064665 (N.D. Cal. Mar. 11, 2024) .......................................21, 23

*In re HealthSouth Corp. Securities Litigation*,
   213 F.R.D. 447 (N.D. Ala. 2003) ................................................................38

*In re Intuitive Surgical Securities Litigation*,
   2016 WL 7425926 (N.D. Cal. Dec. 22, 2016) .............................................29

*In re Key Energy Services, Inc. Securities Litigation*,
   166 F. Supp. 3d 822 (S.D. Tex. 2016).........................................................24

*In re Kirkland Lake Gold Ltd. Securities Litigation,*
  2024 WL 1342800 (S.D.N.Y. Mar. 29, 2024) ......................................... 14, 32

*In re Moody's Corp. Securities Litigation,*
  274 F.R.D. 480 (S.D.N.Y. 2011) ..................................................... 11, 28, 31

*In re Norfolk Southern Corp. Bond/Note Securities Litigation,*
  2026 WL 555420 (2d Cir. Feb. 27, 2026) ......................................... 11, 15, 16

*In re Omnicom Group, Inc. Securities Litigation,*
  597 F.3d 501 (2d Cir. 2010) ........................................................... 26, 28, 31

*In re Petrobras Securities Litigation,*
  104 F. Supp. 3d 618 (S.D.N.Y. 2015) .......................................................... 38

*In re Qualcomm Inc. Securities Litigation,*
  2023 WL 2583306 (S.D. Cal. Mar. 20, 2023) .................................. 16, 25, 27

*In re Scientific-Atlanta, Inc. Securities Litigation,*
  571 F. Supp. 2d 1315 (N.D. Ga. 2007) ............................................ 29, 34, 38

*In re TransDigm Group, Inc. Securities Litigation,*
  440 F. Supp. 3d 740 (N.D. Ohio 2020) ....................................................... 31

*In re Under Armour Securities Litigation,*
  719 F. Supp. 3d 438 (D. Md. 2024) ............................................................. 34

*In re Williams Securities Litigation-WCG Subclass,*
  558 F.3d 1130 (10th Cir. 2009) ................................................................... 17

*Jaeger v. Zillow Group, Inc.,*
  2025 WL 2741642 (9th Cir. Sep. 26, 2025) ............................................ 20, 30

*Katyle v. Penn National Gaming, Inc.,*
  637 F.3d 462 (4th Cir. 2011) ...................................................................... 30

*Local 703, I.B. of T. Grocery & Food Employees Welfare Fund v.*
  *Regions Financial Corp.,*
  762 F.3d 1248 (11th Cir. 2014) ................................................................... 34

*Luczak v. National Beverage Corp.,*
  548 F. Supp. 3d 1256 (S.D. Fla. 2021) ....................................................... 35

*MacPhee v. MiMedx Group, Inc.*,
  73 F.4th 1220 (11th Cir. 2023) ........................................................23, 30, 37

*Meyer v. Greene*,
  710 F.3d 1189 (11th Cir. 2013) .......................................................23, 28, 29

*Pardi v. Tricida, Inc.*,
  2024 WL 4336627 (N.D. Cal. Sep. 27, 2024) ...............................................31

*Prado-Steiman ex rel. Prado v. Bush*,
  221 F.3d 1266 (11th Cir. 2000) ....................................................................35

*Public Employees' Retirement System of Mississippi v. Amedisys, Inc.*,
  769 F.3d 313 (5th Cir. 2014) ........................................................................28

*Ramirez v. Exxon Mobil Corp.*,
  2023 WL 5415315 (N.D. Tex. Aug. 21, 2023) .............................................22

*Sapssov v. Health Management Associates, Inc.*,
  608 F. App'x 855 (11th Cir. 2015) ...............................................................30

*Shupe v. Rocket Cos.*,
  752 F. Supp. 3d 735 (E.D. Mich. 2024) .....................................12, 14, 19, 24

*Sjunde AP-Fonden v. Goldman Sachs Group, Inc.*,
  798 F. Supp. 3d 416 (S.D.N.Y. 2025) ..........................................................33

*Valley Drug Co. v. Geneva Pharmaceuticals, Inc.*,
  350 F.3d 1181 (11th Cir. 2003) ....................................................................37

*West Virginia Pipe Trades Health & Welfare Fund v. Medtronic, Inc.*,
  325 F.R.D. 280 (D. Minn. 2018) .............................................................25, 29

## STATUTES, RULES, AND REGULATIONS

Fed. R. Civ. P. 23 .............................................................................2, 9, 35, 37

## OTHER AUTHORITIES

1 Joseph M. McLaughlin, McLaughlin on Class Actions § 5:26 (22nd
  ed. 2025) .......................................................................................................20

Per Axelson & Matthew D. Cain, *What Is Price Impact? How the*
Goldman *Decisions Are Reshaping Shareholder Class Actions*,
22 Berkeley Bus. L.J. 441, 443 (2025)..............................................................9

**INTRODUCTION**

Lead Plaintiffs' proposed class is premised on alleged misstatements that match—nearly verbatim—those that the Supreme Court rejected as too generic to support class certification in *Goldman Sachs Group, Inc. v. Arkansas Teacher Retirement System*, 594 U.S. 113 (2021) ("*Goldman I*"). *Goldman I* fundamentally changed the landscape for class certification in securities class actions, holding that price impact—which is necessary to certify the class—breaks down where the challenged statements are "generic" but the alleged corrective disclosures are "specific." *Id.* at 123. Lead Plaintiffs' opening brief simply ignores *Goldman I*. It discusses only market efficiency, which Defendants do not contest. Regardless, under *Goldman I*, the generic challenged statements, which include "[s]afety is a way of life at Norfolk Southern," ¶ 411,[1] and "[s]afety is core to [Norfolk Southern's] business," ¶ 415, are mismatched with the specific alleged corrective disclosures about a particular derailment, making it "less likely that the specific disclosure actually corrected the generic misrepresentation." *Goldman I*, 594 U.S. at 123.

Ignoring *Goldman I*, Lead Plaintiffs proceed to invoke the class-wide "fraud-on-the-market" presumption of reliance in *Basic Inc. v. Levinson*, 485 U.S. 224 (1988), to satisfy Federal Rule of Civil Procedure 23(b)(3). That presumption does

---

[1]    Unless otherwise noted, all "¶" citations are to the Consolidated Complaint for Violations of the Federal Securities Laws (ECF No. 82).

not apply where, as here, the company's alleged misstatements had no impact on the price of its stock. Most fundamentally, Norfolk Southern's stock price showed no increase on any of the dates that Defendants made the challenged statements, except three. The economic evidence shows that on those three days, the increases were caused by other confounding news. The economic evidence also demonstrates that Norfolk Southern's generic statements about safety had nothing to do with any decline in its stock price after the East Palestine derailment on February 3, 2023. Rather, the stock price fell because the market correctly recognized the potential for a costly cleanup process and future environmental and personal injury litigation. With no evidence of price impact, the *Basic* presumption falls away, and individual issues of reliance predominate.

Separately, Lead Plaintiffs also cannot establish typicality or adequacy under Rule 23(a). None purchased stock after February 3, 2023. The premise of Lead Plaintiffs' case is that the East Palestine derailment represented a seismic shift in the market's perception of Norfolk Southern's safety profile. If the Court accepts this premise, investors who purchased stock after the derailment necessarily are differently situated with respect to "safety." Moreover, the five challenged statements after the derailment involve different defenses and cannot be litigated efficiently with the rest of the case. For both reasons, Lead Plaintiffs are inadequate representatives as to the period between February 3, 2023 and March 3, 2023.

2

# FACTUAL BACKGROUND

## I.    Norfolk Southern's Business

Norfolk Southern owns Norfolk Southern Railway Company, one of six Class I railroads in North America.  ¶ 73 & n.2.  Like any method of transport, running a Class I railroad entails some level of risk, including a risk of derailments. Norfolk Southern's public derailment data shows that it had, on average, slightly more than three derailments per month between October 28, 2020 and March 3, 2023 (the putative "Class Period"), which is in line with the other Class I railroads.  Ex. 1 (Expert Report of Glenn Hubbard April 16, 2026) ("Hubbard Rep.") ¶¶ 148-49. Given this level of frequency, informed investors bought Norfolk Southern stock with awareness that a derailment was nearly certain to occur if they held the stock in their portfolio for a period of months.

In 2019, Norfolk Southern began to employ elements of a new operations model widely adopted throughout the rail industry called Precision Scheduled Railroading ("PSR").[2]  Norfolk Southern called the new program the "TOP21" program.  ¶¶ 72-75, 79-80, 102.  When Norfolk Southern launched TOP21, it announced a goal to reduce its operating ratio, a metric calculated by dividing operating expenses by operating revenues, to 60% by 2021.  ¶¶ 75, 79-80.  To

---

[2]    During the Class Period, five of the six Class I railroads employed principles of PSR.  ¶ 73 & n.2.

achieve this, Norfolk Southern disclosed that it would reduce its workforce, run longer trains, and tighten capital expenditures.  ¶¶ 80-81.

The benefits and risks of these operational decisions (at Norfolk Southern and more generally across the industry) were well known.  For example, Norfolk Southern disclosed in its 2020 annual report that it had "improved productivity by driving year-over-year average headcount down by 18%." Ex. 2 (Norfolk Southern's 2020 Form 10-K) at K19.  Norfolk Southern's Chief Operations Officer stated during a January 27, 2021 earnings call that the "push for efficiency led to record train weight and record train length in the quarter," and that it got "the job done with a smaller workforce." ¶ 409.  On December 1, 2021, the Company stated publicly that training for conductors had been compressed to "about 10 weeks." ¶ 439.

Public figures also made statements regarding PSR.  In 2022, the U.S. House of Representatives held a public hearing at which a Federal Railroad Administration representative stated that the agency "caught some situations where the training and certification process needs to be improved" and "contacted the railroads directly" about this issue. ¶¶ 91-92.  In addition, a union representative testified that, after the implementation of PSR, "on all the Class I's, carmen [are] only allowed 1 minute for inspection." ¶ 93.  Norfolk Southern representatives were also questioned about the Company's implementation of PSR at the hearing. ¶¶ 95-97, 416.  That hearing broadly publicized many of the practices that Lead Plaintiffs now claim were

4

revealed only *after* the derailment.  ¶¶ 87-94, 98-101.

Meanwhile, documents produced in discovery show that, during the Class Period, Norfolk Southern took concrete steps to mitigate accident risk.  ███████ ████████████████████████████████████████████████████████  ECF No. 185-3 at 1.  █████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

█████████████████████████████  ECF No. 185-5 at 1.  ██████████████

██████████████████████████████████████████████████████████

██████████████████████████  *Id.* at 2; *see also* ECF No. 185-6 at 4 (████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

█████████████████  ); ECF No. 185-6 at 51 (███████████████████

██████████████████████████████████████████████████████████  ).

## II.    The East Palestine Derailment

On February 3, 2023, a Norfolk Southern train derailed in East Palestine, Ohio.  ¶ 277.  The derailment occurred after a wheel bearing overheated and failed. ¶ 4.  A fire ignited at the derailment site affecting several of the train's cars, including five cars carrying vinyl chloride, a combustible and hazardous material.  ¶¶ 278-81.

An emergency response team, which included the local fire chief, state and federal officials, and Norfolk Southern's emergency contractors, was concerned about the risk of polymerization, a chemical reaction occurring when vinyl chloride is exposed to extreme heat, which can cause a catastrophic explosion. ¶¶ 327-28.

On February 5, Ohio Governor DeWine issued a notice ordering the evacuation of anyone within one mile of the derailment site. ¶ 446. The order stated: "Within the last two hours, a drastic temperature change has taken place in a rail car, and there is now the potential of a catastrophic tanker failure which could cause an explosion with the potential of deadly shrapnel traveling up to a mile." *Id.* Given these risks, the local fire chief directed Norfolk Southern's contractors to relieve pressure from the vinyl chloride cars. ¶ 343. The next day, Norfolk Southern's contractors conducted a controlled "vent and burn" of the vinyl chloride cars ordered by the local fire chief. ¶¶ 341-43, 356.

## III.    The Challenged Statements

Lead Plaintiffs assert that 30 of Norfolk Southern's public statements concerning the "safety" of its operations were false or misleading. ¶¶ 407-19, 422, 424-25, 427, 429, 431, 433-34, 437-43. Of the 30 safety statements, the Court has previously described multiple as "very vague," while noting that others merely "extol safety in the abstract." ECF No. 115 at 17-18 (citing ¶¶ 410-11, 414-15); *see also* ¶¶ 407-08, 410-16, 418-19, 422, 424, 427, 441. These include:

- "During a year of unprecedented market disruption and uncertainty, *the Norfolk Southern team delivered record productivity levels while providing safe and reliable freight solutions* for our customers," ¶ 408;

- "We achieved these records due to their hard work and *most importantly, we did so safely*," ¶ 409;

- "*Safety is a way of life at Norfolk Southern, extending beyond our rail operations and into the communities where we live and work*," ¶ 411;

- "*The Board is committed to safety as a core value of Norfolk Southern*," ¶ 414; *see also* ¶ 410; and

- "*[S]afety is top down-bottom up*," ¶ 415.

The Court noted that the remaining safety statements "speak to Norfolk [Southern]'s emphasis on safety within particular programs."  ECF No. 115 at 18. The program statements include:

- "*Our capital spending and replacement programs are and have been designed to assure the ability to provide safe, efficient, and reliable rail transportation services*," ¶¶ 433-34;

- "*[W]e streamlined the hiring process, still very focused on safety*," ¶ 439; and

- "*[I]t's going to take us 3 to 4 months to train crews because we're not going to cut corners on safety*," ¶ 440.

Although no challenged safety statement makes any representation about the risk of derailments, a risk Norfolk Southern fully and repeatedly disclosed,[3] Lead Plaintiffs

---

[3]    Norfolk Southern repeatedly warned of the risk of a "catastrophic rail accident … involving … [the] release of hazardous materials, freight loss, property damage, personal injury, and environmental liability" that could cause losses that would

nonetheless allege that these statements were somehow "corrected" by some combination of: (1) the East Palestine derailment; (2) a series of press, regulatory, and analyst reports discussing the derailment, (3) statements by politicians about the derailment, and (4) two other unrelated minor derailments. ¶¶ 508-52.

Lead Plaintiffs also claim that Norfolk Southern made five additional false statements about the vent and burn, ¶¶ 446-47, 449-51, 453, "concealing that [it] was *not* necessary to prevent the … cars from exploding." Mot. at 10; *see also* ECF No. 115 at 17 n.109. Lead Plaintiffs allege no disclosure about the necessity, or not, of the vent and burn that could "correct" these statements.

## ARGUMENT

### I.    The Lack Of Price Impact Precludes A Finding That Common Questions Of Reliance Predominate

Plaintiffs' proposed class falls short on the required element of predominance.[4] Lead Plaintiffs have not demonstrated that common questions of reliance—an essential element of Lead Plaintiffs' Section 10(b) claim—

---

"exceed [Norfolk Southern's] insurance coverage, resulting in a material adverse effect on [its] liquidity." *E.g.*, ECF No. 99-3 (Norfolk Southern's 2021 Form 10-K) at K12, K14; ECF No. 99-4 (Norfolk Southern's 2022 Form 10-K) at K13-K14.

[4]    Like for any class, plaintiffs in securities class actions "must affirmatively demonstrate [their] compliance" with Rule 23. *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013). Plaintiffs bear the burden of proof for each element of Rule 23(a)— numerosity, typicality, commonality, and adequacy—as well as the superiority and predominance requirements of Rule 23(b)(3).

"predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3); *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 276 (2014) ("*Halliburton II*"). Lead Plaintiffs' "fraud on the market" theory, *see* Mot. at 16, fails because neither the quantitative nor the qualitative evidence shows that the challenged statements impacted the stock price. *See Basic*, 485 U.S. at 225 (presumption allows courts to assume that all buyers relied on alleged misrepresentation); *Halliburton II*, 573 U.S. at 281-82 (presumption applies only where misrepresentation impacted the stock price). In securities class actions where the *Basic* presumption is invoked, defendants "must be afforded an opportunity before class certification to defeat the presumption" through evidence of a lack of price impact. *Halliburton II*, 573 U.S. at 284. And it is well-established that, if they do so, "a Rule 10b-5 suit cannot proceed as a class action." *Id*. at 281-82.

As Lead Plaintiffs' own expert has recognized, *Goldman I* "altered th[e] landscape" for evaluating the price impact of alleged misstatements, Per Axelson & Matthew D. Cain, *What Is Price Impact? How the* Goldman *Decisions Are Reshaping Shareholder Class Actions*, 22 Berkeley Bus. L.J. 441, 443 (2025), holding that "[a]ny showing that severs the link between the alleged misrepresentation and either the price received (or paid) by the plaintiff" demonstrates a lack of price impact that can rebut the *Basic* presumption, *Goldman I*, 594 U.S. at 118 (quoting *Basic*, 485 U.S. at 248); *see also* Ex. 3 (Transcript of April

9

2, 2026 Deposition of Matthew D. Cain, Ph.D.) ("Cain Dep. Tr.") 128:3-13 (price impact questions have "increased significantly" since *Goldman I*), 133:25-134:4 (similar). When evaluating this question, *Goldman I* instructs that lower courts should be "open to *all* probative evidence" to determine "whether it is more likely than not that the alleged misrepresentations had a price impact," *Goldman I*, 594 U.S. at 127, even where the evidence "overlaps with materiality or any other merits issue," *id*. at 124; *see also Babineau v. Fed. Express Corp.*, 576 F.3d 1183, 1190 (11th Cir. 2009) (courts must "consider the merits of the case to the degree necessary to determine whether the requirements of Rule 23 will be satisfied").

Here, analysis of the challenged statements and alleged corrective disclosures reveals the absence of price impact. The challenged statements had no price impact because Norfolk Southern's stock price typically did not increase when they were made, and they are so generic that investors would not have connected them to the specific derailment news that Lead Plaintiffs claim was corrective. Similarly, the corrective disclosures either fail to disclose new information, because all relevant information about PSR and Norfolk Southern's practices was already known to investors, or they do not reveal the supposed "truth" about any challenged statement because they are unconnected in substance to those statements.

10

**A.**   **The Alleged Misstatements Cannot Support An Inference Of Price Impact**

1.   There is no "front end" price impact

First, for the vast majority of the challenged statements, there was no "front end" price impact, meaning no statistically significant price increase on the days Norfolk Southern made these statements.   Hubbard Rep. ¶ 104.[5]   Thus, Lead Plaintiffs cannot show that these challenged statements impacted the price of the Company's stock when made.   *See IBEW Loc. 98 Pension Fund v. Best Buy Co., Inc.*, 818 F.3d 775, 782 (8th Cir. 2016) (lack of "front-end" price impact rebutted the *Basic* presumption); *In re Moody's Corp. Sec. Litig.*, 274 F.R.D. 480, 492 (S.D.N.Y. 2011) (similar).

As discussed in Dr. Hubbard's report, Norfolk Southern's stock price experienced statistically significant increases on the days of only three alleged misstatements: January 27, 2021, December 1, 2021, and April 27, 2022.   Hubbard Rep. ¶ 120.   Even for these three dates, the evidence demonstrates that the price increase was unrelated to the alleged misstatements.   *See* Cain Dep. Tr. 184:18-185:5

---

[5]   This is unsurprising; as Dr. Hubbard explains, information regarding Defendants' operational safety and derailment risk was widely available before and after the alleged misstatements, and Norfolk Southern and other Class I railroads repeatedly made similar statements before and after the Class Period.   Hubbard Rep. §§ V.A-B, V.D.   And the Second Circuit recently affirmed that several of the challenged statements, and other analogous statements, were puffery on which no reasonable investor would have relied.   *See In re Norfolk S. Corp. Bond/Note Sec. Litig.*, 2026 WL 555420, at *1-2 (2d Cir. Feb. 27, 2026).

(noting that "statistical significance … alone is not sufficient to assess … whether the stock price is responding to a specific disclosure").  This is because on all three dates, Norfolk Southern also released unrelated, positive news that caused the price to increase.  On January 27, 2021, Norfolk Southern reported fourth quarter results that analysts described as "handily beat[ing]" estimates.  Hubbard Rep. ¶¶ 121-25.  On December 1, 2021, Norfolk Southern announced improvements to productivity and reiterated its full-year guidance, which drove a price increase.  *Id.* ¶¶ 126-29.  And on April 27, 2022, Norfolk Southern announced positive financial news, which quelled investor fears of a negative revision to full-year guidance; analyst reports pointed to this as the reason that the stock "revert[ed] some of its underperformance" on that day.  *Id.* ¶¶ 130-33.  While the analyst reports from these three dates mention the positive financial news, not one mentioned any of the alleged misstatements.

Meanwhile, of the nearly 1,000 analyst reports during the Class Period, analysts alluded to only one of the 30 challenged safety statements; even for that one statement, analysts did so only in the context of increased hiring after the COVID-19 pandemic, not in the context of safety.  *Id.* ¶¶ 111-19.  This lack of market commentary reinforces that the market (and price of Norfolk Southern's stock) was not reacting to the alleged misstatements on these dates.  *Shupe v. Rocket Cos.*, 752 F. Supp. 3d 735, 779 (E.D. Mich. 2024) (evidence from analyst reports and "broader context surrounding [defendant's] business at the time" of the alleged misstatements,

12

including evidence of confounding news, was "largely dispositive" of price impact); Cain Dep. Tr. 90:6-11 (stating that analyst commentary "is a relevant factor that financial economists look at in considering questions of price impact").

### 2. The alleged misstatements suffer a *Goldman* mismatch

As the evidence strongly undermines any front-end impact for the 30 alleged misstatements, Lead Plaintiffs resort to a claim of inflation maintenance. ¶ 509; Mot. at 17. Inflation maintenance cases use a back-end price drop, meaning a drop in the stock price following an allegedly corrective disclosure, as an "indirect proxy" for price impact at the front end, with the assumption that the challenged statements maintained an artificially high stock price until the truth was revealed. *Ark. Tchr. Ret. Sys. v. Goldman Sachs Grp.*, 77 F.4th 74, 80 (2d Cir. 2023) ("*Goldman II*"); *Goldman I*, 594 U.S. at 123. Even under an inflation-maintenance theory, there is no evidence of price impact from the challenged statements.

The Supreme Court counseled in *Goldman I* that where "the contents of the misrepresentation and the corrective disclosure" are not closely linked, the disclosure is "less likely" to have actually corrected the alleged misrepresentation. *Goldman I*, 594 U.S. at 123. Specifically, where an alleged misrepresentation is generic, such as "we have faith in our business model," and the alleged correction is more specific, the inference that the back-end price drop reflects front-end inflation "starts to break down." *Id.* On remand from *Goldman I*, the Second Circuit, in

13

*Goldman II*, laid out a three-part test (applied by other courts)[6] for how to apply the Supreme Court's guidance.  Courts should assess: (1) whether there is a "gap" or "mismatch" between the content of the front- and back-end disclosures; (2) whether a "truthful … substitute" for the alleged misstatement would have impacted the stock price; and (3) other "indirect evidence of price impact," such as market commentary on the alleged misrepresentations.  *Goldman II*, 77 F.4th at 102-03.  Applying the test here, the back-end price declines that Lead Plaintiffs cite do not reflect front-end price inflation.  *Cf., e.g.*, ¶¶ 24, 515, 521, 525.

Mismatch in Specificity.  The 30 challenged safety statements are disconnected from any alleged corrective disclosure.  These challenged statements fall into two categories: aspirational platitudes, ¶¶ 407-08, 410-16, 418-19, 422, 424, 427, 441, and general descriptions of Norfolk Southern's operations, both current and planned, ¶¶ 409, 417, 425, 429, 431, 433-34, 437-39, 440, 442-43.  On the other hand, the alleged corrective disclosures are specific.  They consist of: (1) three derailments; and (2) press reports, statements by public figures and regulators, and analyst reports discussing the East Palestine derailment.  ¶¶ 508-52.

The challenged safety statements are at least as generic as the statements that

---

[6]   *See, e.g.*, *In re Kirkland Lake Gold Ltd. Sec. Litig.*, 2024 WL 1342800, at *7-10 (S.D.N.Y. Mar. 29, 2024); *In re Concho Res., Inc.*, 2025 WL 1040379, at *12 (S.D. Tex. Apr. 7, 2025); *Shupe*, 752 F.Supp.3d at 780-81.

the Court held "sever[ed] the link" in *Goldman I* itself. *Goldman I*, 594 U.S. at 118. They include statements that Norfolk Southern "is committed to safety as a core value," ¶ 414; that "the Norfolk Southern team … provid[ed] safe and reliable freight solutions," ¶ 408; and that "[s]afety is a way of life at Norfolk Southern," ¶ 411, and "part of who [Norfolk Southern is]," ¶ 415. Viewed side-by-side with the statements in *Goldman I*, the similarity is striking:

| Statements in *Goldman I* | Statements by Norfolk Southern |
|---|---|
| "Integrity and honesty are at the heart of our business." 594 U.S. at 120. | "Safety is part of who we are. Safety is core to our business…" ¶ 415. |
| "Our clients' interests always come first." 594 U.S. at 120. | "None of the three elements listed – safety, customer service, or returning value to shareholders – has to come at the expense of the others. Safety is paramount." ¶ 417. |
| "We have extensive procedures and controls that are designed to identify and address conflicts of interest." 594 U.S. at 120. | "Our capital spending and replacement programs are and have been designed to assure the ability to provide safe, efficient, and reliable rail transportation services." ¶ 434. |

Indeed, this Court previously recognized that several of the challenged statements merely "extol safety in the abstract" or are "very vague." ECF No. 115 at 17-18. And in parallel litigation, the Second Circuit recently confirmed that several of these same challenged safety statements were so generic that they constitute inactionable puffery. *See Norfolk Southern Corp. Bond/Note Sec. Litig.*, 2026 WL 555420, at *1-2. The Second Circuit referred to the statements as "mere[] generalizations regarding Norfolk Southern's business practices" and noted that nearly all Class I railroads made similar statements, which it held "only further

15

illustrates that '[n]o investor would take such statements seriously in assessing a potential investment.'" *Id*. at *1; *see also* Hubbard Rep. ¶ 138.

Moreover, statements need not qualify as puffery to be vague in relation to the specificity of the purported corrective disclosures. *See, e.g.*, *Goldman II*, 77 F.4th at 95-96, 103-04 (analyzing "Conflicts Disclosure" misstatements for mismatch without disputing district court's conclusion that they were not so generic to be immaterial); *In re Qualcomm Inc. Sec. Litig.*, 2023 WL 2583306, at *12 (S.D. Cal. Mar. 20, 2023) (generic positive statements about company's service distribution did not match specific disclosures showing the limited scope of that distribution). Even challenged statements that refer to certain aspects of Norfolk Southern's operations are still about Norfolk Southern's practices in general over time. *See, e.g.*, ¶ 439 ("We streamlined the hiring process, still very focused on safety."); ¶ 440 ("[I]t's going to take us 3 to 4 months to train crews because we're not going to cut corners on safety."); ¶ 442 ("Already we are seeing visible upticks in qualified employees.").

In contrast, the purported back-end corrective disclosures are all specific to an event—either the East Palestine derailment or the minor derailments that occurred immediately after. *See, e.g.*, ¶¶ 511-12, 532, 543 (alleging that particular derailments themselves were corrective disclosures); ¶¶ 514, 518, 551-52 (press about the East Palestine derailment alleged as corrective disclosures); ¶¶ 522-23, 547 (statements by regulators regarding East Palestine alleged as corrective disclosures). This

16

creates a gap in specificity between the challenged statements and their counterpart corrective disclosures. For example, the alleged misstatement related to hazardous materials is that "safety extends to hazardous materials too," ¶ 429, which is generic when compared to the alleged corrective—and very specific—disclosure that "numerous residents described hazardous air quality and other health and environmental concerns" upon their return to East Palestine, ¶ 519.

Turning to the vent-and-burn statements, Lead Plaintiffs' allegations cannot establish any price impact with respect to these challenged statements, ¶¶ 446-47, 449-51, 453, because Lead Plaintiffs have identified *no* disclosures that allegedly reveal these statements to be false.[7] While Lead Plaintiffs claim (for example) that Defendants "concealed that the 'vent and burn' was unnecessary," ¶ 445, no purported corrective disclosure concerns the necessity of the vent and burn, *see* ¶¶ 508-52. Without any corrective disclosure, there can be no corresponding back-

---

[7] Neither Lead Plaintiffs nor their expert have offered a consistent identification of alleged corrective disclosures, let alone which disclosures corrected which alleged misstatements. *See, e.g.*, Cain Dep. Tr. 192:8-23, 194:7-25 (acknowledging Lead Plaintiffs have not attempted a "one-to-one mapping of individual misstatements to individual corrective disclosures"); *compare, e.g.*, ¶¶ 543, 545 (describing a March 4 derailment as a "partial corrective disclosure and materialization of the risks concealed"), *with* Mot. at 10 (March 4 not among disclosure dates listed) *and* ECF No. 185-2 at 5-7 (same). This alone is enough to deny Lead Plaintiffs' motion. *Cf. In re Williams Sec. Lit.-WCG Subclass*, 558 F.3d 1130, 1140 (10th Cir. 2009) (plaintiffs could not show disclosures were "corrective" where plaintiffs' expert "could not tie these four particular disclosures to any of the alleged misrepresentations or describe why they should be considered 'corrective'").

end price impact to impute to this group of challenged statements.[8]  This "mismatch between the contents of the misrepresentation[s] and the corrective disclosure" defeats any possible inference that the challenged vent-and-burn statements inflated the stock price.  *Goldman I*, 594 U.S. at 123.

In sum, for all of the challenged statements, there is a considerable gap in specificity when compared to the corrective disclosures.  This mismatch precludes an inference of price impact under *Goldman I*.  *Id*.

Truthful Substitute.  After demonstrating a mismatch between the challenged safety statements and the purported corrective disclosures, the next step of the *Goldman II* analysis is to consider whether equally generic, indisputably truthful statements—either hypothetical statements or statements the Company actually made—would have impacted Norfolk Southern's stock price.  *See Goldman II*, 77 F.4th at 98-99.  If the Company's stock price would not fall in the wake of such a substitute disclosure, there can be no inference that a similarly generic misstatement inflated the Company's value.

Here, there is no need for the Court to consider "hypothetical" truthful substitutes because "news articles, government reports, public disclosures from [Norfolk Southern] and its peers, and analysts' commentary" discussed the very

---

[8]    And, as discussed above, the statements did not coincide with any front-end price increases, either.  *See supra* Part I.A.1.

18

operational and safety risks that Lead Plaintiffs allege that Defendants buried. Hubbard Rep. ¶ 78. When this commentary was released, no "inflation" was corrected. *See id.* Although the statements in news articles, government reports, and the Company's disclosures may not be "equally generic" as the challenged statements, these specific truthful substitutes prove, collectively, that the alleged misstatements could not have inflated the stock's value.

Market Analysis. Should any doubt remain, a review of relevant analyst commentary confirms that Lead Plaintiffs' proffered inference of back-end relation cannot be supported. *See Goldman II*, 77 F.4th at 102-04. *Goldman II* invites courts to consider contemporaneous "market commentary" evincing investors' reliance (or lack thereof) on the alleged misstatements. *Id.* at 104; *see also* Cain Dep. Tr. 92:20-25 (acknowledging that analyst commentary "can be relevant" to both front-end and back-end price impact). No analyst report during the Class Period mentioned any of the alleged misstatements directly, particularly in the context of safety. *See* Hubbard Rep. ¶¶ 110-19, 169. This weighs heavily against a finding of price impact. *See Shupe*, 752 F. Supp. 3d at 779 (expert report showing that analysts did not discuss misstatements was "largely dispositive" price impact). Very few analysts discussed safety at all, Hubbard Rep. ¶¶ 110-14, and even then, "commentary touching upon only the same subject matter … cannot be enough," *Goldman II*, 77 F.4th at 104.

This silence is even more striking given that the East Palestine derailment spawned extensive "news coverage" generally.  *Goldman II*, 77 F.4th at 103.

In sum, for each prong of the *Goldman II* analysis, the evidence conclusively demonstrates that the alleged misstatements are so mismatched from the corrective disclosures that the alleged misstatements could not have inflated the Company's stock price through an inflation-maintenance theory.

### B.      The Purported Corrective Disclosures Do Not Support An Inference Of Price Impact

Lead Plaintiffs' inflation-maintenance theory also fails because none of Lead Plaintiffs' purported corrective disclosures supports an inference of price impact.

Before certifying a class, courts "must evaluate whether an asserted corrective disclosure in fact qualifies" as both corrective and a disclosure.  1 Joseph M. McLaughlin, McLaughlin on Class Actions § 5:26 (22nd ed. 2025); *see also id*. (courts cannot "simply assume[] at the class certification stage—when evidence must be considered and findings relating to predominance made—that a disclosure is corrective").  Following *Goldman I*, courts "look[] to loss-causation case law for guidance" to assess whether an alleged corrective disclosure can serve as a proxy for front-end price impact.  *Jaeger v. Zillow Grp., Inc.*, 2025 WL 2741642, at *1 (9th Cir. Sep. 26, 2025); *Goldman I*, 594 U.S. at 122 (courts must consider probative evidence "regardless [of] whether the evidence is also relevant to a merits question"); Cain Dep. Tr. 74:24-25 (acknowledging "overlapping elements within a

loss causation analysis and a price impact inquiry"). A corrective disclosure supports an inference of price impact if the corrective statement is (i) "'value relevant' (*i.e.*, caused at least some of the stock price decline)," (ii) "new (unknown to the market … )," and (iii) "corrective of one or more prior false statements or omissions." *In re FibroGen Sec. Litig.*, 2024 WL 1064665, at *12 (N.D. Cal. Mar. 11, 2024).

Lead Plaintiffs appear to allege corrective disclosures on February 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 15, 16, and 17; March 4, 6, 7, 8; and October 25. ¶¶ 511-52. As set forth below, none of these was value-relevant, new, and corrective.

    1.    <u>Many corrective disclosures were not accompanied by statistically significant price declines</u>

The quantitative evidence demonstrates that the disclosures on February 3-6 and February 17 had no price impact. ¶¶ 511-14, 537; Hubbard Rep. ¶¶ 162-64, 213. "[T]he absence of a price decline" on the day of an alleged disclosure "will strongly indicate that there was also no price increase on the day the fraud occurred," and thus no price impact. *In re Am. Int'l Grp., Inc. Sec. Litig.*, 265 F.R.D. 157, 182 (S.D.N.Y. 2010), *vacated and remanded on other grounds*, 689 F.3d 229 (2d Cir. 2012); *see also Erica P. John Fund, Inc. v. Halliburton Co.*, 309 F.R.D. 251, 269-76 (N.D. Tex. 2015) (examining timing evidence and denying certification as to five corrective disclosures based on the absence of statistically significant price reactions, reasoning in part that an efficient market "is said to digest or impound news into the stock price in a matter of minutes").

The analysis prepared by Lead Plaintiffs' own expert economist (Dr. Cain) reveals that on February 6—the first day of trading after the East Palestine derailment and the days of intense news coverage that followed, ¶¶ 511-14—Norfolk Southern's stock experienced *no statistically significant decline*. Hubbard Rep. ¶¶ 162-64. Dr. Cain's analysis similarly refutes any statistically significant decline on February 17, the date of another proposed corrective disclosure (Senator Cantwell's letter to Class I Railroads, ¶ 537). *See* Hubbard Rep. ¶ 213 (discussing Dr. Cain's analysis).

Nor can Lead Plaintiffs rely on stock price declines that occurred days after an alleged corrective disclosure to establish price impact, *see, e.g.*, ¶¶ 518, 521 (attributing stock decline on February 9 to disclosure on February 7); ¶¶ 522, 525 (attributing stock decline on February 14 to disclosure on February 10). "[A]n efficient capital market *rapidly* and *efficiently* digests all available information." *FindWhat Invr. Grp. v. FindWhat.com*, 658 F.3d 1282, 1310 (11th Cir. 2011) (emphasis added); Cain Dep. Tr. 222:23-223:1 ("[I]n my own experience on average the types of disclosures that people tend to study on average are frequently fully impounded within one day."). Thus, in an efficient market, it does not take multiple days for new information to impact stock prices. *See Erica P. John Fund*, 309 F.R.D. at 269; *see also Ramirez v. Exxon Mobil Corp.*, 2023 WL 5415315, at *14 (N.D. Tex. Aug. 21, 2023). And Lead Plaintiffs "cannot contend that the market is efficient"

22

for purposes of invoking the *Basic* presumption "and then cast the theory aside when it no longer suits their needs" by suggesting that the market took as long as four days to absorb a particular disclosure. *Meyer v. Greene*, 710 F.3d 1189, 1198-99 (11th Cir. 2013); ¶¶ 522, 525; *see also* Cain Dep. Tr. 63:21-23 ("[A]cademic research shows that information can be impounded into stock prices before a trade even takes place.").

 2.     Many alleged corrective disclosures did not reveal new information to the market

Because the efficient-market theory on which the *Basic* presumption rests holds that "all publicly available information about a security is reflected in the market price of the security," an alleged corrective disclosure "obviously must disclose new information" to have a price impact. *MacPhee v. MiMedx Grp., Inc.*, 73 F.4th 1220, 1243, 1246 (11th Cir. 2023) (citation omitted); *see also FibroGen*, 2024 WL 1064665, at *12 (front-end price impact cannot be inferred from back-end price drop unless back-end disclosure was "new (unknown to the market … )") (citing *Goldman I*, 594 U.S. at 122-24; *Basic*, 485 U.S. at 238, 248). For the same reason, "'disclosure of confirmatory information—or information already known by the market—will not cause a change in the stock price' because 'the market has already digested that information and incorporated it into the price.'" *MacPhee*, 73 F.4th at 1243 (quoting *FindWhat*, 658 F.3d at 1310). Because many of Lead

23

Plaintiffs' alleged corrective disclosures did not reveal any new information, those disclosures cannot have resulted in any loss attributable to front-end price impact.

First, the East Palestine derailment (and subsequent derailments cited as additional corrective disclosures) reflected only the materialization of a risk that was well-known to the investing public. ¶¶ 511-12, 532, 543; Hubbard Rep. ¶¶ 143-45. Norfolk Southern's 10-K filings repeatedly warn of the risk that a "catastrophic rail accident … involving any or all of release of hazardous materials, freight loss, property damage, personal injury, and environmental liability could compromise critical parts of our rail network." *See, e.g.*, ECF No. 99-3 at K12, K14; ECF No. 99-4 at K13-K14; Hubbard Rep. ¶¶ 71-73; *id.* ¶ 96 (quoting Norfolk Southern's Q3 2019 earnings call warning of financial impact of "a large derailment"). Federal regulators and other researchers published reports and Company-disclosed data on accidents and derailments across the industry before and during the class period. Hubbard Rep. ¶¶ 56-62, 65-70. As a matter of law (and common sense), "the materialization of risks that the Company has previously disclosed and warned against are not corrective disclosures." *In re Key Energy Servs., Inc. Sec. Litig.*, 166 F. Supp. 3d 822, 865 (S.D. Tex. 2016); *see also Shupe*, 752 F. Supp. 3d at 779 (when defendant's "publicly available SEC filings and risk disclosures discussed" specific risk, this suggested no price impact from alleged misstatements). And indeed, analyst and media reports throughout the Class Period commented on that data and

warned of the risk of derailments, including those involving hazardous materials. Hubbard Rep. ¶¶ 64, 74, 76, 100 (quoting analyst reports that Norfolk Southern "is subject to the liabilities associated with hazardous materials spills" and noting risks from "transportation of flammable liquids"); *id.* ¶¶ 152-53 (quoting media and analyst reports highlighting that derailments are "quite common"). In other words, "accurate information about the frequency and risk of derailments was available to the market" throughout the Class Period. *Id.* ¶¶ 143-54; *see also id.* ¶¶ 191-92 (noting that February 9 articles alleged as disclosures referenced public derailment data and prior publicly known derailments). It is unsurprising, then, that news of the East Palestine derailment did not cause a statistically significant price decline in Norfolk Southern stock on the first trading day after the event, despite a full weekend of national media coverage. *Supra* 21-22; *see also Qualcomm*, 2023 WL 2583306, at *13 (evidence "that the market did not react to [a particular disclosure] makes it more likely that the market was already aware" of truth).[9]

Other disclosures also necessarily had no price impact because they merely repeated information that was already known to the market. For example, articles reporting on the February 10 Environmental Protection Agency ("EPA") letter to

---

[9]   To the extent that the scope and impact of the derailment was "new" information, any associated price decline cannot be connected to the challenged statements. *See infra* Part I.B.3.

Norfolk Southern do not reveal anything not previously disclosed by the letter itself, which was already public. ¶¶ 524, 533; *see, e.g.*, *W. Va. Pipe Trades Health & Welfare Fund v. Medtronic, Inc.*, 325 F.R.D. 280, 295 (D. Minn. 2018) (reports that merely "reiterated and reinforced" prior disclosure were not corrective); *City of Warren Gen. Emps.' Ret. Sys. v. Teleperformance SE*, 746 F. Supp. 3d 1395, 1415 (S.D. Fla. 2024) ("[m]edia scrutiny" insufficient to constitute corrective disclosure).

Similarly, news reports (¶ 520) and statements by government and union officials (¶¶ 520, 529-31, 535) repeating concerns that were part of the public discourse well before the East Palestine derailment about train length or staffing levels likewise fail to reveal anything new—as the disclosures *themselves* acknowledge. *See, e.g.*, ¶ 520 (concerns "have … grown" amid implementation of PSR); ¶ 535 (Class I railroads had "*famously* reduced their head counts [and] lengthened trains" as part of PSR (emphasis added)); *see also* Hubbard Rep. ¶¶ 80, 101, 188-89 (noting that the alleged disclosures themselves cite to previous articles on the same concerns, and that the same individuals quoted in the alleged disclosures had already expressed their views publicly); *id.* ¶ 214. Indeed, multiple similar allegations regarding the role of PSR *in the East Palestine derailment specifically* were made prior to the alleged disclosures on February 9. *See, e.g.*, Hubbard Rep. ¶ 187 (quoting February 4 and February 7 press releases). Courts routinely reject claims that "disclosures" such as these, which simply restate long-voiced public

26

concerns, constitute corrective disclosures, because they do not reveal any "new" information. *See, e.g.*, *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 505, 512 (2d Cir. 2010) (no corrective disclosure from article quoting accountant's concerns that defendant's transaction was "suspicious" when fact of the transaction was already known and had been subject to contemporaneous criticism).

*In re Qualcomm Inc. Securities Litigation* is instructive.  2023 WL 2583306, at *12-13.  There, the court concluded that disclosures regarding an anticompetitive licensing policy did not reveal new information because regulators had already accused the defendant of the same anticompetitive conduct and the defendant had previously "defended [the policy] on the public stage at a time when … this commonplace industry practice [was] being debated before Congress."  *Id.*  The same logic applies here.  Norfolk Southern publicly disclosed its goals of increasing train length and reducing staff, ¶¶ 408-09, and—in response to widespread public concern regarding the safety of these measures—defended those practices before Congress at an industry-wide hearing.  ¶¶ 86-94.  Putting aside the subjective characterization of a practice as "safe" or "unsafe," the public was undoubtedly aware of (1) Norfolk Southern's employment of these practices, and (2) the level of risk associated with them.  As in *Qualcomm*, the East Palestine derailment occurred against the "backdrop of an industry" that had widely adopted PSR and was "debating whether that practice could continue" safely.  2023 WL 2583306, at *12.

In this situation, the repetition of these same concerns post-derailment is not a new disclosure—especially where the alleged disclosure was not even the first time that that these concerns had been connected to the East Palestine derailment. *Moody's*, 274 F.R.D. at 487-88 (statement by senator that defendant's industry "must shoulder some responsibility for the subprime mortgage crisis" was not corrective disclosure when it was "not the first time that members of Congress expressed concern").

Separately, these expressions of "concerns" cannot constitute corrective disclosures because they represent nothing more than opinion and speculation about whether these well-known practices (such as running longer trains) in fact led to the East Palestine derailment and its aftermath. ¶ 520 (articles noting that "some are blaming" the derailment on PSR and that "[s]afety concerns have grown"); ¶ 529 (letter from Senators "raising concerns about rail safety"); ¶¶ 530-31 (describing groups that have "pointed" to PSR as "potential contributor" to derailment). Speculation and "opinion, standing alone, cannot reveal[] to the market the falsity" of a prior representation, as they reveal nothing but the speaker's own beliefs—and "negative … characterization[s] of previously disclosed facts" do not "constitute a corrective disclosure." *See Meyer*, 710 F.3d at 1199; *see also Pub. Emps. Ret. Sys. of Miss. v. Amedisys, Inc.*, 769 F.3d 313, 322 (5th Cir. 2014) ("Speculation of wrongdoing cannot by itself arise to a corrective disclosure."); *Omnicom*, 597 F.3d at 511-12 (news coverage of corporate resignation suggesting it was connected with

alleged fraudulent transaction merely "raised concerns" that at best "implied" a problem, but failed to reveal any new "hard fact" and was thus not corrective).

Finally, any disclosures that occurred after the end of the proposed Class Period (¶¶ 544, 547-49, 551-52) necessarily cannot be "corrective" disclosures. Lead Plaintiffs seek to certify a class ending on March 3, 2023. Mot. at 1. Because the class period in a securities fraud case ends on the date that "curative information is publicly announced or otherwise effectively disseminated to the market," *In re Sci.-Atlanta, Inc. Sec. Litig.*, 571 F. Supp. 2d 1315, 1344 (N.D. Ga. 2007), Lead Plaintiffs are taking the position that the "truth" was fully revealed to investors no later than March 3, 2023. Therefore, by the logic of Lead Plaintiffs' own case, any statement made after that date did not reveal any "new" information.[10]

> 3.   Many alleged corrective disclosures were unrelated to, and thus could not correct, the challenged statements

Even where a disclosure reveals new information, it is not "corrective" unless it "relate[s] back" to the alleged misrepresentation "and not to some other negative

---

[10]   Even if these post-Class Period disclosures were relevant to the price impact inquiry, none reveals any challenged statement to be false. *See infra* Part I.B.3. For example, "financial statements"—like those in ¶¶ 551-52—"are not corrective of misrepresentations related to safety." *In re Intuitive Surgical Sec. Litig.*, 2016 WL 7425926, at *16 (N.D. Cal. Dec. 22, 2016). And Lead Plaintiffs have identified no alleged misstatements relating to Norfolk Southern's trackside detector network; the announcement, ¶ 544, of Norfolk Southern's "prospective intent" to enhance that network therefore "did not reveal any new hidden information to the public." *W. Va. Pipe*, 325 F.R.D. at 295.

information about the company." *Meyer*, 710 F.3d at 1197. Therefore, a mismatch "between the contents of the misrepresentation and the corrective disclosure" will defeat the inference that the back-end stock drop is a proxy for front-end price impact. *Goldman I*, 594 U.S. at 123; *see also MacPhee*, 73 F.4th at 1242-43 (disclosure must "reveal[] to the market the falsity of the prior misstatements"); *see also Katyle v. Penn Nat'l Gaming, Inc.*, 637 F.3d 462, 477 n.9 (4th Cir. 2011) ("[T]he standard cannot be so lax that every announcement of negative news becomes a potential 'corrective' disclosure.") (quotations omitted). A decline in Norfolk Southern's stock price "merely because" derailments are "bad news" for railway companies "cannot be recovered by investors through a securities fraud lawsuit." *In re Boeing Co. Aircraft Sec. Litig.*, 2022 WL 3595058, at *28 (N.D. Ill. Aug. 23, 2022). Price impact requires a "closer fit" between the front- and back-end statements than is required to satisfy loss causation. *Goldman II*, 77 F.4th at 99 n.11; *see also Jaeger*, 2025 WL 2741642, at *1.

Here, many of the alleged corrective disclosures—letters from legislators, announcements of EPA or National Transportation Safety Board investigations, and lawsuits stemming from the East Palestine derailment—are not "corrective" of any alleged misstatement. ¶¶ 519, 522-23, 528-31, 533-34, 537, 547, 549. The announcement of an investigation or lawsuit is the beginning of a lengthy process that may not be resolved for months or years; therefore, such an event "does not

30

show any actual wrongdoing and cannot qualify as a corrective disclosure." *Sapssov v. Health Mgmt. Assocs., Inc.*, 608 F. App'x 855, 863 (11th Cir. 2015); *see also Moody's*, 274 F.R.D. at 487-88 (congressional investigation, including statement by senator that defendant must "shoulder some responsibility," "does not amount to a revelation of the alleged fraud"); *Pardi v. Tricida, Inc.*, 2024 WL 4336627, at *11 (N.D. Cal. Sep. 27, 2024) (even if news that FDA sent defendants a letter "might involve the implications of allegedly omitted facts, the disclosure reveals only new regulatory developments" and therefore is not corrective); *In re TransDigm Grp., Inc. Sec. Litig.*, 440 F. Supp. 3d 740, 772 (N.D. Ohio 2020) (letter from congressman not corrective disclosure).

In any event, not a single purported corrective disclosure identified by Lead Plaintiffs speaks to Norfolk Southern's ongoing safety practices, train separations, inspections, or any of the other metrics that Lead Plaintiffs cite, much less to whether safety was (or was not) a "way of life" at Norfolk Southern. The proposed corrective disclosures do not "even purport[] to reveal some then-undisclosed fact with regard to the specific misrepresentations alleged," so they cannot be corrective. *Omnicom*, 597 F.3d at 511. For example, several post-derailment disclosures concern the potential dangers of hazardous materials. *See* ¶ 513 (announcement of evacuation zone due to hazmat risk); ¶¶ 514, 519 (news coverage of health and environmental dangers); ¶¶ 522-23 (EPA letter identifying hazardous materials released); ¶¶ 530-

31 (press release from senators regarding environmental concerns). Lead Plaintiffs do not (and could not) allege that Norfolk Southern concealed the fact that it transported hazardous materials or that hazardous materials pose environmental and health risks. Thus, these post-derailment events cannot be corrective disclosures. *See Brahman Partners II, L.P. v. Ocwen Fin. Corp.*, 2018 WL 11450091, at *7 (S.D. Fla. Dec. 4, 2018) (disclosures that "implicate" but "do not deal directly" with the subject of the misstatement are not corrective); *Gambrill v. CS Disco, Inc.*, 2025 WL 3771433, at *11 (W.D. Tex. Dec. 16, 2025) (disclosure not corrective because it did not "contradict" alleged misstatement). Similarly, claims by government officials that Norfolk Southern would be "liable," "expect[ed] … to pay," ¶ 518, or held "accountable," ¶¶ 533-34, also do not correct any challenged statement because Norfolk Southern never suggested it would not face any liability in the event of a derailment. *See, e.g.*, *Kirkland Lake Gold*, 2024 WL 1342800, at *11 (disclosure that productivity targets had not been met as of company's acquisition date did not render previous statements referring to "future targets" for productivity of potential acquisition false).

Further, several of the alleged corrective disclosures speak to railroad industry-wide matters, including letters sent to all Class I railroads, ¶ 537, and statements that call for the end of PSR in general, ¶ 535. *See also* ¶¶ 520, 529-31, 535-36, 537. These disclosures cannot be corrective because they reflect only

industry-wide changed circumstances. *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 343 (2005).

Finally, neither the East Palestine derailment nor the other minor derailments later in the Class Period, ¶¶ 511-12, 532, 543, "direct[ly] match" the challenged statements because these individual derailments do not indicate that Norfolk Southern failed to prioritize safety in those particular instances or more generally. Every railroad has experienced derailments since long before the implementation of PSR. Hubbard Rep. ¶ 149. Thus, the mere fact that a derailment occurred cannot render the challenged statements false. *See Sjunde AP-Fonden v. Goldman Sachs Grp., Inc.*, 798 F. Supp. 3d 416, 469 (S.D.N.Y. 2025) (disclosure that defendant had met with fraudster did not "necessarily render false" statements that defendant had no insight into details of fraud); *In re Equifax Inc. Sec. Litig.*, 357 F. Supp. 3d 1189, 1226 (N.D. Ga. 2019) (security breach could not render statements that company placed significant emphasis on security false); *see also Boeing*, 2022 WL 3595058, at *29 n.13 (airline crash did not "reveal the falsity of any prior statement, since Boeing never represented that a second crash could not occur").

Because Lead Plaintiffs' alleged corrective disclosures did not reveal new information or correct an alleged misstatement, they cannot serve as proxies for front-end price impact. Without price impact, the *Basic* presumption is rebutted and individual issues of reliance will predominate, which precludes class certification.

## II.     If A Class Is Certified, It Must Be Shortened To Include Only Valid Challenged Statements And Corrective Disclosures

To the extent the Court finds that Lead Plaintiffs can establish a price impact for some subset of challenged statements (which it should not for the reasons already explained), the Court must evaluate each alleged misstatement and corrective disclosure individually and shorten the class period to exclude any challenged statements that had no price impact and any alleged corrective disclosures that are not value relevant, new, and corrective.

The class period in a securities class action begins "on the date of the first misstatement," *In re Under Armour Sec. Litig.*, 719 F. Supp. 3d 438, 465 (D. Md. 2024), and ends "when curative information is publicly announced or otherwise effectively disseminated to the market," *Sci.-Atlanta*, 571 F. Supp. 2d at 1344. Thus, courts considering class certification should ensure that the certified class period ends as soon as the truth has been revealed. In *Local 703, I.B. of T. Grocery & Food Employees Welfare Fund v. Regions Financial Corp.*, for example, the district court certified a class ending on the same date as the final corrective disclosure; however, because the corrective disclosure had been made *prior* to market opening that day, the Eleventh Circuit vacated the certification and remanded for the district court to correct the class period. 762 F.3d 1248, 1261 (11th Cir. 2014).

If the Court finds that a price impact can only be established for certain alleged misstatements and their corresponding corrective disclosures, the class period must

34

be shortened accordingly, and the certified class can only pursue claims based on those alleged misstatements. *See, e.g.*, *In re the Boeing Co. Aircraft Sec. Litig.*, 2026 WL 734721, *18-22 (N.D. Ill. Mar. 16, 2026) (shortening class period when last alleged corrective disclosure did not reveal any new information).

### III. The Claims Of The Named Lead Plaintiffs Are Atypical And They Are Inadequate Representatives Of Post-Derailment Purchasers

The Court should deny Lead Plaintiffs' motion for class certification for the independent reason that Lead Plaintiffs have not shown that their claims are "typical" of the class, Fed. R. Civ. P. 23(a)(3), or that they, as named representatives, will "adequately" protect the class's interests, Fed. R. Civ. P. 23(a)(4). Both named Lead Plaintiffs only purchased Norfolk Southern stock *before* the East Palestine derailment and the challenged vent-and-burn statements. ECF No. 115 at 15. Lead Plaintiffs have no standing to pursue claims based on the vent-and-burn statements, and their interests are not aligned with proposed class members who purchased Norfolk Southern stock after the derailment.

#### A. Lead Plaintiffs Are Atypical Because They Lack Standing To Assert Claims Of Class Members Who Purchased After The Vent-And-Burn Statements

Before certifying a class, a court "must determine that at least one named class representative has Article III standing to raise each class claim." *A&M Gerber Chiropractic LLC v. GEICO Gen. Ins. Co.*, 321 F.R.D. 688, 694 (S.D. Fla. 2017). When no lead plaintiff has standing for a subset of the claims of the proposed class,

35

"[i]t should be obvious that there cannot be adequate typicality." *Prado-Steiman ex rel. Prado v. Bush*, 221 F.3d 1266, 1279 (11th Cir. 2000); *Luczak v. Nat'l Beverage Corp.*, 548 F. Supp. 3d 1256, 1265 (S.D. Fla. 2021) (denying motion to certify class where lead securities plaintiff was deemed atypical on this basis).

The Court previously determined that the named Lead Plaintiffs "lack standing to assert a Rule 10b-5 claim premised on the vent-and-burn statements" in their own right because they "could not have been misled into purchasing stock by a statement that had not yet been made." ECF No. 115 at 15-16. Lead Plaintiffs sought to remedy this problem by arguing that the challenged vent-and-burn statements and safety statements are part of a common scheme to defraud. *Id*. At class certification, where Lead Plaintiffs bear the burden to establish typicality (which is not measured under a liberal motion-to-dismiss pleading standard), this theory cannot withstand the "rigorous analysis" that the Court must now perform. *Comcast*, 569 U.S. at 33; *cf*. ECF No. 115 at 16-17 (noting that Lead Plaintiffs' theory of liability "seems to be" a common scheme to defraud). Establishing the falsity of the vent-and-burn statements will require an analysis that has nothing to do with the "safety" of Norfolk Southern's pre-East Palestine derailment operations. As Lead Plaintiffs have admitted, the relevant question for the vent-and-burn statements is whether Norfolk Southern "conceal[ed] that" the vent and burn "was ***not*** necessary to prevent the … cars from exploding." Mot. at 10. This claim has

36

nothing to do with Norfolk Southern's staffing levels, train inspections, training, train lengths, or other matters bearing on the safety statements. Rather, the claims based on the vent-and-burn statements involve facts about the properties of vinyl chloride, the temperature measurements of the vinyl chloride cars after the derailment, and the decision-making process leading up to the vent and burn.[11] These two sets of statements are "entirely different" and cannot constitute a common scheme to defraud. *Abato v. Marcam Corp.*, 162 F.R.D. 8, 11 (D. Mass. 1995). Because Lead Plaintiffs lack standing as to the vent-and-burn statements, they cannot meet Rule 23(a)'s typicality requirement.

---

[11] Lead Plaintiffs' claims are also atypical of purchasers after the vent and burn because Lead Plaintiffs have little incentive to pursue separate legal theories premised on the vent-and-burn statements. *Valley Drug Co. v. Geneva Pharms., Inc.*, 350 F.3d 1181, 1190 (11th Cir. 2003) (class certification inappropriate "where the economic interests and objectives of the named representatives differ significantly from the economic interests and objectives of unnamed class members"). This conflict is already apparent. The Complaint does not identify *any* corrective disclosure that purports to reveal the truth of any statement about the vent and burn. While this omission has no effect on Lead Plaintiffs' potential recovery based on other challenged statements, the absence of a corrective disclosure defeats class treatment of any claims based on the challenged vent-and-burn statements, and also precludes any class member from establishing the required loss causation element for those statements. *See supra* 17-18; *MacPhee*, 73 F.4th at 1242 (identification of corrective disclosure is a "requirement[] for a plaintiff to demonstrate loss causation in a fraud-on-the-market case"). Because Lead Plaintiffs "lack[] incentive to vigorously pursue claims of certain class members," they are "neither typical nor adequate" class representatives as to these class members. *Beck v. Maximus, Inc.*, 457 F.3d 291, 301 (3d Cir. 2006).

### B.    Lead Plaintiffs Cannot Satisfy Rule 23(a) Because Purchasers After The Derailment Are Subject To Different Defenses

Even where a lead plaintiff has standing, the specific timing of his purchases can create unique defenses and inter-class conflicts that render that plaintiff atypical and inadequate. *See, e.g.*, *Sci.-Atlanta*, 571 F. Supp. 2d at 1328 (lead plaintiffs who held securities through the class period were atypical as to class members who sold prior to the first partial curative disclosure); *In re HealthSouth Corp. Sec. Litig.*, 213 F.R.D. 447, 458-60 (N.D. Ala. 2003) (Rule 23(a)'s typicality requirement is not met "where the legal theories of the named plaintiffs potentially conflict with those of the absentees"); *In re Petrobras Sec. Litig.*, 104 F. Supp. 3d 618, 623 (S.D.N.Y. 2015) (lead plaintiff was inadequate and atypical when they purchased all their shares after "partial disclosures were made and just two weeks before the end of the class period," raising "serious questions" about their reliance on the challenged statements).

Under Lead Plaintiffs' theory of the case, proposed class members who purchased Norfolk Southern stock after the East Palestine derailment are situated very differently than those proposed class members who purchased pre-derailment. The gravamen of Lead Plaintiffs' case is that the East Palestine derailment triggered a fundamental shift in how the market viewed the safety of Norfolk Southern's operations, revealing as false all of the pre-derailment safety statements. Indeed, nearly all of the purported corrective disclosures are statements about the impact of

38

the derailment and the "concerns" that it raised for commentators and government officials.  *Supra* 26-29.  Under Lead Plaintiffs' logic, those who purchased the Company's stock after the derailment had significantly different information about Norfolk Southern's safety practices, which makes them subject to unique defenses.

Additional typicality and adequacy issues arise from Lead Plaintiffs' challenge to other statements that Defendants made *after* the derailment.  Post-vent-and-burn purchasers will face significant challenges to establishing, notwithstanding the intervening East Palestine derailment, that they relied on the pre-derailment safety statements and that those statements caused their losses; as a result, post-vent-and-burn purchasers will necessarily need to focus their reliance and loss-causation arguments on the vent-and-burn statements.  Lead Plaintiffs and other pre-derailment purchasers, in contrast, need to establish reliance and loss-causation only as to the challenged safety statements.

*In re BP p.l.c. Securities Litigation* illustrates Lead Plaintiffs' problem.  2013 WL 6388408, at *1-2 (S.D. Tex. Dec. 6, 2013).  There, plaintiffs brought securities fraud claims in the wake of the Deepwater Horizon oil spill, alleging that BP had made misrepresentations *before* the explosion regarding the implementation of recommendations made by a safety panel and statements regarding BP's "ability to respond to a catastrophic deepwater oil spill."  *Id*.  Plaintiffs also alleged separate misrepresentations *after* the explosion regarding the volume of oil being released.

39

*Id.* at *11.  The court held that the case could not proceed as a single class because purchasers before the explosion "could not have been motivated by … misrepresentations regarding the oil flow rate" in the wake of the disaster and post-explosion purchasers "were not likely motivated by … misrepresentations regarding [BP's] process safety improvements."  *Id.*  This created two "relatively self-contained periods" with class members that "may very well have … competing" interests.  *Id.*  Despite plaintiffs' arguments (as here) that the explosion constituted only a partial disclosure, the court in *BP* found the claims of the proposed pre-explosion-purchasers atypical of proposed class members who purchased after the explosion. *Id.* at *11 & n.9.  The court in *BP* was able to address these issues by creating subclasses, *id.* at *11, but that option is unavailable here because neither Lead Plaintiff purchased Norfolk Southern stock after the East Palestine derailment. Therefore, Lead Plaintiffs cannot establish that their claims are typical or that they are adequate representatives of the proposed class.

## **CONCLUSION**

For the foregoing reasons, the Court should deny Lead Plaintiffs' Motion.

40

DATED: April 16, 2026          Respectfully submitted,

*/s/ Hilary Houston Adams*
Hilary Houston Adams
Georgia Bar No. 926142
HALL, BLOCH, GARLAND & MEYER, LLP
900 Circle 75 Parkway, Suite 500
Atlanta, Georgia 30339-3099
Telephone: (678) 888-0036
Fax: (678) 379-6124
hilaryadams@hbgm.com

Michael G. Bongiorno (admitted *pro hac vice*)
Tamar Kaplan-Marans (admitted *pro hac vice*)
WILMER CUTLER PICKERING HALE AND
  DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
Tel.: (212) 230-8800
Fax: (212) 230-8888
michael.bongiorno@wilmerhale.com
tamar.kaplan-marans@wilmerhale.com

Peter J. Kolovos (admitted *pro hac vice*)
Sofie C. Brooks (admitted *pro hac vice*)
WILMER CUTLER PICKERING HALE AND
  DORR LLP
60 State Street
Boston, MA 02109
Telephone: (617) 526-6000
Fax: (617) 526-5000
peter.kolovos@wilmerhale.com
sofie.brooks@wilmerhale.com

*Counsel for Defendants Norfolk Southern*
*Corporation, James A. Squires, Alan H. Shaw, and*
*Cynthia M. Sanborn*

41

## **CERTIFICATE OF COMPLIANCE**

Pursuant to Local Rule 7.1(D), I hereby certify that the foregoing document was prepared in Times New Roman 14, a font and type selection approved by the Court in L.R. 5.1(C).

This 16th day of April, 2026.


*/s/ Hilary Houston Adams*
Hilary Houston Adams

## CERTIFICATE OF SERVICE

I hereby certify that on April 16, 2026, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will send notice of electronic filing to all counsel of record.

This 16th day of April, 2026.


*/s/ Hilary Houston Adams*
Hilary Houston Adams